FEB 20 2020 PM 1:08
FILED - USDC - BPT - CT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

IN RE:

APPLICATION OF ROBERT GORDON KIDD FOR
AN ORDER UNDER 28 U.S.C. § 1782 TO TAKE
DISCOVERY FROM JOHN THOMAS REYNOLDS
AND MARK MCCALL

Case No. _____

*Ex Parte*

**MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION**
**OF ROBERT GORDON KIDD FOR AN ORDER UNDER 28 U.S.C. § 1782**
**TO TAKE DISCOVERY FROM  JOHN THOMAS REYNOLDS AND MARK MCCALL**

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
tel. +1 212 488 1200

*Attorneys for Applicant*
*Robert Gordon Kidd*

## INDEX

**03506.001 | APPLICATION OF ROBERT GORDON KIDD FOR AN ORDER UNDER 28 U.S.C. § 1782 TO TAKE DISCOVERY FROM JOHN THOMAS REYNOLDS & MARK MCCALL**

**TAB 1**: Civil Cover Sheet

**TAB 2**: Application for Order

**TAB 3**: Memorandum of Law

**TAB 4**: Kerr Declaration

**TAB 5**: Hume Declaration

**TAB 6**: Kim Declaration

**TAB 7**: Exhibit 1 – Jonathan Reynolds Subpoena (Combined)

**TAB 8**: Exhibit 2 – Mark McCall Subpoena (Combined)

**TAB 9**: Exhibit 3 – 2019 Court of Sessions Summons

**TAB 10**: Exhibit 4 – Opinion of Lord Tyre In the cause of Robert Gordon Kidd

**TAB 11**: Exhibit 5 – Lime Rock Partners V, LP Cayman Islands Search Part

**TAB 12**: Exhibit 6 – Lime Rock Management LP Certificate of Limited Partnership & Amendments

**TAB 13**: Exhibit 7 – Lime Rock Management LLP Application for Incorporation

**TAB 14**: Exhibit 8 – Lime Rock Management LLP 2008 Audited Financial Statements

**TAB 15**: Exhibit 9 – Lime Rock Management LLP 2017 Audited Financial Statements

**TAB 16**: Exhibit 10 – Lime Rock Management LLP 2017 Unaudited Financial Statements

**TAB 17**: Exhibit 11 – LRM UK One Limited Companies House Registry

**TAB 18**: Exhibit 12 – LRM UK Two Limited Companies House Registry

**TAB 19**: Exhibit 13 – Lime Rock Management LLP Companies House Registry

**TAB 20**: Exhibit 14 – Lime Rock Partners V, LP's 2008 Amended & Restated Limited Partnership Agreement

**TAB 21**: Exhibit 15 – Lime Rock Partners V, LP's Form D – Notice of Exempt Offering of Securities

**TAB 22**: Exhibit 16 – Lime Rock Partners V, LP's 2019 Form ADV

**TAB 23**: Exhibit 17 – Lime Rock Partners V, LP's 2019 Form ADV Part 2A: Firm Brochure

**TAB 24**: Exhibit 18 – Lime Rock Partners' on-line profile of John Reynolds

**TAB 25**: Exhibit 19 – Lime Rock Partners' on-line profile of Mark McCall

**TAB 26**: Proposed Order

**TAB 27**: Michael S. Kim Notice of Appearance

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

RELEVANT PARTIES ..............................................................................................4

I.      Applicant ...................................................................................................4

II.     Respondents ...............................................................................................4

III.    The Scottish Proceeding Defenders ..............................................................4

        A.      The Lime Rock Company Defenders ....................................................4

        B.      The Lime Rock Individual Defenders.....................................................5

        C.      The Ledingham Chalmers Defenders .....................................................5

FACTUAL BACKGROUND .......................................................................................6

I.      The Transaction ...........................................................................................6

II.     Mr. Kidd Sues Paull & Williamson, Who Admits to a Breach of Duty and
        Contract.....................................................................................................10

III.    The Scottish Proceeding .............................................................................12

IV.     The Respondents' Relationships to Lime Rock V and the Scottish Proceeding ...............13

        A.      The Cayman Corporate Structure ........................................................13

        B.      The Management Companies ...............................................................14

ARGUMENT...........................................................................................................17

I.      The Application Satisfies The Three Statutory Requirements of 28 U.S.C. § 1782 .........17

II.     The Court Should Grant the Section 1782 Application Under the Four
        Discretionary Factors of *Intel* ....................................................................19

        A.      Mr. Reynolds and Mr. McCall Are Not Participants in the Scottish
              Proceeding...........................................................................20

        B.      The Foreign Court Would Be Receptive to the Requested
              Discovery ............................................................................20

        C.      The Section 1782 Application Does Not Attempt to Circumvent
              Scottish Proof-Gathering Restrictions .........................................22

D.      The Discovery Requests Are Narrowly Tailored and Are Not
        "Unduly Intrusive or Burdensome" ............................................................23

**CONCLUSION** ......................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
   673 F.3d 76 (2d Cir. 2012) ........................................................................ 17, 18, 19

*Esses v. Hanania,*
   101 F.3d 873 (2d Cir. 1996)...................................................................................19, 23

*Euromepa S.A. v. R. Esmerian, Inc.,*
   51 F.3d 1095 (2d Cir. 1995)...................................................................................20, 21

*First American Corp. v. Price Waterhouse LLP,*
   154 F.3d 16 (2d Cir. 1998)...................................................................................23

*Gushlak v. Gushlak,*
   486 Fed. App'x 215 (2d Cir. 2012) ...................................................................1

*In re Application of Consellior SAS,*
   No. 13 MC 34, 2015 WL 6685038 (D. Conn. Mar. 26, 2015) .........................1

*In re Application of Hill,*
   No. M19-117 (RJH), 2007 WL 1226141 (S.D.N.Y. Apr. 23, 2007)...................22, 23

*In re Application of Sveaas,*
   249 F.R.D. 96 (S.D.N.Y. 2008) .........................................................................18

*In re Bayer AG,*
   146 F.3d 188 (3d Cir. 1998)...............................................................................20

*In re Consellior SAS,*
   No. 13 MC 34, 2013 WL 5517925 (D. Conn. Oct. 2, 2013).............................20, 23, 24

*In re Gemeinschaftspraxis Dr. Med. Schotldorf,*
   No. Civ. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006)..............22

*In re Hanwha Azdel, Inc.,*
   979 F. Supp. 2d 178 (D. Mass. 2013) ...............................................................1

*In re Honeywell Int'l, Inc. Sec. Litig.,*
   230 F.R.D. 293 (S.D.N.Y. 2003) .......................................................................18

*In re O'Keeffe,*
   646 F. App'x 263 (3d Cir. 2016) .......................................................................21, 23

iv

*In re O'Keeffe*,
    650 F. App'x 83 (2d Cir. 2012) ..............................................................................20

*In re Veiga*,
    746 F. Supp. 2d 8 (D.D.C. 2010)...........................................................................18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004).................................................................................... *passim*

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
    62 F. Supp. 3d 358 (S.D.N.Y. 2014)......................................................................21

*Marubeni America Corp. v. LBA Y.K.*,
    335 F. App'x 95 (2d Cir. 2009) ............................................................................20

*Metallgesellschaft AG v. Hodapp*,
    121 F.3d 77 (2d Cir. 1997)....................................................................................19

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008)...........23

*Ukrnafta v. Carpatsky Petroleum Corp.*,
    No. 3:09 MC 265 (JBA), 2009 WL 2877156 (D. Conn. Aug. 27, 2009) ..............1, 20

**Statutes and Treaties**

28 U.S.C. § 1782...................................................................................... *passim*

v

Robert Gordon Kidd respectfully brings this *ex parte*[1] application for an order under 28 U.S.C. § 1782 ("Section 1782") to take discovery from John Thomas Reynolds and Mark McCall (together, the "Respondents") for use in proceedings currently pending before Scotland's Court of Session (the "Scottish Proceeding").

## PRELIMINARY STATEMENT

1.      Until September 26, 2009, Mr. Kidd wholly-owned and controlled ITS Tubular Services (Holdings) Limited ("ITS"), an extremely successful industrial services company incorporated by Mr. Kidd in Scotland. In 2008, ITS and its affiliates had over 1,000 employees and operations in 20 locations across the globe, with a combined annual revenue in excess of $143 million. ITS anticipated further growth in 2009 and beyond.

2.      In the Scottish Proceeding, Mr. Kidd is asserting fraud-based claims as well as claims that the defendants (or "defenders" in Scottish terminology) dishonestly assisted Mr. Kidd's former attorneys in breaching their fiduciary duties to him. The defenders include Lime Rock Partners V, LP ("Lime Rock V"), a private equity fund affiliated with various entities doing business under the "Lime Rock" name in various corporate structures across the globe (collectively, "Lime Rock"). The claims assert damages in excess of $210 million and they arise from Mr. Kidd's sale of a minority interest in ITS to Lime Rock V as part of a transaction that was plagued by misconduct (the "Transaction").

---

[1] The Applicant does not request oral argument on this *ex parte* motion. Section 1782 applications are brought and decided *ex parte* in the first instance. *See, e.g.,* Order, *In re Application for and Order Under 28:1782 to Take Discovery from Martin A. Mohabeer,* No. 3:17 MC 00100, ECF No. 7 (D. Conn. Apr. 26, 2017) (granting *ex parte* application to take discovery under Section 1782); *In re Application of Consellior SAS,* No. 13 MC 34, 2015 WL 6685038, at *1 (D. Conn. Mar. 26, 2015) (same); *Ukrnafta v. Carpatsky Petroleum Corp.,* No. 3:09 MC 265 (JBA), 2009 WL 2877156, at *5 (D. Conn. Aug. 27, 2009) (same). *See also In re Hanwha Azdel, Inc.,* 979 F. Supp. 2d 178, 179 (D. Mass. 2013) ("The procedure now adopted by this court is common: following allowance of the *ex parte* order, intervention is permitted, and a ruling on a motion to quash on the merits follows."); *Gushlak v. Gushlak,* 486 Fed. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").

3.      Unbeknownst to Mr. Kidd, the attorneys who represented him and ITS in the Transaction, Paull & Williamsons LLP ("P&W"), were tainted by egregious conflicts of interest. These attorneys (P&W) were the long-time corporate transactional lawyers for Lime Rock, and they helped to secure for Lime Rock a deal that was highly advantageous to Lime Rock, and consequently highly disadvantageous to Mr. Kidd, their own client in the Transaction.

4.      Indeed, contemporaneous email communications between an attorney at P&W and Lime Rock confirm that, although P&W would be representing Mr. Kidd and ITS in the Transaction, this attorney would also act as "'unofficial' counsel to Lime Rock . . ." *See* Declaration of Michael S. Kim filed contemporaneously herewith (the "Kim Declaration"), Ex. 3 at ¶ 9. At the time of the Transaction, Mr. Kidd was unaware of the contents of that email. It was not until years later—when the email was disclosed pursuant to a court order in litigation commenced by Mr. Kidd against P&W in Scotland—that Mr. Kidd learned of the email as well as the fact that P&W had, in fact, acted as "unofficial counsel" to Lime Rock in connection with the Transaction.  As soon as the email in question was disclosed in that proceeding, P&W acknowledged that there had been a breach of its fiduciary duty in connection with the Transaction. After all, that email, together with other correspondence, revealed that P&W was advising both sides of the Transaction without Mr. Kidd's informed consent.

5.      Lime Rock V was not only aware of P&W's breach of duty to Mr. Kidd, but as alleged in the Scottish Proceeding, Lime Rock V and certain Lime Rock employees conspired with P&W to actively facilitate that breach for Lime Rock's benefit.   Specifically, the defenders engaged in an unlawful conspiracy with P&W to deprive Mr. Kidd of independent legal advice and secretly pass ITS's and Mr. Kidd's confidential information to Lime Rock.

6.      The result of this conspiracy was that Mr. Kidd was never properly advised regarding the complicated structure of the Transaction.  Among other things, this structure placed Lime Rock in a far more favorable position in respect of its minority interest in ITS than Mr. Kidd in respect of his majority interest in ITS.  Indeed, the Transaction structure stripped Mr. Kidd of his control of ITS, despite his majority shareholding.  Each of the defenders in the Scottish Proceeding, including Lime Rock V, had a role in the unlawful conspiracy, and together they caused Mr. Kidd to suffer damages in excess of $210 million.  Had Mr. Kidd been made aware of the egregious breaches by P&W, and the knowledge of Lime Rock of those breaches, he would not have entered into the Transaction.

7.      The Scottish Proceeding names as defendants certain Lime Rock entities and individuals registered or based in Scotland, the Cayman Islands, and Delaware.  However, Respondents Reynolds and McCall are key Lime Rock witnesses and both reside and work within this District, where Lime Rock has a principal office.

8.      For this reason, and those set forth more fully below, the Court should grant this Section 1782 application and allow Mr. Kidd to take discovery from Mr. Reynolds and Mr. McCall in aid of the Scottish Proceeding.  *First*, the application meets the statutory requirements for a Section 1782 application because the Respondents are "found" in this District and the discovery sought is "for use" in foreign proceedings in which Mr. Kidd is an "interested person."  *Second*, the discretionary factors that this Court must consider to determine whether to grant the application under the United States Supreme Court's decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), all favor granting the application.  Indeed, district courts routinely order Section 1782 discovery from U.S. residents for use in legal proceedings in the United Kingdom. Accordingly, Mr. Kidd respectfully requests that the Court grant his application to take discovery

from Mr. Reynolds and Mr. McCall in the form of the subpoenas attached as Exhibits 1 and 2 to the Kim Declaration.

## RELEVANT PARTIES

### I.    Applicant

9.      Mr. Kidd is the plaintiff in the Scottish Proceeding.  Until October 2009, he was in full time executive control of ITS and its subsidiaries.  Kim Decl., Ex. 3 at ¶¶ 1-2.  Since around July 2008, Mr. Kidd has resided in Cyprus.  *Id.*

### II.    Respondents

10.      Mr. Reynolds is Lime Rock's co-founder and works out of Lime Rock's Westport, Connecticut offices.  Kim Decl., Ex. 18.  Mr. McCall is a managing director of Lime Rock Management LP ("LRM LP") and also works out of Lime Rock's Westport, Connecticut offices. Kim Decl., Ex. 16 at Schedule A; *id.*, Ex. 19.  As described more fully in Paragraphs 40-49 below, Respondents have critical knowledge and/or documents concerning the Transaction by reason of their roles at various Lime Rock entities.

### III.    The Scottish Proceeding Defenders

11.      A short description of each of the defenders in the Scottish Proceeding (collectively, the "Defenders") is included in the Paragraphs that follow.

#### A.    The Lime Rock Company Defenders

12.      Defender Lime Rock V was the entity that acquired Mr. Kidd's shares in ITS in connection with the Transaction.  Kim Decl., Ex. 4 at ¶ 8.  It is a Cayman Islands exempted limited partnership and investment fund, which has as its purpose, among other things: "to seek long-term capital appreciation primarily by acquiring, holding and disposing of Securities, independently or with others, of Persons connected, directly or indirectly, with the Energy Industry . . . ."  Kim Decl., Ex. 14 at p. 1 and § 1.3; *id.,* Ex. 5; *see also id.*, Ex. 3 at ¶ 1.  Although Lime Rock V was

4

the vehicle by which the ultimate purchase of shares in ITS was effectuated, negotiations were conducted by or on behalf of Lime Rock generally.

13.     Defender LRM LP is a Delaware-registered limited partnership which serves as investment manager and provider of advisory services to Lime Rock V. Kim Decl., Ex. 6; *id.*, Ex. 6 at Section 7.B.(1) (Lime Rock V); *see also id.*, Ex. 3 at ¶ 1.

14.     Defender Lime Rock Management LLP ("LRM LLP") is a Scottish-registered Limited Liability Partnership in accordance with Scottish law.  It has its registered office in Aberdeen, Scotland.  Kim Decl., Ex. 7.  LRM LLP additionally advised Lime Rock V in connection with the Transaction and negotiated on behalf of Lime Rock. *See infra.* at ¶ 46.[2]

**B.     The Lime Rock Individual Defenders**

15.     Defender Hamish Hector Lawrence Ross was a Director of, and/or was employed by and/or was an authorized agent of, one or more of the Lime Rock Company Defenders.  Kim Decl., Ex. 3 at ¶ 1; *see also id.,* Ex. 8 at p. 14.

16.     Defender Jason Smith was a Vice President at, and/or was employed by and/or was an authorized agent of, one or more of the Lime Rock Company Defenders.[3]  Kim Decl., Ex. 3 at ¶ 1.

**C.     The Ledingham Chalmers Defenders**

17.     Defender Ledingham Chalmers LLP is a law firm with offices in Scotland. *Id.* Ledingham Chalmers nominally represented the Lime Rock Company Defendants in connection with the Transaction.  However, as discussed herein, Ledingham Chalmers was aware that an

---

[2] Collectively, Defenders LRM LLP, LRM LP, and Lime Rock V are referred to herein as the "Lime Rock Company Defenders".

[3] Together, Defenders Ross and Smith are referred to herein as the "Lime Rock Individual Defenders".

attorney at P&W was secretly providing information regarding the transaction to Lime Rock and to them. *Id.* ¶ 9.

18.     Defenders Malcolm Laing and Rodney Alphonsious Magill Hutchison were practicing solicitors at Ledingham Chalmers LLP and represented one or more of the Lime Rock Company Defendants in connection with the Transaction. *See id.* at ¶¶ 1, 9.[4]

## FACTUAL BACKGROUND

### I.     The Transaction

19.     The Transaction is described in detail in the Summons that commenced the Scottish Proceeding. The Summons' factual allegations regarding the Transaction can be summarized as follows.[5]

20.     In 2007, Mr. Kidd decided to sell part of his interest in ITS to a minority investor as part of a plan to monetize the value of his company with an eye towards retirement. Kim Decl., Ex. 3 at ¶ 2. At the time, Mr. Kidd was under no financial pressure to sell all or any part of his interest in ITS, and ITS was under no financial pressure to obtain outside investment. *Id.* at ¶ 14. Consistent with his practice for all companies he operated during his career, if he was to remain a shareholder in the business following outside investment, Mr. Kidd wished to retain control of ITS. *Id.* at ¶ 2. To assist him in attracting a minority investor, in October 2007, Mr. Kidd hired two new directors for ITS, Jeff Corray and Scott Milne. Mr. Corray was also appointed as CEO. *Id.*

21.     In February 2008, Mr. Kidd and ITS jointly instructed P&W to represent their interests in the negotiation and implementation of any agreement reached with a proposed investor.

---

[4] Collectively, Ledingham Chalmers LLP, Mr. Laing, and Mr. Hutchinson are referred to herein as the "Ledingham Chalmers Defenders".

[5] A copy of the Summons is attached as Exhibit 3 to the Kim Declaration.

*Id.* at ¶ 3.  The instruction of P&W was arranged by Mr. Corray and Mr. Milne, with the knowledge and authority of Mr. Kidd.  *Id.*  Although P&W accepted instructions to act for both Mr. Kidd and ITS, Mr. Kidd was not provided with, and did not sign, an engagement letter with P&W.  *Id.*  Nevertheless, as alleged in the Summons, P&W owed professional duties to Mr. Kidd, including: a duty of trust and confidence; a duty to act honestly and in good faith; a duty to act in Mr. Kidd's best interests; a duty to avoid a conflict of interest; and a duty not to act for the benefit or potential benefit of a third person without Mr. Kidd's informed consent.  *Id.*  In addition, P&W was bound by professional and contractual obligations not to act for any client where there was a conflict of interests with another client without the fully informed consent of both clients.  *Id.*

22.     In September 2008, Mr. Corray and Mr. Milne, on behalf of Mr. Kidd and ITS, instructed an investment banking firm, **Simmons & Company International** ("Simmons"), to market a minority interest in ITS.  *Id.* at ¶ 5.  Simmons had considerable experience in the oil and gas sector and had considerable unpublished information on the potential value of companies such as ITS.  In connection with its engagement, Simmons valued ITS at between $517-621 million to a strategic buyer (*i.e.*, an operating company in the same industry).  *Id.*  During the course of the litigation against P&W, valuations of ITS were obtained showing a "trade sale" value in excess of $220 million.

23.     Following a marketing process by Simmons, Mr. Kidd and ITS received a number of offers from private equity firms, including Lime Rock.  *Id.* at ¶ 6.  After Lime Rock's initial proposal was submitted, Kenneth Gordon, a partner at P&W, emailed the following to Defender Ross, Lime Rock's primary contact for the negotiation of the Transaction:

> ". . . my role here will be 'unofficial' counsel to Lime Rock and that for external consumption and to preserve my practicing certificate I was going to ask Malcolm Laing [of Ledingham Chalmers LLP] to front the investment side." *Id.* at ¶ 9.

In other words, despite P&W's role as counsel for Mr. Kidd and ITS, Mr. Gordon (of P&W) agreed to provide counsel to Lime Rock. He also suggested to Mr. Ross that Lime Rock hire Ledingham Chalmers to "front" the investment "for external consumption", which Lime Rock ultimately did.

24.     Consistent with this email, P&W, through Mr. Gordon, did in fact provide legal advice to the Ledingham Chalmers Defenders in connection with the negotiation of the Transaction, intending that it be passed on to Lime Rock. *Id.* Mr. Gordon also provided to the Ledingham Chalmers Defenders sensitive, confidential information belonging to Mr. Kidd and ITS. *Id.* Mr. Gordon's intent was to assist Lime Rock in closing the Transaction with Mr. Kidd and ITS, the terms of which were ultimately contrary to the interests of Mr. Kidd, but advantageous to Mr. Gordon's long-time client, Lime Rock. *Id.*

25.     The Lime Rock Individual Defenders were aware that Mr. Gordon was representing the interests of Lime Rock while at the same time nominally representing the interests of Mr. Kidd and ITS. *Id.* Indeed, the Lime Rock Individual Defenders "were aware that privileged and/or sensitive information was passed by Mr. Gordon to them and that he and P&W were thereby acting in conflict to the interests of [Mr. Kidd]." *Id.* To cover his tracks, "Mr. Gordon continued to remind the Lime Rock Group that he was 'unofficial', to encourage them to keep secret his engagement by them." *Id.*

26.     In contrast, Mr. Kidd was entirely unaware of the actions of P&W, and unaware that Lime Rock was, in effect, using the services of his own attorneys. *Id.* at ¶ 11. Had he been so aware, he would have terminated any negotiations with Lime Rock (which would have, apart from anything else, have displayed a gross breach of trust on their part) and terminated the engagement of P&W on account of their breach of contract and gross breach of duty. *Id.* ¶¶ 22-24.

8

27.     The final negotiated terms of the Transaction were complex and extremely disadvantageous to Mr. Kidd.  *Id.* at ¶ 10.  Although Mr. Kidd was an experienced operations and trading manager, he had a limited understanding of complex corporate finance transactions.  *Id.* at ¶ 3.  Thus, he relied on P&W, as his counsel, to ensure that he understood the Transaction and to alert him to any substantial issues concerning the effect of the Transaction.  *Id.*  Just as P&W hid the extent of its conflict of interest and breach of fiduciary duty to Mr. Kidd, it also failed to advise Mr. Kidd of the implications of certain material terms of the Transaction.  *Id.* at ¶ 11.  For example, Mr. Kidd was not informed that, despite acquiring only a minority stake in ITS, Lime Rock could control the ITS board of directors by holding the casting vote at board meetings.  In addition, upon an exit or liquidation of the investment by Lime Rock, the interests of Lime Rock were substantially preferred to those of Mr. Kidd.  *Id.*  As such, the Transaction rendered Mr. Kidd's majority shareholding worthless or substantially worthless on the open market, as that shareholding was both subordinated and lacking control.  The Transaction ensured that if ITS were heading towards insolvency, or if insolvency proceedings were commenced, the financial interests of Lime Rock would be preferred to those of Mr. Kidd. *Id.*

28.     Further, the only cash benefit received by Mr. Kidd was $10 million.  *Id.*  All other investment by Lime Rock was paid to ITS as a loan repayable to Lime Rock with a high rate of compounding interest, which was again contrary to Mr. Kidd's understanding.  Mr. Kidd had understood the Transaction to require repayment of the loan to Mr. Kidd—not Lime Rock—since the loan was meant to provide Mr. Kidd additional consideration for the shares he had sold.  *Id.*

29.     Signature pages for the Transaction were delivered to Mr. Kidd in Cyprus via an employee of ITS, who is also the son of Defender Ross (*i.e.*, the main negotiator for Lime Rock in the Transaction).  The contents of the Transaction documents were not shown to Mr. Kidd and,

therefore, he could not have considered the entire agreement, even if he was capable of understanding its terms. *Id.*

30.     Following the closing of the Transaction, the operational performance of ITS deteriorated significantly. *Id.* at ¶ 12. As alleged in the Summons, "ITS's newly constituted board lacked operational experience, lost control of ITS's overseas subsidiaries, and failed to control ITS's capital expenditure and ingathering of revenue." *Id.* Lime Rock then sought to secure an early exit from its investment, and serious offers were received. *Id.* However, Lime Rock would not "accept any dilution of its interest or sell its own shares at a realistic price." *Id.* Eventually, administrators were appointed over ITS on April 19, 2013 and they immediately sold the business and assets of ITS as a going concern to an ITS competitor for US $125 million. *Id.* There was no return to any shareholders, including Mr. Kidd. *Id.*[6] Accordingly, in the time between late 2009 and 2013, Mr. Kidd lost his entire interest in ITS, a company worth in excess of $220 million in 2009.

**II.     Mr. Kidd Sues Paull & Williamson, Who Admits to a Breach of Duty and Contract**

31.     In 2015, still unaware of P&W's role as "unofficial counsel" to Lime Rock, Mr. Kidd sued P&W in Scotland for professional negligence and breach of contract. Mr. Kidd asserted that, in order for P&W to have fulfilled its obligations to him, P&W should have advised him regarding the potential effect of the proposed Transaction. Had P&W done so, Mr. Kidd would not have closed the Transaction and would have instead retained his entire interest in ITS. Kim Decl., Ex. 4 at ¶¶ 2, 11-13; *see also id.*, Ex. 3 at ¶ 14.

---

[6] Mr. Kidd also sought to secure an exit from his remaining interests in ITS given Lime Rock's mismanagement and his inability to exercise control over ITS. *Id.* Thereafter, in 2012, Mr. Kidd sought to re-establish executive control over ITS, but was prevented in court from doing so by Lime Rock. *Id.* Lime Rock was represented in that application by the successor business to P&W following a merger; namely, Burness Paull LLP. *Id.*

32.     It was during discovery in that proceeding that Mr. Kidd first learned that Mr. Gordon had been covertly acting as "unofficial counsel" to Lime Rock. The disclosure was entirely unexpected. The applicable documents were produced shortly before trial, and only after Mr. Kidd insisted that disclosure appeared to be incomplete and that an electronic search of all correspondence concerning the Transaction should be completed.

33.     In particular, as set forth in the Summons, documents produced in that proceeding revealed, among other things, that:

- Mr. Gordon had supplied sensitive, confidential, and privileged information to the Ledingham Chalmers Defenders, Lime Rock's counsel;

- Mr. Gordon had asked Mr. Ross, the primary Lime Rock negotiator, to keep the fact of such disclosure secret;

- Mr. Gordon had been covertly acting on behalf of Lime Rock as their attorneys in respect of the Transaction;

- Mr. Ross had discussed with Mr. Gordon their intention that Mr. Gordon act secretly and that the Ledingham Chalmers Defendants be formally retained by Lime Rock to conceal the true circumstances of Mr. Gordon's representation of Lime Rock; and

- Mr. Gordon inappropriately corresponded with and had meetings on several occasions with Mr. Ross and the Ledingham Chalmers Defenders regarding the Transaction. Kim Decl., Ex. 3 at ¶ 15.

34.     After disclosing the above-referenced documents, P&W admitted that Mr. Gordon and P&W had been in breach of their fiduciary duty and in breach of contract with Mr. Kidd. *Id.* at ¶ 17. Thereafter, the case against P&W was settled before a determination of damages could be rendered by the Court. *Id.*[7]

---

[7] The attorneys representing P&W stated that they were unaware of the breaches until they carried out the electronic search referenced above. However, they accepted that Mr. Gordon, as the author of the emails, was plainly aware of the breaches. Mr. Gordon was a partner in the Defender firm at the time the action was commenced and was thus aware of Mr. Kidd's disclosure application.

35.     The terms of the settlement are confidential.  However, as alleged in the Summons, "the settlement terms were substantially less than the value of [Mr. Kidd's] losses."  *Id.*

### III.     The Scottish Proceeding

36.     On November 26 and 27, 2019, Mr. Kidd served the Summons, thereby commencing the Scottish Proceeding.  *See* Declaration of David Kerr filed contemporaneously herewith (the "<u>Kerr Declaration</u>"), at ¶ 6.

37.     The Summons asserts claims for damages against the Lime Rock Company Defenders, the Lime Rock Individual Defenders, and the Ledingham Chalmers Defenders, jointly and severally, in the amount of $210 million, plus interests and costs.  *See id.*, at ¶ 7.  Mr. Kidd is entitled to seek the leave of the Court (which is very likely to be granted) to amend the amount of the claim upwards.  *Id.*  Mr. Kidd asserts that he has suffered these losses as a result of the fraudulent conduct of the defenders, which conduct took the form of (i) dishonest assistance in P&W's breach of fiduciary duty and (ii) unlawful means conspiracy.  *Id.*

38.     Prior to the Summons being served on the various Defenders, and in accordance with Scottish procedural requirements, Mr. Kidd served a letter outlining the basis for his claims against the Defenders (the "<u>Letters Before Action</u>").  *Id.* ¶ 8.  The Defenders have therefore been aware of the nature of the claims for considerable time.  *Id.*

39.     The Ledingham Chalmers Defenders lodged their "defences" on January 28, 2020.[8] *Id.*, at ¶ 9.  The Lime Rock Company Defenders and the Lime Rock Individual Defenders lodged their "defences" on January 31, 2020.  *Id.*  The Defenders admit certain allegations, contest others, and/or assert different facts in relation to the same events.  Nothing appearing in the defences is materially different from the content of the replies to the Letters Before Action.  *Id.*

---

[8] The lodging of defences is analogous to the filing of an answer under the Federal Rules.

IV.    **The Respondents' Relationships to Lime Rock V and the Scottish Proceeding**

40.    Respondents Reynolds and McCall have information that is critical to the Scottish Proceeding by reason of their key positions at: (i) the Cayman Islands entities that controlled Lime Rock V (*i.e.*, the purchaser of Mr. Kidd's shares in ITS); and (ii) the management companies that advised Lime Rock V in connection with the Transaction.

   **A.    The Cayman Corporate Structure**

41.    The connections of Respondents Reynolds and McCall to Lime Rock V's Cayman Islands corporate structure is summarized in the paragraphs below and can be shown graphically as follows:



Figure 1: Cayman Corporate Structure

42.    As shown in Figure 1, both Respondents Reynolds and McCall served as "Principals" of Lime Rock V, the Cayman Islands fund that purchased Mr. Kidd's shares.  Kim Decl., Ex. 14 at p. 11.[9]

---

[9] Section 2.3(e) of Lime Rock V's Amended and Restated Limited Partnership Agreement, dated April 17, 2008 (the "Limited Partnership Agreement") requires the following of "Principals":

   During the Investment Period, the General Partner and the Manager shall cause the Principals, for so long as they are employed by the Manager or any of its Affiliates, to devote substantially all of their business time and efforts to the investment and other activities of [Lime Rock V] and any Related Investment Funds. . . .

43.     Further, under Cayman law, because Lime Rock V is a Cayman Islands exempted limited partnership, it can only act by its general partner: **Lime Rock Partners GP V, LP** ("LRP GP V LP"). *See* Declaration of Rebecca Hume filed contemporaneously herewith (the "Hume Decl."), at ¶ 4. LRP GP V LP, in turn, as a Cayman Islands exempted limited partnership, can only act by its general partner: LRP GP V, Inc., a Cayman Islands exempt company. *See id.* ¶ 5. Respondent Reynolds served as one of the two Directors for LRP GP V, Inc., and Respondent McCall served as LRP GP V, Inc.'s Chief Financial Officer and Secretary. Kim Decl., Ex. 15 at p. 2.

44.     Given their key roles within the Cayman corporate structure, Respondents Reynolds and McCall are uniquely positioned to provide documents and testimony concerning the Transaction. Indeed, under the terms of Lime Rock V's Limited Partnership Agreement, all decisions relating to the selection and disposition Lime Rock V's investments, including the Transaction, were required to be made exclusively by LRP GP V LP, and, in turn its general partner, LRP GP V, Inc. *See* Kim Decl., Ex. 14 at § 2.1.

**B.     The Management Companies**

45.     Respondents Reynolds and McCall are also intimately involved with the Lime Rock entities that advised Lime Rock V in connection with the Transaction. Respondents' connections to these entities are summarized in the paragraphs below and can be shown graphically as follows:



Figure 2: Management Company Corporate Structure

46.    As shown in Figure 2, Lime Rock V was advised in connection with the Transaction by LRM LP and LRM LLP.  In particular, LRM LP served as "Manager" for Lime Rock V under its Limited Partnership Agreement.  *Id.*, at p. 8.[10]  LRM LP also contracted with LRM LLP so that LRM LLP could additionally provide sub-management services in respect of Lime Rock V, such as helping to source and arrange investment opportunities.  *See* Kim Decl., Ex. 14 at p. 8, 13; *id.*, Ex. 10 at 1; *see also id.*, Ex. 8 at p. 14 and Ex. 9 at p. 16.  LRM LLP received payments from LRM LP for the services it provided in respect of Lime Rock V.  *See, e.g.*, Kim Decl., Ex. 8 at p. 14; *id.*, Ex. 9 at p. 16.

47.    LRM LP is an entity for which: (i) Respondent Reynolds served as a co-founder, managing director, and limited partner; and (ii) Respondent McCall served as a managing director and limited partner.  Kim Decl., Ex. 16 at Schedules A-B; *see also id.*, Exs. 18-19.  In addition,

---

[10] Section 7 of the Limited Partnership Agreement appoints the "Manager" to provide various portfolio management and administrative services to Lime Rock V, including the right to "investigate, analyze, structure and negotiate potential investments . . . ."

Respondents McCall and Reynolds serve as Chief Financial Officer and elected manager, respectively, of LRM LP's general partner: LRM GP LLC.  Kim Decl., Ex. 14 (signature pages); *id.*, Ex. 16 at schedule B.  Respondents Reynolds and McCall also directly or indirectly hold ownership interests in LRM LP.  Kim Decl., Ex. 16 at Schedules A-B.

48.     Further, LRM LLP is indirectly controlled by Respondent McCall, through its designated members, LRM UK One Limited and LRM UK Two Limited.  Kim Decl., Ex. 13 at p. 1/1; *id.*, Ex. 11 at p. 1/1; *id.*, Ex. 12 at p. 1/1; *see also id.*, Ex. 10 at p. 1 and Ex. 9 at p. 16.  LRM LLP ceased trading on December 31, 2018 and its ability to provide relevant documents or testimony in connection with the Scottish Proceeding is therefore uncertain.  Kim Decl., Ex. 10 at p. 1; *see also id.*, Ex. 17 at p. 2.  This heightens the need to seek such discovery from Respondent McCall, who maintains indirect control of LRM LLP.[11]

49.     In sum, by reason of Lime Rock V's corporate organizational structure and management arrangements, the ultimate decision makers in connection with the Transaction must have been LRP GP V LP (by its general partner LRP GP V Inc.), LRM LP, and LRM LLP (collectively, the "Corporate Decision Makers")—all entities for which Respondents Reynolds and McCall served (or serve) as officers, directors, or indirect controlling parties.   As such, Respondents are uniquely positioned to provide documents and testimony concerning both the Transaction and the relevant roles of various Lime Rock entities and individuals that advised or controlled Lime Rock V in connection with the Transaction.

---

[11] At the time of the Transaction, the designated members of LRM LLP were Simon Munro and Defender Lawrence Ross, who were subsequently replaced by LRM UK One Limited and LRM UK Two Limited.  Kim Decl., Ex. 13 at p. 1/2-2/2.

## ARGUMENT

50.     The Court should grant this application for discovery because (i) it meets the statutory prerequisites for relief under 28 U.S.C. § 1782 and (ii) the factors to be weighed by the Court in exercising its discretion under the statute heavily favor granting the application.

I.     **The Application Satisfies The Three Statutory Requirements of 28 U.S.C. § 1782**

51.     Section 1782, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," authorizes federal district courts to order discovery to assist applicants, such as Mr. Kidd, in obtaining evidence in the United States for use in foreign legal proceedings. "[T]he statute has, over the years, been given increasingly broad applicability." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (citations and quotations omitted).

52.     To obtain discovery under Section 1782, an applicant must satisfy three statutory requirements: (i) the person from whom discovery is sought must reside or be found within the district; (ii) the discovery must be for use in a proceeding before a foreign or international tribunal; and (iii) the application must be made by an interested person in the foreign proceeding. 28 U.S.C. § 1782(a).   The application can be made for use in a current, ongoing proceeding in a foreign or international tribunal or a proceeding that is "within reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 243 (2004).

53.     This application seeking discovery from Mr. Reynolds and Mr. McCall should be granted because it meets each of these three requirements.

54.     *First,* the parties from whom discovery is sought, Mr. Reynolds and Mr. McCall, are present within the District of Connecticut. Upon information and belief, Mr. Reynolds currently resides in Wilton, Connecticut and Mr. McCall currently resides in Westport, Connecticut. *See*

17

Kim Decl. at ¶ 4.   Further, both Mr. Reynolds and Mr. McCall are based out of Lime Rock's Westport, Connecticut office.   *See supra* at ¶ 10.

55.   *Second,* the documents and deposition testimony requested are "for use" in the Scottish Proceeding.   The "for use" requirement imposes a *de minimis* burden on the applicant to show that the requested discovery has some relevance to the foreign proceeding.   *See In re Application of Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (the standard for relevance is "broadly permissive"); *In re Veiga*, 746 F. Supp. 2d 8, 18 (D.D.C. 2010) ("the burden imposed upon an applicant is *de minimis*").   Relevance is "broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter [sic] that could bear on, any issue that is or may be in the case." *In re Application of Sveaas*, 249 F.R.D. at 106-07 (internal quotations omitted). "Where relevance is in doubt, the district court should be permissive." *Id.* at 107 (citing *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 301 (S.D.N.Y. 2003).   District courts should not attempt to determine whether the evidence would actually, or even probably, be discoverable or admissible in the foreign proceeding.   *See Brandi-Dohrn*, 673 F.3d at 82 (noting unanimity among the Circuits that have ruled on the issue).

56.   Here, the requested discovery is pertinent to critical factual issues in the Scottish Proceeding including, but not limited to: (1) the extent to which, and the points in time that, the Corporate Decision Makers, and their directors and officers, were directly or indirectly aware of Mr. Gordon's conduct and P&W's consequent undisclosed conflict; (2) the extent to which the Corporate Decision Makers, and their directors and officers, facilitated the Transaction despite their awareness of the conflict; (3) the extent to which the Corporate Decision Makers authorized completion of the Transaction while having knowledge of the conflict; and (4) the official or unofficial control structures and chain of command between and among the Corporate Decision Makers, and their

18

directors and officers, at the time of the Transaction. *See* Kerr Decl., at ¶ 10. Mr. Reynolds and Mr. McCall can provide documents and testimony about these topics due to their various positions at the relevant Lime Rock entities, as detailed in Paragraphs 40-49 above. As such, the discovery will reveal evidence that can be used in the Scottish Proceeding or that, at a minimum, is reasonably likely to lead to such evidence.

57.     *Third,* as the Pursuer (*i.e.*, the plaintiff) in the Scottish Proceeding, "there can be no real dispute" that Mr. Kidd qualifies as an "interested person" under Section 1782. *Esses v. Hanania*, 101 F.3d 873, 875 (2d Cir. 1996) (per curiam) (a party to the underlying foreign proceedings "is an 'interested person' within the meaning of the statute"); *accord Metallgesellschaft AG v. Hodapp*, 121 F.3d 77, 79 (2d Cir. 1997) (as a party to the foreign proceeding, the applicant qualifies as an interested person).

58.     Thus, this application meets each of the statutory requirements for relief under Section 1782.

## II.     The Court Should Grant the Section 1782 Application Under the Four Discretionary Factors of *Intel*

59.     Once the statutory requirements are met, as they are here, courts consider four discretionary factors as articulated by the U.S. Supreme Court in *Intel*: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (iii) whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies;" and (iv) whether the discovery sought is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65. In considering these factors, courts exercise their discretion liberally in favor of granting discovery. *See Brandi-Dohrn*, 673 F.3d at 80. No one

factor "should be dispositive in a district court's analysis." *Marubeni America Corp. v. LBA Y.K.*, 335 F. App'x 95, 97 (2d Cir. 2009). In this case, all four factors favor granting discovery.

### A. Mr. Reynolds and Mr. McCall Are Not Participants in the Scottish Proceeding

60. The first discretionary factor favors the applicant where the respondents are not parties to the foreign proceeding. *See In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2012); *Intel*, 542 U.S. at 264. The Scottish Proceeding is a civil proceeding brought by Mr. Kidd against the Lime Rock Company Defenders, the Lime Rock Individual Defenders, and the Ledingham Chalmers Defenders. Mr. Reynolds and Mr. McCall are not parties to the Scottish Proceeding. This factor, therefore, clearly weighs in favor of granting the requested relief. *See In re Consellior SAS, Kerfraval, Ass'n De Documentation Pour L'industrie Nationale*, No. 13 MC 34, 2013 WL 5517925, at *2 (D. Conn. Oct. 2, 2013).

### B. The Foreign Court Would Be Receptive to the Requested Discovery

61. In examining the second *Intel* factor, "a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of section 1782." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) (emphasis added); *Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09 MC 265 (JBA), 2009 WL 2877156, at *5 (D. Conn. Aug. 27, 2009) (holding that the second *Intel* factor weighs in favor of granting discovery because "there is no basis to believe that the [foreign tribunal] would not accept the documents or testimony obtained by this request") (citation omitted); *see also In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998) ("[T]he burden of demonstrating offense to the foreign jurisdiction . . . should rest with the party opposing the application."). Authoritative proof is limited to proof "embodied in a forum

country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures[.]" *Euromepa*, 51 F.3d at 1100.

62.     There is no such evidence here.  Indeed, no decision in the Scottish courts suggests that documents or testimony obtained by this application could not be used in the Scottish Proceeding.  *See* Kerr Decl., ¶ 11.  Further, the United Kingdom is a signatory to the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters.  This strongly indicates that the Scottish court would be receptive to American judicial assistance.  *See In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016) (holding that the district court did not abuse its discretion in finding, under the second *Intel* factor, that the foreign jurisdiction was likely receptive to American judicial assistance given its status as a signatory to the Hague Convention).

63.     In addition, courts in the Second Circuit routinely grant Section 1782 applications in respect of discovery for use in other courts in the United Kingdom outside of Scotland.  *See, e.g., La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014) (determining that all four *Intel* factors weigh in favor of granting 1782 discovery aimed at United Kingdom proceeding); Order, *In re Bulk Atlantic Inc.*, No. 13-MC-291 (S.D.N.Y. Aug. 14, 2013), Dkt. 4; Order, *In re Texas Keystone Inc.,* No. 12-MC-41 (D. Conn. Apr. 16, 2012), Dkt. 4; *United Co. Rusal, PLC v. Trafigura A.G.,* No. 11-MC-17, 2011 WL 1045532 (D. Conn. Mar. 16, 2011).  In this case, the fact that the Scottish Proceeding is a civil suit in its early stages further counsels in favor of granting the requested discovery.  *See HT S.R.L. v. Velasco*, 125 F. Supp. 3d 211, 223-24 (D.C.C. 2015) ("To determine whether the character of the foreign proceeding favors permitting discovery, courts analyze how far along the foreign suit is in the discovery process.").

64.     For the foregoing reasons, the second *Intel* factor also clearly weighs in favor of granting the application.

C.     **The Section 1782 Application Does Not Attempt to Circumvent Scottish Proof-Gathering Restrictions**

65.     Under the third *Intel* factor, courts examine whether the Section 1782 application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  Courts typically weigh the third *Intel* factor against the applicant only where they find that an application is brought in bad faith.  *See In re Application of Hill*, No. M19-117 (RJH), 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is simply unwilling to weigh the request for § 1782 assistance itself as a negative discretionary factor.") (internal quotations omitted) (citing *In re Gemeinschaftspraxis Dr. Med. Schotldorf*, No. M19-88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006)).

66.     There can be no ambiguity that this application is brought in good faith.  As demonstrated above, Respondents are uniquely positioned to provide relevant documents and information about the Transaction.  *See supra* ¶¶ 40-49.  Further, just as Mr. Kidd asserted meritorious claims against P&W in Scotland (some of which P&W ultimately admitted to), Mr. Kidd is asserting meritorious claims against Lime Rock entities in Scotland.  This application is a critical component of marshalling the proof needed to succeed on such claims and, therefore, there can be no dispute that Mr. Kidd is proceeding in good faith.

67.     Although there are procedures available in Scotland to obtain discovery of documents located in the United States, those procedures are cumbersome and expensive, particularly with respect to discovery from non-parties.  *See* Kerr Decl., ¶ 12.  Any such application would require the Scottish courts to endorse "Letters of Request" to the United States courts, seeking their assistance in the collection and disclosure of documents.  *Id.*  The Scottish

procedures for examining witnesses outside of Scotland are equally cumbersome and expensive, requiring similar requests for assistance. *Id.*

68.     For all these reasons, the third *Intel* factor also weighs in favor of granting the application. *See Hill*, 2007 WL 1226141, at *3 (holding that the applicant's good faith basis for believing it could use the requested documents in the foreign litigation weighed in favor of the third *Intel* factor); *see also Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015) (rejecting the notion that the third *Intel* factor requires an applicant to first seek relevant discovery through foreign means before seeking discovery via Section 1782); *O'Keeffe*, 646 F. App'x at 268 (holding that there is no need to show that discovery would be available through a "Letters of Request" process—let alone commence such process—in order to obtain discovery under Section 1782).

**D.     The Discovery Requests Are Narrowly Tailored and Are Not "Unduly Intrusive or Burdensome"**

69.     The fourth *Intel* factor favors the applicant as long as the requests for discovery are not overly burdensome or duplicative. *See Esses,* 101 F.3d at 876 (affirming discovery where there was no "indication that the district court's order is overly burdensome or duplicative"); *Minatec Fin. S.A.R.L. v. SI Group Inc.*, No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (no undue burden where the document request was "specifically and narrowly tailored"). Where, as here, an applicant's requests concern "the precise subject matter of the underlying litigation," the requests are not unduly burdensome. *See First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998); *see also In re Consellior SAS*, No. 13 MC 34, 2013 WL 5517925, at *3 (D. Conn. Oct. 2, 2013) (holding that it would not pose an "insurmountable burden on Respondents" to review and produce approximately 25,000 documents).

70.     The discovery requests are narrowly tailored to the Scottish Proceeding. For example, the requested discovery seeks, among other things: (i) documents and communications

to or from Respondents Reynolds and McCall regarding ITS, Mr. Kidd, and/or the Transaction; (ii) documents and communications concerning or evidencing the role of P&W and Mr. Gordon in connection with the Transaction; and (iii) documents and communications concerning the official or unofficial control structures at relevant Lime Rock entities.  Indeed, the proposed subpoenas seek production of documents in response to only eight document requests.

71.     Not only are the subpoenas narrowly tailored, but they promote efficiency. Respondents Reynolds and McCall were selected as discovery targets precisely because of their ubiquitous presence at Lime Rock.  Because of their multiple roles at Lime Rock, they should have access to broad sources of information and documents that cut across multiple corporate entities involved in the Transaction, including the Cayman Islands Corporate Decision Makers and other entities not named as Defenders in the Scottish Proceeding.

72.     Finally, the records should be electronically accessible, and, therefore, the relevant documents and testimony should be simple to search for, access, and produce.  Any production and confidentiality concerns, if they arise, can be effectively managed between the parties.  *See In re Consellior SAS, Kerfraval, Ass'n De Documentation Pour L'industrie Nationale*, No. 13 MC 34, 2013 WL 5517925, at *2 (D. Conn. Oct. 2, 2013) (granting a 1782 application against the controlling shareholders of the defendants in the foreign proceeding, in part, because "the burden of production and any confidentiality concerns can be effectively managed through agreements between the parties or court orders.").

73.     For all these reasons, the fourth discretionary *Intel* factor also weighs in favor of granting the application.

## CONCLUSION

74.     Based on the foregoing, Mr. Kidd respectfully moves the Court to issue an Order:

A.  Granting the application for discovery under Section 1782;

B.  Authorizing the issuance of the subpoenas as they appear in the forms

attached as Exhibits 1 and 2 to the Kim Declaration; and

C.  Directing Respondents Reynolds and McCall to provide deposition

testimony and produce the documents in their possession, custody, and

control, as requested in the subpoenas, by the deadlines set forth therein.

Dated: February 20, 2020

Respectfully submitted,

KOBRE & KIM LLP

By: _____
    Michael S. Kim
    800 Third Avenue
    New York, New York 10022
    Tel:  +1 212 488 1200
    michael.kim@kobrekim.com
    District of Connecticut Bar # CT28152

*Attorney for Applicant Robert Gordon Kidd*

25