# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

FEB 20 2020 PH1:08
FILED - USDC - BPT - CT

IN RE:

APPLICATION OF ROBERT GORDON KIDD FOR
AN ORDER UNDER 28 U.S.C. § 1782 TO TAKE
DISCOVERY FROM JOHN THOMAS REYNOLDS
AND MARK MCCALL

Case No. _____

## DECLARATION OF MICHAEL S. KIM

Pursuant to 28 U.S.C. § 1746, I, Michael S. Kim, declare under penalty of perjury as follows:

1.     I am an attorney licensed to practice law in the State of Connecticut and before this Court.  I am a partner at the law firm of Kobre & Kim LLP, counsel for the Applicant, Robert Gordon Kidd.

2.     I submit this Declaration in support of the *Application of Robert Gordon Kidd for an Order under 28 U.S.C. § 1782 to Take Discovery from John Thomas Reynolds and Mark McCall* (the "Application").[1]

3.     I make this Declaration based on personal knowledge of the facts set forth herein and my review of relevant documents.  If called as a witness, I would competently testify to the facts set forth herein.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Memorandum of Law in Support of the Application of Robert Gordon Kidd for an Order Under 28 U.S.C. § 1782 to Take Discovery from John Thomas Reynolds and Mark McCall*.

4.      In connection with the preparation of the Application, Kobre & Kim LLP employees under my supervision ran public and.semi-public internet searches on John Thomas Reynolds and Mark McCall.  The results of those searches indicate that John Thomas Reynolds resides in Wilton, Connecticut and Mark McCall resides in Westport, Connecticut.

5.      Attached hereto as **Exhibit 1** are proposed subpoenas seeking the production of documents and deposition testimony from John Thomas Reynolds.

6.      Attached hereto as **Exhibit 2** are proposed subpoenas seeking the production of documents and deposition testimony from Mark McCall.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of the Summons that commenced the Scottish Proceeding.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of the February 3, 2017 opinion of Lord Tyre in the Scottish Court of Session.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of Lime Rock Partners V, LP's limited partnership registration in the Cayman Islands.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of Lime Rock Management LP's Certificate of Limited Partnership and accompanying amendments.

11.     Attached hereto as **Exhibit 7** is a redacted true and correct copy of Lime Rock Management LLP's Application for Incorporation of a Limited Liability Partnership.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of Lime Rock Management LLP's audited financial statements, as of December 31, 2008.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of Lime Rock Management LLP's audited financial statements, as of December 31, 2017.

14.     Attached hereto as **Exhibit 10** is a true and correct copy of Lime Rock Management LLP's unaudited financial statements, as of December 31, 2018.

15.     Attached hereto as **Exhibit 11** is a redacted true and correct copy of webpages listing the "Officers" and "Persons with Significant Control", respectively, for LRM UK One Limited, as reflected on the Companies House (the United Kingdom's company registrar) website, last accessed January 14, 2020 and available at:

- https://beta.companieshouse.gov.uk/company/SC408293/officers; and
- https://beta.companieshouse.gov.uk/company/SC408293/persons-with-significant-control.

16.     Attached hereto as **Exhibit 12** is a redacted true and correct copy of webpages listing the "Officers" and "Persons with Significant Control", respectively, for LRM UK Two Limited, as reflected on the Companies House (the United Kingdom's company registrar) website, last accessed January 14, 2020 and available at:

- https://beta.companieshouse.gov.uk/company/SC408300/officers; and
- https://beta.companieshouse.gov.uk/company/SC408300/persons-with-significant-control.

17.     Attached hereto as **Exhibit 13** is a redacted true and correct copy of webpages listing the "Officers" and "Persons with Significant Control", respectively, for LRM LLP, as reflected on the Companies House (the United Kingdom's company registrar) website, last accessed January 14, 2020 and available at:

- https://beta.companieshouse.gov.uk/company/SO300122/officers; and
- https://beta.companieshouse.gov.uk/company/SO300122/persons-with-significant-control

18.     Attached hereto as **Exhibit 14** is a true and correct copy of Lime Rock Partners V, LP's Amended and Restated Limited Partnership Agreement, dated April 17, 2008.

19.     Attached hereto as **Exhibit 15** is a true and correct copy of Lime Rock Partners V, LP's Form D – Notice of Exempt Offering of Securities, filed with the Securities and Exchange Commission ("SEC") on April 21, 2008.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of Lime Rock Partners V, LP's Form ADV, filed with the SEC on March 29, 2019.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of Lime Rock Partners V, LP's Form ADV Part 2A: Firm Brochure, filed with the SEC on March 30, 2019.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of Lime Rock Partners' on-line profile of John Reynolds, available at https://www.lrpartners.com/team/john-reynolds/ (last accessed January 14, 2020).

23.     Attached hereto as **Exhibit 19** is a true and correct copy of Lime Rock Partners' on-line profile of Mark McCall, available at https://www.lrpartners.com/team/mark-mccall/ (last accessed January 14, 2020).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Vail, Colorado, on this 19th day of February 2020.

_____
Michael S. Kim

# EXHIBIT 1

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Connecticut

|  |  |  |
|---|---|---|
| _____ | ) | Civil Action No. |
|  | ) |  |
| In re: Application of Robert Gordon Kidd to Take | ) |  |
| Discovery Pusuant to 28 U.S.C. § 1782 | ) |  |
| _____ | ) |  |
|  | ) |  |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                           John Thomas Reynolds
_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Kobre & Kim LLP | Date and Time: |
|---|---|
| 800 Third Avenue<br>New York, NY 10022 | 04/29/2020 9:30 am |

The deposition will be recorded by this method:    Audiovisual

❐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

        *CLERK OF COURT*

                                OR

_____      _____
      *Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Robert Gordon Kidd
_____ , who issues or requests this subpoena, are:
Michael S. Kim, 800 Third Avenue, New York, NY 10022, michael.kim@kobrekim.com, (212) 488 1200

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date: _____        _____

                                                  *Server's signature*

                                        _____

                                                  *Printed name and title*

                                        _____

                                                  *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Connecticut

| | )　 | |
|---|---|---|
| | )　 | Civil Action No. |
| In re: Application of Robert Gordon Kidd to Take Discovery Pusuant to 28 U.S.C. § 1782 | )　 )　 )　 )　 ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                   John Thomas Reynolds

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attachment Rider for Document Requests and related instructions.

| Place: Kobre & Kim LLP, 800 Third Avenue, New York, NY 10022 (or electronically to: adam.lavine@kobrekim.com) | Date and Time: 04/03/2020 9:30 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | | |
|---|---|---|
| | | OR |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Robert Gordon Kidd                                              , who issues or requests this subpoena, are:
Michael S. Kim, 800 Third Avenue, New York, NY 10022, michael.kim@kobrekim.com, (212) 488 1200

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

    ❒ I returned the subpoena unexecuted because: _____

_____ .

    Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

    I declare under penalty of perjury that this information is true.

Date: _____

                               _____
                                              *Server's signature*

                               _____
                                         *Printed name and title*

                               _____
                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

   **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

   **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

   **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

   **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

   **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

   **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

   **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## RIDER TO SUBPOENA

Pursuant to the attached Subpoena, and in accordance with the below Definitions and Instructions, please produce the documents requested in Section III below.

**I.      DEFINITIONS**

1.      "You" and "Your" means John Thomas Reynolds and, where applicable, his agents acting within the scope of such agency.

2.      "Communication" means any transmittal of information (in the form of facts, ideas, inquiries or otherwise).  The term includes, but is not limited to, e-mails, correspondence, instant messages, text messages, whatsapp messages, telephone calls, and voicemails.

3.      "Concerning" means, in whole or in part, directly or indirectly, and without limitation, analyzing, commenting on, connected with, constituting, containing, contradicting, discussing, embodying, evidencing, forecasting, describing, involving, memorializing, mentioning, pertaining to, referring to, reflecting, refuting, relating to, reporting on, in connection with, responding to, showing, supporting, studying, setting forth, considering, recommending, or stating.

4.      "Documents" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34, and includes, without limitation, each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your Possession, Custody, or Control, including but not limited to all printed and electronic copies of electronic mail, computer files maintained in electronic form, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, surveys, computer printouts, data compilations of any kind, telexes, facsimiles, emails, text messages, instant messages, whatsapp messages, voice messages, invoices,

order forms, checks, drafts, statements, credit memos, reports, position reports, summaries, indices, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, CDs, computer disks, brochures, pamphlets, or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced, or reproduced, and also including but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

5.    "Each" includes every, and vice versa.

6.    "ITS" means ITS Tubular Services (Holdings) Limited, a company incorporated in Scotland, and its present and former affiliates and direct and indirect subsidiaries, their respective parents, subsidiaries, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf.

7.    "Ledingham Chalmers" means Ledingham Chalmers LLP, the sixth defender in the proceeding commenced by Mr. Kidd currently pending before Scotland's Court of Session.

8.    "Lime Rock V" means Lime Rock Partners V, LP, a Cayman-exempted limited partnership.

9.    "Lime Rock" means any or all of Lime Rock V, LRM LP, and LRM LLP, their present and former affiliates and direct and indirect subsidiaries, their respective parents, subsidiaries, investment managers, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and

former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf, including but not limited to any Person doing business as "Lime Rock Partners" or "Lime Rock Resources".

10.    "LRM LP" means Lime Rock Management LP, a Delaware-registered limited partnership.

11.    "LRM LLP" means Lime Rock Management LLP, a Scottish-registered Limited Liability Partnership in accordance with Scottish law with its registered office in Aberdeen, Scotland.

12.    "LRP GP V Inc." means LRP GP V, Inc., a Cayman Islands exempt company.

13.    "LRP GP V LP" means Lime Rock Partners GP V, LP, a Cayman Islands exempted limited partnership.

14.    "Mr. Allan" means Scott Allan, formerly a solicitor with P&W, and, where applicable, his agents acting within the scope of such agency.

15.    "Mr. Gordon" means Kenneth Gordon, formerly a solicitor with P&W, and, where applicable, his agents acting within the scope of such agency.

16.    "Mr. Kidd" means Robert Gordon Kidd (also known as, Robert or Bob Kidd) and, where applicable, his agents acting within the scope of such agency.

17.    "P&W" means Paull & Williamsons LLP, and its present and former affiliates and direct and indirect subsidiaries, including the former firm operating as Paull & Williamson, their respective parents, subsidiaries, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf.

18.     "Person" means any natural person or any business, legal or governmental entity or association.

19.     "Possession, Custody, or Control" means in Your physical custody or possession, or, if it is in the physical custody or possession of any other Person, You (a) own such Document in whole or in part, or (b) have a legal right, authority, or practical ability to obtain the Document. Such Documents shall include, without limitation, Documents that are in the custody of Your attorney(s), other representatives, or other agents.

20.     "Pre-Transaction Period" means January 1, 2008 through September 26, 2009.

21.     "Post-Transaction Period" means September 27, 2009 through the present.

22.     "Transaction" means the part sale of Mr. Kidd's interest in ITS to Lime Rock V and related transactions set forth in the agreements and other documents signed by Mr. Kidd on or about September 26, 2009 (also known as "Project Indigo"), including the Share Purchase Agreement, the Investment Agreement, and the corresponding Amended Articles of Association, each dated on or about September 26, 2009.

## II.     **INSTRUCTIONS**

23.     Unless otherwise stated, the Document Requests relate to the time period commencing January 1, 2008 and continuing through April 30, 2013.

24.     The terms herein are to be given their most expansive and inclusive interpretation unless otherwise expressly limited. This includes, without limitation, the following:

      a.  construing "and" and "or" in the disjunctive or conjunctive so as to bring within the scope of any Document Request all information that might otherwise be construed to be outside its scope;

      b.  construing the singular form of a word to include the plural and the plural to include the singular;

      c.  construing the term "among" to mean between and among;

    d.   construing the term "any" and "all" to mean any, all, each, and every;

    e.   construing the words "to" or "from" to mean to or from directly, indirectly, through an intermediary, in the name of, or for the benefit of;

    f.   construing masculine, feminine, or neuter pronouns to include other genders; and

    g.   construing the present tense of a verb to include its past tense and vice-versa.

25.    With respect to electronically stored information, the production should be in a form to be agreed between You and counsel for Mr. Kidd and consistent with Federal Rule 45(e)(1)(B).

26.    Unless otherwise specified, each paragraph and subparagraph hereof and in the Definitions herein are to be construed independently and not by or with reference to any other paragraph or subparagraph or Definition herein for the purposes of limiting the scope of any particular Document Request or the subject matter thereof.

27.    Each and every non-identical copy of a responsive Document or Communication (whether different from the original because of stamps, indications of receipt, handwritten notes, marks, attachment to different documents, or any other reason) is a separate Document or Communication to be produced.

28.    The Document Requests require You to produce all responsive Documents and Communications in Your Possession, Custody, or Control from all files wherever located. If any responsive Document or Communication was, but is no longer, in Your Possession, Custody, or Control then provide the name and address of any Person known or believed by You to have possession, custody, or control of that Document or Communication, or of the information or category of information contained in the Document of Communication.

29.     If any Document or Communication requested herein was at one time in existence, but has been lost, discarded, or destroyed, describe the efforts made to locate the Document or Communication and the reason for being unable to locate it.

30.     If no Documents or Communications responsive to a particular Document Request are within Your Possession, Custody, or Control, You must state so in Your response.

31.     If You purport to lack the ability to fully comply with any Document Request, in whole or in part, then You must comply to the fullest extent possible and specify the reason why You contend that You cannot fully comply.

32.     In the event You claim that any information responsive to the Document Requests is beyond the scope of permissible discovery, specify in detail all the grounds on which such claim rests.

33.     Each Document Request herein contemplates production of Documents and Communications in their entirety without abbreviation or expurgation, regardless of whether You consider portions of the Document or Communication to be non-responsive.  If You redact any portion of the Document or Communication, stamp the word "REDACTED" beside the redacted information on each page of the Document or Communication which You have redacted.  Any redactions to Documents or Communications produced should be identified on a privilege log in accordance with the instructions below.

34.     If any Document Request is deemed to call for the production of privileged or work product materials, and such privilege or work product is asserted, identify in writing each Document withheld and, for each Document, provide the following information in a privilege log:

   a.  The reason for withholding the Document;

   b.  A statement of the basis for the claim of privilege, work product, or other ground of non-disclosure; and

    c.  A brief description of the Document, including;

        i.    The type of document or electronically stored information;

        ii.   The general subject matter of the document or electronically stored information;

        iii.  The date of the document or electronically stored information;

        iv.  The author of the document or electronically stored information; and

        v.   Each recipient of the document or electronically stored information.

35.    The Document Requests shall be deemed to be continuing in nature, and should any Documents or Communications responsive to a Document Request become known to You, or come into Your Possession, Custody, or Control after these Document Requests are answered which would change or supplement the answers given, demand is hereby made that said Documents and Communications be furnished immediately.

36.    The Applicant reserves the right to serve additional discovery requests as permitted by law or court order.

### III.   DOCUMENT REQUESTS

1.   For the Pre-Transaction Period, all Documents and Communications concerning Mr. Kidd, ITS, or the Transaction, including but not limited to:

    a.   Communications sent or received by You concerning the terms and/or negotiation of a potential transaction involving ITS or Mr. Kidd;

    b.   Communications sent or received by You concerning the value ascribed to ITS by any Person; and

    c.   all Documents executed by, or on behalf of, You, LRP GP V Inc., LRP GP V LP, or LRM GP LLC in connection with the Transaction.

2.   For the Post-Transaction Period, all Documents and Communications concerning the Transaction, including but not limited to:

    a.   Communications sent or received by You concerning the terms of the Transaction; and

    b.   Communications sent or received by You concerning the gain or loss to Lime Rock V on account of the Transaction.

3.   All Documents and Communications concerning or evidencing the role of P&W in connection with the Transaction, including but not limited to Communications concerning the Transaction between or copied to You, on the one hand, and Mr. Gordon or Mr. Allan, on the other hand.

4.   All Documents and Communications concerning or evidencing any actual, potential, or perceived conflict in the role of P&W or Ledingham Chalmers in connection with the Transaction, including but not limited to Communications between or copied to You, on the one hand, and Mr. Gordon or Mr. Allan, on the other hand.

5.   All Documents and Communications concerning or evidencing the official or unofficial control structure for each of Lime Rock V, LRP GP V LP, LRP GP V Inc., including but not limited to: (i) lists of officers and directors and/or general partners including the officers and directors of any general partners; (ii) corporate organizational charts; (iii) limited partnership agreements or by-laws or similar governing agreements or corporate organizational documents; (iv) investment management or similar advisory or sub-advisory agreements; (v) offering memoranda or prospectuses; and (vi) powers of attorney.

6.   All Documents and Communications concerning or evidencing the official or unofficial control structure for each of LRM LLP, LRM GP LLC, LRM UK One Limited, and LRM UK Two Limited, including but not limited to: (i) lists of employees, agents, members, officers, and directors; (ii) corporate organizational charts; (iii) limited partnership agreements, memorandum, and articles of

association, or similar governing agreements or corporate organizational documents; (iv) offering memoranda or prospectuses; and (v) powers of attorney.

7.    All Documents and Communications concerning or evidencing the official or unofficial control structure for LRM LP, including but not limited to: (i) lists of general partners and the officers and directors of its general partners; (ii) corporate organizational charts; (iii) limited partnership agreements or similar governing agreements or corporate organizational documents; (iv) offering memoranda or prospectuses; and (v) powers of attorney.

8.    All Documents and Communications provided to investors and/or prospective investors in Lime Rock V concerning Mr. Kidd or the Transaction.

# EXHIBIT 2

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Connecticut

|  |  |
|---|---|
| _____ ) | Civil Action No. |
| In re: Application of Robert Gordon Kidd to Take ) Discovery Pusuant to 28 U.S.C. § 1782 ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                            Mark McCall
_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  Kobre & Kim LLP<br>800 Third Avenue<br>New York, NY 10022 | Date and Time:<br>04/28/2020 9:30 am |
|---|---|

The deposition will be recorded by this method:   Audiovisual

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

                                                OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Robert Gordon Kidd _____ , who issues or requests this subpoena, are:
Michael S. Kim, 800 Third Avenue, New York, NY 10022, michael.kim@kobrekim.com, (212) 488 1200

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

□ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

□ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Connecticut

|  |  |
|---|---|
| In re: Application of Robert Gordon Kidd to Take Discovery Pusuant to 28 U.S.C. § 1782 | ) ) ) ) ) ) |

Civil Action No.

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                    Mark McCall

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Rider for Document Requests and related instructions.

| Place: Kobre & Kim LLP, 800 Third Avenue, New York, NY 10022 (or electronically to: adam.lavine@kobrekim.com) | Date and Time: 04/03/2020 9:30 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|     *CLERK OF COURT* | OR |  |
|---|---|---|
| _____ Signature of Clerk or Deputy Clerk | | _____ Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Robert Gordon Kidd _____ , who issues or requests this subpoena, are:
Michael S. Kim, 800 Third Avenue, New York, NY 10022, michael.kim@kobrekim.com, (212) 488 1200

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

◻ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

◻ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**RIDER TO SUBPOENA**

Pursuant to the attached Subpoena, and in accordance with the below Definitions and Instructions, please produce the documents requested in Section III below.

**I.   DEFINITIONS**

1.      "You" and "Your" means Mark McCall and, where applicable, his agents acting within the scope of such agency.

2.      "Communication" means any transmittal of information (in the form of facts, ideas, inquiries or otherwise).  The term includes, but is not limited to, e-mails, correspondence, instant messages, text messages, whatsapp messages, telephone calls, and voicemails.

3.      "Concerning" means, in whole or in part, directly or indirectly, and without limitation, analyzing, commenting on, connected with, constituting, containing, contradicting, discussing, embodying, evidencing, forecasting, describing, involving, memorializing, mentioning, pertaining to, referring to, reflecting, refuting, relating to, reporting on, in connection with, responding to, showing, supporting, studying, setting forth, considering, recommending, or stating.

4.      "Documents" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34, and includes, without limitation, each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your Possession, Custody, or Control, including but not limited to all printed and electronic copies of electronic mail, computer files maintained in electronic form, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, surveys, computer printouts, data compilations of any kind, telexes, facsimiles, emails, text messages, instant messages, whatsapp messages, voice messages, invoices,

order forms, checks, drafts, statements, credit memos, reports, position reports, summaries, indices, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, CDs, computer disks, brochures, pamphlets, or any written or recorded materials of any other kind, however stored (whether in tangible or electronic form), recorded, produced, or reproduced, and also including but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

5.  "Each" includes every, and vice versa.

6.  "ITS" means ITS Tubular Services (Holdings) Limited, a company incorporated in Scotland, and its present and former affiliates and direct and indirect subsidiaries, their respective parents, subsidiaries, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf.

7.  "Ledingham Chalmers" means Ledingham Chalmers LLP, the sixth defender in the proceeding commenced by Mr. Kidd currently pending before Scotland's Court of Session.

8.  "Lime Rock V" means Lime Rock Partners V, LP, a Cayman-exempted limited partnership.

9.  "Lime Rock" means any or all of Lime Rock V, LRM LP, and LRM LLP, their present and former affiliates and direct and indirect subsidiaries, their respective parents, subsidiaries, investment managers, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and

former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf, including but not limited to any Person doing business as "Lime Rock Partners" or "Lime Rock Resources".

10.   "LRM LP" means Lime Rock Management LP, a Delaware-registered limited partnership.

11.   "LRM LLP" means Lime Rock Management LLP, a Scottish-registered Limited Liability Partnership in accordance with Scottish law with its registered office in Aberdeen, Scotland.

12.   "LRP GP V Inc." means LRP GP V, Inc., a Cayman Islands exempt company.

13.   "LRP GP V LP" means Lime Rock Partners GP V, LP, a Cayman Islands exempted limited partnership.

14.   "Mr. Allan" means Scott Allan, formerly a solicitor with P&W, and, where applicable, his agents acting within the scope of such agency.

15.   "Mr. Gordon" means Kenneth Gordon, formerly a solicitor with P&W, and, where applicable, his agents acting within the scope of such agency.

16.   "Mr. Kidd" means Robert Gordon Kidd (also known as, Robert or Bob Kidd) and, where applicable, his agents acting within the scope of such agency.

17.   "P&W" means Paull & Williamsons LLP, and its present and former affiliates and direct and indirect subsidiaries, including the former firm operating as Paull & Williamson, their respective parents, subsidiaries, predecessors, successors, and assigns, any entities acting under the direction or control or on behalf of any of the foregoing entities, and the respective present and former employees, officers, directors, agents, and representatives of each of the foregoing entities and any other Persons acting under their direction or control or on their behalf.

18.    "Person" means any natural person or any business, legal or governmental entity or association.

19.    "Possession, Custody, or Control" means in Your physical custody or possession, or, if it is in the physical custody or possession of any other Person, You (a) own such Document in whole or in part, or (b) have a legal right, authority, or practical ability to obtain the Document. Such Documents shall include, without limitation, Documents that are in the custody of Your attorney(s), other representatives, or other agents.

20.    "Pre-Transaction Period" means January 1, 2008 through September 26, 2009.

21.    "Post-Transaction Period" means September 27, 2009 through the present.

22.    "Transaction" means the part sale of Mr. Kidd's interest in ITS to Lime Rock V and related transactions set forth in the agreements and other documents signed by Mr. Kidd on or about September 26, 2009 (also known as "Project Indigo"), including the Share Purchase Agreement, the Investment Agreement, and the corresponding Amended Articles of Association, each dated on or about September 26, 2009.

## II.   **INSTRUCTIONS**

23.    Unless otherwise stated, the Document Requests relate to the time period commencing January 1, 2008 and continuing through April 30, 2013.

24.    The terms herein are to be given their most expansive and inclusive interpretation unless otherwise expressly limited.  This includes, without limitation, the following:

   a.  construing "and" and "or" in the disjunctive or conjunctive so as to bring within the scope of any Document Request all information that might otherwise be construed to be outside its scope;

   b.  construing the singular form of a word to include the plural and the plural to include the singular;

   c.  construing the term "among" to mean between and among;

    d.   construing the term "any" and "all" to mean any, all, each, and every;

    e.   construing the words "to" or "from" to mean to or from directly, indirectly, through an intermediary, in the name of, or for the benefit of;

    f.   construing masculine, feminine, or neuter pronouns to include other genders; and

    g.   construing the present tense of a verb to include its past tense and vice-versa.

25.    With respect to electronically stored information, the production should be in a form to be agreed between You and counsel for Mr. Kidd and consistent with Federal Rule 45(e)(1)(B).

26.    Unless otherwise specified, each paragraph and subparagraph hereof and in the Definitions herein are to be construed independently and not by or with reference to any other paragraph or subparagraph or Definition herein for the purposes of limiting the scope of any particular Document Request or the subject matter thereof.

27.    Each and every non-identical copy of a responsive Document or Communication (whether different from the original because of stamps, indications of receipt, handwritten notes, marks, attachment to different documents, or any other reason) is a separate Document or Communication to be produced.

28.    The Document Requests require You to produce all responsive Documents and Communications in Your Possession, Custody, or Control from all files wherever located.  If any responsive Document or Communication was, but is no longer, in Your Possession, Custody, or Control then provide the name and address of any Person known or believed by You to have possession, custody, or control of that Document or Communication, or of the information or category of information contained in the Document of Communication.

29.     If any Document or Communication requested herein was at one time in existence, but has been lost, discarded, or destroyed, describe the efforts made to locate the Document or Communication and the reason for being unable to locate it.

30.     If no Documents or Communications responsive to a particular Document Request are within Your Possession, Custody, or Control, You must state so in Your response.

31.     If You purport to lack the ability to fully comply with any Document Request, in whole or in part, then You must comply to the fullest extent possible and specify the reason why You contend that You cannot fully comply.

32.     In the event You claim that any information responsive to the Document Requests is beyond the scope of permissible discovery, specify in detail all the grounds on which such claim rests.

33.     Each Document Request herein contemplates production of Documents and Communications in their entirety without abbreviation or expurgation, regardless of whether You consider portions of the Document or Communication to be non-responsive.  If You redact any portion of the Document or Communication, stamp the word "REDACTED" beside the redacted information on each page of the Document or Communication which You have redacted.  Any redactions to Documents or Communications produced should be identified on a privilege log in accordance with the instructions below.

34.     If any Document Request is deemed to call for the production of privileged or work product materials, and such privilege or work product is asserted, identify in writing each Document withheld and, for each Document, provide the following information in a privilege log:

     a.  The reason for withholding the Document;

     b.  A statement of the basis for the claim of privilege, work product, or other ground of non-disclosure; and

    c.  A brief description of the Document, including the date of the Document and the following information;

        i.  The type of document or electronically stored information;

        ii.  The general subject matter of the document or electronically stored information;

        iii.  The date of the document or electronically stored information;

        iv.  The author of the document or electronically stored information; and

        v.  Each recipient of the document or electronically stored information.

35.    The Document Requests shall be deemed to be continuing in nature, and should any Documents or Communications responsive to a Document Request become known to You, or come into Your Possession, Custody, or Control after these Document Requests are answered which would change or supplement the answers given, demand is hereby made that said Documents and Communications be furnished immediately.

36.    The Applicant reserves the right to serve additional discovery requests as permitted by law or court order.

III.   **DOCUMENT REQUESTS**

1.   For the Pre-Transaction Period, all Documents and Communications concerning Mr. Kidd, ITS, or the Transaction, including but not limited to:

   a.   Communications sent or received by You concerning the terms and/or negotiation of a potential transaction involving ITS or Mr. Kidd;

   b.   Communications sent or received by You concerning the value ascribed to ITS by any Person; and

   c.   all Documents executed by, or on behalf of, You, LRP GP V Inc., LRP GP V LP, LRM UK One Limited, LRM UK Two Limited, or LRM GP LLC in connection with the Transaction.

2.   For the Post-Transaction Period, all Documents and Communications concerning the Transaction, including but not limited to:

   a.   Communications sent or received by You concerning the terms of the Transaction; and

   b.   Communications sent or received by You concerning the gain or loss to Lime Rock V on account of the Transaction.

3.   All Documents and Communications concerning or evidencing the role of P&W in connection with the Transaction, including but not limited to Communications concerning the Transaction between or copied to You, on the one hand, and Mr. Gordon or Mr. Allan, on the other hand.

4.   All Documents and Communications concerning or evidencing any actual, potential, or perceived conflict in the role of P&W or Ledingham Chalmers in connection with the Transaction, including but not limited to Communications between or copied to You, on the one hand, and Mr. Gordon or Mr. Allan, on the other hand.

5.   All Documents and Communications concerning or evidencing the official or unofficial control structure for each of Lime Rock V, LRP GP V LP, LRP GP V Inc., including but not limited to: (i) lists of officers and directors and/or general partners including the officers and directors of any general partners; (ii) corporate organizational charts; (iii) limited partnership agreements or by-laws or similar governing agreements or corporate organizational documents; (iv) investment management or similar advisory or sub-advisory agreements; (v) offering memoranda or prospectuses; and (vi) powers of attorney.

6.   All Documents and Communications concerning or evidencing the official or unofficial control structure for each of LRM LLP, LRM GP LLC, LRM UK One Limited, and LRM UK Two Limited, including but not limited to: (i) lists of employees, agents, members, officers, and directors; (ii) corporate organizational

charts; (iii) limited partnership agreements, memorandum, and articles of association, or similar governing agreements or corporate organizational documents; (iv) offering memoranda or prospectuses; and (v) powers of attorney.

7.    All Documents and Communications concerning or evidencing the official or unofficial control structure for LRM LP, including but not limited to: (i) lists of general partners and the officers and directors of its general partners; (ii) corporate organizational charts; (iii) limited partnership agreements or similar governing agreements or corporate organizational documents; (iv) offering memoranda or prospectuses; and (v) powers of attorney.

8.    All Documents and Communications provided to investors and/or prospective investors in Lime Rock V concerning Mr. Kidd or the Transaction.

# EXHIBIT 3

Rules of the
Court of Session
1994

 

# IN THE COURT OF SESSION
## SUMMONS
### (Commercial Action)

in the cause

**ROBERT GORDON KIDD**, residing at 12, Mykinon 4045 Kalogiri Germasogia, Limassol,
Cyprus

**PURSUER**

against

**(FIRST) LIME ROCK MANAGEMENT LLP**, a limited liability partnership incorporated under the
Limited Liability Partnerships Act 2002 (registration number SO300122) and having its registered
office at Union Plaza 6th Floor, 1 Union Wynd, Aberdeen, AB10 1DQ; **(SECOND) LIME ROCK
MANAGEMENT LP**, a limited partnership registered in Delaware, USA, according to the laws of that
state (file number 2908252), and having a place of business at 274 Riverside Avenue, Suite 3
Westport, CT 06880 USA; **(THIRD) LIME ROCK PARTNERS V, LP**, a Cayman-exempted limited
partnership and having a place of business at Ugland House, South Church Street, George Town, PO
Box 309GT, Cayman Islands; **(FOURTH) HAMISH HECTOR LAWRENCE ROSS**, residing at Polruan,
16 Arbeadie Avenue, Banchory, Kincardinshire, AB31 4EL; **(FIFTH) JASON SMITH**, residing at 9
Bayview Road, Aberdeen AB15 4EY; **(SIXTH) LEDINGHAM CHALMERS LLP**, a limited liability
partnership incorporated under the Limited Liability Partnerships Act 2002 (registration number
SO300843) and having its registered office at Johnstone House, 52-54 Rose St, Aberdeen AB10 1HA;
**(SEVENTH) MALCOLM LAING**, residing at Pine Villa, Ballater Road, Aboyne, Aberdeenshire, AB34
5HN; and **(EIGHTH) RODNEY ALPHONSIOUS MAGILL HUTCHISON**, care of the Sixth Defender

**DEFENDERS**

Elizabeth II, by the Grace of God, of the United Kingdom of Great Britain and Northern Ireland and of
Her other Realms and Territories, Queen, Head of the Commonwealth, Defender of the Faith, to
**(FIRST) LIME ROCK MANAGEMENT LLP; (SECOND) LIME ROCK MANAGEMENT LP; (THIRD)
LIME ROCK PARTNERS V, LP; (FOURTH) HAMISH HECTOR LAWRENCE ROSS; (FIFTH) JASON
SMITH; (SIXTH) LEDINGHAM CHALMERS LLP; (SEVENTH) MALCOLM LAING; and (EIGHTH)
RODNEY ALPHONSIOUS MAGILL HUTCHISON.**

By this summons, the pursuer craves the Lords of our Council and Session to pronounce a decree
against you in terms of the conclusions appended to this summons. If you have any good reason why
such decree should not be pronounced, you must enter appearance at the Office of Court, Court of
Session, 2 Parliament Square, Edinburgh, EH1 1RQ, within three days after the date of the calling of
the summons in court. The summons shall not call in court earlier than 42 days after it has been
served on you. **Be warned that, if appearance is not entered on your behalf, the pursuer may
obtain decree against you in your absence.**

Given under our signet at Edinburgh on.................................................................

Signed:.......................................
Laura McCorquodale
Harper MacLeod LLP
Citypoint
65 Haymarket Terrace
EDINBURGH
EH12 5HD
OUR REF: EMF/521196
**Solicitor for the Pursuers**

**CONCLUSIONS**

1.   For payment by the Defenders jointly and severally to the Pursuer of the sum of TWO
     HUNDRED AND TEN MILLION US DOLLARS (US$ 210,000,000) with interest thereon
     compounded annually at the rate of 8 per cent per year or at such other rate as to the court
     shall seem proper from 26 September 2009 until payment;

2.   For the expenses of the action.

**CONDESCENDENCE**

**Parties to the Action**

1.   The Pursuer is Robert Gordon Kidd, otherwise known as Bob Kidd.  He resides at 12 Mykinon 4045, Kalogiri Germasogia, Limassol, Cyprus. The First Defender is Lime Rock Management LLP. The First Defender is a Limited Liability Partnership incorporated under the Limited Liability Partnerships Act 2002 (registration number SO300122), with a place of business and registered office at Union Plaza 6th Floor, 1 Union Wynd, Aberdeen. The First Defender is domiciled in Scotland. This Court has jurisdiction against the First Defender and accordingly against the remaining Defenders. The Second Defender is Lime Rock Management LP, being a limited partnership registered in Delaware, USA according to the laws of that State (file number 2908252), and having a place of business at 274 Riverside Avenue, Suite 3 Westport, CT 06880 USA. The Third Defender is Lime Rock Partners V, LP. It is a Cayman-exempted limited partnership with a place of business at Ugland House, South Church Street, George Town, PO Box 309GT, Cayman Islands.  The Fourth Defender is Hamish Hector Lawrence Ross, known as Lawrence Ross. He resides at Polruan, 16 Arbeadie Avenue, Banchory, Kincardinshire, AB31 4EL and is believed to be domiciled in Scotland. The Fifth Defender is Jason Smith.  He is believed to reside at 9 Bayview Road, Aberdeen AB15 4EY. The Sixth Defender is Ledingham Chalmers LLP, a Limited Liability Partnership incorporated under the Limited Liability Partnerships Act 2002 (registration number SO300843) and having its registered office at Johnstone House, 52-54 Rose St, Aberdeen. The Seventh Defenders is Malcolm Laing. He resides at Pine Villa, Ballater Road, Aboyne, Aberdeenshire, AB34 5HN. The Seventh Defender was a member of the Sixth Defender at all times material to these proceedings. The Eighth defender is Rodney Alphonsious Magill Hutchison. He is designed as care of the Sixth Defender, of which he is a member. There are no proceedings underway in any other court between these parties concerning the subject matter of this action.  To the knowledge of the Pursuer, there is no agreement between the parties conferring jurisdiction over this dispute to any other court which prorogates the jurisdiction of this court. This court has jurisdiction accordingly.

2.   Until 26 September 2009 (when the Pursuer sold a quantity of shares to the Third Defender as explained more fully below) the Pursuer was the sole shareholder of ITS Tubular Services (Holdings) Limited, a company incorporated in Scotland, together with its subsidiaries (afterwards referred to as "ITS"). ITS was incorporated by the Pursuer and over many years he was solely responsible for executive decisions of ITS. By September 2009, ITS had considerable value. ITS operated in the oil industry. As at 2008 it operated in 20 locations throughout the world with approximately 1000 employees. For the year ending 31 December 2008, ITS had turnover in excess of US $143 million and EBITDA of around US $ 47.2 million. In 2007, the Pursuer resolved to sell part of his interest as a shareholder in ITS to begin to realise his wealth in a plan towards retirement and in order to provide financial security for his family. He wished to retain control of the business if he remained a shareholder in that business.

3

Retaining ultimate control of companies in which he had an interest had been his business model in all companies he operated during his entire business life. To that end, ITS employed two new Directors, Jeff Corray and Scott Milne, to assist in implementing the Pursuer's plans. Mr Corray was appointed as CEO of ITS with effect from 1st October 2007 and as such exercised executive control over the company. Mr Milne was appointed as a director of ITS with responsibility for corporate development with effect from the same date.

**The Instruction of Solicitors in Scotland by the Pursuer and ITS**

3.    In February 2008, the Pursuer and ITS jointly instructed Paull & Williamsons LLP, Aberdeen ("P&W") to represent their interests in the negotiation of the terms of, and the implementation of, any agreement reached with any proposed investor. The instruction of P&W was arranged by Mr Corray and Mr Milne, but with the knowledge and authority of the Pursuer. P&W were bound by the practice rules and obligations imposed by the Law Society of Scotland upon practising solicitors. The Pursuer was not provided with, and did not sign, any terms of engagement with P&W. P&W were bound by their professional obligations not to act for any client where there was a conflict of interest with another client without the fully informed consent of both clients. P&W owed a contractual duty to the Pursuer to similar effect. The duties owed by P&W to the Pursuer also included a duty of trust and confidence; a duty to act honestly and in good faith; a duty to act in the best interests of the Pursuer; a duty to avoid a conflict of interest; and a duty not to act for the benefit or potential benefit of a third person without the Pursuer's informed consent. Despite the clear and obvious conflict of interest between the interests of ITS and the Pursuer, P&W accepted instructions to act for both. Although highly experienced in trading and operating in the oil industry, the Pursuer had little understanding of the complexities of transactions such as the transaction which was ultimately concluded and hereinafter condescended upon. For that reason he relied upon P&W as his professional advisers to ensure that he understood in simple terms the significant implications of any such proposed transaction and to alert him to any substantial issues concerning the effect of the transaction.

4.    Around this time, indicative offers were received from a number of parties which were subject to serious and detailed negotiations (for example 3i, an investment fund condescended upon below), but none came to fruition. As a result of their being instructed by the Pursuer and ITS, P&W came into possession of confidential information relating to those abortive discussions. They were aware of the terms of indicative offers by interested parties, and of the conditions which those prospective purchasers on the one hand and the sellers (i.e. their own clients) on the other sought to agree. They were aware of the respects in which the Pursuer and ITS (via Mr Corray and Mr Milne) had concerns about those offers and what their ultimate aspirations were.

5.    In September 2008, Mr Corray and Mr Milne were authorised by ITS and the Pursuer to engage and in fact engaged the services of Simmons & Company International ("Simmons"), an

4

investment banking firm with offices in London, Houston, Aberdeen and Dubai, to market the shares held by the Pursuer. Simmons were instructed by Mr Corray and Mr Milne representing ITS and the Pursuer to seek offers for the purchase of a minority of shares. The indicative terms proposed by Simmons to prospective purchasers were substantially modelled upon the terms which had been proposed by 3i. Simmons had provided assessments and projections of EBITDA of ITS. Drawing on knowledge from similar transactions they provided an estimate of multipliers on EBITDA to be expected for the purposes of valuation and sale. Those figures produced a trade sale value of ITS at the time of between $517m US to $621m US. The value of ITS for a private equity sale was in excess of $220m US.

6.    Following the marketing, several indicative offers were received from Private Equity ("PE") investment firms (in particular from Lloyds TSB Development Capital Limited, and TA Associates) for a proportion of the shareholding.  The Lime Rock Group also expressed an interest in purchasing a minority of shares from the Pursuer. The Lime Rock Group is a group of entities including but not limited to the First to Third Defenders, being a private equity enterprise specialising in the international oil and gas sector. The Fourth and Fifth Defenders were at all material times partners or members in, or agents of the Lime Rock Group and empowered to commit that group to investments. On 22 October 2008, the Fourth Defender signed the initial proposal for the purchase (the "Indicative Terms") which was sent to Simmons. He did so on behalf of "Lime Rock Partners" with the intention that the funding would be provided by the Third Defender. "Lime Rock Partners" is synonymous, in context, with the Lime Rock Group referred to herein. The Third Defender was the ultimate vehicle used for the conclusion of the transaction and the source of funds as condescended upon below. The Fourth Defender was primarily involved in negotiation of the transaction on behalf of the Lime Rock Group and each of the First to Third Defenders. During negotiations, he reported back to partners of the various entities in the Lime Rock Group. The Lime Rock Group initially engaged in negotiations, which temporarily terminated, but then recommenced negotiations before finally concluding the transaction as condescended upon.

**Conflict of Interest: Lime Rock Group and P&W**

7.    As condescended upon above, P&W owed and was bound by professional duties and contractual obligations to the Pursuer. Yet, unbeknown at any material time to the Pursuer, for a considerable time prior to 2009, entities within the Lime Rock Group had been clients of P&W and in particular Mr. Kenneth Gordon, a member of P&W.  P&W had represented the interests of the Lime Rock Group on a number of occasions in similar transactions with other parties prior to the Pursuer engaging the services of P&W. Mr Gordon had in many cases acted for Lime Rock Group as the nominated partner within P&W. He had a close professional and personal relationship with the Fourth Defender.  At the time that P&W acted for the Pursuer as condescended upon, P&W were engaged in at least one commercial matter involving the Lime Rock Group.  Mr Gordon was bound by the same professional duties and contractual

5

obligations to the Pursuer as P&W.  The Pursuer was unaware of the close relationship between P&W and the Lime Rock Group. Following the events referred to below being uncovered, Mr Gordon's position as partner in P&W was terminated.

8.    At a precise time unknown to the Pursuer (but towards the end of 2008 and after the Lime Rock Group became interested in offering to invest in ITS) the Lime Rock Group engaged in discussions with P&W regarding a proposed purchase of shares in ITS. The precise nature of that discussion is to the Pursuer unknown. They did so at least with Mr Gordon but another partner in P&W (Scott Allan) was aware that discussions were taking place.

**Lime Rock's Instruction of the Seventh Defenders and Breaches by Mr Gordon**

9.    In early January 2009, the Fourth Defender emailed Mr Gordon to advise him that the Lime Rock Group were intending to negotiate the purchase of shares in ITS. On 14 January 2009 Mr Gordon wrote to the Fourth Defender in the following terms:

> "...my role here will be 'unofficial' counsel to Lime Rock and that for external consumption and to preserve my practising certificate I was going to ask Malcolm Laing [i.e. the Seventh Defender] to front the investment side."

Mr Gordon did thereafter contact the Seventh Defender (as promised in his email) and Mr Gordon thus procured the Seventh Defender and thus the Sixth Defender firm's instructions to act for Lime Rock Group relative to the negotiations and proposed transaction. The engagement by Lime Rock Group of the services of the Sixth Defender firm was in early 2009, the precise date and terms of instruction not being known to the Pursuer. Mr Gordon thereafter regularly corresponded with and met with the Seventh and Eighth Defenders (and thus the Sixth Defenders) and provided them with information regarding the proposed transaction prior to its completion. In addition to information being provided, legal advice was provided by Mr Gordon to the Seventh and Eighth Defenders, and thus the Sixth Defenders, intending that it be passed on to the Lime Rock Group. Sensitive and commercially confidential information relating to both the Pursuer and ITS was passed by him in the same manner, which information had been obtained at least in part as a result of P&W representing the interests of the Pursuer in previous negotiations. The actions of Mr Gordon were calculated to assist the Lime Rock Group in securing completion of the transaction, the completion of which was contrary to the interests of the Pursuer for reasons condescended upon below. On many occasions, the Fourth and Fifth Defenders were copied directly into correspondence sent to the Seventh and Eighth Defenders. They were accordingly aware that Mr Gordon and hence P&W were representing the interests of Lime Rock Group as well as (nominally) the interests of the Pursuer and ITS. They were aware that privileged and/or sensitive information was passed by Mr Gordon to them and that he and P&W were thereby acting in conflict to the interests of the Pursuer. Mr Gordon continued

to remind Lime Rock Group that he was "unofficial", to encourage them to keep secret his engagement by them.

10.  The transaction was on complex terms which were highly disadvantageous to the Pursuer.  Any solicitor or firm of solicitors giving a client independent and proper advice would have drawn to the attention of and explained to the Pursuer the important features of the transaction prior to its completion. P&W gave no advice whatever to the Pursuer despite the highly disadvantageous terms of the transaction to the Pursuer.  P&W had a vested interest in the transaction continuing to conclusion. That interest included the ability to charge fees (which were considerable) by seeing the transaction to a conclusion; and the benefit of facilitation of the transaction for a long term client, namely the Lime Rock Group, to culture future business with them. The benefit to their long term client was particularly acute as the transaction was as favourable to the Lime Rock Group's interests as it was a detriment to the Pursuer's interests. In acting as they did, P&W acted in breach of the fiduciary duties they owed to the Pursuer (and indeed to ITS). In the circumstances P&W were obliged to advise the Pursuer that their long term client was interested in negotiating towards purchase of shares and, absent fully informed consent of the Pursuer for P&W continuing to represent any party in the transaction, to withdraw from acting for the Pursuer and ITS, and to decline to represent the interests of the Lime Rock Group. Although no advice was provided at all to the Pursuer by P&W, the Lime Rock Group were provided by P&W and by Mr Gordon in particular with advice and information relating to the proposed transaction, all of which was calculated to result in the securing the conclusion of the transaction for the Lime Rock Group.

11.  Prior to completion of the transaction, the Pursuer received no legal advice from P&W (or anyone else) as to the legal effect of the transaction upon his financial interest in ITS. The transaction document was signed by the Pursuer in Cyprus, where he resided at the time. An employee of ITS was tasked with taking the necessary signing paperwork to Cyprus for signature. On 26th September 2009 that employee took only the signing pages to Cyprus and not the entire document. Although employed by ITS at that time, the person who took the signature pages to Cyprus for signature was Stuart Ross, whose father is the Fourth Defender, and who had previously been an employee of the Lime Rock Group. The Pursuer only met P&W on one occasion in connection with the transaction, when he met Mr Allan for the limited purpose of signing off on warranties. No advice was provided to the Pursuer by Mr Allan or any other person at P&W. Mr Allan did not disclose to the Pursuer that Mr Gordon was providing legal advice and assistance to Lime Rock Group. At that time, the company was trading well. Despite the global financial "crash", ITS was projected by Simmons, and by Lime Rock Group to perform at a high profit level into the future (hence the desire of the Lime Rock Group to invest). The Pursuer was not advised by P&W that despite only a minority shareholding being purchased by the Lime Rock Group, the effect of the transaction was that the terms were materially unfavourable to him. In particular, the effect of the transaction was that it allowed the

Lime Rock Group to control the board of directors of ITS by their holding the casting vote at board meetings (despite being minority shareholders). In addition, the financial investment by Lime Rock Group was highly advantageous to them by various means, compared to that of the Pursuer.  Upon exit or liquidation, the interests of the Lime Rock Group were substantially preferred to those of the Pursuer. The value of their investment was immediately enhanced by the right to payment of significant interest (compounding annually) on the sums lent to ITS including the US $10m paid to the Pursuer, as hereinafter condescended upon. In the premises, the Transaction rendered the Pursuer's residual and subordinated shareholding worthless or substantially worthless on an open market. Any potential investor in the residual shareholding would appreciate that little or no control could be exercised over the destiny of ITS. A significant risk would be run that the Lime Rock Group would manage ITS in a way that resulted in the liquidation of ITS with no return to shareholders.   Furthermore, upon completion of the transaction, the only cash benefit that the Pursuer obtained was payment of the sum of US $10m.  All other investment by the Lime Rock Group was paid to ITS as a loan repayable to the Lime Rock Group, contrary to the Pursuer's understanding that upon completion the ITS accounts would treat that sum as a loan repayable to the Pursuer, since it was a proportion of his ownership that had been sold to the Lime Rock Group.

12. Following the completion of the transaction, the operational performance of ITS deteriorated. ITS's newly constituted board lacked operational experience, lost control of ITS's overseas subsidiaries, and failed to control ITS's capital expenditure and ingathering of revenue. From the summer of 2011, ITS's bankers began to press for reductions in the levels of borrowing, and it was around this time that the Lime Rock Group decided to pursue an early exit from ITS.  The Pursuer, too, wished to secure an exit on account of the mismanagement and the fact that he did not control the destiny of ITS. Serious offers for investment in ITS were received. The Lime Rock Group would not, however, accept any dilution of its interest or sell its own shares at a realistic price. In 2012, the Pursuer sought to re-establish executive control. He was prevented by the Lime Rock Group from doing so by interdict pronounced in this court. On 19 April 2013, administrators were appointed over ITS, who immediately sold the business and assets of ITS as a going concern to Parker Drilling, a competitor of ITS, for US $125 million.  There was no return to any shareholder.

**The Knowledge of the Seventh and Eighth Defenders**

13. The Seventh and Eighth Defenders were the members of the Sixth Defender firm responsible for representing the interests of the Lime Rock Group in negotiations, and did so on behalf of the Sixth Defender firm. They did so in the knowledge that Mr Gordon was intending to (and did in fact) act as Lime Rock Group's "unofficial counsel" on the transaction. They did so in the knowledge that the instruction of the Sixth Defender firm was designed to give a false impression (in particular to the Pursuer) that both Lime Rock Group on the one hand, and ITS and the Pursuer on the other hand each had wholly independent legal advice. The engagement

8

of the Sixth Defender firm by Lime Rock Group was indeed a "front" designed to obscure the truth, that truth being that P&W were acting in breach of their duty to the Pursuer. The Sixth Defender firm accepted instructions from ITS and the Pursuer, as did the Seventh and Eighth Defenders in the knowledge that Mr Gordon was in breach of his duty of undivided loyalty to the Pursuer (and indeed to ITS). They thereby conspired with the First to Fifth Defenders to deceive the Pursuer by that false representation, and thus knowingly assist P&W to mislead the Pursuer. They did so to cause harm to the Pursuer by depriving him of the opportunity of discovering the breach of fiduciary duty by Mr Gordon, of allowing him to have the knowledge to terminate the relationship with P&W and indeed the Lime Rock Group, and then obtain separate and truly independent advice. All of the Defenders conspired to facilitate the breaches of contracts by P&W, which contracts existed as between P&W and ITS and between P&W and the Pursuer.

**Legal Proceedings against Burness Paull**

14.     In mid 2015, the Pursuer raised proceedings against Burness Paull LLP ("BP") in the Court of Session. BP was renamed as such following a merger of its business with that of P&W on or around 1 December 2012, following the events narrated above.  BP assumed the rights and liabilities of P&W. At the commencement of that litigation the Pursuer was wholly unaware that Mr Gordon had been covertly acting as "unofficial counsel" on the proposed transaction for the benefit of Lime Rock Group. He was unaware of the fact that the defenders had conspired against his interests as they had.  Accordingly, the Pursuer alleged that P&W had failed to provide him with correct advice and were negligent in their conduct and thus in breach of contract with him. He alleged (as was correct) that if he had been advised by them as to the effect of the transaction, he would not have concluded it. He alleged that he would have retained his entire interest in ITS and would, at some stage shortly thereafter, have sold his entire interest in ITS if he decided to sell at all. He was under no financial pressure to sell all or any part of ITS. ITS was under no financial pressure to obtain an investor.

15.     During the progress of the litigation in Scotland, and up to a point only a few weeks prior to a proof date, the process of disclosure of potentially relevant documents was on-going. Assurances had been given by BP that no further relevant documents were outstanding. However, those representing the Pursuer wished to ensure that no documents were in fact undisclosed which may be relevant to the claim. BP were directed by the judge (Lord Tyre) to carry out an electronic search of their databases subject to certain search criteria and yield the results of that search to the Court and to the Pursuer's solicitors. Upon carrying out that task those representing BP indicated that they had discovered important documents. On 7th October 2016, BP provided documents to the court in a sealed envelope. Lord Tyre ordered that the envelope should be opened and copied to the Pursuer's representatives. The contents of the envelope revealed:

(i)     That prior to 13th January 2009 Mr Gordon had supplied confidential and privileged information to Lime Rock Group.

9

    (ii)    That Mr Gordon had asked the Fourth Defender to keep the fact that he had disclosed that information secret.

    (iii)   That Mr Gordon had been covertly acting on behalf of the Lime Rock Group as their solicitor in respect of the transaction;

    (iv)   That Mr Gordon had thus been in breach of his fiduciary duty to the Pursuer (and indeed to ITS);

    (v)    That on behalf of the Lime Rock Group (and with their knowledge and consent) Mr Gordon had procured the assistance of the Sixth to Eighth Defenders. His stated purpose for doing so was for them to "front" the transaction to give the appearance of independent legal representation and to "preserve" his practising certificate.

    (vi)   That the Fourth Defender had discussed with Mr Gordon their intention that Mr Gordon act secretly, and that the Sixth Defender firm and in particular the Seventh Defender should be formally instructed by Lime Rock Group to conceal the true position.

    (vii)   That the Sixth to Eighth Defenders were aware of those breaches by Mr Gordon.

    (viii)  That Mr Gordon inappropriately corresponded with and had meetings on several occasions with the Fourth, Seventh and Eighth (and hence also Sixth) Defenders regarding the proposed transaction; and

    (ix)   That sensitive and confidential information relative to the proposed transaction had been provided by Mr Gordon to the Seventh and Eighth (and hence also Sixth) Defenders.

16.    In the course of his covert engagement by Lime Rock Group, Mr Gordon

    (i)    Issued guidance to Lime Rock on stamp duty saving schemes;

    (ii)    Drafted and circulated his observations on draft agreements and warranties from Lime Rock's perspective;

    (iii)   Provided tactical advice such as how and when strategically to contact Mr Corray and Mr Milne;

    (iv)   Revised draft transaction documents on behalf of Lime Rock in a covert manner, to give the false impression that they had been revised by the Sixth Defender; and

    (v)    Held meetings with the Sixth Defender, the details of which are to the Pursuer as yet unknown but were effected secretly and related to the transaction condescended upon.

17.    The principals of BP stated to the court, via counsel (Mr Dunlop QC), that they had been wholly unaware of the existence of those documents until the electronic search had taken place. They claimed that they as a firm had been wholly unaware of the actions of Mr Gordon until they had found the documents. The Pursuer is unaware as to when BP first became aware of the content of the said documents, but the Pursuer could not with reasonable diligence have become aware of them until they were disclosed to him by BP. He had served a specification of documents, unaware of the fact of the conflict of interest. BP failed to produce those documents, claiming that they were ignorant of their existence. Upon disclosing the documentation referred to above, BP admitted that Mr Gordon and P&W had been in breach of their fiduciary duty. They admitted

that they were in breach of contract with the pursuer. The proof diet was discharged, and BP found liable on an agent client basis for one half of the expenses, on account of their failure to disclose the documents previously. A further proof was fixed for approximately one year later limited to causation and quantum. During that time, investigations into the value of the Pursuer's losses were progressed. On the morning of the rescheduled proof, the claim settled as between the Pursuer and BP. The terms of settlement were agreed by the parties to remain confidential. However the settlement terms were substantially less than the value of the Pursuer's losses.

18.  At all material times, the Fourth and Fifth Defenders were partners in or members of or authorised agents of the Lime Rock Group. In particular, the First to Third Defenders were aware (on account of the knowledge of the Fourth and Fifth Defenders) of the fact that Mr Gordon and hence P&W were in breach of their fiduciary duties. At all material times, the Fourth Defender was a Director of the First to Third Defenders. At all material times, the Fifth Defender was Vice President of the Lime Rock Group. All of the Defenders were aware that Mr Gordon was acting in breach of his fiduciary duty to the Pursuer (and indeed to ITS). They conspired to facilitate that breach and so caused the Pursuer to suffer the loss and damage hereinafter condescended upon.

19.  Each and all of the Defenders dishonestly assisted Mr Gordon (and hence P&W) in breaching his fiduciary duty owed to the Pursuer. They each knew that Mr Gordon was acting in breach of that duty and, separately, acting in breach of the contract between P&W and with the Pursuer, and in breach of the Law Society of Scotland's professional requirements. The First to Fifth Defenders knew that on account of the content of the email sent by Mr Gordon to the Fourth Defender. The remaining Defenders knew that on account of the fact that Mr Gordon was providing them with confidential and privileged information prior to the conclusion of the transaction and that P&W represented the interests of the Pursuer. In addition, the Sixth to Eighth Defenders knew that P&W were in breach of their fiduciary duty to the Pursuer and their contractual and professional obligations as, being solicitors themselves, they knew the obligations which were incumbent upon Mr Gordon and P&W, which would apply to all solicitors and firms of solicitors in Scotland. Their actions were contrary to normally acceptable standards of honest conduct. The First to Fifth Defenders thus dishonestly assisted Mr Gordon and P&W by instructing the Sixth Defender firm who they knew to be a "front", to conceal the truth from the Pursuer. The truth was that they were receiving privileged and confidential information from Mr Gordon. At all material times the First to Third Defenders were principals of the Fourth and Fifth Defenders and are vicariously liable for their actions. Alternatively, at the material time the Fourth and Fifth Defenders were the controlling members of the First to Third Defenders and thus their actions are actions of the First to Third Defenders. The Sixth to Eighth Defenders knowingly and dishonestly assisted Mr Gordon by accepting those instructions to represent the Lime Rock Group, knowing that Mr Gordon was acting in breach of his obligations owed to the

Pursuer. But for their assistance in that regard, the breaches by Mr Gordon would not have been capable of being committed and/or continued.

20.   Further and separately, each of the Defenders engaged in a conspiracy which was calculated by them to cause harm to the pursuer by unlawful means. On precise dates to the Pursuer unknown, but from around November 2008 until conclusion of the transaction, each and all of the Defenders engaged in an unlawful conspiracy which was at least in part calculated to (and did in fact) cause harm to the Pursuer. That conspiracy was given effect to by all of the Defenders presenting a knowingly false impression to (in particular) the Pursuer that the proposed transaction was at arm's length with each party (the Pursuer and ITS on the one hand, and the Lime Rock Group on the other) being represented independently and according to proper professional standards incumbent upon solicitors. Those obligations required that the Pursuer be shown a duty of undivided loyalty and without breach of privilege or the obligation to respect confidentiality of information passed to those solicitors by their client. All and each of the Defenders conspired to conceal from the Pursuer:

(i)     that Mr Gordon was covertly acting for the Lime Rock Group;

(ii)    that the instruction of the Sixth to Eighth Defenders was a "front" to conceal that covert representation; and

(iii)   that Mr Gordon was providing privileged and/or confidential and/or sensitive information to the Sixth to Eighth Defenders regarding the transaction under negotiation.

The harm suffered by the Pursuer was to deprive him of the knowledge required to realise that he required independent legal advice in the light of the fact that P&W was operating under a conflict of interest. The consequence of his inability to make that decision is that any other solicitor would have advised him of the effect of the transaction, and had he received that advice he would not have concluded the transaction and would not have suffered the loss condescended upon.

21.   The First to Fifth Defenders gave effect to that conspiracy at least by (but not limited to):

(i)     Instructing the Sixth to Eighth Defenders to be the Lime Rock Group's legal representatives which was calculated to lead the Pursuer to the impression that the Lime Rock Group had independent legal representation according to proper professional standards, the truth being that they were a "front";

(ii)    Continuing to receive (via the Sixth to Eighth Defenders) information from Mr Gordon regarding the proposed transaction and by making use of that information;

(iii)   By purporting to negotiate the terms of the transaction through the medium of the Sixth to Eighth Defenders;

(iv)    By concluding the transaction in the knowledge that it was tainted in the manner referred to above.

22.    The Sixth to Eighth Defenders ought not to have accepted instructions nominally to represent the interests of the Lime Rock Group, knowing that Mr Gordon was acting in breach of his obligations to the Pursuer. They ought not to have continued to act as solicitors for the Lime Rock Group until the conclusion of the transaction. The First to Fifth Defenders continued to instruct the Sixth Defender firm as the Lime Rock Group's solicitors, in the knowledge that P&W were in breach of their fiduciary duties. Those actions throughout led the Pursuer to believe that legal advice was being provided to him regarding the transaction at an arm's length basis, untainted by breaches of duties by his solicitors. All and each of the Defenders were aware that that was not so. Had the Pursuer been represented by solicitors who acted in a professionally appropriate manner, it is likely that he would have been advised that the transaction was highly disadvantageous to him. He would certainly have been advised that his rights as a shareholder were seriously compromised. Had he been so advised, he would not have concluded the contract with the Lime Rock Group, and would probably have retained the entire shareholding and sold ITS shortly thereafter in a trade sale. Such a sale would have realised very significant sums, probably substantially in excess of US $220m. Had the Pursuer been made aware at any time prior to the conclusion of the transaction that the Lime Rock Group had been obtaining information from his own solicitors, he would have with immediate effect terminated those discussions and under no circumstances would have conclude the transaction with the Lime Rock Group on account of their involvement in the deceit.

23.    Further and in any event, each of the Fourth and Fifth, and Seventh and Eighth Defenders induced, procured and facilitated P&W's actionable breach of contract with the Pursuer. It was a material term of the contract of engagement that P&W would show to the Pursuer the undivided loyalty to be expected of solicitors in practise in Scotland. It was their obligation in terms of that contract not to divulge any information to the counterparty to a potential contract without that being authorised by the Pursuer himself. The Defenders were aware that Mr Gordon was providing all and each of them with information which was confidential to P&W and only obtained by them by reason of their having been instructed by the Pursuer and ITS. By accepting that information and seeing the transaction to completion by reliance upon that information, each of the Fourth and Fifth, and Seventh and Eighth Defenders induced the breach of contract by P&W.

24.    As a result of the conspiracy and/or the procurement and inducement of the breach of contract by P&W as condescended upon, the Pursuer has suffered loss and damage. The Pursuer was induced by the wrongful conduct of the Defenders outlined above to complete the transaction. Had they not acted in the wrongful manner condescended upon, he would not have completed the transaction. At the time of completion of the transaction, the Pursuer's shareholding in ITS had a value of at least US $220m. Upon completion of the transaction, his remaining shareholding was virtually worthless on account of the immediate loss of rights. He was, at that

time, unaware of the dramatic effect on the value of his shareholding. He was unaware that he had been induced to complete the transaction in the circumstances condescended upon. As condescended upon above, the only cash benefit that he had obtained was payment upon completion of the transaction of the sum of US $10m. All other investment by the Lime Rock Group was paid to ITS as a loan repayable to the Lime Rock Group, and contrary to the Pursuer's understanding that upon completion the ITS accounts would treat that sum as a loan repayable to the Pursuer. His losses are therefore measured by the difference in value of his shareholding from the time immediately prior to completion of the Transaction to the time immediately following its completion, less the US $10m he received as cash. That sum is no less, but probably significantly more, than US $210m. The Pursuer reserves his right to plead more fully as to quantum of his losses following expert valuation of that loss.

25.   The Pursuer has demonstrated by his business acumen that he is capable of making significant return on his investments. ITS was originally established in the 1970s by the pursuer borrowing a sum of £5,000 and rapidly became a business worth a very significant sum. As condescended upon, at time the transaction was concluded, the market was buoyant. The pursuer had several other associated business interests. It is accordingly in the interests of justice that interest is awarded on the damages sought at compound rates annually, to compensate him adequately for the loss of capital which he would have been capable of investing for the future. Compound interest is sought for that reason, and on account of the conduct on the part of the Defenders.

26.   The Defenders have been called upon to make reparation to the Pursuer but have refused or at least delayed in doing so. This action is accordingly necessary.

## PLEAS IN LAW

1.   The Pursuer having suffered loss and damage through the fraudulent conduct of the Defenders all as condescended upon, he is entitled to reparation and equitable compensation from them therefor.

2.   The sum sued for being a reasonable estimate of the loss and damage suffered by the Pursuer, decree should be pronounced in that sum.

IN RESPECT WHEREOF

Laura McCorquodale
Harper MacLeod LLP
Citypoint
65 Haymarket Terrace
EDINBURGH
EH12 5HD
OUR REF: EMF/521196
**Solicitor for the Pursuers**

14

## SCHEDULE OF DOCUMENTS

1   Copy Letter from Paull & Williamsons to the Pursuer and ITS dated 7 February 2008 (6 pages)

2   Copy Letter from Paull & Williamsons to ITS Tubular Services (Holdings) Ltd dated 7 February 2008 (9 pages)

3   Copy Email from Mark Kerr of 3i Investments plc to Scott Milne of International Tubular Services Ltd with attachment 'Project Indigo – main terms' dated 11 February 2008 (6 pages)

4   Copy Letter from Lime Rock Management LLP to Mike Beveridge and Jennifer Simpson at Simmons & Co International with Indicative Proposal dated 22 October 2008

5   Copy Letter from Lloyds Development Capital (LDC) to Mike Beveridge of Simmons & Company International Limited with Indicative Proposal dated 23 October 2008 (7 pages)

6   Copy TA Associates, Inc. Indicative Proposal to International Tubular Services Ltd (undated) (11 pages)

7   Copy Letter from Lime Rock Management LLP to Mike Beveridge and Jennifer Simpson at Simmons & Co International with Indicative Proposal dated 22 December 2008 (6 pages)

8   Copy Letter from Lime Rock Management LLP to Mike Beveridge and Jennifer Simpson at Simmons & Co International with Indicative Proposal dated 7 January 2009 (7 pages)

9   Copy Letter from Lime Rock Management LLP to Jeff Corray at ITS Tubular Services (Holdings) Limited with Indicative Proposal dated 12 January 2009 (7 pages)

10   Copy Letter from Paull & Williamsons to the Pursuer and ITS Tubular Services (Holdings) Limited dated 26 January 2009 (7 pages)

11   Copy Letter from Lime Rock Management LLP to Jeff Corray at ITS Tubular Services (Holdings) Limited dated 1 June 2009 (3 pages)

12   Copy Letter from TA Associates to Jeff Corray at International Tubular Services with Indicative Proposal dated 18 June 2009 (4 pages)

13   Copy Letter from Lime Rock Management LLP to Jeff Corray at ITS Tubular Services (Holdings) Limited, signed and unsigned copies, dated 30 July 2009 (8 pages)

14   Copy Investment Agreement among ITS Tubular Services (Holdings) Limited and the Pursuer and Jeffery Neal Joseph Corray and Others and Lime Rock Partners V L.P. dated 26 September 2009 (275 pages)

15   Copy Power of Attorney signed by the Pursuer dated 26 September 2009 (1 page)

16   Copy Stock Transfer Form from the Pursuer to Lime Rock Partners V, L.P dated 26 September 2009 (2 pages)

17   Copy Letter of Disclosure from Robert Gordon Kidd, Jeff Corray, Scott Colin Milne, Neil Burlison and ITS Tubular Services (Holdings) Limited dated 26 September 2009 (47 pages)

18   Copy Share Purchase Agreement between Robert Gordon Kidd and Lime Rock Partners V, L.P. re ITS Tubular Services (Holdings) Limited dated 26 September 2009 (88 pages)

19   Copy Articles of Association of ITS Tubular Services (Holdings) Limited dated 26 September 2009 (64 pages)

Rules of the
Court of Session
1994



# IN THE COURT OF SESSION

## Commercial Action
## SUMMONS

in the cause

## ROBERT GORDON KIDD

Pursuer

against

## LIME ROCK MANAGEMENT LLP & OTHERS

Defender

No.        **1**        Of
                        Process

Harper Macleod LLP
Citypoint
65 Haymarket Terrace
Edinburgh
EH12 5HD

Our Ref:  DK/EMF/521196

# EXHIBIT 4

**ROBERT GORDON KIDD AGAINST (FIRST) PAULL & WILLIAMSONS LLP AND (SECOND) BURNESS PAULL LLP**



### OUTER HOUSE, COURT OF SESSION

[2017] CSOH 16

CA211/15

OPINION OF LORD TYRE

In the cause

ROBERT GORDON KIDD

<u>Pursuer</u>

against

(FIRST) PAULL & WILLIAMSONS LLP and

(SECOND) BURNESS PAULL LLP

<u>Defenders</u>

**Pursuer:  A Smith QC, J Brown;  Levy & McRae**

**Defender:  RW Dunlop QC, Paterson, Fordyce;  BTO Solicitors LLP**

<u>3 February 2017</u>

**Introduction**

[1]     The pursuer was until September 2009 the owner of the whole share capital of a company incorporated in Scotland called ITS Tubular Services (Holdings) Limited ("ITS"). The business of ITS consisted of the provision, at various locations worldwide, of downhole tools and drilling equipment to the oil industry, together with ancillary services.  The first defender is a limited liability partnership incorporated on 24 February 2009 to carry on the business formerly conducted in Aberdeen and elsewhere by the firm

of solicitors known as Paull & Williamsons ("P&W"). The second defender was created in December 2012 by a merger of Burness LLP and the first defender.

[2]     The pursuer is a former client of P&W and, subsequently, of the first defender. In this action he sues the defenders jointly and severally for the sum of $210 million in respect of loss and damage which he claims to have sustained as a consequence of the sale in September 2009 of part of his interest in ITS. The loss and damage is said to have been caused by the first defender's breach of contract, fault and negligence, breach of fiduciary duty and fraudulent misrepresentation. At the end of a debate which took place between 13 and 16 December 2016, the pursuer moved for summary decree in respect of his case based on breach of fiduciary duty and on fraudulent misrepresentation, and the defenders moved for dismissal of the action.

**Factual Background: The Sale of ITS**

[3]     The pleadings of both parties are lengthy and complex. They cover much ground which it is unnecessary to narrate in detail for the purposes of the present opinion. What follows is a summary of relevant factual matters pled by the pursuer which are either admitted by the defenders or which do not appear to be seriously in dispute. Until about October 2007, the pursuer was in full time executive control of ITS and its subsidiaries. In 2007 he wished to step back from management and to pursue a sale of his interest in ITS. He decided to appoint a new executive director or directors with a view to making the business attractive to potential purchasers. Mr Jeff Corray was a partner in KPMG in Aberdeen who specialised in corporate finance. He was a professional adviser to ITS and familiar with its business. Following discussions with the pursuer, Mr Corray accepted appointment as a director and CEO of ITS, with effect from 1 October 2007. The pursuer subsequently acceded to a recommendation by Mr Corray that Mr Scott Milne, a director at KPMG in Aberdeen, also be appointed as a director of ITS, with responsibility for corporate development. The pursuer's involvement in executive management thereafter reduced.

[4]     With the pursuer's authority, Mr Corray began to attempt to identify a potential purchaser of ITS. The pursuer envisaged that he would personally receive a sum of around $50 million, with an equivalent sum being invested in the company, in return for which the investor would acquire around a one-third interest. Such a potential investor

would probably be a private equity fund looking to achieve growth in the value of the business with a view to realisation of its investment at a profit within a period of five years or less, probably by a sale of the entire business or an initial public offering.  By February 2008 an expression of interest had been received from 3i Investments plc.  P&W were instructed by Messrs Corray and Milne to act as solicitors in connection with the proposed sale of some of the pursuer's shares in ITS and the investment of funds by 3i.  The P&W partner primarily responsible for carrying out these instructions was Mr Scott Allan.  Mr Corray also appointed Messrs Simmons & Co ("Simmons"), a firm of investment bankers, to advise on the corporate finance aspects of a deal.

[5]     The proposed transaction with 3i fell through.  In about September 2008, Messrs Corray and Milne instructed Simmons to expose a minority interest in ITS to the private equity market.  The indicative terms provided by Simmons to prospective investors were a total equity investment of $100 to $150 million, including payment of a minimum of $50 million to the pursuer, in exchange for a minority stake in ITS.  Proposals were received in October 2008 from Lloyds TSB Development Capital Limited ("LDC"), TA Associates Limited ("TA"), and Lime Rock Partners ("Lime Rock").  The proposals differed significantly in their terms.  LDC's offer was to invest $125 million including a payment of $50 million to the pursuer, leaving 76% of ordinary equity in the hands of the pursuer and/or the executive directors.  TA's offer was to invest $130 million, including $55 million to the pursuer, in exchange for a 34.5% interest in ITS.  Lime Rock's initial offer was for payment of $5 million to the pursuer and a further investment of $45 million into the company, in exchange for a 27.5% interest.  None of those proposals was a firm offer capable of acceptance.

[6]     Negotiations were conducted with the three interested parties.  According to averments by the defenders which are not admitted by the pursuer, those negotiations encountered difficulties because of the global financial crisis and the consequent decline in oil prices.  In December 2008, both LDC and TA indicated that they were unable to put forward firm investment proposals.  A revised indicative proposal was submitted by Lime Rock in January 2009 and negotiations between Mr Corray and Lime Rock continued.  A fresh indicative proposal was subsequently submitted by TA in June 2009, but shortly thereafter TA advised that they were not in a position to proceed with it.

[7]     On 26 January 2009, a letter of engagement was sent by P&W to the pursuer and to ITS under Mr Allan's reference, stating *inter alia* as follows:

"We refer to Scott Milne and Jeff Corray's recent meetings with our Scott Allan and Ken Gordon.

We write to set out our understanding of our scope of work and secondly detailing our business terms for doing that work.  This letter sets out the terms upon which we will act for you and certain information which we are required to give you under Law Society of Scotland rules.  The attached Terms of Business apply except where they are inconsistent with the express terms of this letter."

The scope of work, in summary, was the carrying out of a due diligence exercise and production of a report on ITS and its subsidiaries addressed to Lime Rock.  One of the Terms of Business annexed to the letter of engagement dealt with conflicts of interest:

"9.1  Subject to certain exceptions, the practice rules of the Law Society of Scotland prevent us from acting for two or more clients whose interests conflict or potentially conflict.  If we believe we may be prevented from advising you or any Other Beneficiaries in connection with any matter as a result of such a conflict we shall advise you or any Other Beneficiaries of this as soon as the potential conflict is identified.  In those circumstances, we may require you or any Other Beneficiaries to seek independent legal advice elsewhere and may require to decline to undertake further work on your or any Other Beneficiary's behalf."

[8]      There are major factual issues between the parties as to the extent to which the pursuer was kept informed by Messrs Corray and Milne, and/or by Mr Allan, of the progress of negotiations and of the options from time to time available to him, and, consequently, whether he was enabled properly to understand the import of the transactions into which he was advised to, and did, enter.  These are not matters for determination in this opinion.  It is sufficient for present purposes to narrate that on 26 September 2009, agreements were entered into between the pursuer and others on the one hand and Lime Rock on the other.  These included:

(i)      a share purchase agreement between the pursuer and Lime Rock for the sale of 6,612 A ordinary shares in ITS for the sum of $10 million;

> (ii)     an investment agreement among ITS, the pursuer, Lime Rock, and
> Messrs Corray and Milne and another director, providing for:

- subscription by Lime Rock of $45 million for 29,752 A ordinary shares in ITS;
- the grant of a right to Lime Rock to appoint and remove up to two directors of ITS;
  and
- prohibition of appointment of directors of ITS without Lime Rock's consent, such
  consent not to be unreasonably withheld;

> (iii)     amendment of the articles of association of ITS:

- to confer upon Lime Rock's shares a fixed cumulative preferential dividend at an
  annual rate of 10% of the issue price per share;
- to confer upon Lime Rock a first priority on return of capital on liquidation; and
- to remove the pursuer's casting vote at board meetings.

**Post-sale Events:  Pursuer's Averments**

[9]     According to the pursuer's averments, ITS experienced financial difficulties in late
2012.  These, it is averred:

> "…were substantially caused by gross mismanagement of its affairs by its executive
> directors, including Messrs Corray and Milne.  The mismanagement included a
> complete failure effectively to manage the company's cash flow…  The failure to
> manage cash receivable was compounded by excessive and unauthorised capital
> expenditure on plant and equipment, and by the expenditure of very substantial
> (and in many cases excessive and unnecessary) sums on professional fees".

This is said to have resulted in alleged breaches of ITS's bank covenants.  The pursuer
further avers that by this time Lime Rock, a US entity, wished to terminate its interest in
ITS as soon as possible because of political difficulties caused by ITS subsidiaries' trading
in jurisdictions, including Iran, which were subject to US state department sanctions.  By
letter dated 9 November 2012 Lime Rock gave notice that by virtue of the bank covenant
breaches, a "trigger event" had occurred entitling Lime Rock to force a sale.  The pursuer
attempted to appoint additional directors to the ITS board to address what he saw as the
mismanagement of its affairs.  Lime Rock raised interdict proceedings and on 15 January
2013 this court suspended the appointments and interdicted the board from attempting to

appoint any director without Lime Rock's consent.  ITS went into administration on 19 April 2013.  Its business was sold as a going concern to a competitor.  The pursuer received nothing from the sale proceeds.

**The Pursuer's Case:  Breach of Contract and Negligence**

[10]    The pursuer's case, in so far as founded upon breach of contract and fault and negligence, is that the first defender, which assumed responsibility for provision of legal services to the pursuer from the date of transfer of P&W's assets and liabilities in April 2009, failed to provide advice to and take instructions from the pursuer directly, but instead relied upon communication through the medium of persons whose interests conflicted with those of the pursuer.  It is averred that it was the first defender's duty to inform the pursuer directly not only of the material terms of the transaction but also of their practical effect;  to ensure that he understood the transaction he was proposing to enter into and its foreseeable risks;  to recognise that the persons purporting to issue instructions on behalf of the pursuer, namely Messrs Corray and Milne, had conflicting personal interests;  and to report that to the pursuer.  It was or ought to have been obvious to Mr Allan that the pursuer's interests diverged from *inter alia* those of Messrs Corray and Milne and those of ITS itself.  By failing to avoid acting in conflict of interest, the first defender was in breach of contract and negligent, and thereby caused the loss sustained by the pursuer.  If the pursuer had had the advice to which he was entitled, he would not have proceeded with the transaction with Lime Rock and would not have sustained the loss claimed.

**The Pursuer's Case:  Breach of Fiduciary Duty and Fraudulent Misrepresentation**

[11]    The pursuer's case, in so far as founded upon breach of fiduciary duty and fraudulent misrepresentation, has a somewhat different basis.  At the time when it made its indicative proposal with regard to purchase of shares in ITS, Lime Rock was an existing client of P&W.  The partner of P&W (and subsequently of the first defender) with primary responsibility for Lime Rock's business was Mr Kenneth Gordon.  The pursuer avers that he was not informed by P&W or the first defender of its actings on behalf of Lime Rock, and that P&W and subsequently the first defender represented falsely that it was acting only for ITS and the pursuer.  Reference is made to the terms of the letter of engagement

issued by P&W, referred to above.  Under reference to contemporaneous emails, the pursuer avers that in fact Mr Gordon had agreed to act as "unofficial counsel" to Lime Rock in connection with the ITS transaction, while having a solicitor from another firm "front" the negotiation.

[12]     On the basis of this and other material, the pursuer avers that at all material times from commencement of Lime Rock's interest, Mr Gordon was actively assisting and advising Lime Rock, including giving commercial advice on negotiation strategy and revising documentation for Lime Rock's interest.  He did so covertly and arranged for Ledingham Chalmers, another firm, to be presented as Lime Rock's advisers in order to convey the impression that Lime Rock were being appropriately and independently advised.  The pursuer further avers that Mr Allan was aware of Mr Gordon's improper activity: he (Mr Allan) provided information and forwarded documents to Mr Gordon on the basis that they would be reported to Lime Rock; he asked Mr Gordon for Lime Rock's position on certain matters; and he purported to negotiate certain matters with him.  In these circumstances, it is averred that P&W and the first defender were at all times from late 2008 in breach of their fiduciary duty both to the pursuer and to ITS.  The breaches were knowing and deliberate, and the representations to the pursuer that they were acting only for him and ITS were dishonest.  Had the first defender disclosed to the pursuer its improper actings on behalf of Lime Rock, it is averred that the pursuer would not have proceeded with the transaction, would have withdrawn the first defender's instructions, and would have terminated the negotiation with Lime Rock.  He would thereafter have realised the full value of his interest in ITS instead of receiving only $10 million.

[13]     In response, the defenders admit that Mr Gordon considered himself to be the "unofficial counsel" for Lime Rock in the due diligence exercise conducted by it; that he passed various information and advice to Lime Rock; and that he therefore placed the first defender in a position of conflict.  It is averred that Mr Allan was unaware of the role Mr Gordon perceived he was undertaking for Lime Rock or that Mr Gordon was communicating directly with Lime Rock during the transaction.  The defenders accept, however, that Mr Gordon's actions caused a conflict of interest and admit for the purposes of the present action that the first defender was in breach of its fiduciary duty not to act in a position of conflict.  They do not accept that the first defender was guilty of dishonesty or that it is liable for intentional injury.  They aver that the letter of engagement was issued by

Mr Allan who honestly believed in the truth of its content; it was accordingly not dishonest. They further aver that Mr Gordon acted out of a desire to continue to assist a longstanding client, and not with the intention of causing harm to the pursuer or to ITS.

**The Pursuer's Motion for Summary Decree**

[14]     The pursuer moved the court to grant partial summary decree by sustaining his first, second and third pleas in law to the extent of holding that there was no defence on the merits to the pursuer's cases based on fraudulent misrepresentation and breach of fiduciary duty.  The defenders did not oppose the granting of partial summary decree in respect of breach of fiduciary duty but maintained that the case based on fraudulent misrepresentation was irrelevant.

**Fraudulent Misrepresentation**

*Argument for the Pursuer*

[15]     On behalf of the pursuer, the following propositions were advanced.

[16]     *(i)* The first defender was liable for every legal wrong committed by its members in the course of its business, and an act of fraud on the part of a member was imputed to it. Limited liability partnerships were a statutory creation.  As section 1(5) of the Limited Liability Partnerships Act 2000 made clear, the law relating to partnerships did not apply to LLPs except as provided by the Act.  It followed that the incidence of liability of an LLP for the wrongdoing of a member was governed by the Act and not by analogy with the law of partnership.  Section 6(1) stated that every member of the LLP was its agent.  Section 6 (4) stated that where a member of an LLP was liable to any person as a result of a wrongful act or omission of his in the course of the business of the LLP, the LLP was liable to the same extent as the member.  A fraudulent act by a member was accordingly a fraudulent act of the LLP.

[17]     *(ii)* The acts and omissions of Mr Gordon and Mr Allan were carried out in the course of the business of the first defender.

[18]     *(iii)* Those acts and omissions were such as to amount to fraud.  Scots law had accepted the definition of fraud in *Derry* v *Peek* (1889) 14 App Cas 337 (Lord Herschell at 374), namely "when it is shown that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false".  A

fraudulent misrepresentation might be express or implied from circumstances. A firm of solicitors which expressly represented that it was acting for one contracting party impliedly represented that it was not acting for the other party. Here the first defender contrived an arrangement designed to disguise the existence of the conflict of interest, repeatedly and falsely representing to the pursuer that it was acting only for him and ITS. Moreover, in certain circumstances mere silence could amount to fraud. Where there was a positive duty to speak, as there was in a fiduciary relationship between solicitor and client, failure to do so, if dishonest, will amount to fraud: *Adams* v *R* [1995] 1 WLR 52 (HL), Lord Jauncey of Tullichettle at 65. The same conclusion would be reached by analysing the transaction as containing an implied representation of legitimacy or honesty. It was equally clear that a fraudulent misrepresentation might arise from suppression of information, whether in whole or in part.

[19]    In the present case, it was clear from the emails produced that Mr Gordon had known that what he was doing was improper. The whole arrangement was dishonest *ab initio* and remained so. The practical consequence was that the pursuer, Mr Corray and ITS were prevented from learning the true nature of Mr Gordon's advice to and actings on behalf of Lime Rock. There was no room for a defence of mistaken but honestly held belief. The defenders' averments regarding Mr Gordon's alleged motive were irrelevant. Honesty was measured by an objective and not a personal standard: cf *Starglade Properties Ltd* v *Nash* [2010] EWCA Civ 1314, Chancellor (Morritt) at paragraph 32. As regards Mr Allan, the defenders' averment that he was unaware that Mr Gordon was communicating directly with Lime Rock was demonstrably untrue. The significance of the letter of engagement was that the court could readily infer that both Mr Allan and Mr Gordon were aware of its contents, constituting a specific written representation that they both knew to be untrue yet failed to correct. It formed part of the dishonest pretence infecting the entirety of the engagement.

[20]    *(iv)* Where fraudulent misrepresentation was established, it was presumed that the misrepresentation materially influenced the misrepresentee in the decision to enter into a contract. The pursuer did not have to prove that his reliance on the representation was reasonable. For the defenders to avoid liability, they would have to prove that the pursuer, knowing what he knew now, would have acted in the same way. It was not open to them

to speculate as to what different course of action he would have adopted: *Zurich Insurance Co plc* v *Hayward* [2016] 3 WLR 637, Lord Clarke of Stone-cum-Ebony at paragraphs 36-38.

[21]   *(v)* An award of damages for fraud fell to be assessed in accordance with the causation test laid down in *Doyle* v *Olby (Ironmongers) Ltd* [1969] 2 QB 158 and *Smith New Court Securities Ltd* v *Citibank NA* [1997] AC 254: the proper measure was all the damage directly flowing from the fraudulent inducement that was not rendered too remote by the pursuer's own conduct, whether or not the loss was foreseeable by the defender.

[22]   *(vi)* Any contractual limitation of liability in the defenders' terms of engagement did not apply to a fraudulent misrepresentation.

[23]   *(vii)* Contributory negligence was not a relevant defence to a case based on deceit, ie fraudulent misrepresentation.

[24]   In these circumstances, partial summary decree should be pronounced holding that there was no defence on the merits to the pursuer's case based on fraudulent misrepresentation, with proof being restricted to quantification and causation of loss.


*Argument for the Defender*

[25]   On behalf of the defender, it was accepted (i) that the test for causation in cases of fraudulent misrepresentation was as stated in *Doyle* v *Olby (Ironmongers) Ltd* (above); and (ii) that the contractual limitation of liability did not apply to the case based on fraud. It was nevertheless submitted that the case based on fraudulent misrepresentation was irrelevant. The requirements for a case in fraud were set out in *Bradford Third Equitable Benefit Building Society* v *Borders* [1941] 2 All ER 205 (HL), Viscount Maugham at 211: (1) there must be a representation of fact made by words or conduct; (2) the representation must be made with the knowledge that it is false; (3) it must be made with the intention that it should be acted upon by the pursuer, in the manner which resulted in damage to him, although it is immaterial that there was no intention to cheat or injure him; and (4) the pursuer must have acted upon the false statement and sustained damage by so doing. In the present case, none of those requirements was satisfied.

[26]   Firstly, it was contended, the pursuer failed to aver a representation by the defenders. He denied receipt of the letter of engagement. There was no averment of a positive misrepresentation by Mr Gordon to the pursuer. In so far as the pursuer founded upon silence on the part of the first defender, more was required: silence, however morally

wrong, will not support an action based on fraudulent misrepresentation: *Peek v Gurney* (1873) LR 6 HL 377, Lord Cairns at 403; *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyds Rep 61, Lord Hoffmann at paragraph 75.  In *Nocton v Lord Ashburton* [1914] AC 398, the solicitor's failure to disclose a personal interest was held to constitute a breach of fiduciary duty but did not give rise to an action in deceit.  A breach of a duty of disclosure gave a right to avoid the agreement but did not give a right to damages.

[27]    Secondly, there were no relevant averments of dishonesty on the part of the first defender.  The pursuer's argument failed to distinguish between the first defender being liable for a member's fraud on the one hand and the first defender being attributed a member's guilty knowledge on the other.  Guilty knowledge on the part of Mr Gordon did not equate to guilty knowledge of the first defender.  Where a representation is said to be fraudulent, the person making the representation must have the guilty knowledge and is not to be fixed with "deemed" knowledge: cf *Zurich CSG Ltd v Gray & Kellas* 2007 SLT 917, Lord Ordinary (Brodie) at paragraph 23.  The fact that that case concerned a partnership and not an LLP was not a ground of distinction.  It was not averred that Mr Allan, who sent the letter of engagement, knew that it was false when he sent it.  If the case in fraud was based on an implied misrepresentation that the first defender was not acting in conflict, that was a representation by the firm, not Mr Gordon.  As the firm was not fixed with Mr Gordon's knowledge there was no relevant averment of dishonesty.

[28]    Thirdly, it was not averred that Mr Gordon, or anyone else for whom the defenders were responsible, made a fraudulent misrepresentation about the contract of which the pursuer complained, namely the sale of part of his shareholding in ITS.  Proof of fraud relating to the contract of agency between the pursuer and the first defender was not proof of intention that the representation be acted on in the manner occasioning loss.  The pursuer did not aver that he was induced to sell his shares through fraud on the part of the first defender; there was accordingly no relevant averment of intention.

[29]    Fourthly, the pursuer did not relevantly assert reliance on the supposed fraud.  The only reliance pled was his continuing to allow the first defender to act.  According to the pursuer's pleadings, the cause of his loss was not the alleged fraudulent misrepresentation, but the first defender's failure to tender adequate advice on the consequences of entering into the transaction.  In the absence of reliance on the fraudulent misrepresentation, the

case was irrelevant. This was not a case in which a presumption of inducement could be applied. The only presumption that could be applied would relate to the first defender's continuing retainer; it could not be taken further and applied to the pursuer's decision to enter into the share sale.

[30]     At worst for the defenders, there were important factual issues to be explored, regarding *inter alia* Mr Gordon's intention, Mr Allan's knowledge, the existence of any inducement, and the extent of the pursuer's reliance. The pursuer's case was at least of doubtful relevance. It would not be appropriate to pronounce summary decree in relation to fraudulent misrepresentation without inquiry into these matters. In any event, a defence of contributory fault on the part of the pursuer was available in respect of a case based on fraudulent misrepresentation, and was relevantly pled.


*Decision*

[31]     In my opinion the pursuer has not pled a relevant case against the defenders based upon fraudulent misrepresentation by the first defender. I reject at the outset the pursuer's proposition that a fraudulent misrepresentation by a member of an LLP is to be treated, as a matter of law, as fraud on the part of the LLP itself. There is in my view no basis in the 2000 Act for that suggestion. Section 6(4) is clear: it imposes liability on the LLP for the wrongful act or omission of a member. That is not the same thing as deeming the LLP to have itself committed the wrongful act or omission, and I find nothing else in the Act that would have that effect. In my opinion, the following observations by Lord Brodie in *Zurich CSG Ltd* v *Gray & Kellas* (above) at paragraph 23 are apposite to the present case:

> "…The imputed knowledge of the firm and the actual knowledge of the individual partners are different one from the other. An intentionally false and therefore dishonest statement requires actual knowledge on the part of the person making the statement that the statement he is making is false. A firm, which is not a natural person, is incapable of dishonesty, although it might be vicariously liable for the dishonest actions of its individual partners (or employees), whether acting alone or together. Only individuals can lack an honest belief. Only individuals therefore can make fraudulent misrepresentations."

These are observations of a general nature on the capacity (or otherwise) in law of natural and non-natural persons to make fraudulent representations. They are not part of the "law relating to partnerships" for the purposes of section 1(5) of the 2000 Act. They recognise the distinction between, on the one hand, liability of a corporate entity for the dishonest actions of an individual and, on the other, attribution of fraudulent intent to the entity itself. In the context of an LLP, the former is expressed in section 6(4); the latter is no part of either the statutory scheme or the underlying law.

[32]     In the present case, the pursuer does not aver that any fraudulent representation was made to him by Mr Gordon or indeed by Mr Allan. The representations founded upon are those contained in the terms of business regarding conflict of interest annexed to the letter of engagement. Those representations were made by the first defender. They do not, in any event, appear to me to add anything to the professional duties imposed upon the first defender by the practice rules of the Law Society of Scotland to which the terms of business refer. As the knowledge of individual members is not, as a matter of law, imputed to the first defender, it follows that the representations are not fraudulent. For this reason, I reject the pursuer's first proposition.

[33]     Secondly, I consider that the pursuer has no satisfactory answer to the defenders' submission based upon the third *Bradford Third* requirement, ie that there must be a representation made with the intention that it should be acted upon by the pursuer, in the manner which resulted in damage to him. In *Tackey* v *McBain* [1912] AC 186, the defendant made a statement which he knew to be untrue regarding the finding of oil by his employer company, apparently in order to avoid disclosing inside information. The Privy Council expressed its approval of a jury direction by the trial judge in the following terms:

> "The mere fact that [the defendant] misled by a false statement does not necessarily prove that he was dishonestly misleading because he may have thought it necessary to keep this matter close for the interests of the company. The real point you have to consider is what was in his mind when he did that and you must find there is as much as a direct intention that shares should be put upon the market, that is to say that people should be induced to sell and that he must have had the intention when he made his statement of making people sell."

By analogy, it would be necessary in the present case for the pursuer to offer to prove that when the first defender expressly (and indeed impliedly, by accepting and not thereafter declining instructions to act on behalf of the pursuer) represented that it would not act in conflict of interest, it did so with the intention of inducing the pursuer to enter into the transaction which he now avers caused him loss, ie the sale of part of his interest in ITS to Lime Rock.  The pursuer makes no such averment, and its absence is, in my view, fatal to the case based on fraudulent misrepresentation.

[34]    Nor, in my opinion, is the pursuer able to rely on a presumption of materiality.  In contrast to the more straightforward circumstances of *Zurich Insurance Co plc* v *Hayward* (above) and other cases founded upon by the pursuer, there is no averment (and it is not easy to see how there could be) of direct connection between the representation regarding absence of conflict of interest **and the pursuer's decision** to enter into the sale agreement. The pursuer asserts that if he had been made aware of the conflict of interest, he would have withdrawn his instructions from the first defender and ended the negotiations with Lime Rock.  But that is not the same as an averment that the representation, whether express or implied, that the first defender was not acting in conflict of interest, materially influenced the pursuer in his decision to enter into the contract.  In the absence of such an averment, there is no scope for application of the presumption.  And without the presumption, there is no relevant case pled of reliance by the pursuer on the alleged fraudulent misrepresentation in his decision to sell to Lime Rock.

[35]    For each of those reasons I hold that the pursuer's **case based on fraudulent** misrepresentation is irrelevant.  The question of granting partial summary decree in respect of this branch of the case does not therefore arise.  Nor does the defence of contributory negligence, although I address the question of the availability of such a defence in a case based on fraudulent misrepresentation in the course of my discussion below of its availability in relation to a claim for breach of fiduciary duty.


**Breach of fiduciary duty**

*Introduction*

[36]    Different issues arise with regard to the pursuer's case based upon the first defender's breach of fiduciary duty.  As I have already noted, the defenders admit that

such a breach occurred and do not resist the granting of summary decree to that extent. The following matters, however, remain contentious:

> (i)      The correct approach to be adopted in assessing compensation recoverable as a consequence of a breach of fiduciary duty;
>
> (ii)     Whether the pursuer has relevantly averred a causal link between the admitted breach of fiduciary duty and the loss that he claims to have sustained;
>
> (iii)    Whether any such causal link is sufficiently direct to entitle the pursuer to recover the loss that he claims to have sustained;
>
> (iv)    Whether the loss that the pursuer claims to have sustained, if sufficiently directly linked to **the first defender's breach** of duty, is reflective of a loss sustained by ITS and accordingly not recoverable by the pursuer; and
>
> (v)     Whether contributory negligence is available as a defence to an action based upon breach of fiduciary duty.

The pursuer also makes averments regarding further breaches of fiduciary duty said to have occurred in 2012 and 2013, which I will address separately.


*(i)      Equitable Compensation:  Approach to Assessment*

[37]    In *Nocton* v *Lord Ashburton*, a solicitor made a misleading statement to his client which induced the client to discharge a security, to the detriment of the client and to the personal benefit of the solicitor.  The action was brought on **the basis of "fraud"**.  **The judge** at first instance held that the client had failed to prove deceit (according to the definition in *Derry* v *Peek*) and dismissed the action.  The Court of Appeal reversed that decision and awarded damages for fraud.  The House of Lords held that the Court of Appeal had had no justification for reversing the finding of fact of the judge at first instance in relation to deceit, but decided that the client was entitled to relief in equity on the basis of breach of fiduciary duty.  A question arose as to the correct form of remedy for this equitable relief. Viscount Haldane LC observed (page 958):

> "**The proper mode of giving relief might have** been to order Mr. Nocton to restore to the mortgage security what he had procured to be taken out of it, in addition to making good the amount of interest lost by what he did. The measure of damages may not always be the same as in an **action of deceit or for negligence.**"

[38]     Breach of fiduciary duty is now well recognised in English law and in other
common law jurisdictions as a potential ground of liability entirely separate from
fraudulent misrepresentation.  It is further recognised that the nature of the appropriate
remedy will depend upon the circumstances of the case.  In *AIB Group (UK) plc v Mark
Redler & Co* [2015] AC 1503, Lord Toulson observed (para 55):

> "In a case of breach of the duty of undivided loyalty, there are possible alternative
> remedies.  If the trustee has benefited from it, the court will order him to account for
> it on the application of the beneficiary.  In *Bristol and West Building Society v Mothew*
> [1998] Ch 1, 18, Millett LJ described such relief as 'primarily restitutionary or
> restorative rather than compensatory'.  Alternatively, the beneficiary may seek
> compensation in respect of his loss."

As Lord Toulson acknowledged (para 56), the matter is more complex than this summary
might suggest.  One of the principal questions that has arisen – and which arises in the
present case – is this:  where the relief is compensatory rather than restitutionary, what is
the appropriate measure of the compensation?  Judicial and academic discussion of this
question has placed significant emphasis on the equitable – as opposed to common law –
origin of the existence of a remedy for breach of fiduciary duty.

[39]     It is equally clear that Scots law, which has never adopted the English dichotomy
between law and equity, has for long allowed claims for breach of fiduciary duty: see
eg *Aberdeen Railway Co v Blaikie Brothers* (1854) 17D (HL) 20.  In *Allen v McCombie's Trs* 1909
SC 710, the court rejected the proposition that breach of trust was correctly categorised as a
species of breach of contract.  In *Robinson v National Bank of Scotland Ltd* 1916 SC (HL) 154,
*Nocton v Lord Ashburton* was distinguished on its facts without any suggestion that it did
not represent the law of Scotland.  More recently, in *Parks of Hamilton Holdings Ltd v
Campbell* 2014 SC 726, a company shareholder conducted the negotiation of a sale of the
company on behalf of all shareholders, but omitted to disclose to the others that he had
agreed a higher price for his own shares than for theirs.  The other shareholders
successfully sued on the basis of breach of fiduciary duty for the loss sustained by them as
a consequence of the discrepancy in sale prices.  As to appropriate remedy, Lord
Drummond Young observed (para 44):

"...The reclaimer could have been made to account for his profit, but the remedy chosen by the respondents is damages for the loss that they suffered.  I consider that such a remedy is competent.  I should note that in *São Paulo Alpargatas SA v Standard Chartered Bank Ltd* [1985 SLT 433] Lord Grieve expressed the view that damages is not a remedy that is available to remedy a breach of fiduciary duty.  In my opinion this view is plainly wrong.  The only authority cited is a sentence in Gloag, *Law of Contract* (p 521), but that sentence is not vouched by the authority cited in support.  In my opinion it is clear that either accounting or damages is available as a remedy for breach of fiduciary duty.  The remedy ultimately insisted on by the respondents is damages, and in my opinion that is their entitlement."

[40]    The foregoing observation confirms that Scots law, untroubled by historic distinctions between law and equity, recognises damages as one of the available remedies for breach of fiduciary duty.  It does not, however, go so far as to examine the appropriate measure of such damages and, in particular, whether the analogy should be with damages for intentional wrongdoing, or with compensation for breach of trust, or with damages for negligence.  The point is of practical importance.  If the analogy adopted is damages for fraudulent misrepresentation, then the applicable test is that set out in *Doyle* v *Olby (Ironmongers) Ltd* (above), namely all the damage directly flowing from the breach of duty, whether or not foreseeable by the defender.  If the appropriate analogy is damages for negligence, foreseeability becomes relevant.  This matter has not to date, I am informed, been the subject of decision by a Scottish court.

[41]    I am assisted, however, by the fact that the matter has been the subject of recent and detailed analysis by the Supreme Court, in the context of English law, in *AIB Group (UK) plc* v *Mark Redler & Co* (above).  In that case, a bank agreed to advance the sum of £3.3 million for the re-mortgage of a property.  The bank instructed the defendant firm of solicitors *inter alia* to secure the redemption of all existing securities in respect of the property.  The solicitors erroneously repaid the sum outstanding under only one of two accounts, leaving an outstanding indebtedness of £309,000, and paid the balance to the borrowers.  The existing lender refused to release its security.  The bank eventually agreed to enter into a deed of postponement enabling it to register its security as a second charge.  The borrowers defaulted and the property was sold for £1.2 million, of which the bank

received approximately £865,000.  The bank, alleging that the solicitors had acted in breach of trust and of fiduciary duty, and in breach of contract and with negligence, sued them for the full amount of the loan, less the amount recovered by the sale.  The judge at first instance held that the defendants had acted in breach of trust to the extent that they had released to the borrowers the amount of their outstanding indebtedness to the existing lender, but awarded the bank only £273,777 by way of compensation.  The Supreme Court upheld this award, holding that where (as here) the appropriate remedy was equitable compensation, the measure was to be assessed at the date of the trial, with the benefit of hindsight and on a common sense view of causation, so as to ensure that the loss recovered had in fact resulted from the breach of trust and not from some other cause.  Foreseeability of loss was regarded as irrelevant.

[42]    Delivering one of the two leading judgments in *AIB*, Lord Toulson observed (para 62):

> "There are arguments to be made both ways, as the continuing debate among scholars has shown, but absent fraud, which might give rise to other public policy considerations that are not present in this case, it would not in my opinion be right to impose or maintain a rule that gives redress to a beneficiary for loss which would have been suffered if the trustee had properly performed its duties."

Lord Toulson approved the statement of Lord Browne-Wilkinson in *Target Holdings Ltd* v *Redferns* [1996] AC 421, echoing observations of McLachlin J in *Canson Enterprises Ltd* v *Boughton & Co* (1991) 85 DLR (4th) 129 (Supreme Court of Canada), that the object of equitable compensation for breach of trust was to make good loss which the beneficiary would not have suffered but for the breach.  He concluded:

> "Equitable compensation and common law damages are remedies based on separate legal obligations.  What has to be identified in each case is the content of any relevant obligation and the consequences of its breach.  On the facts of the present case, the cost of restoring what the bank lost as a result of the solicitors' breach of trust comes to the same as the loss caused by the solicitors' breach of contract and negligence."

[43]    The other leading judgment was delivered by Lord Reed, who, after a review of English and Commonwealth authorities, likewise concluded that the model of equitable compensation, where trust property has been misapplied and the trust has come to an end, is to put the beneficiary in the position he would have been in if the trustee had performed his obligation.  Lord Reed continued:

> "135  **The measure of compensation should** therefore normally be assessed at the date of trial, with the benefit of hindsight.  The foreseeability of loss is generally irrelevant, but the loss must be caused by the breach of trust, in the sense that it must flow directly from it.  Losses resulting from unreasonable behaviour on the part of the claimant will be adjudged to flow from that behaviour, and not from the breach.  The requirement that the loss should flow directly from the breach is also the key to determining whether causation has been interrupted by the acts of third parties...
>
> 136  It follows that the liability of a trustee for breach of trust, even where the trust arises in the context of a commercial transaction which is otherwise regulated by contract, is not generally the same as a liability in damages for tort or breach of contract.  Of course, the aim of equitable compensation is to compensate: that is to say, to provide a monetary equivalent of what has been lost as a result of a breach of duty.  At that level of generality, it has the same aim as most awards of damages for tort or breach of contract.  Equally, since the concept of loss necessarily involves the concept of causation, and that concept in turn inevitably involves a consideration of the necessary connection between the breach of duty and a postulated consequence (and therefore of such questions as whether a consequence flows 'directly' from the breach of duty, and whether loss should be attributed to the conduct of third parties, or to the conduct of the person to whom the duty was owed), there are some structural similarities between the assessment of equitable compensation and the assessment of common law damages.
>
> 137  Those structural similarities do not however entail that the relevant rules are identical..."

[44]    The *AIB* case was concerned with breach of trust, which is a particular species of breach of fiduciary duty.  Breach of trust has the distinctive feature that where a trust fund

continues to exist at the time when the court is **called upon to grant relief for a trustee's** breach, the appropriate remedy is likely to be restorative rather than compensatory:  in other words, the trustee will be required to put the trust fund in the position in which it would have been if the breach of trust had not occurred.  But it seems to me that the approach adopted by the Supreme Court in *AIB* is, and is intended to be, equally applicable to breaches of fiduciary duty where there is (and has been) no trust fund in existence.  An example of such a situation is *Canson Enterprises*, which concerned a secret profit made by the solicitor acting on behalf of a party to a land purchase transaction.  In her analysis which has subsequently been cited with approval by, *inter alia*, the Supreme Court in *AIB*, McLachlin J rejected the proposition that damages under the law of tort provided a suitable analogy for equitable compensation for breach of fiduciary duty not involving a trust fund, observing (page 156):

> "...In my view it is preferable to deal with both remedies under the same system — equity. Rather than begin from tort and proceed by changing the tort model to meet the constraints of trust, I prefer to start from trust, using the tort analogy to the extent shared concerns may make it helpful. This said, I readily concede that we may take wisdom where we find it, and accept such insights offered by the law of tort, in particular deceit, as may prove useful.
>
> My second concern with proceeding by analogy with tort is that it requires us to separate so called 'true trust' situations, where the trustee holds property as agent for the beneficiary, from other fiduciary obligations. This distinction is necessary if one proceeds by analogy with tort because the tort analogy cannot apply in the former category... In my view, however, this distinction is artificial and undercuts the common wrong embraced by both categories—the breach of the obligation of trust and utmost good faith which lies on one who undertakes to control or manage something – be it property or some other interest— on behalf of another."

[45]    What, then, is the position of Scots law on the measurement of compensation for breach of fiduciary duty?  The Court of Session is often described as exercising an equitable jurisdiction, but that does not necessarily mean that it has adopted principles of English law derived from equity as opposed to common law: the law of trusts in Scotland

is an obvious example where analysis based on English equitable doctrines has not been received. For my part, however, I see no barrier in principle to the application in Scotland of the approach adopted by the Supreme Court in *AIB*, which draws in turn upon analyses by judges in a variety of Commonwealth jurisdictions. I find support for this conclusion in Lord Reed's observations in *AIB* at paragraph 138:

> "This does not mean that the law is clinging atavistically to differences which are explicable only in terms of the historical origin of the relevant rules. The classification of claims as arising in equity or at common law generally reflects the nature of the relationship between the parties and their respective rights and obligations, and is therefore of more than merely historical significance. As the case law on equitable compensation develops, however, the reasoning supporting the assessment of compensation can be seen more clearly to reflect an analysis of the characteristics of the particular obligation breached. This increase in transparency permits greater scope for developing rules which are coherent with those adopted in the common law. To the extent that the same underlying principles apply, the rules should be consistent. To the extent that the underlying principles are different, the rules should be understandably different."

[46]     Applying these observations in a Scots law context, I accept the proposition advanced on behalf of the pursuer that where a court in Scotland finds that equitable compensation (as opposed to, for example, restitution of funds or property) is the appropriate remedy for a breach of fiduciary duty, the measure of such compensation is what is required to put the pursuer in the position he would have been in but for the breach. The assessment is to be made with the benefit of hindsight and not as at the date of the breach. Foreseeability is not therefore a relevant consideration. But the loss compensated must flow directly from the breach, and the actings of the pursuer, as well as the actings of third parties after the date of the breach, will be material to the determination of whether the link between breach and loss is sufficiently direct to entitle the pursuer to the compensation sought. In some cases this may result in a quantification which differs little, if at all, from damages for negligence or breach of contract; in others it may produce a recovery which more closely resembles that appropriate for fraudulent misrepresentation.

*(2)      Causal Link between Breach and Loss*

[47] I turn now to the application of the foregoing analysis to the circumstances of the present case. It follows from what I have said, and is in any event common ground between the parties, that in order to be recoverable, the loss which the pursuer claims to have sustained must flow directly from the first defender's breach of fiduciary duty. On behalf of the defenders it was submitted that the pursuer failed to aver a relevant causal link. The defenders' criticism was directed towards the following averments by the pursuer:

> "Had the first defender disclosed to the pursuer its improper actings on behalf of Lime Rock, as it was obliged to do, the pursuer would not have proceeded with the transaction, would have withdrawn the first defender's instructions and would have terminated the negotiation with Lime Rock. He would have regarded the behaviour of Lime Rock in seeking covertly and improperly to obtain advice and information from his solicitors as untrustworthy and reprehensible and would have considered them to be persons he did not wish to be in business with."

It was submitted that this was a flawed analysis. It assumed the occurrence of the breach, when the appropriate exercise was to ascertain what would have happened if the breach had not occurred. Reference was made to *Nationwide Building Society* v *Balmer Radmore* [1999] PNLR 606, Blackburne J at 671-2. On behalf of the pursuer, it was submitted that the question whether and to what extent the first defender's breach caused the loss complained of was a question for proof. Speculation as to what course the pursuer would have taken if the conflict had been disclosed was irrelevant: *London Loan & Savings Company of Canada* v *Brickenden* [1934] 3 DLR 465 (PC) at paragraph 16.

[48]      In my opinion, the defenders' criticism of the passage in the pursuer's pleadings that I have quoted is well founded. The relevant question for determination in relation to causation is not what the pursuer would have done if he had discovered the breach of fiduciary duty because, as the defenders submitted, this approach assumes the breach to have been committed. The question is rather what would have occurred if the breach had not been committed: see eg *Canson Enterprises* at 160; *Target Holdings* at 438-9. In the context of the present case, the question is what would have occurred if the first defender

had avoided committing a breach of fiduciary duty by timeous disclosure of the existence of its conflict of interest. It is irrelevant to consider the hypothesis that the pursuer became aware of the breach prior to concluding the sale of his ITS shares, and the passage quoted must be excluded from probation.

[49]   The pursuer's case, however, is not founded solely upon this passage. Immediately before it is the averment "Had the pursuer had the advice to which he was entitled he would not have proceeded with the transaction". Immediately after it is the following: "He would in any event have received independent advice following the termination of the first defender's agency. That advice would have been competent and properly independent. It would have explained fully to the pursuer what the risks of the transaction were, and once such advice was received the pursuer would in any event have withdrawn from the transaction for those reasons, if he had not already done so." The pursuer then goes on to aver alternative courses of action that he might have taken if the Lime Rock transaction had been abandoned. In my opinion those averments reflect the correct test for causation, and are relevant for proof.

[50]   I should note at this point that the defenders' response is to aver that even if all of the pursuer's complaints of breach of duty were well founded, he suffered no loss as a result because he would in any event have signed up to the deal proffered by Lime Rock, being the best and only offer available in the market at the material time. In *London Loan & Savings Company of Canada* v *Brickenden* (above), Lord Thankerton, delivering the judgment of the Privy Council, observed (para 16):

> "When a party, holding a fiduciary relationship, commits a breach of his duty by non-disclosure of material facts, which his constituent is entitled to know in connection with the transaction, he cannot be heard to maintain that disclosure would not have altered the decision to proceed with the transaction, because the constituent's action would be solely determined by some other factor, such as the valuation by another party of the property proposed to be mortgaged. Once the court has determined that the non-disclosed facts were material, speculation as to what course the constituent, on disclosure, would have taken is not relevant."

If one were to adopt a broad interpretation of this dictum, it could be argued that the defence presented in the present case could not be advanced. That might be regarded as

surprising, and the pursuer did not advance such an argument.  The approach taken since 1934 by English and other courts to Lord Thankerton's observation was examined at length by Blackburne J in *Nationwide Building Society* v *Balmer Radmore*.  Blackburne J expressed the view (page 663) that the dictum should be approached with caution and not elevated into a statement of inflexible principle.  At page 670-1, he concluded that

> "…where, as in the cases before me, what is at issue is the consequence of a misrepresentation or non-disclosure made by the fiduciary which has caused the beneficiary to authorise the application of his monies in a particular way, the only sensible approach to the question of compensation for the consequences of the misrepresentation or non-disclosure is to consider what would have happened if there had been no misrepresentation or the appropriate disclosure had been made.  I can well see that, where the fiduciary has induced the giving of the authority by a statement which he knows to be untrue, it may be that the same policy, so clearly articulated in the speech of Lord Steyn in *Smith New Court Securities Ltd v. Citibank NA* [1997] AC 254 at 279E to 280C, which applies in the case of common law deceit resulting in compensation assessed on the restitutionary or 'but for' basis, should apply to the question of compensation in equity.  Short of that however, I do not see why equity should close its eyes to what the beneficiary would have done if there had been no misrepresentation or the appropriate disclosure had been made."

It respectfully seems to me that Scots law should adopt the same approach, and that the defenders in the present case are entitled to offer to prove that the outcome would have been the same if the first defenders' breach of fiduciary duty had not occurred.

*(3)     Directness of Causal Link*

[51]     The next issue is whether the causal link averred by the pursuer between the breach of fiduciary duty and the loss sustained is sufficiently direct.  It was submitted by the defenders that, applying the approach adopted by the Supreme Court of Canada in *Canson Enterprises*, such a link was absent.  On the basis of the pursuer's own narrative (see paragraph [9] above), the cause of the pursuer's loss was the financial mismanagement of the company by its executive directors.  The defenders could not be held liable for the effect of events occurring up to three years after the breach of duty.  The facts of *Canson*

*Enterprises* provided an appropriate analogy. The court could hold now that the ultimate loss of value in the pursuer's shareholding was not sufficiently linked to the breaches of duty complained of for causation to be established, regardless of whatever ground of action was in play. For negligence and breach of contract, the duty which the first defender was averred to have breached was a duty to advise the pursuer of the risks and consequences of the share sale, not to protect the pursuer from risks caused by significant mismanagement. As regards breach of fiduciary duty, the necessary direct link between the breach and the loss was not averred.

[52]    On behalf of the pursuer it was submitted that proof of causation should be allowed. After the share sale had been concluded, the pursuer was locked into his business relationship with Lime Rock on the new terms concerning, for example, appointment of board members, preference on liquidation and loss of a casting vote. The loss sustained by him resulted from the decision to go down the Lime Rock route. In particular the US sanctions issue which drove Lime Rock's decision to treat the bank covenant breach as a trigger event to force a sale at a disadvantageous time would not have arisen if the Lime Rock transaction had not gone ahead. The proper analogy was with the circumstances of *Smith New Court Securities Ltd* v *Citibank NA* (above).

[53]    With some hesitation, I have concluded that the pursuer's causation case is sufficient for proof before answer. There is undoubtedly an analogy to be drawn between the facts averred by the pursuer in the present case and the facts of *Canson Enterprises*. I have already mentioned that that case concerned a secret profit made by the solicitor acting for a purchaser of development land. A warehouse was built on the property and the owner sustained loss because of negligence on the part of the soil engineer and the piling contractor. The owner was only able to recover part of his loss from the engineer and contractor, and sought to recover the balance from the solicitor who had been in breach of fiduciary duty. As there was no direct causal link between the breach of fiduciary duty and the loss sustained, this branch of the claim failed. On one reading of the pursuer's pleadings in the present case, the same might be said: it is specifically averred that the financial difficulties experienced by ITS in 2012 were caused by gross mismanagement of its affairs by its executive directors, including Messrs Corray and Milne. It is not averred that responsibility for the financial difficulties rests with any person appointed by Lime Rock. The necessary direct link is, however, said to arise

because the pursuer was "locked into" the terms of his agreement with Lime Rock and was consequently unable to take remedial action to restore the value of ITS.

[54]     The expression "locked in" appears to be derived from the speeches of Lord Browne-Wilkinson and Lord Steyn in *Smith New Court Securities Ltd* v *Citibank NA*.  In that case the plaintiff was induced by a fraudulent misrepresentation to purchase shares which, as a consequence of a separate unrelated fraud, subsequently fell in value.  The House of Lords held that the defendant was liable for the whole loss sustained by the plaintiff and not merely the difference between the purchase price and either the market value at the date of purchase or the price which the plaintiff would have paid but for the misrepresentation.  The general rule requiring credit to be given for market value did not apply because the plaintiff had bought the shares for a purpose (as a market-making risk) and at a price which precluded immediate disposal.  It was in those special circumstances that it was held that the plaintiff was "locked into" the shares.

[55]     It is not clear to me that the pursuer in the present case was "locked into" the fortunes of ITS shares in the same way as the plaintiff in *Smith New Court Securities*. However, I consider that that is a matter better determined after inquiry into the facts.  The pursuer founds upon the terms of his agreement with Lime Rock and not simply upon the mismanagement (which is not laid at Lime Rock's door) that is said to have occurred after the sale of part of the pursuer's shareholding in 2009.  I am not prepared to go so far as to hold at this stage that the pursuer's case is certain to fail even if all of his averments are proved.  I shall therefore allow a proof before answer with regard to the pursuer's case based on breach of fiduciary duty.

[56]     It will be apparent, however, from what I have said that I consider that the pursuer's case is at least of doubtful relevancy, and accordingly that it would not be appropriate for the court to grant summary decree at this stage in respect of anything other than that which is a matter of admission, namely that the first defenders were in breach of fiduciary duty.


*(4)     Reflective Loss*

[57]     The defenders' next argument was that the losses that the pursuer claimed to have sustained were not recoverable by him because they were, if established, merely a reflection of losses suffered by ITS.  This argument has its roots in the principle that A

cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C.  When applied to companies, this is sometimes known as the rule in *Foss* v *Harbottle* (1843) 2 Hare 461, which precludes derivative actions by shareholders for losses sustained by the company.  The rationale for the rule was explained by the Court of Appeal in *Prudential Assurance Co Ltd* v *Newman Industries Ltd (No 2)* [1982] Ch 204 at 222-223:

> "..If directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting.  But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage.  He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company.  The shareholder does not suffer any personal loss.  His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent shareholding.  The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association.  The shares themselves, his right of participation, are not directly affected by the wrongdoing.  The plaintiff still holds all the shares as his own absolutely unencumbered property.  The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

In *Johnson* v *Gore Wood* [2002] 2 AC 1 at 35, the principle was formulated by Lord Bingham of Cornhill as follows:

> "Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss.  No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company.  A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss… "

[58]    On behalf of the defenders, it was submitted that the loss claimed by the pursuer was a loss for which ITS could have sued.  The pursuer professed to have been locked into a chain of events which ended with the failure of the company; in essence his claim was for the loss in value of his shares due to the company's failure.  A claim by a shareholder for diminution in value of his shares was the paradigm example of reflective loss.  If the pursuer had a cause of action against the defenders, then so did ITS.  It was unnecessary that it be the same cause of action, although the pursuer asserted that it was.

[59]    In my opinion, those submissions are unsound.  The circumstances in the present case differ significantly from those in which a shareholder's loss has been held to be reflective of a loss sustained by the company.  In such cases the damage to the company – and hence the fall in value of its shares – was alleged to have been caused by the wrongdoing (intentional or otherwise) of the person sued.  That is not the case here, where it is averred that the diminution in value of the company – and hence of the pursuer's shares – was caused by directors' mismanagement which the pursuer had been rendered powerless to prevent.  It may be that an action for reparation by a shareholder of ITS based on alleged mismanagement would be dismissed as a derivative action seeking to recover reflective loss: that is not a matter I have to decide.  The pursuer's complaint is rather that he sustained loss because he was, as he asserts, locked into the company's plight by breach of contract, negligence and breach of fiduciary duty on the part of the defenders in relation to alleged failures in the provision of advice.  That is a loss which the pursuer claims to have sustained as a consequence of proceeding to enter into the transaction on the terms agreed, including the sale of part of his interest in ITS.  It is not in any sense a loss sustained by ITS; if anything, ITS benefited from the share sale because it received an injection of $45 million.  I accept the pursuer's submission that, on the basis of the case pled, any loss was sustained when the transaction was concluded, albeit that it requires (at least as regards the case based on breach of fiduciary duty) to be quantified with the benefit of hindsight.  I also accept that an important aspect of the rationale underlying the general prohibition of derivative actions, namely the avoidance of double recovery, has no role to play in this case.  This is not, in my view, a derivative action, and the loss claimed to have been sustained by the pursuer is not reflective of a loss suffered by the company.

*(5)      Contributory Negligence*

[60]      The final contentious issue in relation to the pursuer's case based on breach of fiduciary duty concerns the availability of a defence of contributory negligence. The defenders plead (in answer 25) that any loss sustained by the pursuer was caused or materially contributed to by his own fault and negligence. This defence proceeds on the basis of averments by the pursuer that he was unaware of the content of the deal with Lime Rock which, it will be recalled, had been concluded by documents that he himself had executed. The defenders aver that:

> "If [the pursuer] truly executed the contracts without reading same or taking time to query, even briefly, the content thereof, and if so doing caused him any loss (which is denied) then he was the author of his own misfortune and the sole cause thereof. *Esto* there was any parallel and causative breach of duty on the part of the first defender, which is denied, any damages should be reduced on account of the pursuer's own gross culpability."

[61]      On behalf of the pursuer, it was submitted that contributory negligence was not a relevant defence to his claim based on breach of fiduciary duty. The same principles applied to breach of fiduciary duty as applied to fraudulent misrepresentation, with regard to which the defence was not available: *Standard Chartered Bank* v *Pakistan National Shipping Corporation* [2003] 1 AC 959, Lord Hoffmann at paragraphs 10-18; Lord Rodger of Earlsferry at paragraphs 42-45. As there was no material difference between the relevant English and Scottish provisions of the Law Reform (Contributory Negligence) Act 1945, there was no reason why the same rule should not apply in Scotland. There were, moreover, policy reasons why the defence should not be available with regard to breach of fiduciary duty. The essence of the fiduciary relationship was that A placed reliance and trust upon B, and should not have to look over B's shoulder. It was repugnant to principle that A's claim should be reduced due to a failure to police B's actings on his behalf. In *Pilmer* v *Duke Group Ltd* [2001] HCA 31, the High Court of Australia had rejected the concept of "contributory fault" in a claim for equitable compensation for breach of fiduciary duty.

[62]      On behalf of the defenders, it was submitted that the dicta in *Standard Chartered Bank* founded upon by the pursuer, although of high authority, were not consistent with

the law of Scotland and should not be followed.  The implication of those dicta was that in any case where contributory negligence was accepted, it was necessary to determine whether, prior to enactment of the 1945 Act, contributory negligence would have been a complete defence at common law.  There was no Scots law authority that before 1945 contributory negligence was not a defence to intentional wrongdoing.  The fact that wrongdoing was intentional did not exclude defences based on the pursuer's actings: assault and defamation were examples where such a defence was clearly available.  The focus under Scots law had been on *culpa*, which included both negligence and intentional wrongdoing: see eg *McNaughton* v *Caledonian Railway Co* (1858) 21D 160, Lord Justice Clerk Inglis at 163.  The preferable view was that the availability of a defence of contributory negligence depended upon the circumstances of a particular case: cf *Day* v *Mead* [1987] 2 NZLR 443, Cooke P at 451.  Here the pursuer did not assert fraudulent inducement to enter into the Lime Rock contract, and there was no reason why contributory negligence should not apply.

[63]     Section 1(1) of the Law Reform (Contributory Negligence) Act 1945 provides as follows:

> "Where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage…"

Fault is defined, so far as applicable to England and Wales, as "negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to the defence of contributory negligence".  In the application of the Act to Scotland, fault is defined as "wrongful act, breach of statutory duty or negligent act or omission which gives rise to liability in damages, or would apart from this Act, give rise to the defence of contributory negligence".

[64]     In the absence of any directly relevant Scottish authority, I take the *Standard Chartered Bank* case as my starting point.  In this case Standard Chartered made payment to a seller under letters of credit after having been presented late with a bill of lading which,

unknown to them, had been falsely dated.  Standard Chartered waived the late
presentation and sought payment from the issuing bank, misrepresenting in their turn that
the bill of lading had been timeously presented.  The issuing bank refused payment and
Standard Chartered sued the seller for damages for deceit.  A defence of contributory
negligence was rejected by the House of Lords, on the ground that there was no such
defence at common law to a claim based on fraudulent misrepresentation.  Having quoted
the terms of the 1945 Act, Lord Hoffmann (with whom all others agreed) observed:

> "11.  In my opinion, the definition of 'fault' is divided into two limbs, one of which is
> applicable to defendants and the other to plaintiffs.  In the case of a defendant, fault
> means 'negligence, breach of statutory duty or other act or omission' which gives rise
> to a liability in tort.  In the case of a plaintiff, it means 'negligence, breach of statutory
> duty or other act or omission' which gives rise (at common law) to a defence of
> contributory negligence…
>
> 12.  It follows that conduct by a plaintiff cannot be 'fault' within the meaning of the
> Act unless it gives rise to a defence of contributory negligence at common law.  This
> appears to me in accordance with the purpose of the Act, which was to relieve
> plaintiffs whose actions would previously have failed and not to reduce the damages
> which previously would have been awarded against defendants.  Section 1(1) makes
> this clear when it says that 'a claim in respect of that damage shall not be defeated by
> reason of the fault of the person suffering the damage, but [instead] the damages
> recoverable in respect thereof shall be reduced …'"

[65]     This *dictum* was criticised by the defenders because it attributed two different
meanings to the word "fault" and also because it required investigation of whether, under
pre-1945 Act law, the act or omission founded on as contributory negligence would have
created a complete defence.  It was highly unlikely it was submitted, that modern law was
circumscribed by such constraints, and was not so regarded by Scots law in which
contributory negligence was admitted as a defence in many cases where the act or omission
founded on would not have been a complete defence before 1945.  In my opinion the
difficulty with this criticism is that it relates to the express wording of the Act rather than to
the observations of Lord Hoffmann.  It is the definition of fault, both as applicable in

England and Wales and as applicable in Scotland, that directs examination of the common law. The House of Lords was obviously bound to apply that definition, as am I.

[66]    It is important to read the observations in *Standard Chartered Bank* in the context in which they were made, namely a principal claim based on intentional wrongdoing.  At paragraph 42, Lord Rodger of Earlsferry (with whom Lord Hobhouse agreed) stated:

> "As Lord Hoffmann has explained, whether or not the defence of contributory negligence is available to Mr Mehra depends on whether Standard Chartered's payment of the sum under the letter of credit would, apart from the Law Reform (Contributory Negligence) Act 1945, give rise to a defence of contributory negligence.  In agreement with Mummery J in *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 WLR 1462 , Lord Hoffmann has concluded that there is no common law defence of contributory negligence in the case of fraudulent misrepresentation.  I respectfully regard that conclusion as compelling.  As Mummery J pointed out, if the negligence of the plaintiff had been a defence to an action of deceit at common law, this would have meant that it would have been a complete defence, absolving the fraudulent defendant of all liability.  Such an extreme doctrine could hardly have passed through the law without leaving its mark in the cases.  But there is no trace of it.  Indeed, the signs are that before 1945 the defence of contributory negligence was thought not to apply where the defendant intended to cause the plaintiff harm."

I can see no reason why that statement is not equally applicable to Scots law.  Section 1(1) is in the same terms for both jurisdictions, and there is no difference of substance between the parallel definitions of fraud.  I am not convinced that the examples suggested by the defenders, involving defamation and provocation, are truly cases of contributory negligence under pre-1945 law.  I regard the observations of Lord Hoffmann and Lord Rodger as at least highly persuasive and conclude that under Scots law the defence of contributory fault would not be available in a case based upon fraudulent misrepresentation.

[67]    The issue for me, however, is whether the same applies to a case based upon breach of fiduciary duty.  Applying Lord Hoffmann's interpretation of the 1945 Act in *Standard Chartered Bank,* the question becomes whether breach of fiduciary duty is an act or omission

which, apart from the Act, would give rise to the defence of contributory negligence.  Again I was not referred to, and am not aware of, any direct Scottish authority on the point, one way or the other.  Historically, Scots law has adopted an uncompromising stance to breach of fiduciary duty.  Restitutionary remedies such as reduction of a transaction or accounting for profit have been granted regardless of whether the transaction was objectively fair, or whether the fiduciary acted reasonably, or whether the estate suffered a loss:  see eg Scottish Law Commission Discussion Paper 123 on Breach of Trust (September 2003) at paragraph 4.2ff.  It has been regarded as immaterial that the fiduciary was unaware that he was acting in breach of his duty:  *Cherry's Trs* v *Patrick* 1911 2 SLT 313, Lord Ordinary (Ormidale) at 315.

[68]     The point was addressed, albeit *obiter,* by the High Court of Australia in *Pilmer* v *Duke Group Ltd* (above), a case in which the breach of fiduciary duty alleged does not appear to have been an intentional one.  The court's reasons for rejecting the argument that contributory fault could have operated as a defence to a claim for equitable compensation for breach of fiduciary duty were encapsulated in the following passage (para 86) in the judgment of four of the five members of the Court:

> "Contributory negligence focuses on the conduct of the plaintiff, fiduciary law upon the obligation by the defendant to act in the interests of the plaintiff.  Moreover, any question of apportionment with respect to contributory negligence arises from legislation, not the common law."

On this approach, contributory negligence is excluded as a defence even where the breach of fiduciary duty is unintentional.  The case is not, however, directly in point because in contrast to the position under Scots law, it did not require construction of a statute whose interpretative provisions referred expressly to the common law.

[69]     I have already noted that it has been recognised in certain cases, such as *Cherry's Trs* v *Patrick* and the New Zealand case of *Day v Mead* (above) that circumstances may arise where a breach of fiduciary duty is "innocent", or unintentional.  The breach of duty committed by the defender in such cases may be more akin to negligence than fraudulent misrepresentation.  Is a defence of contributory negligence nevertheless always excluded?  Or, to put it in the statutory context, would a defence of contributory negligence still be excluded, apart from the 1945 Act?  In order to answer that question I refer again to the

observations of Lord Reed in the *AIB* case upon which I have placed reliance. Contributory negligence did not have to be addressed in *AIB,* but it seems to me that Lord Reed's observation at paragraph 135 that "losses resulting from unreasonable behaviour on the part of the claimant will be adjudged to flow from that behaviour, and not from the breach" is not necessarily restricted to acts or omissions of the claimant that occur after the date of the breach. It would be a somewhat inequitable type of equitable compensation if, in circumstances akin to negligence, the compensation due approximated to the damages that would have been awarded for negligence except that the deduction which could be made for contributory fault of the pursuer in a negligence case was prohibited. I therefore conclude that, at least in cases where the breach of fiduciary duty is found to have been unintentional, a defence of contributory fault may be available to the defender.

[70]    Applying this conclusion to the present case, the defenders deny acting dishonestly. They aver that although Mr Gordon acted in the manner he did deliberately, he did not do so with the intention of causing harm to the pursuer. In my opinion it cannot be said without inquiry into the facts that there are no circumstances in which a defence of contributory fault will be available to the defenders. This is particularly so where the alleged contributory negligence of the pursuer (failure to read and confirm his understanding of contractual documents) is unconnected with the admitted breach of fiduciary duty (acting in conflict of interest). The availability of a contributory fault defence in the circumstances of the present case will be best determined after findings in fact have been made. I shall therefore allow proof before answer of the defenders' averments of sole fault and contributory negligence of the pursuer.

**Breach of Fiduciary Duty in 2012**

[71]    In Article 20 of the summons, the pursuer avers that certain separate and subsequent breaches of fiduciary duty were committed by the defenders, and in particular by Mr Gordon. I referred earlier in this opinion to the pursuer's narrative that following the alleged bank covenant breaches by ITS in November 2012, Lime Rock gave notice that a "trigger event" had occurred entitling Lime Rock to force a sale. It is averred by the pursuer that Mr Gordon, by then a member of the second defender, attended at least one board meeting of ITS in the capacity of solicitor for Lime Rock, without disclosing his earlier actings in 2008-09 on their behalf. This, it is asserted, was a further breach of fiduciary

duty.  The second defender subsequently accepted instructions to act for Lime Rock in the interdict proceedings against the pursuer to which I have referred; this is characterised by the pursuer as "a further conflict of interest".  The pursuer avers that by withholding disclosure of their earlier actings on behalf of Lime Rock and of Lime Rock's "complicity in and procurement of improper actings", the defenders deprived the pursuer of the opportunity to make use of that information in the interdict proceedings.  Had he had access to that information, the pursuer might have sought to reduce the investment agreement.

[72]     The defenders challenged the relevancy of the pursuer's assertion that a breach of fiduciary duty had occurred in 2012.  It was not suggested by the pursuer that by 2012 the defenders continued to act for him.  After the termination of a solicitor's retainer, there was no continuing fiduciary relationship: *Prince Jefri Bolkiah* v *KPMG* [1999] 2 AC 222, Lord Millett at 235.  There could not therefore have been a breach of fiduciary duty.

[73]     In his oral submission to the court, senior counsel for the pursuer explained that the averments regarding events in 2012 (and into 2013) were not to be read as a separate ground of liability, but rather as part of the narrative of causation of loss.  Properly characterised, the complaint was of a breach of a duty of confidentiality which subsisted after the solicitor/client relationship had been terminated.  Reference was made to Lord Hope of Craighead's speech in *Prince Jefri* at page 227.  It was impossible for the pursuer to know whether confidentiality had been breached when the defenders acted for Lime Rock against him in 2012.

[74]     It is, in my view, quite clear from the speech of Lord Millett in *Prince Jefri*, with which the other members of the Judicial Committee concurred, that there is no conflict of interest, real or perceived, where a solicitor acts for a client against a former client.  As Lord Millett put it:

> "The fiduciary relationship which subsists between solicitor and client comes to an end with the termination of the retainer. Thereafter the solicitor has no obligation to defend and advance the interests of his former client. The only duty to the former client which survives the termination of the client relationship is a continuing duty to preserve the confidentiality of information imparted during its subsistence."

In the circumstances of the present case, the defenders owed a continuing duty to the pursuer to preserve the confidentiality of any information imparted by him during the

time when they acted on his behalf.  There is, however, no hint in the pursuer's pleadings of any case based upon breach of that duty.  This is perhaps not surprising when one recalls that the pursuer's case against the first defender is based upon alleged absence of direct communication.  In any event, I am satisfied that the only case made regarding events in 2012 and 2013, based on alleged breach of fiduciary duty arising out of conflict of interest, has no foundation in law.  I am not minded to exclude from probation the whole of the pursuer's averments of those events, lest they turn out to be material in relation to causation of loss.  I shall however exclude the specific averments (i) that when Mr Gordon attended meetings in the capacity of solicitor for Lime Rock this was a further breach of fiduciary duty, and (ii) that the second defender acted in conflict of interest when accepting instructions to act on behalf of Lime Rock in the pursuer's interdict proceedings.

**Pursuer's Case based on Breach of Contract and Negligence**

[75]    It has been unnecessary in this opinion to say much about those branches of the pursuer's case that are based on alleged breach of contract and negligence on the part of the first defender.  It is, however, necessary to record that some of the defenders' arguments were directed against those branches of the case as well as the branches based on fraudulent misrepresentation and breach of fiduciary duty.  In particular, I was invited to sustain the defenders' first plea in law (a general relevancy plea) and to dismiss the action if I upheld the defenders' arguments with regard to either or both of issues (iii) (absence of sufficiently direct causal link between breach and loss sustained) and (iv) (reflective loss) in paragraph [36] above.  As I have found the pursuer's pleadings to be relevant for proof before answer as regards the first of those issues and have rejected the defender's argument in relation to the second, no question arises at this time of dismissal of the entire action.  The defenders' general relevancy plea will remain standing until after inquiry.

**Summary and Disposal**

[76]    The practical consequences of the foregoing opinion may be summarised as follows:

    1.    The pursuer's case based upon fraudulent misrepresentation will be dismissed as irrelevant.

    2.    With regard to the pursuer's case based upon breach of fiduciary duty:

      (a)     Summary decree will be granted to the extent of finding that the first defender was in breach of its fiduciary duty to the pursuer; *quoad ultra* the pursuer's motion for summary decree will be refused;

      (b)     Averments by the pursuer of a causal link based upon failure by the first defender to disclose its breach of duty (see paragraph [48] above) will be excluded from probation;

      (c)     Averments by the pursuer of separate breaches of fiduciary duty in 2012-13 will be excluded from probation;

      (d)     *Quoad ultra* the relevancy of the pursuer's claim to have sustained loss as a consequence of the first defender's breach of fiduciary duty will be determined after proof;

      (e)     The relevancy of the defence of contributory negligence will be determined after proof.

    3.    The defenders' motion to dismiss the action based upon breach of contract and negligence as irrelevant at this stage will be refused.

[77]    I wish to express my gratitude to all counsel for their very full and carefully researched presentation of difficult issues.  Before pronouncing an interlocutor I shall put the case out by order to discuss further procedure, including more precise identification of the passages in the pleadings that are to be excluded from proof.  Questions of expenses are reserved.

# EXHIBIT 5



# Search Report

| | |
|---|---|
| **Entity Name :** | Lime Rock Partners V, L.P. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 25110 |
| **Registration Date :** | 31st March 2008 |
| **Entity Type :** | Partnership |
| **Registered Office :** | MAPLES CORPORATE SERVICES LIMITED |
| | P. O. Box 309 |
| | Ugland House, |
| | South Church Street, |
| | George Town, |
| | Grand Cayman  KY1-1104 |
| | Cayman Islands |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 31st March 2008 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION

- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 144773519976
www.verify.gov.ky
26 June 2019

# EXHIBIT 6

# CERTIFICATE OF LIMITED PARTNERSHIP

## OF

## LIME ROCK MANAGEMENT LP

This Certificate of Limited Partnership of Lime Rock Management LP (the "Partnership") is being duly executed and filed by the undersigned general partner (the "General Partner") to form a limited partnership under the Delaware Revised Uniform Limited Partnership Act (6 Del. C. Section 17-101, et seq.).

1.      The name of the limited partnership formed hereby is Lime Rock Management LP.

2.      The address of the Partnership's registered office in the state of Delaware is National Corporate Research, Ltd., 9 East Loockerman Street, County of Kent, City of Dover, State of Delaware 19901. The name of the Partnership's registered agent for service of process on the Partnership in the State of Delaware is National Corporate Research, Ltd., 9 East Loockerman Street, Dover Delaware 19901.

3.      The name and business address of the General Partner of the Partnership is as follows:

> Lime Rock GP LLC
> 400 East 71st Street, Apt. 11G
> New York, NY 10021

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Limited Partnership of Lime Rock Management LP, this 12th day of June, 1998.

**LIME ROCK MANAGEMENT LP**

By:  Lime Rock GP LLC,
     General Partner

By: _Paige Purcell_
Name:  Paige Purcell
Title:   Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:01 PM 06/12/1998
981228860 - 2908252

JUL 23 98 THU 10:30          NOR 1341450

FHA NO. 1341410     SECRETARY OF STATE
                    DIVISION OF CORPORATIONS
                    FILED 03:00 PM 07/23/1998
                    981287400 - 2908252

# CERTIFICATE OF AMENDMENT
## OF THE
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## LIME ROCK MANAGEMENT LP

This Certificate of Amendment of the Certificate of Limited Partnership of Lime Rock Management LP (the "Partnership"), is being duly executed and filed by the undersigned, as a general partner (the "General Partner") of the Partnership, pursuant to the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17-202, et seq.).

1.     The name of the limited partnership is "Lime Rock Management LP"

2.     Paragraph 3 of the Certificate of Limited Partnership is hereby amended to reflect the change of address of the General Partner so that Paragraph 3 shall henceforth read in its entirety as follows:

"3. The name and business address of the General Partner of the Partnership is as follows:

> Lime Rock GP LLC
> 518 Riverside Avenue
> Westport, Connecticut 06880"

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment of the Certificate of Limited Partnership of the Partnership this 23rd day of July, 1998.

### LIME ROCK MANAGEMENT LP

By:   Lime Rock GP LLC
      General Partner

By: _Paige Purcell_
      Name: Paige Purcell
      Title:   Authorized Person

*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 12:00 PM 10/09/1998*
*981391886 - 2908252*

## CERTIFICATE OF SECOND AMENDMENT
### OF THE
## CERTIFICATE OF LIMITED PARTNERSHIP
### OF
## LIME ROCK MANAGEMENT LP

This Certificate of Second Amendment of the Certificate of Limited Partnership of Lime Rock Management LP (the "Partnership"), is being duly executed and filed by the undersigned, as a general partner (the "General Partner") of the Partnership, pursuant to the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17-202, et seq.).

    1.       The name of the limited partnership is Lime Rock Management LP.

    2.       Paragraph 3 of the Certificate of Limited Partnership is hereby amended to reflect the change of name of the General Partner so that Paragraph 3 shall henceforth read in its entirety as follows:

"3.  The name and business address of the General Partner of the Partnership is as follows:

        Lime Rock Management GP LLC
        518 Riverside Avenue
        Westport, Connecticut  06880"

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Second Amendment of the Certificate of Limited Partnership of the Partnership this 7ᵗʰ day of October, 1998.

                      **LIME ROCK MANAGEMENT LP**

                      By:  Lime Rock Management GP LLC
                            General Partner

                      By: _John T Reynolds_
                      Name: John T. Reynolds
                      Title:  Authorized Person

SR2NY\410268v2

# STATE OF DELAWARE
## CERTIFICATE OF AMENDMENT

1.  Name of Limited Liability Company:  Lime Rock Management LP

2.  The Certificate of Formation of the limited liability company is hereby amended as follows:

> The address of the registered agent in Delaware is
> The Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE 19801
> County of New Castle
>
> The name of the registered agent in Delaware is
> The Corporation Trust Company

**IN WITNESS WHEREOF,** the undersigned have executed this Certificate on the _22ND_ day of _October_ , A.D. _2007_ .

Lime Rock Management GP LLC,
General Partner

By: _____
Authorized Person(s)

Name: _MARK A. McCALL_
Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:25 PM 10/23/2007
FILED 04:00 PM 10/23/2007
SRV 071145284 - 2908252 FILE

DE084 - 05/18/2007 C T System OnLine

# EXHIBIT 7



Companies House
*for the record*

**Please complete in typescript, or in bold black capitals.**

CHWP000

COMPANIES HOUSE
FEE PAID £95
EDINBURGH

**LLP2**
(Section 2 LLP Act 2000)

**Application for Incorporation of a Limited Liability Partnership**

| | |
|---|---|
| **Please leave this box blank** | 50 300 122 |
| **Full Name of Limited Liability Partnership** | LIME ROCK MANAGEMENT LLP |
| **Situation of Registered Office** | Scotland |
| | *Insert "England and Wales", "Wales" or "Scotland"* |
| **Registered Office Address** | Investment House |
| | 6 Union Row |
| **Post town** | Aberdeen |
| **County / Region** | UK Postcode AB10 1DQ |

*PO Box number only is not acceptable*

**Will all Members from time to time be designated members?**   X YES   [ ] NO   *If no, at least two of the listed members must be designated members*

*(List members overleaf)*

Number of continuation sheets attached to this application for incorporation   0

I certify that I am a: *(Please tick appropriate box)*

X   Solicitor engaged in the formation of this LLP

[ ]   Member named overleaf of the LLP

And that the two or more persons named overleaf are associated for carrying on a lawful business with a view to profit.

**Signed**   *[signature]*   **Date** 26/7/02

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record.

Paull & Williamsons, Solicitors,

Investment House, 6 Union Row, Aberdeen, AB10 1DQ

Ref. LIM/3/7-KSG/SNP/AYM   Tel   01224 621621

E-mail   SNPratt@paull-williamsons.co.uk

SCT   S1FDWCWP   0306
COMPANIES HOUSE   29/07/02

When you have completed and signed the form please send it to the Registrar of Companies at:

**Companies House, Crown Way, Cardiff, CF14 3UZ**      DX 33050 Cardiff
for partnerships registered in England and Wales      **or**
**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**
for partnerships registered in Scotland      DX ED235 Edinburgh

**List of Members on Incorporation**

| | | |
|---|---|---|
| *Peers or others known by a title may use the title instead of or in addition to their name* | Surname or Corporate name | Ross |
| | Forename(s) | Hamish Hector Lawrence |

| | | Date of Birth | Day | Month | Year |
|---|---|---|---|---|---|
| Member Reference Number * *(as advised by Companies House)* | | | ▉▉▉ | | |

†† **Tick this box if the address shown is a service address for the beneficiary of a Confidentiality Order granted under the provisions of section 723B of the Companies Act 1985**

†† Usual Residential Address *(or registered or principal office address in the case of a corporation or ...)*

▉▉▉▉▉▉▉▉▉▉▉

| | |
|---|---|
| Post town | Banchory |
| County / Region | Kincardineshire |
| UK Postcode | AB31 4EL |
| Country | UK |

I consent to act as a member of the limited liability partnership named on page 1

*(Please tick this box if consenting to act as a designated member)* ☑

* Voluntary information

**Signed** _Ross_    **Date** 25·vii·02

*(Member to sign and date)*

| | | |
|---|---|---|
| *Peers or others known by a title may use the title instead of or in addition to their name* | Surname or Corporate name | Munro |
| | Forename(s) | Simon |

| | | Date of Birth | Day | Month | Year |
|---|---|---|---|---|---|
| Member Reference Number * *(as advised by Companies House)* | | | ▉▉▉ | | |

†† **Tick this box if the address shown is a service address for the beneficiary of a Confidentiality Order granted under the provisions of section 723B of the Companies Act 1985**

†† Usual Residential Address *(or registered or principal office address in the case of a corporation or Scottish firm)*

▉▉▉▉▉▉▉▉▉▉▉

| | |
|---|---|
| Post town | Aberdeen |
| County / Region | |
| UK Postcode | AB15 5BB |
| Country | UK |

I consent to act as a member of the limited liability partnership named on page 1

*(Please tick this box if consenting to act as a designated member)* ☑

* Voluntary information

**Signed** _S____._    **Date** 25/7/02

*(Member to sign and date)*

NOTE:    Unless there are at least two designated members, all members will be designated members.

**FILE COPY**



# CERTIFICATE OF INCORPORATION
# OF A
# LIMITED LIABILITY PARTNERSHIP

Partnership No. SO300122

The Registrar of Companies for Scotland hereby certifies that

LIME ROCK MANAGEMENT LLP

is this day incorporated under the Limited Liability Partnerships Act 2000 as a limited liability partnership and that the partnership is limited.

Given at Companies House, Edinburgh the 30 July 2002



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*
— *for the record* —

# EXHIBIT 8

# Lime Rock Management LLP

# Annual report and financial statements

# for the year ended 31 December 2008

**Registered Number : SO300122**

FRIDAY

*SJJXZAGG*

SCT     05/06/2009     257

COMPANIES HOUSE

# Lime Rock Management LLP

## Annual report and financial statements

## for the year ended 31 December 2008

## Contents

Members and Advisors for the year ended 31 December 2008 ............................................................................ 1

Members' report for the year ended 31 December 2008 ..................................................................... 2

Independent auditors' report to the members of Lime Rock Management LLP ....................................... 4

Profit and loss account for the year ended 31 December 2008 .............................................................. 6

Balance sheet as at 31 December 2008 ............................................................................................. 7

Cash flow statement for the year ended 31 December 2008 .............................................................. 8

Notes to the financial statements for the year ended 31 December 2008 ........................................... 9

# Lime Rock Management LLP

## Members and Advisors for the year ended 31 December 2008

**Members**
HHL Ross
S Munro

**Secretary and registered office**
Paull & Williamson
Union Plaza (6th Floor)
1 Union Wynd
ABERDEEN
AB10 1DQ

**Auditors**
PricewaterhouseCoopers LLP
32 Albyn Place
ABERDEEN
AB10 1YL

**Solicitors**
Paull & Williamsons
Union Plaza (6th Floor)
1 Union Wynd
ABERDEEN
AB10 1DQ

**Bankers**
Bank of Scotland
38 Albyn Place
ABERDEEN
AB10 1YN

# Lime Rock Management LLP

## Members' report for the year ended 31 December 2008

The members present their report and the audited financial statements for the year ended 31 December 2008.

### Business review and principal activities
The principal activity is advising on and arranging private equity transactions for Lime Rock Management L.P., an associated firm in the United States of America.

The profit for the year before members' remuneration and profit shares amounted to £895,805 (2007 : £477,184). Profits of £894,552 (2007 : £477,649) were allocated to members during the year, with the retained profit of £1,253 (2007 : loss of £465) being transferred to/from reserves.

The members are confident that the company will continue to operate profitably.

### Risks and uncertainties
The members of the business acknowledge that the management and the execution of the company's strategy are subject to a number of risks.

The key business risks affecting the company are those which could have an impact on dealflow including commodity price uncertainty, competition from other funding sources and the sector's attitude to external investment.

### Members' profits shares
Members are remunerated out of profits generated by the company and are responsible for funding their own pensions. Final allocation of profits to members is based on members' profit share proportions.

### Drawings
The policy for members' drawings is to distribute the majority of the profit generated during the financial year, taking into account the need to maintain sufficient funds to finance the working capital and other needs of the business. The members set the level of monthly drawings based on the individual member's equity and profit sharing proportions.

### Financing and financial instruments
The firm is financed through a mixture of members' capital and members' subordinated long term loans. The financing structure is based upon the working capital needs of the business and the capital adequacy requirements of the Financial Services Authority. The amount of capital and subordinated loans provided by each member is based upon that member's individual profit share proportion. Capital is repayable at par when the member retires.

The company's principal financial assets are its bank and debtor balances. The members consider the credit risk on liquid funds to be limited based on the credit-rating assigned to its banker by an international credit-rating agency. The company does not enter into derivative financial instruments for currency hedging. Debtor balances mainly relate to income accrued from Lime Rock Management L.P. which is an associated firm for which the members consider these to be low credit risk.

### Key performance indicators ("KPIs")
Given the straightforward nature of the business, the members are of the opinion that analysis using KPIs is not necessary for an understanding of the development, performance or position of the business.

2

# Lime Rock Management LLP

**Members**
The members who held office during the year are listed below:

HHL Ross
S Munro

**Statement of members' responsibilities in respect of the financial statements**
The Companies Act 1985, as applied to limited liability partnerships, requires the members to prepare financial statements for each financial period that give a true and fair view of the state of affairs of Lime Rock Management LLP (the 'LLP') and of the profit or loss for that period.  In preparing those financial statements the members are required to:

- Select suitable accounting policies and then apply them consistently

- Make judgements and estimates that are reasonable and prudent

- State whether applicable accounting standards have been followed, subject to any material departures disclosed and explained in the financial statements

- Prepare the financial statements on the going concern basis unless it is inappropriate to presume the LLP will continue in business.

The members are also responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the LLP and to enable them to ensure that the financial statements comply with the Companies Act 1985, as applied to limited liability partnerships.  They are also responsible for safeguarding the assets of the LLP and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

**Statement on disclosure of information to the auditors**
The members in office at the date of approval of this report confirm that:

(a)    So far as each member is aware, there is no relevant audit information of which the partnership's auditors are unaware.  Relevant information is defined as "information needed by the partnership's auditors in connection with preparing their report."

(b)    Each member has taken all the steps that they ought to have taken in their duty as a member in order to make themselves aware of any relevant information and to establish that the partnership's auditors are aware of that information.

**Auditors**
The auditors, PricewaterhouseCoopers LLP, have indicated their willingness to continue in office, and a resolution concerning their reappointment will be proposed.

**On behalf of the members**

Partner
23 March 2009

3

# Lime Rock Management LLP

# Independent auditors' report to the members of Lime Rock Management LLP

We have audited the financial statements of Lime Rock Management LLP for the year ended 31 December 2008 which comprise the Profit and Loss Account, Balance Sheet, the Cash Flow Statement and the related notes. These financial statements have been prepared under the accounting policies set out therein.

### Respective responsibilities of members and auditors

The members' responsibilities for preparing the Annual Report and the financial statements in accordance with applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice) are set out in the Statement of Members' Responsibilities.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland). This report, including the opinion, has been prepared for and only for the members of the partnership in accordance with the Companies Act 1985 as applied to limited liability partnerships by the Limited Liability Partnerships Act 2000 and regulations made there under, and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985, as applied to limited liability partnerships. We also report to you if, in our opinion, the Members' Report is not consistent with the financial statements, if the limited liability partnership has not kept proper accounting records, or if we have not received all the information and explanations we require for our audit.

We read the other information contained in the Annual Report, and consider whether it is consistent with the audited financial statements. This other information comprises only the Members' Report. We consider the implications for our report if we become aware of any apparent misstatements or material inconsistencies with the financial statements. Our responsibilities do not extend to any other information.

### Basis of audit opinion

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgments made by the members in the preparation of the financial statements, and of whether the accounting policies are appropriate to the limited liability partnership's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

# Lime Rock Management LLP

**Opinion**

In our opinion the financial statements:

- give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of the partnership's affairs as at 31 December 2008 and of its profit and cash flows for the year then ended; and

- have been properly prepared in accordance with the provisions of the Limited Liability Partnerships Regulation 2001 made under the Limited Liability Partnerships Act 2000.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
Chartered Accountants and Registered Auditors
Aberdeen
23 March 2009

5

# Lime Rock Management LLP

## Profit and loss account for the year ended 31 December 2008

|  | Note | 2008 £ | 2007 £ |
|---|---|---|---|
| **Turnover** | 2 | **1,718,532** | 1,134,268 |
| Administrative expenses |  | **(828,696)** | (660,959) |
| **Operating profit** | 5 | **889,836** | 473,309 |
| Interest receivable and similar income |  | **5,969** | 4,009 |
| Interest payable and similar charges |  | **-** | (134) |
| **Profit for the financial year before members' remuneration and profit shares and available for division among members** | 10 | **895,805** | 477,184 |
| Members' remuneration charged as an expense | 10 | **(894,552)** | (477,649) |
| **Profit/(loss) for the financial year available for discretionary division among members** |  | **1,253** | (465) |

No members received salaried remuneration.

All items dealt with in arriving at the profit/(loss) for the year relate to continuing operations.

The LLP has no recognised gains and losses other than the profit/(loss) above and therefore no separate statement of total recognised gains and losses has been presented.

There is no difference between the profit/(loss) available for discretionary division among members and its historical cost equivalent.

# Lime Rock Management LLP

## Balance sheet as at 31 December 2008

| | Note | 2008 £ | 2007 £ |
|---|---|---|---|
| **Fixed assets** | | | |
| Tangible assets | 6 | 177,941 | 220,052 |
| | | 177,941 | 220,052 |
| **Current assets** | | | |
| Debtors | 7 | 132,475 | 150,941 |
| Cash at bank and in hand | | 169,906 | 68,920 |
| | | 302,381 | 219,861 |
| Creditors: amounts falling due within one year | 8 | (187,003) | (146,403) |
| Net current assets | | 115,378 | 73,458 |
| Creditors: amounts falling due after one year | 9 | (2,169) | (3,613) |
| Net assets attributable to members | | 291,150 | 289,897 |
| **Represented by:** | | | |
| Loans and other debts due to members | | | |
| Members capital classified as a liability under FRS 25 | 10 | 230,000 | 230,000 |
| Other amounts | 11 | 61,150 | 59,897 |
| | | 291,150 | 289,897 |

## Total members' interests

| | Note | 2008 £ | 2007 £ |
|---|---|---|---|
| Loans and other debts due to members | | | |
| - falling due within one year | | 33,122 | 46,507 |
| - falling due after more than one year | | 59,557 | 59,557 |
| Members' other interests | | 231,593 | 230,340 |
| | 10 | 324,272 | 336,404 |

The financial statements on pages 6 to 15 were signed on 23 March 2008 on behalf of the members of Lime Rock Management LLP by:

7

# Lime Rock Management LLP

## Cash flow statement for the year ended 31 December 2008

| | Note | 2008 £ | 2007 £ |
|---|---|---|---|
| **Net cash inflow from operating activities** | 15 | **1,020,457** | 478,041 |
| | | | |
| **Returns on investment and servicing of finance** | | | |
| Interest received | | **5,969** | 4,009 |
| HP Interest paid | | **-** | (134) |
| **Net cash inflow from returns on investment and servicing of finance** | | **5,969** | 3,875 |
| | | | |
| **Capital expenditure and financial investment** | | | |
| Purchase of tangible fixed assets | 6 | **(16,059)** | (248,219) |
| Proceeds from sale of tangible fixed assets | | **-** | 1,063 |
| **Net cash outflow from capital expenditure** | | **(16,059)** | (247,156) |
| | | | |
| **Financing** | | | |
| Capital introduced by members | | **-** | 120,000 |
| Hire purchase financing | | **-** | 5,872 |
| Repayment of hire purchase financing | | **(1,444)** | (1,083) |
| **Net cash (outflow)/inflow from financing** | | **(1,444)** | 124,789 |
| | | | |
| **Transactions with members** | | | |
| Drawings and distributions to members | | **(907,937)** | (476,584) |
| Net cash outflow from transactions with members | | **(907,937)** | (476,584) |
| Increase / (decrease) in net cash | | **100,986** | (117,035) |

8

# Lime Rock Management LLP

## Notes to the financial statements
## for the year ended 31 December 2008

### 1    Principal accounting policies

The following accounting policies have been applied consistently to the financial statements.

**Basis of accounting**
The financial statements have been prepared under the historical cost convention, in accordance with applicable Accounting Standards and the Statement of Recommended Practice, Accounting by Limited Liability Partnerships (2006).

**Tangible fixed assets**
Tangible fixed assets are stated at cost less aggregate depreciation. Depreciation is provided on cost in equal annual instalments over the estimated lives of the assets.  The rates of depreciation are as follows:

|                        | %  |
|------------------------|----|
| Fixtures and fittings  | 20 |
| Tenants improvements   | 20 |
| Office equipment       | 33 |

**Leases**
Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee.  Finance leases are capitalised on the balance sheet and any associated interest is charged to the profit and loss account over the period of the lease.

Rental costs under operating leases are charged to the profit and loss account in equal annual amounts over the periods of the leases.

**Foreign currencies**
Transactions denominated in foreign currencies are translated at the rate of exchange ruling at the date of the transaction or at a contracted rate if the transaction is covered by a forward exchange contract.  Monetary assets and liabilities denominated in foreign currencies are converted to sterling at the rate of exchange ruling at the balance sheet date or if appropriate at the forward contract rate.  Profits and losses arising on translation are credited or charged to the profit and loss account in the year in which they arise.

**Pensions**
Members are required to make their own provision for pensions and do so mainly through contributions to personal pension policies and other appropriate investments.

**Taxation**
Income tax payable on the LLP's profits is solely the personal liability of the individual members and consequently is not dealt with in these financial statements.

### 2    Turnover

Turnover, which excludes value added tax and trade discounts, represents the invoiced value of services supplied in the United Kingdom.

9

# Lime Rock Management LLP

## 3    Staff costs

|  | 2008 £ | 2007 £ |
|---|---|---|
| Salaries | 446,712 | 354,855 |
| Social security costs | 54,653 | 42,826 |
|  | 501,365 | 397,681 |

| The average monthly number of employees (excluding members) during the year was: | 2008 | 2007 |
|---|---|---|
| Advisory | 3 | 3 |
| Administration | 1 | 1 |
|  | 4 | 4 |

## 4    Members' profit share

The average monthly number of members during the year was:

|  | 2008 | 2007 |
|---|---|---|
| By activity |  |  |
| Advisory | 2 | 2 |
|  | 2 | 2 |

The profit attributable to the member with the largest entitlement to profit was £576,753 (2007 : £318,433).

# Lime Rock Management LLP

## 5    Operating profit

| Operating profit is stated after charging/(crediting): | 2008 £ | 2007 £ |
|---|---|---|
| Depreciation charge for the year | | |
| - tangible owned fixed assets | 56,213 | 44,591 |
| - tangible leased fixed assets | 1,957 | 979 |
| Gain on sale of tangible fixed assets | - | (1,063) |
| Operating lease charges: | | |
| - land and buildings | 61,000 | 70,333 |
| Loss on exchange | 796 | 134 |
| Auditors' remuneration: | | |
| - audit | 7,500 | 7,210 |

## 6    Tangible assets

| | Tenants improvements £ | Office equipment £ | Fixtures and fittings £ | Total £ |
|---|---|---|---|---|
| Cost at 1 January 2008 | 178,728 | 60,557 | 46,555 | 285,840 |
| Additions | - | 13,259 | 2,800 | 16,059 |
| Disposals | - | (6,394) | - | (6,394) |
| **At 31 December 2008** | **178,728** | **67,422** | **49,355** | **295,505** |
| Depreciation at 1 January 2008 | 21,606 | 21,853 | 22,329 | 65,788 |
| Charge for the year | 35,745 | 15,742 | 6,683 | 58,170 |
| Disposals | - | (6,394) | - | (6,394) |
| **At 31 December 2008** | **57,351** | **31,201** | **29,012** | **117,564** |
| **Net book value** | | | | |
| **At 31 December 2008** | **121,377** | **36,221** | **20,343** | **177,941** |
| At 31 December 2007 | 157,122 | 38,704 | 24,226 | 220,052 |

| Assets held under finance leases and capitalised in office equipment | 2008 £ | 2007 £ |
|---|---|---|
| Cost | 5,872 | 5,872 |
| Aggregate depreciation | (2,936) | (979) |
| **Net book value** | **2,936** | **4,893** |

11

# Lime Rock Management LLP

## 7    Debtors

|                                  | 2008<br>£ | 2007<br>£ |
|----------------------------------|-----------|-----------|
| Prepayments and accrued income   | 89,330    | 108,608   |
| Other debtors                    | 43,145    | 42,333    |
|                                  | 132,475   | 150,941   |

Other debtors includes two deposits related to the old office at Queen's Gardens (£8,000) and the new office in 38 Carden Place (£30,500) (2007 : £38,500).  These deposits are repayable upon demand and are non interest bearing.

## 8    Creditors – Amounts falling due within one year

|                                  | 2008<br>£ | 2007<br>£ |
|----------------------------------|-----------|-----------|
| Trade creditors                  | 18,660    | 32,883    |
| Other tax and social security    | 83,918    | 43,071    |
| Amounts due to members           | 33,122    | 46,507    |
| Accruals and deferred income     | 50,127    | 22,766    |
| HP Creditor (Note 13)            | 1,176     | 1,176     |
|                                  | 187,003   | 146,403   |

Amounts due to members are payable on demand and do not bear interest.

## 9    Creditors – Amounts falling due after one year

|                        | 2008<br>£ | 2007<br>£ |
|------------------------|-----------|-----------|
| HP Creditor (Note 13)  | 2,169     | 3,613     |
|                        | 2,169     | 3,613     |

# Lime Rock Management LLP

## 10   Members interests

| | Members' other interests | | | Loans and other debts due to members £ | Total £ |
|---|---|---|---|---|---|
| | Members capital £ | Other reserves £ | Sub-total £ | | |
| At 1 January 2008 | 230,000 | 340 | 230,340 | 106,064 | 336,404 |
| Profit for the financial year available for division among members | - | 895,805 | 895,805 | - | 895,805 |
| Allocated profit | - | (894,552) | (894,552) | 894,552 | - |
| Drawings | - | - | - | (907,937) | (907,937) |
| **Members' interests at 31 December 2008** | 230,000 | 1,593 | 231,593 | 92,679 | 324,272 |

In the event of a winding up, loans and other debts due to members rank equally with unsecured creditors. Members other interests rank after unsecured creditors.

## 11   Loans and other debts due to members - Other amounts

| | 2008 £ | 2007 £ |
|---|---|---|
| Long term loans | 59,557 | 59,557 |
| Retained profit available for discretionary division among members | 1,593 | 340 |
| | 61,150 | 59,897 |

Long term loans due to members are repayable when the members retire or leave the partnership and do not bear interest.

## 12   Operating lease commitments

At 31 December 2008 the LLP had annual commitments under non-cancellable operating leases expiring as follows:

| | 2008 Land and buildings £ | 2007 Land and buildings £ |
|---|---|---|
| Leases which expire: | | |
| Within 1 year | - | - |
| 2 to 5 years | 61,000 | 61,000 |
| | 61,000 | 61,000 |

# Lime Rock Management LLP

## 13   HP finance lease commitments

Future minimum payments under finance leases are as follows:-

|  | 2008<br>£ | 2007<br>£ |
|---|---|---|
| Within 1 year | 1,176 | 1,176 |
| 1 to 2 years | 1,176 | 1,176 |
| 2 to 5 years | 993 | 2,437 |
|  | 3,345 | 4,789 |

## 14   Related party transactions

During the year Lime Rock Management LLP received £1,737,008 (2007: £1,093,132) from Lime Rock Management L.P. in respect of advisory services provided to the partnership. HHL Ross is a member of Lime Rock Management L.P. At 31 December 2008, £62,000 (2007 : £86,105) of the above balance has been recorded as accrued income as Lime Rock Management LLP had still to invoice this amount in relation to 2008. No amounts have been recorded as deferred income (2007 : £nil).

## 15   Cash flow statement

### (a)   Reconciliation of operating profit to net cash inflow from operating activities

|  | 2008<br>£ | 2007<br>£ |
|---|---|---|
| Operating profit | 889,836 | 473,309 |
| Depreciation charge | 58,170 | 45,570 |
| Gain on sale of tangible fixed assets | - | (1,063) |
| Decrease/(increase) in debtors | 18,466 | (41,087) |
| Increase in creditors | 53,985 | 1,312 |
|  | 1,020,457 | 478,041 |

# Lime Rock Management LLP

**(b)** **Reconciliation of net cash flow to movement in net funds**

|  | 2008 £ | 2007 £ |
|---|---|---|
| Increase/(decrease) in cash in the year | **100,986** | (117,035) |
| Movement in net funds in the year | **100,986** | (117,035) |
| Opening net funds | **68,920** | 185,955 |
| **Closing net funds** | **169,906** | 68,920 |

**(c)** **Analysis of net debt**

|  | At 1 January 2008 £ | Cash flows £ | At 31 December 2008 £ |
|---|---|---|---|
| Cash at bank and in hand | 68,920 | 100,986 | **169,906** |
| HP financing due within 1 year | (1,176) | - | **(1,176)** |
| HP financing due after 1 year | (3,613) | (1,444) | **(2,169)** |
| Amounts due to members due within 1 year | (46,507) | (13,385) | **(33,122)** |
| Amounts due to members due after 1 year | (59,557) | - | **(59,557)** |
|  | (41,933) | 89,045 | **47,112** |

15

# EXHIBIT 9

REGISTERED NUMBER: SO300122

# Lime Rock Management LLP

# Annual Report and Financial Statements

## 31 December 2017



FRIDAY

SCT    *S7FFZNTS*    #461
28/09/2018
COMPANIES HOUSE

<u>**PRICEWATERHOUSECOOPERS LLP**</u>
Chartered accountant & statutory auditor
The Capitol
431 Union Street
Aberdeen
UK
AB11 6DA

# Lime Rock Management LLP

## Annual Report and Financial Statements

### Year ended 31 December 2017

| Contents | Page |
|---|---|
| Members' report | 1 |
| Independent auditor's report to the members | 3 |
| Income statement | 6 |
| Statement of financial position | 7 |
| Reconciliation of members' interests | 8 |
| Statement of cash flows | 10 |
| Notes to the annual report and financial statements | 11 |

# Lime Rock Management LLP

## Members' Report

## Year ended 31 December 2017

The members present their report and the annual report and financial statements of the LLP for the year ended 31 December 2017.

### Principal activities

The principal activity was advising on and arranging private equity transactions, principally in the Oil and Gas sector, for Lime Rock Management LP, the manager of the Lime Rock funds in the United States of America.

### Designated members

The designated members who served the LLP during the year were as follows:

LRM UK One Limited
LRM UK Two Limited

### Policy regarding members' drawings and the subscription and repayment of amounts subscribed or otherwise contributed by members

Members are permitted to make drawings in anticipation of profits which will be allocated to them. The amount of such drawings is set at the beginning of each financial year, taking into account the anticipated cash needs of the LLP.

New members are required to subscribe a minimum level of capital and in subsequent years members are invited to subscribe for further capital, the amounts of which are determined by the performance and security of those members. On retirement, capital is repaid to members.

### Going concern

The financial statements have been prepared on the going concern basis, notwithstanding that the partnership had net current assets of £185,501 (2016, £131,232), which the members believe to be appropriate for the following reasons. The partnership is dependent for its working capital on financial support provided by its customer Lime Rock Management LP who has indicated to the partnership that for at least the next twelve months from the date of approval of these financial statements it will continue to support the partnership to the extent needed. This should enable the partnership to continue in operational existence for the foreseeable future by meeting its liabilities as they fall due for payment.

The members acknowledge that there can be no certainty that this support will continue, although, at the date of approval of these financial statements, they have no reason to believe that it will not do so. Based on this undertaking the members believe that it remains appropriate to prepare the financial statements on a going concern basis. The financial statements do not include any adjustments that would result from this basis of preparation being inappropriate.

# Lime Rock Management LLP

## Members' Report *(continued)*

### Year ended 31 December 2017

**Members' responsibilities statement**

The members are responsible for preparing the Annual Report and the financial statements in accordance with applicable law and regulation.

Company law, as applied to limited liability partnerships by the Limited Liability Partnerships (Accounts and Audit) (Application of Companies Act 2006) Regulations 2008 (the "Regulations"), requires the members to prepare financial statements for each financial year. Under that law the members have prepared the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards, comprising FRS 102 "The Financial Reporting Standard applicable in the UK and Republic of Ireland", and applicable law). Under company law, as applied to limited liability partnerships, the members must not approve the financial statements unless they are satisfied that they give a true and fair view of the state of affairs of the limited liability partnership and of the profit or loss of the limited liability partnership for that period. In preparing the financial statements, the members are required to:

- select suitable accounting policies and then apply them consistently;
- state whether applicable United Kingdom Accounting Standards, comprising FRS 102, have been followed, subject to any material departures disclosed and explained in the financial statements;
- make judgements and accounting estimates that are reasonable and prudent; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the limited liability partnership will continue in business.

The members are responsible for keeping adequate accounting records that are sufficient to show and explain the limited liability partnership's transactions and disclose with reasonable accuracy at any time the financial position of the limited liability partnership and enable them to ensure that the financial statements comply with the Companies Act 2006 as applied to limited liability partnerships by the Regulations.

The members are also responsible for safeguarding the assets of the limited liability partnership and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

This report was approved by the members on 23 April 2018 and signed on behalf of the members by:

Signed on behalf of the members

TM Burgess
Chief Executive

Registered office:
Union Plaza (6th Floor)
1 Union Wynd
Aberdeen
UK
AB10 1DQ

2

# *Independent auditors' report to the members of Lime Rock Management LLP*

## Report on the financial statements

### Our opinion

In our opinion, Lime Rock Management LLP's financial statements (the "financial statements"):

- give a true and fair view of the state of the limited liability partnership's affairs as at 31 December 2017 and of its profit and cash flows for the year then ended;

- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice; and

- have been prepared in accordance with the requirements of the Companies Act 2006 as applied to limited liability partnerships by the Limited Liability Partnerships (Accounts and Audit) (Application of Companies Act 2006) Regulations 2008.

### What we have audited

The financial statements, included within the Annual report and financial statements (the "Annual Report"), comprise:

- the statement of financial position as at 31 December 2017;

- the income statement for the year then ended;

- the statement of cash flows for the year then ended;

- the reconciliation of members' interests for the year then ended; and

- the notes to the financial statements, which include a summary of significant accounting policies and other explanatory information.

The financial reporting framework that has been applied in the preparation of the financial statements is United Kingdom Accounting Standards, comprising FRS 102 "The Financial Reporting Standard applicable in the UK and Republic of Ireland", and applicable law (United Kingdom Generally Accepted Accounting Practice).

In applying the financial reporting framework, the members have made a number of subjective judgements, for example in respect of significant accounting estimates. In making such estimates, they have made assumptions and considered future events.

## Other matters on which we are required to report by exception

### Adequacy of accounting records and information and explanations received

Under the Companies Act 2006 as applicable to limited liability partnerships we are required to report to you if, in our opinion:

- we have not received all the information and explanations we require for our audit; or

- adequate accounting records have not been kept, or returns adequate for our audit have not been received from branches not visited by us; or

- the financial statements are not in agreement with the accounting records and returns.

We have no exceptions to report arising from this responsibility.

## Responsibilities for the financial statements and the audit

### Our responsibilities and those of the members

As explained more fully in the Members' Responsibilities Statement set out on page 1, the members are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view.

Our responsibility is to audit and express an opinion on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland) ("ISAs (UK & Ireland)"). Those standards require us to comply with the Auditing Practices Board's Ethical Standards for Auditors.

This report, including the opinion, has been prepared for and only for the members of the partnership as a body in accordance with the Companies Act 2006 as applied to limited liability partnerships by the Limited Liability Partnerships (Accounts and Audit) (Application of Companies Act 2006) Regulations 2008 and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

## What an audit of financial statements involves

We conducted our audit in accordance with ISAs (UK & Ireland). An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of:

- whether the accounting policies are appropriate to the limited liability partnership's circumstances and have been consistently applied and adequately disclosed;

- the reasonableness of significant accounting estimates made by the members; and

- the overall presentation of the financial statements.

We primarily focus our work in these areas by assessing the members' judgements against available evidence, forming our own judgements, and evaluating the disclosures in the financial statements.

We test and examine information, using sampling and other auditing techniques, to the extent we consider necessary to provide a reasonable basis for us to draw conclusions. We obtain audit evidence through testing the effectiveness of controls, substantive procedures or a combination of both.

In addition, we read all the financial and non-financial information in the Annual Report to identify material inconsistencies with the audited financial statements and to identify any information that is apparently materially incorrect based on, or materially inconsistent with, the knowledge acquired by us in the course of performing the audit. If we become aware of any apparent material misstatements or inconsistencies we consider the implications for our report.

Jamie Drummund (Senior Statutory Auditor)
for and on behalf of PricewaterhouseCoopers LLP
Chartered Accountants and Statutory Auditors
Aberdeen
23 April 2018

# Lime Rock Management LLP

## Income Statement

### Year ended 31 December 2017

|  | Note | 2017 £ | 2016 £ |
|---|---|---|---|
| Turnover | 4 | 1,093,756 | 3,291,635 |
| Staff costs | 5 | (871,930) | (2,284,478) |
| Depreciation and other amounts written off tangible and intangible fixed assets |  | 3,135 | (299,517) |
| Other operating expenses |  | (162,874) | (685,379) |
| Operating profit | 7 | 62,087 | 22,261 |
| Other interest receivable and similar income | 8 | – | 1 |
| Interest payable and similar expenses | 9 | – | (4,867) |
| Profit for the financial year before members' remuneration and profit shares |  | 62,087 | 17,395 |
| Members' remuneration charged as an expense |  | (62,041) | (17,000) |
| Profit for the financial year available for discretionary division among members |  | 46 | 395 |

All the activities of the LLP are from continuing operations.

The LLP has no other recognised items of income and expenses other than the results for the year as set out above.

---

The notes on pages 10 to 16 form part of these annual report and financial statements.

# Lime Rock Management LLP

## Statement of Financial Position

### 31 December 2017

| | Note | 2017 £ | 2016 £ |
|---|---|---|---|
| **Fixed assets** | | | |
| Tangible assets | 10 | – | 54,223 |
| **Current assets** | | | |
| Debtors | 11 | 223,272 | 283,858 |
| Cash at bank and in hand | | 184,552 | 162,196 |
| | | 407,824 | 446,054 |
| Creditors: amounts falling due within one year | 12 | (222,323) | (314,822) |
| Net current assets | | 185,501 | 131,232 |
| Total assets less current liabilities | | 185,501 | 185,455 |
| Net assets | | 185,501 | 185,455 |
| **Represented by:** | | | |
| **Loans and other debts due to members** | | | |
| Members' capital classified as a liability | 13 | 180,000 | 180,000 |
| Other amounts | 13 | 5,501 | 5,455 |
| | | 185,501 | 185,455 |
| **Members' other interests** | | | |
| Other reserves, including the fair value reserve | | – | – |
| | | 185,501 | 185,455 |
| **Total members' interests** | | | |
| Loans and other debts due to members | 13 | 185,501 | 185,455 |
| Members' other interests | | – | – |
| | | 185,501 | 185,455 |

These annual report and financial statements were approved by the members and authorised for issue on 23 April 2018, and are signed on their behalf by:

*J. M. Burgess*

TM Burgess
Chief Executive

Registered number: SO300122

The notes on pages 10 to 16 form part of these annual report and financial statements.

**Lime Rock Management LLP**

**Reconciliation of Members' Interests**

**Year ended 31 December 2017**

| | Members' other interests | | Loans and other debts due to members less any amounts due from members in debtors | | | Total members' interests |
| --- | --- | --- | --- | --- | --- | --- |
| | Other reserves, including the fair value reserve | Total | Members' capital (classified as debt) | Other amounts | Total | Total 2017 |
| | £ | £ | £ | £ | £ | £ |
| Balance at 1 January 2017 | – | – | 180,000 | 5,455 | 185,455 | 185,455 |
| Profit for the financial year available for discretionary division among members | 46 | 46 | · | - | - | 46 |
| Members' interests after profit for the year | 46 | 46 | 180,000 | 5,455 | 185,455 | 185,501 |
| Other division of profits | (46) | (46) | - | 46 | 46 | – |
| **Balance at 31 December 2017** | – | – | 180,000 | 5,501 | 185,501 | 185,501 |

The reconciliation of members' interests
continues on the following page.
The notes on pages 10 to 16 form part of these annual report and financial statements.

7

## Lime Rock Management LLP

### Reconciliation of Members' Interests *(continued)*

#### Year ended 31 December 2017

| | Members' other interests | | Loans and other debts due to members less any amounts due from members in debtors | | | Total members' interests |
|---|---|---|---|---|---|---|
| | Other reserves, including the fair value reserve | Total | Members' capital (classified as debt) | Other amounts | Total | Total 2016 |
| | £ | £ | £ | £ | £ | £ |
| Balance at 1 January 2016 | – | – | 180,000 | 5,060 | 185,060 | 185,060 |
| Profit for the financial year available for discretionary division among members | 395 | 395 | – | – | – | 395 |
| Members' interests after profit for the year | 395 | 395 | 180,000 | 5,060 | 185,060 | 185,455 |
| Other division of profits | (395) | (395) | – | 395 | 395 | – |
| Balance at 31 December 2016 | – | – | 180,000 | 5,455 | 185,455 | 185,455 |

The notes on pages 10 to 16 form part of these annual report and financial statements.

8

# Lime Rock Management LLP

## Statement of Cash Flows

### Year ended 31 December 2017

|  | 2017 £ | 2016 £ |
|---|---|---|
| **Cash flows from operating activities** | | |
| Profit for the financial year | 46 | 395 |
| *Adjustments for:* | | |
| Depreciation of tangible assets | – | 299,517 |
| Other interest receivable and similar income | – | (1) |
| Interest payable and similar expenses | – | 4,867 |
| Gains on disposal of tangible assets | (3,135) | – |
| Accruals and deferred income | (11,085) | (121,115) |
| *Changes in:* | | |
| Trade and other debtors | 60,586 | (108,739) |
| Trade and other creditors | (81,414) | (116,299) |
| Cash generated from operations | (35,002) | (41,375) |
| Interest paid | – | (4,867) |
| Interest received | – | 1 |
| Net cash used in operating activities | (35,002) | (46,241) |
| **Cash flows from investing activities** | | |
| Proceeds from sale of tangible assets | 57,358 | (1) |
| Net cash from/(used in) investing activities | 57,358 | (1) |
| **Cash flows from financing activities** | | |
| Payments of finance lease liabilities | – | (7,573) |
| Net cash used in financing activities | – | (7,573) |
| Net increase/(decrease) in cash and cash equivalents | 22,356 | (53,815) |
| Cash and cash equivalents at beginning of year | 162,196 | 216,011 |
| Cash and cash equivalents at end of year | 184,552 | 162,196 |

The notes on pages 10 to 16 form part of these annual report and financial statements.

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements

### Year ended 31 December 2017

**1. General information**

The LLP is registered in Scotland. Its registered office address is Union Plaza (6th Floor), 1 Union Wynd, Aberdeen, AB10 1DQ, UK.

**2. Statement of compliance**

These annual report and financial statements have been prepared in compliance with FRS 102, 'The Financial Reporting Standard applicable in the UK and the Republic of Ireland', and the requirements of the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships' issued in January 2017 (SORP 2017).

**3. Accounting policies**

**Basis of preparation**

The annual report and financial statements have been prepared on the historical cost basis, as modified by the revaluation of certain financial assets and liabilities and investment properties measured at fair value through profit or loss.

The annual report and financial statements are prepared in sterling, which is the functional currency of the entity.

**Judgements and key sources of estimation uncertainty**

The preparation of the financial statements requires management to make judgements, estimates and assumptions that affect the amounts reported. These estimates and judgements are continually reviewed and are based on experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

**Going concern**

The financial statements have been prepared on the going concern basis, notwithstanding that the partnership had net current assets of £185,501 (2016, £131,232), which the members believe to be appropriate for the following reasons. The partnership is dependent for its working capital on financial support provided by its customer Lime Rock Management LP who has indicated to the partnership that for at least the next twelve months from the date of approval of these financial statements it will continue to support the partnership to the extent needed. This should enable the partnership to continue in operational existence for the foreseeable future by meeting its liabilities as they fall due for payment.

The members acknowledge that there can be no certainty that this support will continue, although, at the date of approval of these financial statements, they have no reason to believe that it will not do so. Based on this undertaking the members believe that it remains appropriate to prepare the financial statements on a going concern basis. The financial statements do not include any adjustments that would result from this basis of preparation being inappropriate.

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements *(continued)*

### Year ended 31 December 2017

**Accounting policies** *(continued)*

**Significant judgements**

Management does not feel that the accounts include any judgements (apart from those involving estimations) that have any significant effect on the amounts recognised in the financial statements.

**Key sources of estimation uncertainty**

Accounting estimates and assumptions are made concerning the future and, by their nature, will rarely equal the related actual outcome. Management does not think that there are key assumptions and other sources of estimation uncertainty that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the financial statements.

**Revenue recognition**

Turnover is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods supplied and services rendered, stated net of discounts and of Value Added Tax.

**Members' participation rights**

Members' participation rights are the rights of a member against the LLP that arise under the members' agreement (for example, in respect of amounts subscribed or otherwise contributed, remuneration and profits).

Members' participation rights in the earnings or assets of the LLP are analysed between those that are, from the LLP's perspective, either a financial liability or equity, in accordance with Section 22 of FRS 102, 'The Financial Reporting Standard applicable in the UK and the Republic of Ireland', and the requirements of the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships'. A member's participation right results in a liability unless the right to any payment is discretionary on the part of the LLP.

**Foreign currencies**

Foreign currency transactions are initially recorded in the functional currency, by applying the spot exchange rate as at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated at the exchange rate ruling at the reporting date, with any gains or losses being taken to the profit and loss account.

**Tangible assets**

Tangible assets are initially recorded at cost, and subsequently stated at cost less any accumulated depreciation and impairment losses.

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements *(continued)*

### Year ended 31 December 2017

**Accounting policies** *(continued)*

**Depreciation**

Depreciation is calculated so as to write off the cost or valuation of an asset, less its residual value, over the useful economic life of that asset as follows:

| | | |
|---|---|---|
| Tenant's Improvements | - | 20% straight line |
| Fixtures and fittings | - | 20% straight line |
| Office equipment | - | 33% straight line |

**Impairment of fixed assets**

A review for indicators of impairment is carried out at each reporting date, with the recoverable amount being estimated where such indicators exist. Where the carrying value exceeds the recoverable amount, the asset is impaired accordingly. Prior impairments are also reviewed for possible reversal at each reporting date.

For the purposes of impairment testing, when it is not possible to estimate the recoverable amount of an individual asset, an estimate is made of the recoverable amount of the cash-generating unit to which the asset belongs. The cash-generating unit is the smallest identifiable group of assets that includes the asset and generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets.

**Finance leases and hire purchase contracts**

Assets held under finance leases and hire purchase contracts are recognised in the statement of financial position as assets and liabilities at the lower of the fair value of the assets and the present value of the minimum lease payments, which is determined at the inception of the lease term. Any initial direct costs of the lease are added to the amount recognised as an asset.

Lease payments are apportioned between the finance charges and reduction of the outstanding lease liability using the effective interest method. Finance charges are allocated to each period so as to produce a constant rate of interest on the remaining balance of the liability.

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements *(continued)*

### Year ended 31 December 2017

**Accounting policies** *(continued)*

**Financial instruments**

A financial asset or a financial liability is recognised only when the LLP becomes a party to the contractual provisions of the instrument.

Basic financial instruments are initially recognised at the transaction price, unless the arrangement constitutes a financing transaction, where it is recognised at the present value of the future payments discounted at a market rate of interest for a similar debt instrument.

Debt instruments are subsequently measured at amortised cost. Other financial instruments, including derivatives, are initially recognised at fair value, and are subsequently measured at fair value, with any changes recognised in profit or loss, with the exception of hedging instruments in a designated hedging relationship.

Financial assets that are measured at cost or amortised cost are reviewed for objective evidence of impairment at the end of each reporting date. If there is objective evidence of impairment, an impairment loss is recognised in profit or loss immediately.

For all equity instruments regardless of significance, and other financial assets that are individually significant, these are assessed individually for impairment. Other financial assets are either assessed individually or grouped on the basis of similar credit risk characteristics.

Any reversals of impairment are recognised in profit or loss immediately, to the extent that the reversal does not result in a carrying amount of the financial asset that exceeds what the carrying amount would have been had the impairment not previously been recognised.

**4.   Turnover**

Turnover arises from:

|  | 2017 £ | 2016 £ |
|---|---|---|
| Provision of services | 1,093,756 | 3,291,635 |

The whole of the turnover is attributable to the principal activity of the LLP wholly undertaken in the United Kingdom.

**5.   Staff costs**

The average number of persons employed by the LLP during the year, including the members with contracts of employment, amounted to:

|  | 2017 No. | 2016 No. |
|---|---|---|
| Administrative | – | 1 |
| Number of advisory staff | 1 | 5 |
|  | 1 | 6 |

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements *(continued)*

### Year ended 31 December 2017

**5.** **Staff costs** *(continued)*

The aggregate employment costs incurred during the year (excluding members) were:

| | 2017 £ | 2016 £ |
|---|---|---|
| Wages and salaries | 871,930 | 2,284,478 |

**6.** **Auditor's remuneration**

| | 2017 £ | 2016 £ |
|---|---|---|
| Fees payable for the audit of the annual report and financial statements | 10,927 | 10,927 |

**7.** **Operating profit**

Operating profit or loss is stated after charging:

| | 2017 £ | 2016 £ |
|---|---|---|
| Gains on disposal of tangible assets | (3,135) | – |
| Foreign exchange differences | – | 128 |

**8.** **Other interest receivable and similar income**

| | 2017 £ | 2016 £ |
|---|---|---|
| Interest on bank deposits | – | 1 |

**9.** **Interest payable and similar expenses**

| | 2017 £ | 2016 £ |
|---|---|---|
| Interest on obligations under finance leases and hire purchase contracts | – | 4,867 |

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements (continued)

### Year ended 31 December 2017

**10.   Tangible assets**

|  | Fixtures and fittings £ | Office equipment £ | Total £ |
|---|---|---|---|
| **Cost** | | | |
| At 1 January 2017 | 168,144 | 10,050 | 178,194 |
| Disposals | (168,144) | (10,050) | (178,194) |
| **At 31 December 2017** | – | – | – |
| **Depreciation** | | | |
| At 1 January 2017 | 117,271 | 6,700 | 123,971 |
| Disposals | (117,271) | (6,700) | (123,971) |
| **At 31 December 2017** | – | – | – |
| **Carrying amount** | | | |
| **At 31 December 2017** | – | – | – |
| At 31 December 2016 | 50,873 | 3,350 | 54,223 |

**Finance lease agreements**

Included within the net book value of £nil (2016, £54,223) is £nil (2016, £nil) relating to assets held under finance lease agreements and capitalised as office equipment. The depreciation charged to the financial statements in the year in respect of such assets amounted to £nil (2016, £nil).

**11.   Debtors**

|  | 2017 £ | 2016 £ |
|---|---|---|
| Prepayments and accrued income | 221,448 | 259,093 |
| Other debtors | 1,824 | 24,765 |
|  | 223,272 | 283,858 |

**12.   Creditors: amounts falling due within one year**

|  | 2017 £ | 2016 £ |
|---|---|---|
| Trade creditors | 9,640 | 30,207 |
| Accruals and deferred income | 28,362 | 39,447 |
| Social security and other taxes | 184,321 | 245,168 |
|  | 222,323 | 314,822 |

# Lime Rock Management LLP

## Notes to the Annual Report and Financial Statements (continued)

### Year ended 31 December 2017

**13**    **Loans and other debts due to members**

|                                                | 2017<br>£ | 2016<br>£ |
|------------------------------------------------|-----------|-----------|
| Other amounts                                  | 5,501     | 5,455     |
| Members' capital classified as a liability     | 180,000   | 180,000   |
|                                                | 185,501   | 185,455   |

**14**    **Financial risk management**

The company has exposures to liquidity risk.

**Liquidity risk**

The objective of the company in managing liquidity risk is to ensure that it can meet its financial obligations as and when they fall due. The company expects to meet its financial obligations through operating cash flows. In the event that the operating cash flows would not cover all of the obligations the company has credit facilities available.

**15**    **Ultimate parent company**

Lime Rock Management LLP is owned by two members, LRM UK One Limited and LRM UK Two Limited, both companies incorporated within the United Kingdom.

LRM UK One Limited owns the entire share capital in LRM UK Two Limited, M McCall is the ultimate controlling party as a result of his ownership of 100% of the share capital in LRM UK One Limited.

**16**    **Transactions with members**

In the event of winding up, loans and other debts due to members rank equally with unsecured creditors. Members' other interests rank after unsecured creditors. All profits are divided automatically each year, and a member may demand the return of capital. No element of members' remuneration is clearly identifiable as a return on amounts subscribed or otherwise contributed. Accordingly, no part of the return to the members is regarded as a return on capital.

**17**    **Related party transactions**

During the year Lime Rock Management LLP received £1,093,756 (2016, £3,291,635) from Lime Rock Management LP in respect of advisory services provided to the partnership. At 31 December 2017, £198,500 was recorded as accrued income (201, £156,100).

Other than the transactions above there are no other related party transactions.

16

# EXHIBIT 10

**REGISTERED NUMBER: SO300122**

# Lime Rock Management LLP

# Unaudited Financial Statements

## 31 December 2018



FRIDAY

*S8EUX1JU*

SCT    27/09/2019    #860

COMPANIES HOUSE

**Lime Rock Management LLP**

**Financial Statements**

**Year ended 31 December 2018**

| Contents | Page |
|---|---|
| Members' report | 1 |
| Statement of income and retained earnings | 2 |
| Statement of financial position | 4 |
| Reconciliation of members' interests | 5 |
| Notes to the financial statements | 6 |

# Lime Rock Management LLP

## Members' Report

## Year ended 31 December 2018

The members present their report and the unaudited financial statements of the LLP for the year ended 31 December 2018.

### Principal activities

The principal activity was advising on and arranging private equity transactions, principally in the Oil and Gas sector, for Lime Rock Management LP, the manager of the Lime Rock funds in the United States of America.

The company ceased trading on 31 December 2018.

### Designated members

The designated members who served the LLP during the year were as follows:

LRM UK One Limited
LRM UK Two Limited

### Policy regarding members' drawings and the subscription and repayment of amounts subscribed or otherwise contributed by members

Members are permitted to make drawings in anticipation of profits which will be allocated to them. The amount of such drawings is set at the beginning of each financial year, taking into account the anticipated cash needs of the LLP.

New members are required to subscribe a minimum level of capital and in subsequent years members are invited to subscribe for further capital, the amounts of which are determined by the performance and seniority of those members. On retirement, capital is repaid to members.

This report was approved by the members on 13 September 2019 and signed on behalf of the members by:

Trevor Burgess
Chief Executive

Registered office:
Union Plaza 6th Floor
1 Union Wynd
Aberdeen
AB10 1DQ

1

# Lime Rock Management LLP

## Statement of Income and Retained Earnings

## Year ended 31 December 2018

| | Note | 2018 £ | 2017 £ |
|---|---|---|---|
| **Turnover** | | 879,248 | 1,093,756 |
| **Gross profit** | | 879,248 | 1,093,756 |
| Administrative expenses | | (879,433) | (1,034,804) |
| Other operating income | | – | 3,135 |
| **Operating (loss)/profit** | 5 | (185) | 62,087 |
| **(Loss)/profit for the financial year before members' remuneration and profit shares** | | (185) | 62,087 |
| Members' remuneration charged as an expense | | (187) | 62,041 |
| **Profit for the financial year available for discretionary division among members** | | 2 | 46 |

The notes on pages 6 to 8 form part of these financial statements.

# Lime Rock Management LLP

## Statement of Financial Position *(continued)*

### 31 December 2018

| | Note | 2018 £ | 2017 £ |
|---|---|---|---|
| **Current assets** | | | |
| Debtors | 6 | 198,272 | 223,272 |
| Cash at bank and in hand | | 14,499 | 184,552 |
| | | 212,771 | 407,824 |
| **Creditors: amounts falling due within one year** | 7 | (32,769) | (222,323) |
| **Net current assets** | | 180,002 | 185,501 |
| **Total assets less current liabilities** | | 180,002 | 185,501 |
| **Net assets** | | 180,002 | 185,501 |
| **Represented by:** | | | |
| **Loans and other debts due to members** | | | |
| Members' capital classified as a liability | 8 | 180,000 | 180,000 |
| Other amounts | 8 | 2 | 5,501 |
| | | 180,002 | 185,501 |
| **Total members' interests** | | | |
| Loans and other debts due to members | 8 | 180,002 | 185,501 |
| Members' other interests | | – | – |
| | | 180,002 | 185,501 |

These financial statements have been prepared in accordance with the provisions applicable to LLPs subject to the small LLPs' regime and in accordance with FRS 102 'The Financial Reporting Standard applicable in the UK and Republic of Ireland'.

For the year ending 31 December 2018 the LLP was entitled to exemption from audit under section 477 of the Companies Act 2006 (as applied by The Limited Liability Partnerships (Accounts and Audit) (Application of Companies Act 2006) Regulations 2008) relating to small LLPs.

The members acknowledge their responsibilities for complying with the requirements of the Act (as applied to LLPs) with respect to accounting records and the preparation of financial statements.

These financial statements were approved by the members and authorised for issue on 13 September 2019, and are signed on their behalf by:

J.M. Burgess

Trevor Burgess
Chief Executive

Registered number: SO300122

---

**The notes on pages 6 to 8 form part of these financial statements.**

Case 3:20-mc-00016-KAD   Document 1-4   Filed 02/20/20   Page 146 of 162

# Lime Rock Management LLP

## Reconciliation of Members' Interests

### Year ended 31 December 2018

| | Members' other interests | | Loans and other debts due to members less any amounts due from members in debtors | | | Total members' interests |
| --- | --- | --- | --- | --- | --- | --- |
| | Other reserves | Total | Members' capital (classified as debt) | Other amounts | Total | Total_2018 |
| | £ | £ | £ | £ | £ | £ |
| Balance at 1 January 2018 | – | – | 180,000 | 5,501 | 185,501 | 185,501 |
| Profit for the financial year available for discretionary division among members | 2 | 2 | – | – | – | 2 |
| Members' interests after profit for the year | 2 | 2 | 180,000 | 5,501 | 185,501 | 185,503 |
| Other division of profits | (2) | (2) | – | 2 | 2 | – |
| Other movements | – | – | – | (5,501) | (5,501) | (5,501) |
| Balance at 31 December 2018 | – | – | 180,000 | 2 | 180,002 | 180,002 |

The reconciliation of members' interests
continues on the following page.

The notes on pages 6 to 8 form part of these financial statements.

4

# Lime Rock Management LLP

## Reconciliation of Members' Interests (continued)

### Year ended 31 December 2018

| | Members' other interests | | Loans and other debts due to members less any amounts due from members in debtors | | | Total members' interests |
|---|---|---|---|---|---|---|
| | Other reserves | Total | Members' capital (classified as debt) | Other amounts | Total | Total_2017 |
| | £ | £ | £ | £ | £ | £ |
| Balance at 1 January 2017 | – | – | 180,000 | 5,455 | 185,455 | 185,455 |
| Profit for the financial year available for discretionary division among members | 46 | 46 | | 46 | 46 | 46 |
| Members' interests after profit for the year | 46 | 46 | 180,000 | 5,455 | 185,455 | 185,501 |
| Other division of profits | (46) | (46) | | 46 | 46 | – |
| Balance at 31 December 2017 | – | – | 180,000 | 5,501 | 185,501 | 185,501 |

The notes on pages 6 to 8 form part of these financial statements.

5

## Lime Rock Management LLP

### Notes to the Financial Statements

### Year ended 31 December 2018

**1.    General information**

The LLP is registered in Scotland.  The address of the registered office is Union Plaza 6th Floor, 1 Union Wynd, Aberdeen, AB10 1DQ.

**2.    Statement of compliance**

These financial statements have been prepared in compliance with Section 1A of FRS 102, 'The Financial Reporting Standard applicable in the UK and the Republic of Ireland', and the requirements of the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships' issued in January 2017 (SORP 2017).

**3.    Accounting policies**

**Basis of preparation**

The financial statements have been prepared on the historical cost basis, as modified by the revaluation of certain financial assets and liabilities and investment properties measured at fair value through profit or loss.

The financial statements are prepared in sterling, which is the functional currency of the entity.

**Disclosure exemptions**

The entity satisfies the criteria of being a qualifying entity as defined in FRS 102. As such, advantage has been taken of the following disclosure exemptions available under paragraph 1.12 of FRS 102:

(a) No cash flow statement has been presented for the LLP.
(b) Disclosures in respect of financial instruments have not been presented.
(c) No disclosure has been given for the aggregate remuneration of key management personnel.

**Judgements and key sources of estimation uncertainty**

The preparation of the financial statements requires management to make judgements, estimates and assumptions that affect the amounts reported. These estimates and judgements are continually reviewed and are based on experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

**Revenue recognition**

Turnover is measured at the fair value of the consideration received or receivable and represents amounts receivable for goods supplied and services rendered, stated net of discounts and of Value Added Tax.

## Lime Rock Management LLP

### Notes to the Financial Statements *(continued)*

### Year ended 31 December 2018

**3.    Accounting policies** *(continued)*

**Members' participation rights**

Members' participation rights are the rights of a member against the LLP that arise under the members' agreement (for example, in respect of amounts subscribed or otherwise contributed, remuneration and profits). Members' participation rights in the earnings or assets of the LLP are analysed between those that are, from the LLP's perspective, either a financial liability or equity, in accordance with Section 22 of FRS 102, 'The Financial Reporting Standard applicable in the UK and the Republic of Ireland', and the requirements of the Statement of Recommended Practice 'Accounting by Limited Liability Partnerships'. A member's participation right results in a liability unless the right to any payment is is discretionary on the part of the LLP.

**Depreciation**

Depreciation is calculated so as to write off the cost or valuation of an asset, less its residual value, over the useful economic life of that asset as follows:

Fixtures and fittings       -       20% straight line
Office equipment            -       20% straight line

**Financial instruments**

A financial asset or a financial liability is recognised only when the entity becomes a party to the contractual provisions of the instrument.

Basic financial instruments are initially recognised at the transaction price, unless the arrangement constitutes a financing transaction, where it is recognised at the present value of the future payments discounted at a market rate of interest for a similar debt instrument.

Debt instruments are subsequently measured at amortised cost.

**4.    Employee numbers**

The average number of persons employed by the LLP during the year, including the members with contracts of employment, amounted to 1 (2017: 1).

**5.    Operating profit**

Operating profit or loss is stated after charging:

|                                                        | 2018 £ | 2017 £ |
|--------------------------------------------------------|--------|--------|
| Fees payable for the audit of the financial statements | –      | 16,000 |

**6.    Debtors**

|              | 2018 £  | 2017 £  |
|--------------|---------|---------|
| Other debtors | 198,272 | 223,272 |

7

# Lime Rock Management LLP

## Notes to the Financial Statements *(continued)*

### Year ended 31 December 2018

**7.   Creditors: amounts falling due within one year**

|  | 2018 £ | 2017 £ |
|---|---|---|
| Trade creditors | 750 | 9,640 |
| Social security and other taxes | – | 184,321 |
| Accruals and deferred income | 32,019 | 28,362 |
|  | 32,769 | 222,323 |

**8.   Loans and other debts due to members**

|  | 2018 £ | 2017 £ |
|---|---|---|
| Members capital classified as a liability | 180,000 | 180,000 |
| Other amounts | 2 | 5,501 |
|  | 180,002 | 185,501 |

8

# EXHIBIT 11

1/14/2020                         LRM UK ONE LIMITED - Officers (free information from Companies House)

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LRM UK ONE LIMITED

Company number **SC408293**

- Officers
- Persons with significant control (https://beta.companieshouse.gov.uk/company/SC408293/persons-with-significant-control)

## Filter officers

☐
Current officers

Apply filter

## 5 officers / 4 resignations

---

### BURGESS, Trevor Michael

Correspondence address ███████████████████ Aberdeen, AB10 1DQ

Role Active **Director**

Date of birth ████ 1954

Appointed on **10 August 2015**

Nationality **British**

Country of residence **United Kingdom**

Occupation **None**

---

### ROSS, Hamish Hector Lawrence

Correspondence address ██████████ Aberdeen, Scotland, AB10 1UP

Role Resigned **Director**

Date of birth ████ 1952

Appointed on **28 September 2011**

Resigned on **24 April 2014**

Nationality **British**

Country of residence **Scotland**

Occupation **Company Director**

---

### SCOFIELD, Jeffrey Bennett

Correspondence address ██████████████ London, England, W1J 6EQ

Role Resigned **Director**

Date of birth ████ 1978

Appointed on **24 April 2014**

Resigned on **31 August 2015**

1/14/2020                                      LRM UK ONE LIMITED - Officers (free information from Companies House)

Nationality  **American**

Country of residence  **United Kingdom**

Occupation  **Investment Management**

## STARK, James Gordon Croll

Correspondence address ▇▇▇▇▇▇▇▇▇▇ **Letham, Angus, United Kingdom, DD8 2ST**

Role Resigned  **Director**

Date of birth ▇▇▇▇ **1963**

Appointed on  **28 September 2011**

Resigned on  **28 September 2011**

Nationality  **British**

Country of residence  **Scotland**

Occupation  **Solicitor**

## P & W DIRECTORS LIMITED

Correspondence address  **Union Plaza, (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Role Resigned  **Director**

Appointed on  **28 September 2011**

Resigned on  **28 September 2011**

### Registered in a European Economic Area What's this?

Placed registered  **UNITED KINGDOM**

Registration number  **SC210957**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page? (link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SC408293/officers)

1/14/2020                                    Persons with significant control

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LRM UK ONE LIMITED

Company number **SC408293**

- Officers (https://beta.companieshouse.gov.uk/company/SC408293/officers)
- Persons with significant control

1 active person with significant control / 0 active statements

---

## Mark Mccall Active

Correspondence address ▮▮▮▮▮▮ **Westport, Connecticut, United States, 06880**

Notified on  **6 April 2016**

Date of birth ▮▮ **968**

Nationality  **American**

Nature of control  **Ownership of shares – 75% or more   Ownership of voting rights - 75% or more
Right to appoint and remove directors**

Country of residence  **United States**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page?
(link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SC408293/persons-with-significant-control)

# EXHIBIT 12

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LRM UK TWO LIMITED

Company number **SC408300**

- Officers
- Persons with significant control (https://beta.companieshouse.gov.uk/company/SC408300/persons-with-significant-control)

## Filter officers

☐
Current officers

Apply filter

## 5 officers / 4 resignations

## BURGESS, Trevor Michael

Correspondence address ███████████████ ████████ **Aberdeen, AB10 1DQ**

Role Active **Director**

Date of birth ████ **1954**

Appointed on **10 August 2015**

Nationality **British**

Country of residence **United Kingdom**

Occupation **None**

## ROSS, Hamish Hector Lawrence

Correspondence address ████████ **Aberdeen, Scotland, AB10 1UP**

Role Resigned **Director**

Date of birth ████ **1952**

Appointed on **28 September 2011**

Resigned on **24 April 2014**

Nationality **British**

Country of residence **Scotland**

Occupation **Company Director**

## SCOFIELD, Jeffrey Bennett

Correspondence address ████████████ **London, England, W1J 6EQ**

Role Resigned **Director**

Date of birth ████████ **1978**

Appointed on **24 April 2014**

Resigned on **31 August 2015**

1/14/2020                                    LRM UK TWO LIMITED - Officers (free information from Companies House)

Nationality  **American**

Country of residence  **United Kingdom**

Occupation  **Investment Management**

---

# STARK, James Gordon Croll

Correspondence address  ████████████  **Letham, Angus, United Kingdom, DD8 2ST**

Role Resigned  **Director**

Date of birth  █████  **1963**

Appointed on  **28 September 2011**

Resigned on  **28 September 2011**

Nationality  **British**

Country of residence  **Scotland**

Occupation  **Solicitor**

---

# P & W DIRECTORS LIMITED

Correspondence address  **Union Plaza, (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Role Resigned  **Director**

Appointed on  **28 September 2011**

Resigned on  **28 September 2011**

## Registered in a European Economic Area What's this?

Placed registered  **UNITED KINGDOM**

Registration number  **SC210957**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page? (link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SC408300/officers)

2cb4aebeee3fd13e

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LRM UK TWO LIMITED

Company number **SC408300**

- Officers (https://beta.companieshouse.gov.uk/company/SC408300/officers)
- Persons with significant control

1 active person with significant control / 0 active statements

## Lrm Uk One Limited Active

Correspondence address **Union Plaza (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Notified on **6 April 2016**

Governing law **United Kingdom (Scotland)**

Legal form **Limited By Shares**

Place registered **Companies House**

Registration number **Sc408293**

Nature of control **Ownership of shares – 75% or more  Ownership of voting rights - 75% or more
 Right to appoint and remove directors**

Incorporated in **Scotland**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page?
(link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SC408300/persons-with-significant-control)

# EXHIBIT 13

1/14/2020                    LIME ROCK MANAGEMENT LLP - Officers (free information from Companies House)

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LIME ROCK MANAGEMENT LLP

Company number **SO300122**

- Officers
- Persons with significant control (https://beta.companieshouse.gov.uk/company/SO300122/persons-with-significant-control)

## Filter officers

☐
Current officers

Apply filter

## 4 officers / 2 resignations

### LRM UK ONE LIMITED

Correspondence address  **Union Plaza (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Role Active  **LLP Designated Member**

Appointed on  **20 February 2012**

#### Registered in a European Economic Area What's this?

Placed registered  **UNITED KINGDOM**

Registration number  **SC408293**

### LRM UK TWO LIMITED

Correspondence address  **Union Plaza (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Role Active  **LLP Designated Member**

Appointed on  **20 February 2012**

#### Registered in a European Economic Area What's this?

Placed registered  **UNITED KINGDOM**

Registration number  **SC408300**

### MUNRO, Simon

Correspondence address  ███████████ **Aberdeen, Aberdeenshire, AB10 1UP**

Role Resigned  **LLP Designated Member**

Date of birth  ██████ **1966**

Appointed on  **30 July 2002**

Resigned on  **20 February 2012**

Country of residence  **United Kingdom**

1/14/2020                           LIME ROCK MANAGEMENT LLP - Officers (free information from Companies House)

## ROSS, Hamish Hector Lawrence

Correspondence address ████████████  **Aberdeen, Aberdeenshire, AB10 1UP**

Role Resigned  **LLP Designated Member**

Date of birth  ████ **1952**

Appointed on  **30 July 2002**

Resigned on  **20 February 2012**

Country of residence  **Scotland**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page?
(link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SO300122/officers)

1/14/2020                                    Persons with significant control

# Companies House

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

LIME ROCK MANAGEMENT LLP

Company number **SO300122**

- Officers (https://beta.companieshouse.gov.uk/company/SO300122/officers)
- Persons with significant control

1 active person with significant control / 0 active statements

## Lrm Uk One Limited Active

Correspondence address  **Union Plaza (6th Floor), 1 Union Wynd, Aberdeen, Scotland, AB10 1DQ**

Notified on  **30 July 2017**

Governing law  **United Kingdom (Scotland)**

Legal form  **Limited By Shares**

Place registered  **Companies House**

Registration number  **Sc408293**

Nature of control  **Ownership of voting rights - 75% or more  Right to surplus assets - 75% or more
Right to appoint and remove members**

Incorporated in  **Scotland**

## Statement Withdrawn

**The company has identified a registrable person in relation to the company but all the required particulars of that person have
not been confirmed**

Notified on  **30 July 2016**

Withdrawn on  **30 July 2017**

Tell us what you think of this service(link opens a new window) (https://www.research.net/r/S78XJMV) Is there anything wrong with this page?
(link opens a new window) (https://beta.companieshouse.gov.uk/help/feedback?
sourceurl=https://beta.companieshouse.gov.uk/company/SO300122/persons-with-significant-control)