# EXHIBIT 14

**Execution Copy**

# LIME ROCK PARTNERS V, L.P.

AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT

Dated April 17, 2008

**THE LIMITED PARTNER INTERESTS (THE "INTERESTS") OF LIME ROCK PARTNERS V, L.P. HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND ARE SUBJECT TO SIGNIFICANT RESTRICTIONS ON TRANSFERABILITY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS AND THE TERMS AND CONDITIONS OF THIS PARTNERSHIP AGREEMENT, INCLUDING SECTION 10.1(a) HEREOF. THEREFORE, PURCHASERS OF INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

**TABLE OF CONTENTS**

ARTICLE I

GENERAL PROVISIONS

| | | |
|---|---|---|
| 1.1 | DEFINITIONS | 1 |
| 1.2 | NAME AND OFFICE | 15 |
| 1.3 | PURPOSES | 15 |
| 1.4 | TERM | 15 |
| 1.5 | FISCAL YEAR | 15 |
| 1.6 | POWERS | 15 |
| 1.7 | SPECIFIC AUTHORIZATION | 17 |
| 1.8 | AMENDMENT AND RESTATEMENT OF AGREEMENT; ADMISSION OF LIMITED PARTNERS | 17 |
| 1.9 | EXPENSES | 18 |

ARTICLE II

THE GENERAL PARTNER

| | | |
|---|---|---|
| 2.1 | MANAGEMENT OF THE FUND, ETC | 18 |
| 2.2 | RELIANCE BY THIRD PARTIES | 18 |
| 2.3 | CONFLICTS OF INTEREST, ETC | 18 |
| 2.4 | LIABILITY OF THE GENERAL PARTNER AND OTHER COVERED PERSONS | 21 |
| 2.5 | REMOVAL OF THE GENERAL PARTNER | 22 |
| 2.6 | BANKRUPTCY, DISSOLUTION OR WITHDRAWAL OF THE GENERAL PARTNER | 23 |

ARTICLE III

THE LIMITED PARTNERS

| | | |
|---|---|---|
| 3.1 | NO PARTICIPATION IN MANAGEMENT, ETC | 24 |
| 3.2 | LIMITATION OF LIABILITY | 24 |
| 3.3 | NO PRIORITY | 24 |
| 3.4 | ERISA PARTNERS AND PUBLIC PLAN PARTNERS | 24 |
| 3.5 | LIMITED PARTNERS SUBJECT TO THE BANK HOLDING COMPANY ACT | 27 |
| 3.6 | FOUNDATION PARTNERS | 28 |
| 3.7 | BANKRUPTCY, DISSOLUTION OR WITHDRAWAL OF A LIMITED PARTNER | 28 |
| 3.8 | ADVISORY COMMITTEE | 28 |
| 3.9 | FEEDER FUNDS | 30 |

ARTICLE IV

INVESTMENTS

| | | |
|---|---|---|
| 4.1 | INVESTMENTS IN PORTFOLIO COMPANIES | 31 |
| 4.2 | INVESTMENT RESTRICTIONS | 31 |
| 4.3 | PLAN ASSETS | 33 |
| 4.4 | UNRELATED BUSINESS TAXABLE INCOME AND EFFECTIVELY CONNECTED INCOME | 33 |
| 4.5 | TEMPORARY INVESTMENTS | 33 |
| 4.6 | RELATED INVESTMENT FUNDS | 34 |

ARTICLE V

CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 5.1 | CAPITAL COMMITMENTS | 39 |
| 5.2 | CAPITAL CONTRIBUTIONS | 39 |
| 5.3 | RETURN OF UNUSED CAPITAL CONTRIBUTIONS | 41 |
| 5.4 | PARTNERS EXCUSED FROM MAKING CAPITAL CONTRIBUTIONS | 41 |
| 5.5 | PARTNERS THAT DEFAULT ON CAPITAL CONTRIBUTIONS | 43 |
| 5.6 | EARLY TERMINATION OF INVESTMENT PERIOD | 45 |

ARTICLE VI

CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

| | | |
|---|---|---|
| 6.1 | CAPITAL ACCOUNTS | 46 |
| 6.2 | ADJUSTMENTS TO CAPITAL ACCOUNTS | 46 |
| 6.3 | DISTRIBUTIONS ATTRIBUTABLE TO PORTFOLIO INVESTMENTS | 47 |
| 6.4 | OTHER DISTRIBUTIONS | 48 |
| 6.5 | TAX DISTRIBUTIONS | 49 |
| 6.6 | GENERAL DISTRIBUTION PROVISIONS | 49 |
| 6.7 | DISTRIBUTIONS IN KIND | 51 |
| 6.8 | NEGATIVE CAPITAL ACCOUNTS | 52 |
| 6.9 | NO WITHDRAWAL OF CAPITAL | 52 |
| 6.10 | ALLOCATIONS TO CAPITAL ACCOUNTS | 52 |
| 6.11 | TAX ALLOCATIONS AND OTHER TAX MATTERS | 52 |
| 6.12 | WITHHOLDING | 53 |
| 6.13 | NOTIFICATION; ASSISTANCE IN OBTAINING REFUNDS | 55 |
| 6.14 | SEGREGATED RESERVE ACCOUNTS | 55 |
| 6.15 | OPERATING PARTNERSHIP INVESTMENTS. | 56 |

ii

ARTICLE VII

THE MANAGER

| 7.1 | APPOINTMENT OF THE MANAGER | 58 |
| 7.2 | MANAGEMENT FEE | 59 |

ARTICLE VIII

BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

| 8.1 | MAINTENANCE OF BOOKS AND RECORDS | 61 |
| 8.2 | AUDITS AND REPORTS | 61 |
| 8.3 | ANNUAL MEETING | 62 |
| 8.4 | TAX INFORMATION | 62 |

ARTICLE IX

INDEMNIFICATION

| 9.1 | INDEMNIFICATION OF COVERED PERSONS | 62 |
| 9.2 | RETURN OF CERTAIN DISTRIBUTIONS TO FUND INDEMNIFICATION | 64 |
| 9.3 | OTHER SOURCES OF RECOVERY | 65 |
| 9.4 | INDEMNIFICATION AGREEMENTS FOR COVERED PERSONS | 65 |

ARTICLE X

TRANSFERS; SUBSEQUENT CLOSING PARTNERS

| 10.1 | TRANSFERS BY PARTNERS | 66 |
| 10.2 | SUBSEQUENT CLOSING PARTNERS | 69 |

ARTICLE XI

DISSOLUTION AND WINDING UP OF THE FUND

| 11.1 | DISSOLUTION | 72 |
| 11.2 | WINDING UP | 73 |
| 11.3 | CLAWBACK | 75 |
| 11.4 | DISSOLUTION | 76 |

4209061_3.DOC

## ARTICLE XII

### AMENDMENTS; POWER OF ATTORNEY

12.1   AMENDMENTS ........................................................................................... 76
12.2   POWER OF ATTORNEY ............................................................................. 78

## ARTICLE XIII

### MISCELLANEOUS

13.1   NOTICES ................................................................................................... 80
13.2   COUNTERPARTS ....................................................................................... 80
13.3   TABLE OF CONTENTS AND HEADINGS .................................................... 80
13.4   SUCCESSORS AND ASSIGNS ..................................................................... 80
13.5   SEVERABILITY ........................................................................................ 80
13.6   FURTHER ACTIONS .................................................................................. 81
13.7   DETERMINATIONS OF THE PARTNERS ..................................................... 81
13.8   NON-WAIVER .......................................................................................... 81
13.9   APPLICABLE LAW .................................................................................... 81
13.10  CONFIDENTIALITY ................................................................................... 81
13.11  SURVIVAL OF CERTAIN PROVISIONS ....................................................... 82
13.12  WAIVER OF PARTITION ........................................................................... 82
13.13  ENTIRE AGREEMENT; MOST FAVORED NATIONS PROVISION ................... 82
13.14  NO THIRD PARTY BENEFICIARIES ........................................................... 83
13.15  COMPLIANCE WITH ANTI-MONEY LAUNDERING REQUIREMENTS ............. 83
13.16  FUND COUNSEL ...................................................................................... 83
13.17  CURRENCY ............................................................................................. 84

| | | |
|---|---|---|
| Schedule A | - | Partners; Capital Commitments |
| Exhibit 1 | - | Management Agreement |
| Exhibit 2 | - | Indemnification Agreement |
| Exhibit 3 | - | Guarantee |

iv

# LIME ROCK PARTNERS V, L.P.

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Lime Rock Partners V, L.P., a Cayman Islands exempted limited partnership acting through its general partner (the "Fund"), is made and entered into on April 17, 2008, by and among Lime Rock Partners GP V, L.P., as the general partner of the Fund, the Initial Limited Partner and the Persons listed in Schedule A hereto (as such schedule is supplemented or amended from time to time) as limited partners of the Fund. Capitalized terms used herein without definition have the meanings specified in Section 1.1.

## R E C I T A L S:

WHEREAS, the Fund is an exempted limited partnership registered under the Partnership Law with the Registrar of Partnerships in the Cayman Islands on March 31, 2008 (the "Formation Date") and since its formation has been governed by the Limited Partnership Agreement of the Fund, dated March 31, 2008 (the "Original Agreement"), between Lime Rock Partners GP V, L.P., a Cayman Islands exempted limited partnership, acting through its general partner, a Cayman Islands exempted company, as the general partner, and the Initial Limited Partner; and

WHEREAS, the General Partner, the Initial Limited Partner and the Limited Partners admitted on the date hereof desire to amend and restate the Original Agreement in its entirety and to enter into this Agreement;

NOW, THEREFORE, the parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement, as follows:

## ARTICLE I

## GENERAL PROVISIONS

1.1     Definitions.   As used herein the following terms have the meanings set forth below:

"Additional Partner" shall mean any Person admitted to the Fund as a Limited Partner after the Initial Closing pursuant to Section 10.2.

"Adjustment Date" shall mean the last day of each Fiscal Year or any other date that the General Partner determines to be appropriate for an interim closing of the Fund's books.

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time.

"Advisory Committee" shall have the meaning set forth in Section 3.8(a).

"Affiliate" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified, *provided* that Portfolio Companies (including Portfolio Companies of any Alternative Investment Funds), Blocker Corporations, Intermediate Entities and Related Investment Funds shall not be deemed to be "Affiliates" of the Manager, the General Partner or the Fund, and *provided, further,* that each of the Principals (and each of their respective spouses, children, parents and siblings, and each of the spouses of such children, parents and siblings) shall be deemed to be an "Affiliate" of the Manager and the General Partner for so long as such Principal is an employee of the Manager or any of its Affiliates; and *provided, finally,* that the Manager shall be deemed to be an Affiliate of the General Partner and *vice-versa.*

"Affiliated Partner" shall mean a Limited Partner at least 51% of whose outstanding Securities, determined based on vote or Value, are held, directly or indirectly, by the Manager and/or one or more of its Affiliates.

"Agreement" shall mean this Amended and Restated Limited Partnership Agreement, including Schedule A hereto, as amended, supplemented or restated from time to time.

"Alternative Investment Fund" shall have the meaning set forth in Section 4.6(d).

"Annual Meeting" shall have the meaning set forth in Section 8.3.

"Available Assets" shall mean, as of any date, the excess of (*a*) the cash, cash equivalent items and Temporary Investments held by the Fund over (*b*) the sum of the amount of such items as the General Partner determines to be necessary for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent), and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Fund's investment activities and operations.

"BHC Act" shall mean the U.S. Bank Holding Company Act of 1956, as amended from time to time.

"BHC Partner" shall mean a Limited Partner that (*a*) is subject to the BHC Act, or is directly or indirectly "controlled" (as that term is defined in the BHC Act) by a company that is subject to the BHC Act and (*b*) so indicates in its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto.

2

"Blocker Corporation" shall have the meaning set forth in Section 6.15(a).

"Blocker Expenses" shall mean, with respect to any Blocker Corporation, any taxes or expenses incurred by or allocable to such Blocker Corporation or any related Intermediate Entity as determined by the General Partner in its sole discretion.

"Bridge Investment" shall have the meaning set forth in Section 4.1(b).

"Business Day" shall mean any day other than (a) Saturday and Sunday and (b) any other day on which banks located in New York City are required or authorized by law to remain closed.

"Capital Account" shall have the meaning set forth in Section 6.1.

"Capital Commitment" shall mean, with respect to any Partner, the amount set forth opposite the name of such Partner on Schedule A hereto, as amended from time to time.

"Capital Contribution" shall mean, with respect to any Partner, the amount of capital contributed pursuant to a single Drawdown or the aggregate amount of such contributions made or, in each case, deemed to have been contributed, as the context may require, by such Partner to the Fund pursuant to this Agreement, other than Interest Payments.

"Cayman Islands" shall mean the Cayman Islands, British West Indies.

"Certificate" shall mean the Certificate of Registration of the Fund as an Exempted Limited Partnership, including the statement of registration filed by the General Partner with the Registrar of Partnerships in the Cayman Islands, as amended from time to time.

"Claims" shall have the meaning set forth in Section 9.1(a).

"Closing" shall mean the Initial Closing and any date as of which the General Partner shall admit one or more Subsequent Closing Partners to the Fund pursuant to this Agreement and one or more Subscription Agreements.

"Co-Investing Partner" shall mean a Limited Partner that has indicated on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund that such Limited Partner is interested in participating in co-investment or financing opportunities that may be offered by the General Partner to such Limited Partner.

"Co-Investment Fund" shall have the meaning set forth in Section 4.6(b)(i).

"Co-Investors" shall have the meaning set forth in Section 4.6(b)(iii).

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

3

"Covered Person" shall mean the General Partner, the Manager, the Sub Manager and each of their respective Affiliates; each of the current and former shareholders, officers, directors, employees, partners, members, managers and agents of any of the General Partner, the Manager, the Sub Manager and each of their respective Affiliates; each Person serving, or who has served, as a member of the Advisory Committee (and, with respect to Claims or Damages arising out of or relating to such service only, the Limited Partner that such Person represents and each of such Limited Partner's officers, directors, employees, partners, members, managers, agents and other representatives); and any other Person designated by the General Partner as a Covered Person who serves at the request of the General Partner or the Manager on behalf of the Fund as an officer, director, employee, partner, member or agent of a Portfolio Company, Blocker Corporation, Intermediate Entity or any other Person that is an Affiliate of the General Partner or the Fund; *provided*, that no agent of the General Partner, the Manager or any of their respective Affiliates shall be considered a Covered Person unless such agent was selected with reasonable care.

"Damages" shall have the meaning set forth in Section 9.1(a).

"Default" shall have the meaning set forth in Section 5.5(a).

"Defaulted Amount" shall have the meaning set forth in Section 5.5(b).

"Defaulted Capital Commitment" shall have the meaning set forth in Section 5.5(c).

"Defaulting Partner" shall have the meaning set forth in Section 5.5(a).

"Disabling Conduct" shall mean, with respect to any Person, other than a voting member of the Advisory Committee, an intentional material violation of this Agreement by such Person that, if curable, is not cured within 30 days after written notice describing such violation has been given to such Person; fraud, willful malfeasance or gross negligence by or of such Person; or reckless disregard of duties by such Person in the conduct of such Person's office; and with respect to any voting member of the Advisory Committee, fraud or willful malfeasance by or of such member.

"Distributable Cash" shall mean cash received by the Fund from the sale or other disposition of, or dividends, interest or other income from or in respect of, a Portfolio Investment or Temporary Investment, or otherwise received by the Fund, other than Capital Contributions and amounts deposited in any Segregated Reserve Account or any income earned thereon, to the extent such cash constitutes Available Assets.

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"Drawdown Date" shall have the meaning set forth in Section 5.2(a).

"Drawdown Notice" shall have the meaning set forth in Section 5.2(a).

"Drawdowns" shall mean the Capital Contributions made to the Fund pursuant to Section 5.2 from time to time by the Partners pursuant to a Drawdown Notice.

"ECI" shall mean income that is "effectively connected with the conduct of a trade or business within the United States" within the meaning of sections 871 and 882 of the Code (excluding income treated as so effectively connected under section 897 of the Code).

"Electing Blocker Partner" shall mean any Tax-Exempt Partner or Non-U.S. Partner that has made an election in writing to invest its Capital Contributions with respect to an equity investment in an Operating Partnership through a Blocker Corporation and provided such election to the General Partner.

"Employee Co-Investment Fund" shall have the meaning set forth in Section 4.6(b)(ii).

"Energy Industry" shall mean the industry and businesses engaged in the exploration, development, production, transportation, refining or marketing of energy and energy sources or the provision of related products, services and technologies.

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Partner" shall mean a Limited Partner that (A) (i) is a "benefit plan investor" (as such term is defined in Section 3(42) of ERISA) and (ii) so indicates on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto or (B) is deemed to be an "ERISA Partner" with the consent of the General Partner.

"Excess Organizational Expenses" shall mean the amount of Organizational Expenses (other than Placement Fees) in excess of $1,000,000.

"Excused Partner" shall mean, with respect to any Portfolio Investment, any Limited Partner that, pursuant to Section 5.4, has been excused from making a Capital Contribution in respect thereof.

"Existing Funds" shall mean: Friends of Lime Rock LP, a Delaware limited partnership; Riverside Investments LLC, a Delaware limited liability company; Lime Rock Partners II, L.P., a Cayman Islands exempted limited partnership; Lime Rock Partners III, L.P., a Cayman Islands exempted limited partnership; Lime Rock Partners IV, L.P., a Cayman Islands exempted limited partnership; Lime Rock Resources A, L.P., a Delaware limited partnership; Lime Rock Resources B, L.P., a Delaware limited partnership; Lime Rock

5

Resources C, L.P., a Delaware limited partnership; and their respective alternative investment funds and related investment funds.

"Feeder Fund" shall mean a Limited Partner that may be formed by the General Partner to serve as a collective investment fund.

"Fee Income" shall mean 80% of the sum of all directors' fees, transaction fees, investment banking fees, break-up fees, advisory fees, monitoring fees or other similar fees received by the Manager, the Sub Manager, the General Partner or any of their respective Affiliates (or, if any Existing Funds or Related Investment Funds have made an investment in a Portfolio Company, a *pro rata* share of such fees based on the capital invested in such Portfolio Company by the Fund and such other Persons) in connection with the consummation, holding or disposition of a Portfolio Investment or the termination of a proposed but unconsummated investment (and, for the avoidance of any doubt, such fees shall not include any fees received directly or indirectly from the Portfolio Company, proposed Portfolio Company or any other Person in respect of any investor or potential investor (other than the Fund, the Existing Fund or any Related Investment Funds or any Limited Partners) in such Portfolio Company or proposed Portfolio Company, or the capital provided or proposed to be provided thereby). For these purposes, directors' fees shall include any options, warrants and other non-cash compensation paid, granted or otherwise conveyed for services, valued on the date of exercise thereof, as members of boards of directors of Portfolio Companies received by the Manager, the Sub Manager, the General Partner or any of their respective Affiliates, including any employees thereof.

"Fee Transition Date" shall have the meaning set forth in Section 7.2(a).

"Final Admission Date" shall mean the last day of the ninth calendar month following the month in which the Initial Closing occurs.

"Fiscal Year" shall mean the fiscal year of the Fund, as determined pursuant to Section 1.5.

"Follow-On Investment" shall mean an investment by the Fund after the termination of the Investment Period in Securities of a Portfolio Company or a Person whose business is related or complementary to that of (and is or will be under common management with) a Portfolio Company in which the General Partner determines that it is appropriate or necessary for the Fund to invest for the purpose of preserving, protecting or enhancing the Fund's prior investment in such Portfolio Company.

"Formation Date" shall have the meaning set forth in the preamble hereto.

"Foundation Partner" shall mean a Limited Partner that (A) (*i*) is a "private foundation" within the meaning of section 509 of the Code and (*ii*) so indicates on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which

6

such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto or (B) is deemed to be a "Foundation Partner" with the consent of the General Partner.

"Fund" shall have the meaning set forth in the preamble hereto.

"Fund Expenses" shall mean the costs, expenses and liabilities that in the good faith judgment of the General Partner are incurred by or arise out of the operation and activities of the Fund, including:  (a) the Management Fee; (b) the fees and expenses relating to consummated Portfolio Investments, proposed but unconsummated investments, and Temporary Investments, including the evaluation, acquisition, holding and disposition thereof, to the extent that such fees and expenses are not reimbursed by a Portfolio Company or other third Person; (c) premiums for insurance protecting the Fund and any Covered Persons from liabilities to third Persons in connection with Fund affairs; (d) legal, custodial and accounting expenses, including expenses associated with the preparation of the Fund's financial statements, tax returns and Schedule K-1s and the representation of the Fund or the Partners by the tax matters partner; (e) auditing, accounting, banking and consulting expenses; (f) appraisal expenses; (g) expenses related to organizing Persons through or in which Portfolio Investments may be made; (h) expenses of the Advisory Committee; (i) costs and expenses that are classified as extraordinary expenses under generally accepted accounting principles; (j) taxes and other governmental charges, fees and duties payable by the Fund; (k) Damages; (l) costs of reporting to the Partners and of the Annual Meeting; and (m) costs of winding up and liquidating the Fund; but not including Organizational Expenses, Blocker Expenses or Manager Expenses.

"General Partner" shall mean Lime Rock Partners GP V, L.P., a Cayman Islands exempted limited partnership (acting through its general partner), in its capacity as the general partner of the Fund, or any additional or successor general partner admitted to the Fund as a general partner thereof in accordance with the terms hereof, in its capacity as a general partner of the Fund, in every case, as the context requires.

"Initial Closing" shall mean the closing of the sale on April 17, 2008 of interests in the Fund pursuant to Subscription Agreements and the execution and delivery of this Agreement on such date by the General Partner, the Initial Limited Partner and the Limited Partners admitted to the Fund on such date.

"Initial Limited Partner" shall mean Mark A. McCall.

"Interest Payment" shall have the meaning set forth in Section 10.2(b)(ii).

"Intermediate Entity" shall have the meaning set forth in Section 6.15(a).

"Investment Company Act" shall mean the U.S. Investment Company Act of 1940, as amended from time to time, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

7

"Investment Objectives" shall have the meaning set forth in Section 1.3.

"Investment Period" shall mean the period commencing on the date of the Initial Closing and ending on the earliest to occur of (a) the sixth anniversary of the last day of the month of the Initial Closing, (b) the first date on which all Remaining Capital Commitments (net of amounts reserved by the General Partner for the payment of Fund Expenses throughout the Term and the funding of Follow-On Investments and investments with respect to which commitments have been made as of such date) are zero, and (c) the date of any early termination of the Investment Period pursuant to Section 5.6.

"Limited Partners" shall mean the Persons listed on Schedule A hereto, which is hereby incorporated in and made part of this Agreement (as such schedule is supplemented or amended from time to time), as limited partners of the Fund, and shall include their successors and permitted assigns to the extent admitted to the Fund as limited partners in accordance with the terms hereof, in their capacities as limited partners of the Fund, and shall exclude any Person that ceases to be a Partner in accordance with the terms hereof. For purposes of the Partnership Law, the Limited Partners shall constitute a single class, series and group of limited partners.

"Majority (or other specified percentage) in Interest" shall mean Limited Partners, other than Affiliated Partners and Defaulting Partners, that at the time in question have Capital Commitments aggregating in excess of 50% (or such other specified percentage) of all Capital Commitments of all Limited Partners, other than Affiliated Partners and Defaulting Partners, *provided*, *however*, that in the event that the actual vote of a single Limited Partner has the effect, due to the size of such Limited Partner's Capital Commitment, of blocking the vote of the percentage specified and no other Limited Partner has voted the same way as such Limited Partner, the specified percentage shall, solely for the purposes of the subject vote, be deemed to have been satisfied.

"Management Fee" shall have the meaning set forth in Section 7.2(a).

"Manager" shall mean Lime Rock Management LP, a Delaware limited partnership, and any successor thereto.

"Manager Expenses" shall mean the costs and expenses incurred by the Manager in providing for its and the General Partner's normal operating overhead, including salaries of the Manager's employees, rent and other expenses incurred in maintaining the Manager's place of business, but not including Organizational Expenses, Blocker Expenses or Fund Expenses.

"Marketable Securities" shall mean Securities that are (a) traded on an established U.S. national or non-U.S. securities exchange, (b) reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system or (c) otherwise traded over-the-counter or purchased and sold in transactions effected pursuant to Rule 144A under the Securities Act, that in each case are not subject to restrictions on Transfer under the

4209061_3 DOC

Securities Act or other applicable securities laws or subject to contractual restrictions on Transfer.

"Material Adverse Effect" shall mean (*a*) a violation of a statute, rule, or regulation of a U.S. federal or state or non-U.S. governmental authority applicable to a Partner that is reasonably likely to have a material adverse effect on a Portfolio Company or any Affiliate thereof or on the Fund, the General Partner, the Manager or any of their respective Affiliates or on any Partner or any Affiliate of any such Partner or, with respect to an ERISA Partner, on the sponsor of such ERISA Partner or any of such sponsor's Affiliates, (*b*) an occurrence that is reasonably likely to subject a Portfolio Company or any Affiliate thereof or the Fund, the General Partner, the Manager or any of their respective Affiliates or any Partner or any Affiliate of any such Partner or, with respect to an ERISA Partner, the sponsor of such ERISA Partner or any of such sponsor's Affiliates, to any material regulatory requirement to which it would not otherwise be subject, or that is reasonably likely to materially increase any such regulatory requirement beyond what it would otherwise have been, (*c*) an occurrence that is reasonably likely to result in any Securities or other assets owned by the Fund being deemed to be "plan assets" under ERISA or that is reasonably likely to result in a "prohibited transaction" under ERISA or (*d*) an occurrence that is reasonably likely to give rise to (*i*) any material amount of tax imposed on a Partner that is a private tax-exempt foundation or any of its managers pursuant to sections 4941 through 4947 (other than section 4942 thereof) of the Code, to which it would not otherwise be subject, (*ii*) a material violation of, or a material breach of, the fiduciary duties of such Partner's trustees under any U.S. federal or state law applicable to private foundations or any rule or regulation adopted thereunder by any agency, commission or authority having jurisdiction, or (*iii*) a material violation of law.

"Maximum Segregated Reserve Amount" shall mean, with respect to any Limited Partner and as of any date, the amount that such Limited Partner would be entitled to receive from the Segregated Reserve Account for such Limited Partner pursuant to Section 11.2(c) upon a deemed dissolution and liquidation of the Fund pursuant to Section 11.2 on such date, assuming that (*a*) Portfolio Investments and all other remaining assets of the Fund other than Temporary Investments were sold for 50% of their acquisition cost and all Temporary Investments were sold for their Value and (*b*) if such date occurs prior to the end of the Investment Period, such Limited Partner's Remaining Capital Commitment (if any) were contributed by such Limited Partner and invested in Portfolio Investments.

"NASDAQ" shall mean the automated screen-based quotation system operated by the Nasdaq Stock Market, Inc., a subsidiary of the National Association of Securities Dealers, Inc., or any successor thereto.

"Net Unrealized Loss" shall mean, with respect to any Limited Partner as of any date of determination, the excess, if any, of (*a*) the aggregate Capital Contributions of such Limited Partner used to fund the purchase price of each Portfolio Investment (other than a Bridge Investment) then held by the Fund over (*b*) the aggregate of the product of (*i*) the Value of

each such Portfolio Investment as of such date of determination and (*ii*) such Limited Partner's Sharing Percentage for such Portfolio Investment.

"Non-Defaulting Partners" shall have the meaning set forth in Section 5.5(b).

"Non-Plan Party" shall have the meaning set forth in Section 3.4(a).

"Non-U.S. Partner" shall mean a Limited Partner that (*a*) is not a "United States person" within the meaning of section 7701(a)(30) of the Code and (*b*) so indicates on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto.

"Operating Partnership" shall mean a Portfolio Investment that is an entity treated as a partnership for U.S. federal income tax purposes and is engaged in a trade or business.

"Organizational Expenses" shall mean all costs and expenses incurred in connection with the formation and organization of, and sale of interests in, the Fund, as determined by the General Partner, including all Placement Fees and all out-of-pocket legal, accounting, printing, travel and filing fees and expenses but not including Blocker Expenses.

"Original Agreement" shall have the meaning set forth in the recitals hereto.

"Parallel Fund" shall have the meaning set forth in Section 4.6(c).

"Partners" shall mean the General Partner and the Limited Partners.

"Partnership Law" shall mean the Exempted Limited Partnership Law (2007 Revision) of the Cayman Islands, as amended, and any successor to such statute.

"Payment Date" shall have the meaning set forth in Section 7.2(a).

"Period" shall mean, for the first Period, the period commencing on the date of the Initial Closing and ending on the next Adjustment Date; and for each subsequent Period shall mean the period commencing on the day after an Adjustment Date and ending on the next Adjustment Date.

"Permitted Public Securities" shall have the meaning set forth in Section 4.2(g).

"Person" shall mean any individual or entity, including a corporation, partnership, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated association, government or governmental agency or authority.

"Placement Fees" shall mean the fees and any interest on deferred fees charged by any placement agent designated by the General Partner or the Fund and other similar fees in connection with the marketing and sale of interests in the Fund.

"Portfolio Company" shall mean an entity in which a Portfolio Investment is made, and continues to be held, by the Fund.

"Portfolio Investments" shall mean debt or equity investments (other than Temporary Investments and investments in Blocker Corporations or Intermediate Entities) made by the Fund, including any Bridge Investments.

"Pre-Existing Investment" shall have the meaning set forth in Section 2.3(b).

"Prime Rate" shall mean the rate of interest published from time to time in *The Wall Street Journal*, Eastern Edition (or any successor publication thereto), designated therein as the prime rate, or if not so published, the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as identified in writing by the General Partner to the Limited Partners.

"Principals" shall mean Saad Bargach, Jonathan C. Farber, Mark A. McCall, Townes G. Pressler, Jr., John T. Reynolds, and Lawrence Ross and shall include such other individuals who shall from time to time be elected as Qualified Additions or Qualified Replacements, in each case for so long as such individual remains affiliated with the General Partner, the Manager or any of their respective Affiliates.

"Proceeding" shall have the meaning set forth in Section 9.1(a).

"Public Plan Partner" shall mean a Limited Partner that (A) (*i*) is a governmental plan or a church plan within the meaning of sections 3(32) and 3(33), respectively, of ERISA and (ii) so indicates on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto or (B) is deemed to be a "Public Plan Partner" with the consent of the General Partner.

"Qualified Addition" shall have the meaning set forth in Section 5.6(a)(ii).

"Qualified Replacement" shall have the meaning set forth in Section 5.6(a)(ii).

"Related Investment Funds" shall mean all Co-Investment Funds, Employee Co-Investment Funds, Parallel Funds and Alternative Investment Funds established by the General Partner or any of its Affiliates pursuant to this Agreement.

"Remaining Capital Commitment" shall mean, with respect to any Partner, the amount of such Partner's Capital Commitment, determined at any date, that has not been contributed or deemed to have been contributed as a Capital Contribution, (*a*) decreased, in the case of the General Partner or any Affiliated Partner, by the Capital Contributions that would have been made by such Partner had it been required to pay Management Fees, Excess Organizational Expenses and Placement Fees, and (*b*) increased by all distributions from the Fund to such Partner to the extent of such Partner's Capital Contributions (*i*) returned without being used

by the Fund, (*ii*) used during the Investment Period to fund investments disposed of within the time periods specified in Sections 4.1(b) and 4.1(d), (*iii*) used during the Investment Period to pay the Management Fee or any Excess Organizational Expenses or Placement Fees or, in the case of the General Partner and any Affiliated Partner, the Capital Contributions that would have been made by the General Partner and such Affiliated Partner had they been required to pay such fees, up to an aggregate amount pursuant to this clause (*iii*) not to exceed 15% of such Partner's Capital Commitment and (*iv*) returned in connection with the admission to the Fund of any Subsequent Closing Partner, *provided* that if the date of determination with respect to a Partner is after delivery of a Drawdown Notice but before the related Drawdown Date, the amount specified as payable by such Partner in such Drawdown Notice (as the same may be amended by a subsequent Drawdown Notice related thereto) shall not be included in such Partner's Remaining Capital Commitment unless such investment is abandoned or unless and to the extent that such Partner is an Excused Partner with respect to such investment.

"Removal Conduct" shall mean (*a*) being convicted of a felony or entering a plea of *nolo contendere* with respect to a felony, in either case, having a material adverse effect on the Fund, (*b*) being subject to the entry of a final judgment, verdict, order or injunction that prevents the General Partner from materially performing its obligations to the Fund, (*c*) being adjudicated by a court of competent jurisdiction to have committed actions or omissions constituting fraud, willful malfeasance, gross negligence or reckless disregard of duties with respect to the Fund or (*d*) a material breach of this Agreement that if curable, is not cured within 30 days after written notice describing such violation has been given to such Person.

"Runoff Activities" shall mean (*a*) holding, disposing of and otherwise dealing with the investments and other assets of the Fund, (*b*) completing investments with respect to which commitments have been made as of the end of the Investment Period, (*c*) making further investments only in Temporary Investments and Follow-On Investments and refinancing any outstanding Bridge Investments, (*d*) issuing Drawdown Notices in respect of Follow-On Investments, Organizational Expenses and Fund Expenses, (*e*) engaging in the other non-investment activities of the Fund and (*f*) engaging in other activities that the General Partner determines are necessary, advisable, convenient or incidental to the foregoing.

"Securities" shall mean shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities of whatever kind of any Person, whether readily marketable or not.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended from time to time, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Segregated Reserve Account" shall have the meaning set forth in Section 6.14.

"Sharing Percentage" shall mean, with respect to any Partner and any Portfolio Investment, a fraction, expressed as a percentage, (*a*) the numerator of which is the aggregate

4209061_3.DOC

amount of the Capital Contributions of such Partner used to fund the cost of such Portfolio Investment and (b) the denominator of which is the aggregate amount of the Capital Contributions of all of the Partners used to fund the cost of such Portfolio Investment, taking into account any adjustments related to Subsequent Closing Partners pursuant to Section 10.2 attributable to such Portfolio Investment.

"Sub Manager" shall mean Lime Rock Management LLP (UK) and any other entity controlled by one or more partners of the General Partner and with which the Manager contracts for sub-management services.

"Subscription Agreements" shall mean the Subscription Agreements entered into by the Limited Partners in connection with their purchases of interests in the Fund.

"Subsequent Closing Partner" shall have the meaning set forth in Section 10.2(a).

"Substitute Partner" shall have the meaning set forth in Section 10.1(d).

"Successor Fund" shall have the meaning set forth in Section 2.3(a).

"Suspension Period" shall mean the period of time specified in Sections 2.5 and 5.6(a) during which the Investment Period is suspended and, unless the Advisory Committee otherwise consents, the Fund is permitted to engage only in Runoff Activities.

"Tax-Exempt Partner" shall mean any Limited Partner that (A) (i) is exempt from tax under section 501 of the Code and is subject to section 511 of the Code and (ii) so indicates on its Subscription Agreement or otherwise in writing to the General Partner on or before the Closing at which such Limited Partner is admitted to the Fund and is so identified on Schedule A hereto or (B) is deemed to be a "Tax-Exempt Partner" with the consent of the General Partner.

"Temporary Investment" shall mean investments in (a) cash or cash equivalents, (b) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition thereof, (c) money market instruments, commercial paper or other short-term debt obligations having at the date of purchase by the Fund the highest or second highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Services, Inc., or their respective successors, (d) interest bearing accounts at a registered broker-dealer, (e) money market mutual funds, (f) certificates of deposit maturing within one year from the date of acquisition thereof issued by commercial banks incorporated under the laws of the United States or any state thereof or the District of Columbia, each having at the date of acquisition by the Fund combined capital and surplus of not less than $100 million, (g) overnight repurchase agreements with primary Federal Reserve Bank dealers collateralized by direct U.S. Government obligations or (h) pooled investment funds or accounts that invest only in Securities or instruments of the type described in (a) through (d).

13

"Term" shall have the meaning set forth in Section 1.4.

"Third Party Co-Investor" shall have the meaning set forth in Section 4.6(b)(i).

"Transfer" shall mean a direct or indirect transfer in any form, including a sale, assignment, conveyance, pledge, mortgage, encumbrance, hypothecation or other disposition, or the act of so doing, as the context requires.

"Transferee" shall have the meaning set forth in Section 10.1(b).

"Transferor" shall have the meaning set forth in Section 10.1(b).

"Treasury Regulations" shall mean the regulations of the U.S. Treasury Department issued pursuant to the Code.

"UBTI" shall mean "unrelated business taxable income" within the meaning of section 512 of the Code, determined without regard to the special rules contained in section 512(a)(3) of the Code that are applicable solely to an organization described in paragraph (7), (9), (17) or (20) of section 501(c) of the Code.

"U.S. Tax-Exempt Partner" shall have the meaning set forth in Section 6.13.

"Value" shall mean, as of any date of determination (a) with respect to Marketable Securities (i) that are primarily traded on a securities exchange, the average of their closing sale prices on the principal securities exchange on which they are traded for each Business Day during the period commencing five days prior to such date and ending on the last day prior to such date or, if no sales occurred on any such day, the mean between the closing "bid" and "asked prices" on such day and (ii) the principal market for which is or is deemed to be the over-the-counter market, the average of their closing sales prices on each Business Day during such period, as published by NASDAQ or any similar organization, or if such price is not so published on any such day, the mean between their closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer and (b) with respect to all other Securities or other assets of or interests in the Fund, other than cash, the value determined by the General Partner in good faith considering all factors, information and data deemed to be pertinent, *provided* that for purposes of the definition of Net Unrealized Loss, the Value of any Portfolio Investment shall not be less than the acquisition cost thereof unless the General Partner shall have determined in good faith that such Portfolio Investment has suffered a significant and permanent impairment in value, *provided further* that if the Advisory Committee reasonably objects to the Value of any Securities or other assets or interests of the Fund determined by the General Partner, the General Partner shall obtain (at the Fund's expense) a valuation of such assets from an independent recognized investment banking, accounting or other appraisal firm selected by the General Partner with the consent of the Advisory Committee.

"VCOC" shall mean a "venture capital operating company" within the meaning of the DOL Regulations.

1.2     Name and Office.

(a)     Name.   The name of the Fund is Lime Rock Partners V, L.P.   Upon the termination of the Fund, all of the Fund's right, title and interest in and to the use of the name "Lime Rock Partners V, L.P." and any variation thereof, including any name to which the name of the Fund may be changed, shall become the property of the General Partner, and the Limited Partners shall have no right and no interest in and to the use of any such name.

(b)     Registered Office.   The registered office of the Fund in the Cayman Islands is Maples Corporate Services Limited, Ugland House, P.O. Box 309 GT, George Town, Grand Cayman, Cayman Islands, British West Indies, and the agent for service of process on the Fund at such address is Maples Corporate Services Limited.   At any time, the General Partner may designate another registered office within the Cayman Islands.

1.3     Purposes.   The purposes of the Fund are (*a*) to seek long-term capital appreciation primarily by acquiring, holding and disposing of Securities, independently or with others, of Persons connected, directly or indirectly, with the Energy Industry (the "Investment Objectives"), in accordance with and subject to the other provisions of this Agreement, (*b*) to engage in such other activities as the General Partner deems necessary, advisable, convenient or incidental to the foregoing and (*c*) to engage in any other lawful acts or activities consistent with the foregoing for which limited partnerships may be formed under the Partnership Law, *provided* that the Fund shall not undertake business with the public on the Cayman Islands (other than so far as may be necessary to carry on the activities of the Fund exterior to the Cayman Islands).

1.4     Term.   The term of the Fund commenced on the Formation Date, and shall continue, unless the Fund is sooner dissolved, until the tenth anniversary of the Initial Closing, *provided* that, unless the Fund is sooner dissolved, the term of the Fund may be extended by the General Partner with the consent of the Advisory Committee for up to two successive periods of one year each (such term, including any such extensions, being referred to as the "Term").   Notwithstanding the expiration of the Term, the Fund shall continue in existence until the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4.

1.5     Fiscal Year.   The Fiscal Year of the Fund shall end on the 31st day of December in each year.   The Fund shall have the same Fiscal Year for income tax and for financial and partnership accounting purposes.

1.6     Powers.   Subject to the other provisions of this Agreement, the Fund shall be and hereby is authorized and empowered to do or cause to be done any and all acts determined by the General Partner to be necessary, advisable, convenient or incidental in furtherance of the purposes of the Fund, without any further act, approval or vote of any Person, including any Limited Partner; and without limiting the generality of the foregoing, the Fund (and the General Partner on behalf of the Fund) is hereby authorized and empowered:

15

(a)     to acquire, hold, Transfer, manage, vote and own Securities and any other assets held by the Fund, in accordance with and subject to the Investment Objectives;

(b)     to establish, maintain or close one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space and to engage personnel;

(c)     to open, maintain and close bank, brokerage and money market accounts, to draw checks or other orders for the payment of moneys, to exchange U.S. dollars held by the Fund into non-U.S. currencies and vice-versa, to enter into currency forward and futures contracts and to hedge Portfolio Investments (but not for speculative purposes), and to invest such funds as are temporarily not otherwise required for Fund purposes in Temporary Investments;

(d)     to set aside funds for reasonable reserves, anticipated contingencies and working capital;

(e)     to bring, defend, settle and dispose of Proceedings, *provided* that the General Partner shall notify the Advisory Committee of the settlement of any Proceeding requiring a payment by the Fund;

(f)     to engage consultants, custodians, attorneys, placement agents, accountants and other agents and employees (including Persons that may be Limited Partners or Affiliates thereof or Affiliates of the General Partner, *provided* that the terms of any such engagement are no less favorable to the Fund than could be obtained in arm's-length negotiations with unrelated third Persons for similar services) and to authorize each such agent and employee (who may be designated as officers) to act for and on behalf of the Fund;

(g)     to (*i*) retain the Manager to render investment advisory and managerial services to the Fund as contemplated by Section 7.1, *provided* that such retention shall not relieve the General Partner of any of its obligations hereunder, (*ii*) execute, deliver and perform its obligations under the management agreement referred to in Section 7.1 and (*iii*) amend or supplement such agreement, *provided* that such amendment or supplement is not inconsistent with the provisions of Section 7.1 and would not be reasonably likely to have an adverse economic effect on the Limited Partners;

(h)     to execute, deliver and perform its obligations under contracts and agreements of every kind, and amendments thereto, necessary or incidental to the offer and sale of interests in the Fund, to the acquisition, holding and Transfer of Securities, or otherwise to the accomplishment of the Fund's purposes, and to take or omit to take such other actions in connection with such offer and sale, with such acquisition, holding or Transfer, or with the investment and other activities of the Fund, as may be necessary, advisable, convenient or incidental to further the purposes of the Fund;

(i)     subject to Sections 4.2 and 4.4, to borrow money and to issue guarantees;

16

(j)      to prepare and file all tax returns of the Fund; to make such elections under the Code (including an election under section 754 of the Code) and other relevant tax laws as to the treatment of items of Fund income, gain, loss and deduction, and as to all other relevant matters, as the General Partner deems necessary or appropriate; to determine which items of cash outlay are to be capitalized or treated as current expenses; and, subject to Section 8.1, to select the method of accounting and bookkeeping procedures to be used by the Fund;

(k)      to take all action that may be necessary, advisable, convenient or incidental for the continuation of the Fund's valid existence as an exempted limited partnership under the Partnership Law (including making such filings with the Registrar of Exempted Limited Partnerships in the Cayman Islands as are necessary to continue the registration of the Fund as an exempted limited partnership under the Partnership Law) and in each other jurisdiction in which such action is necessary to protect the limited liability of the Limited Partners or to enable the Fund, consistent with such limited liability, to conduct the investment and other activities in which it is engaged;

(l)      to organize and capitalize one or more Blocker Corporations and Intermediate Entities; and

(m)      to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Fund's investment and other activities.

1.7      Specific Authorization. The Fund, and the General Partner on behalf of the Fund, may execute, deliver and perform the management agreement referred to in Section 7.1, the Subscription Agreements and any agreements to induce any Person to purchase interests in the Fund, and any amendments to such agreements, all without any further act, approval or vote of any Partner or other Person. The General Partner is hereby authorized to enter into and perform on behalf of the Fund the agreements described in the immediately preceding sentence, but such authorization shall not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Fund (subject to any other restrictions expressly set forth in this Agreement).

1.8      Amendment and Restatement of Agreement; Admission of Limited Partners. The parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement. Immediately following the admission of Limited Partners on the date hereof, the Initial Limited Partner shall cease to be a partner of the Fund and the Fund shall return the original capital contribution made by the Initial Limited Partner, who shall have no further rights or claims against, or obligations as a partner of, the Fund. A Person shall be admitted at the Initial Closing as a limited partner of the Fund at the time that (*a*) this Agreement or a counterpart hereof and a Subscription Agreement or a counterpart thereof are executed by or on behalf of such Person and (*b*) such Person is listed by the General Partner as a limited partner of the Fund on Schedule A hereto. The General Partner shall inscribe the names of the Limited Partners in the Register of Limited Partnership Interests. After the Initial Closing, Persons shall be admitted as limited partners of the Fund as provided in Article X. The General Partner, without the consent of any Person,

17

including any other Partner, may amend or revise Schedule A hereto in accordance with this Agreement.  Any amendment or revision to Schedule A hereto made in accordance with this Agreement shall not be deemed an amendment to this Agreement and all references in this Agreement to Schedule A hereto shall be deemed to be references to Schedule A hereto as so amended or revised and in effect from time to time.

1.9    Expenses.  All Organizational Expenses and all Fund Expenses shall be paid by the Fund.  To the extent that the General Partner, the Manager or any of their respective Affiliates pays any Organizational Expenses or Fund Expenses on behalf of the Fund, the Fund shall reimburse the General Partner, the Manager or such Affiliate, as the case may be, upon request.  All Manager Expenses shall be paid by the Manager or the General Partner.  Blocker Expenses shall be paid in accordance with Section 6.15(e) and (f).

## ARTICLE II

### THE GENERAL PARTNER

2.1    Management of the Fund, etc.  The management, control and operation of and the determination of policy with respect to the Fund and its investment and other activities shall be vested exclusively in the General Partner (acting directly or through its duly appointed agents), which is hereby authorized and empowered on behalf and in the name of the Fund and in its own name, if necessary or appropriate, but subject to the other provisions of this Agreement, to carry out any and all of the purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary, advisable, convenient or incidental thereto, including organizing any Related Investment Funds.  The General Partner may exercise on behalf of the Fund, and may delegate to the Manager, all of the powers set forth in Sections 1.6 and 1.7, *provided* that the management and the conduct of the activities of the Fund shall remain the sole responsibility of the General Partner and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement.

2.2    Reliance by Third Parties.  In dealing with the General Partner and its duly appointed agents, including the Manager, no Person shall be required to inquire as to the General Partner's or any such agent's authority to bind the Fund.

2.3    Conflicts of Interest, etc.

(a)    Sponsorship of Successor Funds.  Until the earlier of (*i*) the date on which at least 75% of the aggregate Capital Commitments of the Non-Defaulting Partners has been contributed to the Fund or committed to make Portfolio Investments, used to pay Organizational Expenses and Fund Expenses, or reserved for the funding of Follow-On Investments or refinancing any outstanding Bridge Investments or the payment of Organizational Expenses and Fund Expenses, and (*ii*) the last day of the Investment Period, neither the General Partner nor any of its Affiliates will organize any pooled multiple-investment vehicle (other than the Fund, any Related

18

Investment Funds and any entity formed in connection with a Portfolio Investment) having investment objectives and strategies substantially similar to those of the Fund (a "Successor Fund") without the consent of at least $66^{2}/_{3}$% in Interest. For purposes of clarification, a pooled, multiple-investment vehicle focused on alternative energy, renewable energy, clean or "green" technology or oil service technology shall not be considered to have investment objectives and strategies substantially similar to those of the Fund.

(b)     Personal Investments.  During the Term, none of the General Partner nor any of its Affiliates may acquire, invest in or hold Securities of any Portfolio Company without the consent of the Advisory Committee, *provided* that the foregoing restriction shall not apply to (*i*) Securities held by the General Partner and its Affiliates through the General Partner, the Fund, any Related Investment Fund, any Existing Fund or any Successor Fund or (*ii*) Securities of a Portfolio Company that were granted or paid to the General Partner, the Manager or any of their respective Affiliates in such Person's capacity as a director of such Portfolio Company or an Affiliate thereof (it being understood that any such Securities shall be treated as included in Fee Income for all purposes of this Agreement) and *provided, further,* that nothing in this Section 2.3(b) shall prohibit any Affiliate of the General Partner from acquiring, investing in, reinvesting in, holding or disposing of Securities of a Person or an Affiliate of a Person in which such Affiliate of the General Partner either holds an investment, or as to which such Affiliate of the General Partner has entered into a prior written commitment to invest, prior to the Initial Closing (or, in the case of any Person that becomes an Affiliate of the General Partner after the date of the Initial Closing, prior to the date on which such Person becomes such an Affiliate) (any such investment by an Affiliate of the General Partner being referred to as a "Pre-Existing Investment").

(c)     Allocation of Deal Flow.  Subject to Section 4.6, during the Investment Period any investment opportunity, other than Pre-Existing Investments, that is presented to the General Partner or any of its Affiliates and that the General Partner believes in good faith is suitable and appropriate for the Fund and consistent with the Investment Objectives will be offered by the General Partner to the Fund, and the General Partner shall cause its Affiliates to offer any such investment opportunities to the Fund, to the extent that the Fund has available Remaining Capital Commitments net of reserves, including amounts reserved for (*i*) payment of Organizational Expenses and Fund Expenses throughout the Term, (*ii*) funding of Follow-On Investments and (*iii*) funding of any investments that are in process, sufficient to enable the Fund effectively to participate in such investment opportunity, *provided* that during the investment period of any Existing Fund, if the general partner of such Existing Fund determines in good faith that an investment opportunity presented to it is suitable and appropriate for such Existing Fund, such investment opportunity may first be offered to such Existing Fund before it is offered to the Fund. The General Partner shall disclose to the Advisory Committee any investment made by the General Partner, any of its Affiliates or the Principals during the Investment Period in an entity in the Energy Industry in which an investment was offered to and declined by the Fund pursuant to this Section 2.3(c). Notwithstanding the foregoing, the Fund may with the consent of the Advisory Committee co-invest with an Existing Fund or a Successor Fund in any investment opportunity offered to the Fund, *provided* that in the case of a co-investment with an Existing

Fund the General Partner shall have also obtained the consent of at least a majority of the members of the Advisory Committee who are not affiliated with limited partners of the Existing Fund if there are at least three such unaffiliated Advisory Committee members; otherwise, the additional consent described in this proviso shall not be required.  The General Partner may allocate such portion of such investment opportunity to such Existing Fund or Successor Fund as the General Partner determines to be appropriate.  The General Partner agrees that the Fund may not sell to, or acquire from, any Existing Fund or Successor Fund investments without the consent of the Advisory Committee.

(d)     Transactions with Affiliates.  (*i*) The Fund may enter into (*A*) contracts and transactions with any of the General Partner and its Affiliates authorized or contemplated by this Agreement and (*B*) any such contracts not authorized or contemplated by this Agreement and (*ii*) the General Partner and its Affiliates may enter into (*A*) contracts and transactions with the Fund and with any Portfolio Company authorized or contemplated by this Agreement and (*B*) any such contracts not authorized or contemplated by this Agreement, *provided*, in each case referred to in clause (i)(B) or clause (ii)(B) above, that the Advisory Committee has consented to such contract or transaction.  Notwithstanding the foregoing, the consent of the Advisory Committee shall not be required under this Section 2.3(d) with respect to any payments of or arrangements with respect to Fee Income.

(e)     Devotion of Time.  During the Investment Period, the General Partner and the Manager shall cause the Principals, for so long as they are employed by the Manager or any of its Affiliates, to devote substantially all of their business time and efforts to the investment and other activities of the Fund and any Related Investment Funds.  Subject to the foregoing, each of the Principals may (*i*) serve on boards of directors of public and private companies and retain fees for such services for such Principal's own account, (*ii*) engage in such civic, professional, industry and charitable activities as such Principal shall choose, (*iii*) conduct and manage such Principal's personal and family investment activities and (*iv*) engage in any other activities approved by the Advisory Committee;  *provided, however*, that notwithstanding any other provision of this Agreement, each of the Principals may devote such time and efforts as they deem reasonably necessary to the affairs of the Existing Funds, any Successor Funds and any Pre-Existing Investments.   Notwithstanding the foregoing or any other provision of this Agreement, however, after the end of the Investment Period, the General Partner and the Manager shall, and shall cause each of the Principals for so long as such Principal is employed by the Manager or any of its Affiliates to, devote such time to the Fund as is reasonably required to conduct the investment and other activities of the Fund.  Subject to the foregoing and to the other provisions of this Agreement, the General Partner, the Manager, the Principals and their respective Affiliates may engage independently or with others in other investments or business ventures of any kind.

(f)     Other Potential Conflicts of Interest.

(i)     While the General Partner and the Manager intend to avoid situations involving conflicts of interest, each Limited Partner acknowledges that there may be situations in which

20

the interests of the Fund, in a Portfolio Company or otherwise, may conflict with the interests of any Related Investment Fund, any Existing Fund, any Successor Fund, the General Partner, the Manager, the Principals or their respective Affiliates. Each Limited Partner agrees that the activities of any Related Investment Fund, any Existing Fund, any Successor Fund, the General Partner, the Manager, the Principals and their respective Affiliates expressly authorized or contemplated by this Section 2.3 or in any other provision of this Agreement may be engaged in by such Related Investment Fund, such Existing Fund, such Successor Fund, the General Partner, the Manager, the Principals or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or of any duty that might be owed by any such Person to the Fund or to any Partner.

(ii)     The General Partner will seek the consent of the Advisory Committee on any matter that the General Partner determines involves a conflict of interest not provided for in this Section 2.3 or elsewhere in this Agreement. If the Advisory Committee waives such conflict of interest or the General Partner or the Manager acts in a manner, or pursuant to standards or procedures, approved by the Advisory Committee with respect to such conflict of interest, then none of the Related Investment Funds, the Existing Funds, the Successor Funds, the General Partner, the Manager, the Principals or any of their respective Affiliates shall have any liability to the Fund or any Partner for such actions in respect of such matter taken in good faith by them, including actions in the pursuit of their own interests.

2.4     <u>Liability of the General Partner and Other Covered Persons.</u>

(a)     <u>General</u>. The General Partner has the liabilities set forth herein and, unless otherwise modified herein, under the Partnership Law to (*i*) Persons other than the Fund and the other Partners and (*ii*) subject to the other provisions of this Agreement, the Fund and the other Partners. No Covered Person shall be liable to the Fund or any Partner, and each Partner does hereby release such Covered Person, for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Fund and is within the scope of authority granted to such Covered Person by this Agreement, *provided* that such act or omission does not constitute Disabling Conduct by the Covered Person. No Partner shall be liable to the Fund or any Partner for any action taken by any other Partner. To the extent that, at law or in equity, a Covered Person has duties and liabilities relating thereto to the Fund or to the Partners, any Covered Person acting under this Agreement shall not be liable to the Fund or any Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity and to the extent permitted by law, are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b)     <u>Reliance</u>. A Covered Person shall incur no liability in acting in good faith upon any signature or writing believed by such Covered Person to be genuine, may rely on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect

21

(c)      the replaced General Partner shall thereafter be entitled to receive all distributions that otherwise would have been distributable to it  pursuant to Article VI as if it had not been removed as the general partner of the Fund with respect to Portfolio Investments made by the Fund on or before the effective date of the removal of the General Partner and without regard to Portfolio Investments made, or fees and expenses incurred, thereafter, except that in the case of the removal of the General Partner pursuant to clause (x) of Section 2.5, amounts otherwise distributable to the General Partner pursuant to clauses (d) and (e) of Section 6.3 shall be reduced by 50%;

(d)      the replaced General Partner and its Affiliates shall continue to be Covered Persons and to be entitled to indemnification hereunder pursuant to Section 9.1, but only with respect to Damages (*i*) relating to Portfolio Investments made prior to the removal of the General Partner or (*ii*) arising out of or relating to their activities during the period prior to the removal of the General Partner as the general partner of the Fund or otherwise arising out of the replaced General Partner's service as general partner of the Fund or any Related Investment Fund;

(e)      the obligation of the replaced General Partner under Section 11.3 shall be unaffected, except that Section 11.3 shall be applied to the replaced General Partner (and all calculations thereunder shall be made) as though the only Portfolio Investments, Organizational Expenses and Fund Expenses were those made and incurred prior to the removal of the General Partner;

(f)      any amounts held in Segregated Reserve Accounts shall be transferred to an escrow account established in the name of the Fund at a bank selected by the replacement general partner for such purpose, and such escrow account shall constitute the Segregated Reserve Accounts and amounts deposited therein shall be held, applied and released as provided in Sections 6.14 and 11.2(c) and not used for any other purpose;

(g)      for all other purposes of this Agreement, the replacement general partner of the Fund shall be deemed to be the "General Partner" hereunder and shall be deemed to be admitted as the general partner of the Fund effective immediately prior to the removal of the replaced General Partner and shall continue the investment and other activities of the Fund without dissolution; and

(h)      the appointment of the Manager pursuant to Article VII, the right of the Manager to receive future installments of the Management Fee and any management agreement between the Fund and the Manager pursuant to Article VII shall terminate.

2.6      <u>Bankruptcy, Dissolution or Withdrawal of the General Partner</u>.  In the event of the bankruptcy or dissolution and commencement of winding-up of the General Partner or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Fund under the Partnership Law, the Fund shall be dissolved and wound up as provided in Article XI unless the General Partner is removed and replaced pursuant to Section 2.5.  The General Partner shall take no action to accomplish its voluntary dissolution.  The General Partner

shall not withdraw as general partner of the Fund prior to the dissolution of the Fund except pursuant to Section 2.5 or 10.1(e).

## ARTICLE III

## THE LIMITED PARTNERS

3.1    No Participation in Management, etc.  No Limited Partner shall take part in the management or control of the Fund's investment or other activities, transact any business in the Fund's name, conduct Fund business, have the power to enter into agreements on behalf of the Fund or sign documents, letters, contracts, deeds or instruments for, or otherwise bind, the Fund. No Limited Partner shall hold itself out as being a general partner of the Fund.  Except as expressly provided herein, no Limited Partner shall have the right to vote for the election, removal or replacement of the General Partner.  No provision of this Agreement shall obligate any Limited Partner (other than an Affiliated Partner) to refer investments to the Fund or restrict any investments that such Limited Partner may make.  The exercise by any Limited Partner of any right conferred herein shall not be construed to constitute participation by such Limited Partner in the control of the investment or other activities of the Fund so as to make such Limited Partner liable as a general partner for the debts and obligations of the Fund for purposes of the Partnership Law or otherwise.

3.2    Limitation of Liability.  Except as may otherwise be required by the Partnership Law or as expressly provided for herein, the liability of each Limited Partner is limited to its Capital Commitment.

3.3    No Priority.  No Limited Partner shall have priority over any other Limited Partner either as to the return of the amount of its Capital Contribution or, except as provided in Article VI, as to any allocation of any item of income, gain, loss, deduction or credit of the Fund.

3.4    ERISA Partners and Public Plan Partners.

(a)    Action by a Limited Partner.  If an ERISA Partner or a Public Plan Partner shall deliver to the General Partner an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, that (i) as a result of the adoption of or amendment to any statute or regulation or a development in the case law or the DOL's interpretation of the DOL Regulations regarding the definition of "plan assets" for purposes of ERISA, or (if the Fund intends to qualify as a VCOC for purposes of Section 4.3) the failure of the Fund to be treated as a VCOC, there is a reasonable likelihood that all or any part of the Fund's assets would be deemed to be "plan assets" for purposes of ERISA or (ii) in the case of a Public Plan Partner, as a result of a change in the statute or regulation applicable to such Public Plan Partner that authorizes or governs such Public Plan Partner's investment in the Fund and in other investment vehicles like the Fund, investing in the Fund would be illegal for such Public Plan Partner, as the case may be, such Limited Partner may, with the consent of the General Partner (which consent shall not be unreasonably withheld):

24

(A)     accelerate the payment of its Remaining Capital Commitment so as to avail itself of any "grandfather" provisions that may be applicable under such statute, regulation or interpretation thereof; or

(B)     transfer all or any portion of its interest in the Fund to a third Person whose acquisition of such interest would result in a reduction in the percentage of the Fund's assets that are or might be treated as assets of an employee benefit plan (a "Non-Plan Party"), in a transaction that complies with Section 10.1.

If an ERISA Partner or a Public Plan Partner is unable pursuant to this Section 3.4(a) to dispose of such portion of its interest in the Fund that is sufficient, in the case of an ERISA Partner, to prevent the Fund's assets from being deemed "plan assets" for purposes of ERISA or, in the case of a Public Plan Partner, to prevent the investment by such Public Plan Partner in the Fund from being considered illegal, within 30 days after delivery of the opinion referred to in Section 3.4(a) or the General Partner having notified such Limited Partner of the determination described in the first sentence of Section 3.4(b), then at the written election of such Limited Partner delivered to the General Partner within 30 days after delivery of such opinion or notification of such determination, such Limited Partner may withdraw from the Fund. Any such Limited Partner so electing to withdraw from the Fund may, at the election of such Limited Partner and to the extent permitted under ERISA, receive in connection therewith a special distribution in respect of such Limited Partner's interest in the Fund in the form of an interest bearing promissory note of the Fund as provided in clause (iv) of the third sentence of Section 3.4(b). Such note shall have a principal amount equal to the Value of such Limited Partner's interest in the Fund as of the date of withdrawal (as mutually agreed by the General Partner and such Limited Partner) and shall mature on the date of the final distribution by the Fund to the Partners in accordance with Section 11.2, *provided* that such note shall be prepaid (in full satisfaction thereof) at such times, and in such amounts, as distributions would have been made to such Limited Partner had such Limited Partner not withdrawn from the Fund, *provided further* that in no event shall the aggregate of all payments due or made to such Limited Partner on such note exceed the lesser of (*1*) the aggregate amount of such distributions and (*2*) the principal amount of such note plus interest thereon at the Prime Rate. All costs and expenses incurred in connection with actions taken by or with respect to a Limited Partner under this Section 3.4(a) shall be paid by such Limited Partner.

(b)     Action by the General Partner. If the General Partner determines that there is a reasonable likelihood that (*x*) any or all of the assets of the Fund would be deemed to be "plan assets" for purposes of ERISA or (*y*) investment in the Fund would become illegal for a Public Plan Partner, as the case may be, each ERISA Partner (in the case of a determination referred to in clause (x) above) or such Public Plan Partner (in the case of a determination referred to in clause (y) above) will, upon the written request and with the reasonable cooperation of the General Partner, use commercially reasonable efforts (or, if such reasonable likelihood of such assets being deemed "plan assets" for purposes of ERISA arose because of the General Partner's failure to comply with Section 4.3, such ERISA Partner will cooperate in the commercially reasonable efforts of the General Partner) to dispose of such ERISA Partner's or Public Plan

Partner's entire interest in the Fund (or such portion of its interest that the General Partner determines is sufficient to prevent the Fund's assets from being deemed to be "plan assets" for purposes of ERISA or to prevent investment in the Fund by such Public Plan Partner from being considered illegal, as the case may be) to a Non-Plan Party at a price reasonably acceptable to such ERISA Partner or Public Plan Partner, in a transaction that complies with Section 10.1.  If the General Partner makes a request pursuant to the preceding sentence, the General Partner shall elect that the affected ERISA Partners and Public Plan Partners take such action in proportion to their Capital Commitments.  If an ERISA Partner or a Public Plan Partner has not disposed of its entire interest in the Fund (or such portion of its interest that the General Partner determines is sufficient to prevent the Fund's assets from being deemed "plan assets" for purposes of ERISA or to prevent the investment in the Fund by such Public Plan Partner from being considered illegal) within 30 days of the General Partner having notified such ERISA Partner or Public Plan Partner of the General Partner's determination described in the first sentence of this Section 3.4(b), then, notwithstanding anything to the contrary herein, the General Partner shall have the right, but not the obligation, upon five Business Days' prior written notice, to do any or all of the following to reduce or alleviate any restrictions, prohibitions or other material complications resulting from the Fund's assets being deemed "plan assets" for purposes of ERISA or to prevent such investment in the Fund by such Public Plan Partner from being considered illegal:

(i)     prohibit an ERISA Partner or a Public Plan Partner, as the case may be, from making a Capital Contribution with respect to any and all future Portfolio Investments and reduce its Remaining Capital Commitment to any amount greater than or equal to zero;

(ii)     offer to each Non-Defaulting Partner other than ERISA Partners and, if determined to be appropriate by the General Partner, other than Public Plan Partners (but including Substitute Partners) the opportunity to purchase a portion of the ERISA Partner's or Public Plan Partner's interest in the Fund at the Value thereof, including all or such portion of the ERISA Partner's or Public Plan Partner's Remaining Capital Commitment (calculated prior to giving effect to paragraph (i) above of this Section 3.4(b)), in each case as the General Partner shall determine, *provided* that, without the consent of the General Partner, no Limited Partner shall be entitled to purchase a percentage of such interest that would result (*A*) in such Partner's Capital Commitment (or the excess of its Capital Commitment over its Remaining Capital Commitment) being equal to or greater than 10% of the aggregate Capital Commitments of all Partners, or (*B*) in such Partner's Capital Contribution in respect of any Portfolio Investment being greater than the largest amount (rounded to the nearest one hundred dollars) that, in the judgment of the General Partner, such Partner could contribute or invest without having a Material Adverse Effect;

(iii)     offer to any Non-Plan Party the opportunity to purchase, or purchase itself, at the Value thereof, all or any portion of the ERISA Partner's or Public Plan Partner's interest in the Fund that remains after giving effect to the transactions contemplated by paragraph (ii) above of this Section 3.4(b);

26

(iv)     cause the Fund to make a special distribution to the ERISA Partner or Public Plan Partner of cash, cash equivalents, Securities, a promissory note (the terms of which shall be mutually agreeable to the General Partner and such Partner) or any combination of the foregoing, as determined by the General Partner, in an amount (or having a Value) equal to the Value of such ERISA Partner's or Public Plan Partner's interest in the Fund, in which case such ERISA Partner's or Public Plan Partner's right to receive future distributions pursuant to Articles VI and XI shall be appropriately adjusted in good faith by the General Partner; or

(v)     dissolve and terminate the Fund and distribute the Fund's assets in accordance with Article XI.

In determining the appropriate action to take under this Section 3.4(b), the General Partner shall take into consideration the effect of such action on all of the Partners, including those Partners that have not caused the General Partner to consider any of the foregoing actions.

(c)     Documentation, etc.  Subject to the requirements of Section 10.1, the details and documentation relating to any transaction or transactions effected pursuant to this Section 3.4 shall be as determined by the General Partner and shall not require the consent of the Advisory Committee or of any of the Limited Partners.  Upon the closing of any transaction or transactions effected pursuant to this Section 3.4, the General Partner (*i*) may admit each purchaser that is not already a Partner or Substitute Partner immediately prior to the time of such purchase to the Fund as a Substitute Partner on such terms and upon the delivery of such documents as the General Partner shall determine to be appropriate and (*ii*) shall make such additional adjustments to the Capital Accounts, Capital Commitments, Sharing Percentages, Remaining Capital Commitments and Capital Contributions of such ERISA Partner or Public Plan Partner and of all Partners and Substitute Partners who have purchased interests pursuant to this Section 3.4 as the General Partner shall determine to be appropriate to give effect to and reflect such transactions.  The General Partner may, without the consent of any Person, including any other Partner, amend Schedule A hereto as may be necessary or appropriate to reflect the changes in Partners and Capital Commitments made pursuant to this Section 3.4.

3.5     Limited Partners Subject to the Bank Holding Company Act.  Notwithstanding any other provision of this Agreement, all BHC Partners shall be subject to the limitations on voting set forth in this Section 3.5.  If at any time a BHC Partner holds an interest in the Fund that would otherwise represent 5% or more of the total voting interests in the Fund, such BHC Partner may not vote any portion of its interest in the Fund representing in excess of 4.99% of the interests in the Fund entitled to vote.  Whenever the vote, consent or decision of a Limited Partner is required or permitted pursuant to this Agreement, a BHC Partner shall not be entitled to participate in such vote or consent, or to make such decision, with respect to the portion of such BHC Partner's interest in excess of 4.99% of the interests in the Fund, and such vote, consent or decision shall be tabulated or made as if such BHC Partner were not a Partner with respect to such BHC Partner's interest in excess of 4.99% of the interests in the Fund.  Each BHC Partner hereby further irrevocably waives its corresponding right to vote for a successor

27

general partner under the Partnership Law with respect to any non-voting interest, which waiver shall be binding upon such BHC Partner and any Person that succeeds to its interest. In the event that two or more BHC Partners are affiliated, the limitations of this Section 3.5 shall apply to the aggregate interests in the Fund held by such BHC Partners and each such BHC Partner shall be entitled to vote its *pro rata* portion of 4.99% of the interests in the Fund entitled to vote. Except as provided in this Section 3.5, any interest of a BHC Partner held as a non-voting interest shall be identical in all respects to the interests of the other Limited Partners. Any such interest held as a non-voting interest shall remain a non-voting interest in the event that the BHC Partner holding such interest ceases to be a BHC Partner and shall continue as a non-voting interest with respect to any assignee or other Transferee of such interest.

3.6    Foundation Partners.  If a Foundation Partner shall deliver to the General Partner an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, which opinion may assume that such Foundation Partner's activities (other than the ownership of an interest in the Fund) may cause such Partner to acquire an "excess business holdings" (within the meaning of Section 4943 of the Code), to the effect that (i) remaining as a Limited Partner of the Fund will cause such Foundation Partner to hold an "excess business holdings," (ii) ownership by such Foundation Partner of more than one "excess business holdings" would cause such Foundation Partner to lose its exemption from U.S. federal taxation and (iii) accordingly, based on the assumption that such Foundation Partner's other activities may cause such Foundation Partner to own other "excess business holdings," remaining as a Limited Partner in the Fund might reasonably cause the Foundation Partner to lose its exemption from U.S. federal taxation, such Foundation Partner may Transfer its interest in the Fund to another Person in a transaction that complies with Section 10.1 or, if such Transfer is not practicable, may withdraw from the Fund.  In the event of the delivery of the opinion of counsel referred to in the preceding sentence, any Transfer of such Foundation Partner's interest in the Fund and/or any withdrawal of such Foundation Partner contemplated by this Section 3.6 shall be effected pursuant to the procedures outlined in Section 3.4 (modified as the General Partner determines is appropriate in this context), as if such Foundation Partner's were an ERISA Partner.

3.7    Bankruptcy, Dissolution or Withdrawal of a Limited Partner.  The bankruptcy, dissolution or withdrawal of a Limited Partner shall not in and of itself dissolve or terminate the Fund. No Limited Partner shall withdraw from the Fund prior to the dissolution of the Fund except pursuant to Section 3.4, 3.6 or 10.1.

3.8    Advisory Committee.

(a)    Appointment of Members, etc.  The General Partner shall establish promptly after the Initial Closing an advisory committee (the "Advisory Committee") having at least three voting members appointed by the General Partner and may from time to time appoint one or more additional members to the Advisory Committee. Each voting member of the Advisory Committee shall be a representative of a Limited Partner of the Fund (other than an Affiliate of the General Partner), *provided* that no Limited Partner shall have more than one representative

on the Advisory Committee.   The General Partner shall have the right to appoint one representative of the General Partner to serve as a non-voting member and the Chairman of the Advisory Committee.   Each Person appointed to the Advisory Committee shall serve for a two-year term, unless such term ends earlier due to such Person's death, resignation or removal at the request of the Partner that such Person represents.   Any member of the Advisory Committee may resign by giving the General Partner 30 days' prior written notice, and shall be deemed removed if the Limited Partner that the member represents (*i*) becomes a Defaulting Partner, (*ii*) assigns in excess of 50% of its interest in the Fund to a Person that is not an Affiliate of such Partner, (*iii*) is determined pursuant to Section 5.4(c) to be a Limited Partner whose continued participation in the Fund would have a Material Adverse Effect or (*iv*) is notified that such member has been removed upon the recommendation of the General Partner with the consent of a majority of the other members of the Advisory Committee.   Upon the death or resignation of a member of the Advisory Committee or the removal of such member upon the recommendation of the General Partner or the Limited Partner that such member represents prior to the expiration of such member's term, the Limited Partner that such member represents may appoint a replacement for such member for the balance of such term.   Upon the deemed removal of a member of the Advisory Committee, the General Partner may appoint a replacement for the balance of such member's term.   Upon the expiration of the term of a member of the Advisory Committee, the General Partner may reappoint such member for an additional term or appoint a replacement member.

(b)      Scope of Authority.   The Advisory Committee shall be authorized to (*i*) consent to, approve, review or waive any matter requiring the consent, approval, review or waiver of the Advisory Committee as set forth in this Agreement, (*ii*) review valuations of Securities or other assets of the Fund and (*iii*) provide such advice and counsel as is requested by the General Partner or required pursuant to this Agreement in connection with potential conflicts of interest, valuation matters and other matters relating to the Fund.   The Advisory Committee shall constitute a committee of the Fund and shall take no part in the control or management of the Fund, nor shall it have any power or authority to act for or on behalf of the Fund, and all investment decisions, as well as all responsibility for the management of the Fund, shall rest with the General Partner.   Except for those matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement, any actions taken by the Advisory Committee shall be advisory only, and none of the General Partner, the Manager or any of their respective Affiliates shall be required or otherwise bound to act in accordance with any decision, action or comment of the Advisory Committee or any of its members.   Notwithstanding anything to the contrary in this Agreement, in no event shall a member of the Advisory Committee be permitted to take any action that would result in such Limited Partner being considered a general partner of the Fund by agreement, estoppel, as a result of the performance of such member's duties or otherwise.

(c)      Other Activities of the Members.   The Partners acknowledge that the members of the Advisory Committee (*i*) will not be obligated, to the fullest extent permitted by applicable law, to act in a fiduciary capacity with respect to the Fund or any Partner, (*ii*) have substantial responsibilities in addition to their Advisory Committee activities and are not obligated to devote

any fixed portion of their time to the activities of such Committee and (*iii*) other than any non-voting member appointed by the General Partner, will not be subject to the restrictions set forth in Section 2.3 and will not be prohibited from engaging in activities that compete or conflict with those of the Fund, nor shall any such restrictions apply to any of their respective Affiliates.

(d)    Meetings.  Regular meetings of the Advisory Committee shall be held at least annually, commencing after the Initial Closing, upon not less than 30 days' prior written notice by the General Partner to the members of the Advisory Committee.  Special meetings of the Advisory Committee may be called either by the General Partner or a member of the Advisory Committee at any time to consider matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement or is requested by the General Partner. Notice of each such special meeting shall be given by telephone, hand delivery or air courier service or sent by facsimile or other electronic means to each member of the Advisory Committee at least five Business Days prior to the date on which the meeting is to be held. Attendance at any meeting of the Advisory Committee shall constitute waiver of such notice. The quorum for a meeting of the Advisory Committee shall be a majority of its voting members. Members of the Advisory Committee may participate in a meeting of the Advisory Committee by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  All actions taken by the Advisory Committee shall be by a vote of a majority of the voting members present at a meeting thereof at which a quorum is present or by a written consent setting forth the action so taken and signed by a majority of the voting members of the Advisory Committee.  Except as expressly provided in this Section 3.8, the Advisory Committee shall conduct its business in such manner and by such procedures as a majority of its members deems appropriate.

(e)    Fees and Expenses, etc.  The members of the Advisory Committee shall serve without compensation, but shall be reimbursed by the Fund for all reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee.  The members of the Advisory Committee shall be Covered Persons and indemnified by the Fund as provided in Section 9.1.

3.9    Feeder Funds.  The interestholders of a Feeder Fund shall participate indirectly in the Fund through such Feeder Fund.  The Fund shall establish on its books and records separate Capital Accounts, and shall have the authority to make separate computations under Articles VI and XI, with respect to each portion of a particular Feeder Fund's limited partner interest attributable to a separate interestholder in such Feeder Fund.  The provisions of this Agreement shall be applied to each Feeder Fund as if each portion of its limited partner interest attributable to an interestholder of such Feeder Fund were held by a separate Limited Partner.  A Feeder Fund may make any election, or give or withhold any vote, waiver or consent, with respect to any such portion of its limited partner interest without prejudice to such Feeder Fund's right to take such action with respect to the other portions of the limited partner interests held by such Feeder Fund.  The General Partner shall have full authority, without the consent of any other Person, including any other Partner, to amend or interpret this Agreement as may be necessary or appropriate to give effect to the intent of the provisions of this Section 3.9.

30

# ARTICLE IV

## INVESTMENTS

4.1   <u>Investments in Portfolio Companies.</u>

(a)   <u>Portfolio Investments.</u>   The General Partner will use its best efforts to obtain suitable opportunities for the Fund to make Portfolio Investments in accordance with the Investment Objectives.

(b)   <u>Bridge Investments.</u>   The Fund may provide interim financing to or make investments that are intended to be of a temporary nature in Securities of any Portfolio Company or any subsidiary thereof in connection with or subsequent to an investment by the Fund in such Portfolio Company (each a "<u>Bridge Investment</u>"), *provided* that the acquisition cost of the Portfolio Investment including such Bridge Investment in such Portfolio Company shall not exceed the lesser of (i) 25% of the aggregate Capital Commitments of all the Non-Defaulting Partners and (ii) the aggregate Remaining Capital Commitments of all the Non-Defaulting Partners as of the time that such Bridge Investment is made, *provided further* that, without the consent of the Advisory Committee, no more than two Bridge Investments shall be outstanding at any time. The General Partner intends that the Fund will make Bridge Investments on a highly selective and limited basis in cases where the General Partner determines that such Bridge Investment is crucial to the operations of a Portfolio Company or to securing a transaction for the Fund. Bridge Investments that are not repaid, refinanced or otherwise disposed of before the 18-month anniversary of the date that such Bridge Investment was made shall no longer be treated as Bridge Investments, as provided in Section 6.4.

(c)   <u>Investments Following Termination of Investment Period.</u>   Following the termination of the Investment Period, no new Portfolio Investments will be made by the Fund, *provided* that Remaining Capital Commitments may be drawn down from time to time for a period of two years following the termination of the Investment Period (or, with the consent of the Advisory Committee, after such two-year period) to (*i*) complete investments with respect to which a written commitment has been made prior to the end of the Investment Period and (*ii*) fund Follow-On Investments in an aggregate amount up to 15% of aggregate Capital Commitments.

(d)   <u>Reinvestment.</u> The General Partner may increase the Partners' Remaining Capital Commitments by an amount equal to all or any portion of Distributable Cash received by the Fund in respect of a Portfolio Investment prior to the 18-month anniversary of the Fund's acquisition of such Portfolio Investment, up to and in proportion to the Capital Contributions of the Partners with respect to such Portfolio Investment, and the amount so added to the Partners' Remaining Capital Commitments shall be subject to recall by the Fund.

4.2   <u>Investment Restrictions.</u>   Without the consent of the Advisory Committee, the Fund shall not:

31

(a)     except as otherwise provided in Section 4.1(b), make any investment in any Person (including any Affiliates of such Person) that (when taken together with all other investments by the Fund in, and the amount at that time of guarantees made by the Fund with respect to, such Person and any Affiliates of such Person) would result in an investment by the Fund at that time of an aggregate amount in such Person in excess of 15% of the aggregate Capital Commitments, *provided* that the Fund may make an investment in one such Person that would result in an investment by the Fund at that time in excess of 15% but not in excess of 20% of the aggregate Capital Commitments;

(b)     borrow money, except that the Fund may pay Placement Fees on a deferred basis and may borrow on a temporary basis in anticipation of receipt of Drawdowns pursuant to Section 5.2, *provided* that all or part of such Drawdowns shall be used to repay such temporary borrowings;

(c)     make an investment in any other pooled multiple investment vehicle that provides for a payment by the Fund of a management fee or carried interest or other incentive or performance based fee, *provided* that nothing in this paragraph shall prevent employees or directors of or other service providers to a Portfolio Company from receiving any interest in such Portfolio Company and the Limited Partners hereby acknowledge that stock option, "cheap stock" and other similar incentive arrangements for management of Portfolio Companies and joint venture vehicles shall not be deemed subject to the prohibition of this clause (c);

(d)     make any investment in any Person whose principal source of revenue is derived from the ownership, management, acquisition or development of real estate, excluding any such Persons connected directly or indirectly with the Energy Industry;

(e)     make any investment in derivatives for speculative purposes;

(f)     make an investment in a Portfolio Company that is organized under the laws of a country other than the United States, unless the General Partner shall have first obtained advice from a qualified professional, addressed to the Fund, in form and substance reasonably acceptable to the General Partner for such purpose, to the effect that (*i*) under the laws of such country the limited liability of the Limited Partners related to the activities of the Fund in such country will be recognized, and (*ii*) assuming that no Partner has any income from, or any activities or operations within, such country other than Portfolio Investments to be made by the Fund, no income or assets of any Limited Partner, other than related to the Fund or the Fund's income, assets or activities, or those from sources within such country, will be subject to taxation in such country by virtue of the Fund's activities; or

(g)     make purchases of Securities at any time to the extent that, at such time, more than 10% of the aggregate Capital Commitments would be invested in Securities purchased in the public market (determined based on the cost of such Securities at the time of investment), *provided* that such limitation shall not apply to Temporary Investments, privately-negotiated investments, investments in Securities of Persons that, at the time of the initial investment of the Fund, were not publicly-traded, or Securities of Persons purchased with the intent that such

32

Securities will no longer be publicly-traded (such Securities to which the 10% limitation of this Section 4.2(g) does not apply, "Permitted Public Securities"), *provided further* that if the Value of Securities purchased in the public market other than Permitted Public Securities at any time exceeds 20% of the Value of the Portfolio Investments then held by the Fund, the General Partners shall use commercially reasonable efforts, taking into account liquidity considerations, to reduce such Securities to less than 20% of the Value of the Portfolio Investments then held by the Fund.

4.3    Plan Assets.  The General Partner shall use its reasonable best efforts to ensure that the Fund assets are excepted from being deemed to be "plan assets" for purposes of ERISA. The General Partner shall notify the Limited Partners promptly after (a) the assets of the Fund become "plan assets" for purposes of ERISA or (b) facts or circumstances known to the General Partner are reasonably likely to result in the assets of the Fund becoming "plan assets" for purposes of ERISA.  Unless otherwise expressly stated in the first Drawdown Notice delivered to the Partners, the delivery of the first Drawdown Notice shall constitute the General Partner's certification to the Partners that the assets of the Fund are not, and shall not be upon the Partnership's receipt of all or any portion of the funds called pursuant to such Drawdown Notice, "plan assets" for purposes of ERISA.  If the first Drawdown Notice expressly states that the assets of the Fund are, or shall be upon the Partnership's receipt of all or any portion of the fund called pursuant to such Drawdown Notice, "plan assets" for purposes of ERISA, the ERISA Partners shall not be required to contribute the capital requested in such Drawdown Notice and in such event the ERISA Partners and the General Partner shall cooperate to establish an escrow or other customary funding arrangement for the ERISA Partners.

4.4    Unrelated Business Taxable Income and Effectively Connected Income.  The General Partner shall use commercially reasonable efforts to structure Portfolio Investments in a manner that will not result in the realization by any Tax-Exempt Partner of a substantial amount of UBTI or in the realization by any Non-U.S. Partner of a substantial amount of ECI unless the General Partner determines that such structure has a significant risk of materially decreasing the rate of return to the Fund with respect to such Portfolio Investment, materially impairing the ability to obtain financing on favorable terms for the Portfolio Company in which such Portfolio Investment is made, materially impairing the ability of the Fund to make such Portfolio Investment, or otherwise materially adversely affecting such Portfolio Company, such Portfolio Investment or the Fund.  Notwithstanding the foregoing, the covenant set forth in the preceding sentence shall not apply with respect to UBTI or ECI that may result from reductions in Management Fees pursuant to Section 7.2(a)(ii) or any borrowing permitted by Section 4.2(b). The Limited Partners acknowledge that the use by the General Partner of any structure permitting the Limited Partners to participate in a Portfolio Investment through a Blocker Corporation satisfies the commercially reasonable effort requirement set forth in the first sentence of this Section 4.4.

4.5    Temporary Investments.  To the extent commercially reasonable, the General Partner shall cause the Fund to invest cash held by the Fund in Temporary Investments pending

33

investment in Portfolio Investments, distribution or payment of Organizational Expenses or Fund Expenses.

4.6    Related Investment Funds.

(a)    General. Notwithstanding any other provision of this Agreement, the General Partner or any of its Affiliates may establish one or more Related Investment Funds as provided in this Section 4.6.

(b)    Co-Investment Funds.

(i)    *Co-Investment by Co-Investing Partners and Third Party Co-Investors.* At any time, the General Partner or an Affiliate thereof may permit the Co-Investing Partners to co-invest (other than in their capacity as Partners) with the Fund in the Securities of, or provide financing to, Portfolio Companies, *pro rata* in proportion to their respective Capital Commitments (with the right to increase proportionately their respective shares in the event that one or more Co-Investing Partners declines such offer), subject to such timing and other conditions as the General Partner may impose, *provided* that the General Partner shall provide notice of any such co-investment opportunity to the Co-Investing Partners at least 21 days prior to the date on which such Co-Investing Partners must elect to participate in such co-investment opportunity. Any such co-investment may, if the General Partner so requires, be made through one or more investment partnerships or other vehicles (each a "Co-Investment Fund") formed to facilitate such co-investment. In determining the appropriateness of offering any such opportunity to the Co-Investing Partners, the General Partner may take into account the advisability of offering such opportunity (with or without the participation of any Co-Investing Partners) to a Person other than Co-Investing Partners and other than the General Partner, the Manager and their respective Affiliates (each, a "Third Party Co-Investor"). Any such offer may be made to such Co-Investing Partners and/or Third Party Co-Investors in such proportions as the General Partner shall determine, and the General Partner may allocate such portion of an investment opportunity to a Co-Investment Fund as the General Partner determines to be appropriate.

(ii)    *Co-Investment by Employees and Other Designees of the Manager.* During the Investment Period, the General Partner or an Affiliate thereof may form one or more partnerships or other investment vehicles (each, an "Employee Co-Investment Fund") to provide the Principals and other employees and designees of the Manager and its Affiliates with the opportunity to co-invest with the Fund in Portfolio Companies. The General Partner shall promptly notify the Limited Partners of the formation of any such Employee Co-Investment Fund and of the amount of capital committed thereto. Subject to any legal, tax, regulatory and other similar considerations, the Employee Co-Investment Funds shall co-invest with the Fund in each Portfolio Company in proportion to the respective remaining capital commitments of the Fund and the Employee Co-Investment Funds immediately prior to such investment.

34

(iii)   *Co-Investment Conditions.*   Each co-investment by a Co-Investment Fund, an Employee Co-Investment Fund or as otherwise contemplated by Section 4.6(b)(i) or (ii) (collectively, "Co-Investors") shall, subject to legal, tax, regulatory or other similar considerations, (*A*) be on terms that are no more favorable to such Co-Investors than those received by the Fund and (*B*) be made generally at the same time as the Fund.  With respect to each investment in which Co-Investors co-invest (or propose to co-invest) with the Fund, any investment expenses or indemnification obligations related to such investments shall be borne by the Fund and such Co-Investors in proportion to the capital committed by each to such investment.  Unless the Advisory Committee otherwise consents, the General Partner shall not permit any Co-Investor to dispose of any such investment in a Portfolio Company before the Fund disposes of its investment in such Portfolio Company.   If any such investment by a Co-Investor in a Portfolio Company and the Fund's investment in such Portfolio Investment are disposed of at substantially the same time, such Co-Investor shall dispose of no more than its *pro rata* share of the Fund's and its investments in such Portfolio Company and on terms no more favorable to such Co-Investor than those received by the Fund.  The General Partner ordinarily will have the power to, and ordinarily will cause the Co-Investors to, dispose of any such investment in a Portfolio Company on a *pro rata* basis with the Fund and at substantially the same time that the Fund disposes of its investment in such Portfolio Company, unless the Co-Investors desire, for tax or other reasons, to hold some or all of such investment until a later date and the General Partner has determined that it would not be contrary to the best interests of the Fund for the Co-Investors to do so.

(iv)   *Mechanics of Formation of Co-Investment Funds and Employee Co-Investment Funds.*  In the event that the General Partner or an Affiliate thereof forms one or more Co-Investment Funds or Employee Co-Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate to facilitate the formation and operation of such Related Investment Funds and the investments contemplated by this Section 4.6(b), *provided* that any such amendment shall not materially and adversely affect the rights of any Limited Partner, and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.6(b). Accordingly, if any such Related Investment Funds are formed, all references in this Agreement to the Fund shall, where appropriate, be deemed to include any such Related Investment Funds. Each Co-Investment Fund will be controlled by the General Partner or an Affiliate thereof and may be managed by the Manager or an Affiliate thereof.  Participation by a Limited Partner in a co-investment opportunity, whether directly or through a Co-Investment Fund, shall be entirely the responsibility and investment decision of such Limited Partner, and none of the Fund, the General Partner, the Manager or any of their respective Affiliates shall assume any risk, responsibility or expense, or be deemed to have provided any investment advice, in connection therewith.   Upon each date on which a Subsequent Closing Partner is admitted to the Fund, any Securities then held by both the Fund and any Employee Co-Investment Fund shall be purchased and sold at cost (plus Interest Payments thereon) between the Fund and the Employee Co-Investment Fund so that their resulting ownership of such Securities is proportionate to the relative capital commitments of the Fund

and the Employee Co-Investment Funds, and the General Partner shall make all appropriate adjustments as may be necessary or appropriate to give effect to the intent of this Section 4.6(b).

(c)     Parallel Funds.

(i)     *Formation of Parallel Funds to Accommodate Investor Considerations.* Prior to the Final Admission Date, the General Partner or an Affiliate thereof may, to accommodate legal, tax, regulatory or other similar considerations of certain investors, form one or more pooled investment vehicles having substantially the same terms as the Fund (each a "Parallel Fund") to co-invest with the Fund. In addition, the General Partner may, at any time, to accommodate legal, tax, regulatory or other considerations, require one or more Limited Partners to be admitted as limited partners or other similar investors to one or more Parallel Funds, and in connection therewith and in consideration for the cancellation of their entire interest in the Fund, such Limited Partners will receive an equivalent interest in such Parallel Funds. In furtherance of the foregoing, each such Limited Partner will have a capital commitment, remaining capital commitment and capital account in the Parallel Fund equivalent to such Limited Partner's Capital Commitment, Remaining Capital Commitment and Capital Account in the Fund and such Limited Partners will cease to be limited partners of the Fund. Each Parallel Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof, and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund, with such differences as may be required by the legal, tax, regulatory or other similar considerations referred to above. The General Partner shall provide the Limited Partners with a copy of the organizational documents governing each Parallel Fund. Subject to such legal, tax, regulatory or other similar considerations, the Parallel Funds will co-invest with the Fund in each Portfolio Company in proportion to the respective remaining capital commitments of the Parallel Funds and the Fund immediately prior to such investment. All references in this Section 4.6(c) to the limited partners of a Parallel Fund shall be deemed to include all investors in a Parallel Fund formed as a vehicle other than a limited partnership.

(ii)     *Parallel Investment Conditions.* Each investment by a Parallel Fund shall, subject to legal, tax, regulatory or other similar considerations, (*A*) be on substantially the same terms as and on economic terms that are no more favorable to such Parallel Fund than those received by the Fund and (*B*) after the Final Admission Date, be made generally at the same time as the Fund. With respect to each investment in which Parallel Funds participate (or propose to participate) with the Fund, any investment expenses or any indemnification obligations related to such investment shall be borne by, and any Fee Income shall be allocated among, the Fund and any Parallel Funds in proportion to the capital committed by each to such investment, *provided* that each Parallel Fund shall bear its share of the Fund's Organizational Expenses and Fund Expenses in proportion to the respective capital commitments of the Fund and the Parallel Funds, subject to such adjustment as the General Partner deems fair and equitable to the Fund and the Parallel Funds. The Fund and the

36

Parallel Funds shall sell their respective interests in a Portfolio Company at the same time and on the same terms, in proportion to their respective ownership interests therein.

(iii)    *Mechanics of Formation of Parallel Funds.*   In the event that the General Partner or an Affiliate thereof forms one or more Parallel Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate to facilitate the formation and operation of such Parallel Funds and the investments contemplated by this Section 4.6(c), *provided* that any such amendment shall not materially and adversely affect the rights of any Limited Partner, and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.6(c).   Accordingly, if any such Parallel Funds are formed, all references in this Agreement to the Fund shall, where appropriate, be deemed to include any Parallel Funds and, in all cases where the vote, waiver or consent of a Majority in Interest or other specified percentage in Interest is required, such vote, waiver or consent shall be calculated as if the Fund and any Parallel Funds were one entity.   At the time that a Parallel Fund first admits limited partners, and upon each date on which a Subsequent Closing Partner is admitted to the Fund or an additional limited partner is admitted to a Parallel Fund (or a previously admitted partner increases its commitment to a Parallel Fund), (*A*) any Securities then held by the Fund and/or the Parallel Funds shall be purchased and sold at cost (plus Interest Payments thereon) between the Fund and the Parallel Funds so that their resulting ownership of such Securities is proportionate to the relative capital commitments of the Fund and the Parallel Funds, (*B*) any Organizational Expenses and Fund Expenses shall be allocated among the Fund and the Parallel Funds in proportion to the relative capital commitments of the Fund and the Parallel Funds, and the General Partner shall make all appropriate adjustments as may be necessary or appropriate to give effect to the intent of this Section 4.6(c).

(d)    Alternative Investment Funds.

(i)    *Formation of Alternative Investment Funds for Particular Investments.*   If at any time the General Partner determines that for legal, tax, regulatory or other similar considerations certain or all of the Partners should participate in a potential Portfolio Investment through one or more alternative investment structures, the General Partner may effect the making of all or any portion of such investment outside of the Fund by requiring certain or all Partners, subject in all cases to Section 5.4, to make capital contributions with respect to such potential portfolio investment to a limited partnership or other similar vehicle (each, an "Alternative Investment Fund").   Each Alternative Investment Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof, and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund, with such differences as may be required by the legal, tax, regulatory or other similar considerations referred to above, *provided* that the Limited Partners investing therein shall not be generally liable for the obligations of such Alternative Investment Fund.   The General Partner shall provide the Limited Partners with a copy of the organizational documents governing each Alternative

37

Investment Fund. All references in this Section 4.6(d) to the limited partners of an Alternative Investment Fund shall be deemed to include all investors in an Alternative Investment Fund formed as a vehicle other than a limited partnership.

(ii)    *Alternative Investment Conditions.* Each Partner investing in an Alternative Investment Fund shall be obligated to make contributions to such Alternative Investment Fund in a manner similar to that provided by Section 5.2, and each such Partner's Remaining Capital Commitment shall be reduced by the amount of such contributions to the same extent as if such contributions were made to the Fund as Capital Contributions. With respect to each investment in which an Alternative Investment Fund participates with the Fund, any investment expenses or indemnification obligations related to such investment shall be borne by the Fund and such Alternative Investment Fund in proportion to the capital committed by each to such investment. Any management fee funded by a Partner with respect to an Alternative Investment Fund shall reduce such Partner's share of the Management Fee funded by such Partner, and payable to the Manager by the Fund, by a corresponding amount. The investment results of an Alternative Investment Fund will be aggregated with the investment results of the Fund for purposes of determining distributions either by the Fund or such Alternative Investment Fund unless at the time the investment is made by the Alternative Investment Fund the General Partner otherwise determines with the consent of the Advisory Committee that such aggregation increases the risk of any adverse tax consequences or imposes legal or regulatory constraints or creates contractual or business risks that would be undesirable for the Fund or the Partners.

(iii)    *Mechanics of Formation of Alternative Investment Funds.* In the event that the General Partner or an Affiliate thereof forms one or more Alternative Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any Partner, to amend this Agreement as may be necessary or appropriate to facilitate the formation and operation of such Alternative Investment Fund and the investments contemplated by this Section 4.6(d), *provided* that any such amendment shall not materially and adversely affect the rights of any Limited Partner, and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.6(d). The General Partner shall make all appropriate adjustments as may be necessary or otherwise appropriate to give effect to the intent of this Section 4.6(d). Accordingly, if any such Alternative Investment Funds are formed, all references in this Agreement to the Fund shall, where appropriate, be deemed to include any Alternative Investment Fund. The limited partnership agreement and/or other organizational documents of any Alternative Investment Fund will be executed on behalf of the Limited Partners investing therein by the General Partner pursuant to the power of attorney granted by each of the Limited Partners pursuant to Section 12.2. With respect to any Alternative Investment Fund formed prior to the Final Admission Date, upon each date on which a Subsequent Closing Partner is admitted to the Fund, the General Partner may, consistent with the conditions set forth in Section 4.6(d)(i), require such Partner to make Capital Contributions to such Alternative Investment Fund, and any Securities then held by both the Fund and such Alternative Investment Fund shall be purchased and sold at cost (plus Interest

Payments thereon) between the Fund and such Alternative Investment Fund so that their resulting ownership of such Securities is proportionate to the relative capital commitments of the Partners investing directly through the Fund and the partners investing through the Alternative Investment Fund.

## ARTICLE V

## CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

5.1     Capital Commitments.  Except as otherwise provided herein, each Partner shall make Capital Contributions to the Fund in the aggregate up to the amount of its Capital Commitment, which is set forth opposite such Partner's name on Schedule A hereto. Notwithstanding any other provision of this Agreement, the aggregate Capital Commitments of the General Partner and the Affiliated Partners shall equal at least $28 million.  The General Partner and/or one or more of the Affiliated Partners may increase, but not decrease, their respective Capital Commitments on or before the Final Admission Date as a Subsequent Closing Partner pursuant to Section 10.2.

5.2     Capital Contributions.  Except as otherwise provided in Section 5.4 or elsewhere in this Agreement, the Capital Contributions of the Partners shall be paid in separate Drawdowns in amounts determined pursuant to the terms of Section 5.2(d), subject to the following terms and conditions:

(a)     Timing of Drawdown Notices; Use of Drawdowns.  The General Partner shall provide each Partner with a notice of each Drawdown (a "Drawdown Notice") at least 10 days prior to the date on which such Drawdown is due and payable (the "Drawdown Date"), *provided* that in the case of a Drawdown in connection with a Closing, the General Partner may provide a Drawdown Notice as few as five Business Days prior to the Drawdown Date.  Each Drawdown shall be used to make Portfolio Investments by the Fund or shall be applied to provide for Organizational Expenses or Fund Expenses.  If the Fund intends to qualify as a VCOC for purposes of Section 4.3, then the Drawdown used to fund the first Portfolio Investment shall be invested promptly after its Drawdown Date in a Portfolio Company as to which the Fund obtains "management rights" that will enable it to qualify as a VCOC.

(b)     Contents of Drawdown Notices.  In the case of a Drawdown to be used to make a Portfolio Investment, the relevant Drawdown Notice shall give such description of such Portfolio Investment as the General Partner shall determine is appropriate, including a general description of the business to be acquired, the Securities expected to be acquired and the purchase price therefor (unless the General Partner determines that such disclosure would be contrary to the best interests of the Fund).  In addition, such Drawdown Notice shall specify, to the knowledge of the General Partner as of the date thereof, the amount of such Drawdown that will be used by the Fund to make Portfolio Investments or pay Organizational Expenses and/or Fund Expenses.

39

(c)    Revised Drawdown Notices. Notwithstanding Section 5.2(a), if the actual Capital Contribution to be paid by a Partner changes after delivery of a Drawdown Notice (due, for example, to a change in the amount or nature of the Securities to be acquired by the Fund or a default by or excuse of another Partner), the General Partner shall issue a revised Drawdown Notice to the Partners. Such Partners shall pay any additional Capital Contribution thereby required no later than the Drawdown Date specified in such revised Drawdown Notice.

(d)    Calculation of Each Partner's Share of a Drawdown. Each Partner shall pay the Capital Contributions determined in accordance with the provisions of this Section 5.2(d) and specified in the relevant Drawdown Notice, as the same may be revised pursuant to Section 5.2(c), by wire transfer in immediately available funds to the account specified therein. Except as otherwise provided herein, the required Capital Contribution of each Partner shall be made no later than the Drawdown Date specified in such Drawdown Notice and shall equal the following, in each case up to an amount not to exceed such Partner's Remaining Capital Commitment:

(i)    in the case of a Portfolio Investment, including Fund Expenses determined by the General Partner to be attributable to such Portfolio Investment, with respect to each Partner (other than Excused Partners with respect to such Portfolio Investment), such Partner's *pro rata* share (based on Remaining Capital Commitments of all the Partners other than Excused Partners with respect to such Portfolio Investment) of the aggregate amount required to make such Portfolio Investment or pay such attributable Fund Expense,

(ii)    in the case of Organizational Expenses (other than Placement Fees) or Fund Expenses (other than the Management Fee or a Fund Expense described in clause (i) above), such Partner's *pro rata* share (based on Capital Commitments of all the Partners) of the aggregate amount required to pay such Organizational Expenses or Fund Expenses, as the case may be,

(iii)    in the case of the Management Fee, with respect to each Limited Partner, such Limited Partner's share of the Management Fee then payable by the Fund, calculated as provided in Section 7.2, and

(iv)    in the case of Placement Fees, with respect to each Limited Partner, such Limited Partner's *pro rata* share (based on the Capital Commitments of all the Limited Partners) of any Placement Fees then payable by the Fund (which, as provided in clause (A) of Section 7.2(a)(ii), shall reduce the Management Fee with respect to such Limited Partner).

(e)    Use of Distributable Cash to Fund Drawdowns. The General Partner may determine to retain and use Distributable Cash that otherwise would be distributable to a Partner pursuant to Article VI to pay all or part of any Capital Contribution that is required to be made by such Partner, and the amount of such Distributable Cash so retained shall be deemed for all purposes of this Agreement to have been distributed to such Partner and then recontributed to the Fund by such Partner as a Capital Contribution on the same date. In the event that the retained amount with respect to any Partner is not sufficient to cover such Partner's Capital Contribution requirement, the amount necessary to cover the balance of such Capital Contribution shall be

paid by such Partner pursuant to a Drawdown Notice as provided in this Section 5.2. Prior to or concurrent with the payment of any Capital Contributions out of retained Distributable Cash pursuant to this Section 5.2(e), the General Partner shall provide to each Limited Partner the distribution notice described in Section 5.3 and, if such Capital Contributions are to be used to make a Portfolio Investment, the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b).

5.3     Return of Unused Capital Contributions.  If any proposed Portfolio Investment with respect to which there has been a Drawdown (including amounts deemed pursuant to Section 5.2(e) to have been recontributed to the Fund as a Capital Contribution) is not consummated within 60 days following the relevant Drawdown Date or if the amount of funds drawn down for any particular Portfolio Investment exceeds the amount necessary to consummate such Portfolio Investment, as the case may be, the General Partner shall promptly return such Drawdown or such excess amount of funds, together, in each case, with any interest or gains thereon (net of any Fund Expenses in respect thereof), to the Partners in the same proportions that such funds were contributed by the Partners, *provided* that, subject to Section 5.4, some or all of such Drawdown or such excess amount of funds (and any interest or gains thereon) may be retained by the Fund and not so returned to the extent that the Fund is likely, as determined by the General Partner, to consummate a proposed Portfolio Investment or require payment of Fund Expenses within 60 days following the relevant Drawdown Date, and instead may be used to fund such proposed Portfolio Investment or to pay such Fund Expenses, and *provided, further*, that if the General Partner determines to rely on the first proviso of this Section 5.3, the General Partner shall promptly provide to the Limited Partners the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b).   The Remaining Capital Commitment of each Partner shall be increased by amounts returned pursuant to this Section 5.3 (other than any interest or gains returned).

5.4     Partners Excused from Making Capital Contributions.

(a)     Conditions to Excuse.  A Limited Partner will be excused from making a Capital Contribution to the Fund, or shall be entitled to a return of Capital Contributions previously made to the Fund and retained pursuant to Section 5.2(e) or 5.3, in each case in respect of a particular Portfolio Investment, if the following conditions are met:

(i)     such Limited Partner reasonably determines that the making of such investment as described in the relevant Drawdown Notice (and such Limited Partner's making a Capital Contribution in respect of such investment) is reasonably likely to have a Material Adverse Effect on such Limited Partner, or the General Partner reasonably determines that such Limited Partner's making a Capital Contribution in respect of such investment is reasonably likely to have a Material Adverse Effect on the Fund or the participation of such Limited Partner in such investment would prevent the Fund from being able to consummate such investment or would otherwise result in a material increase in the risk or difficulty to the Fund of consummating such investment or impose any material filing, tax, regulatory or

41

other burden to which the Fund, a Portfolio Company or any Partner or its Affiliates would not otherwise be subject;

(ii)    in the case of a determination by a Limited Partner pursuant to paragraph (i) above of this Section 5.4(a), such Limited Partner shall notify the General Partner in writing no later than five Business Days after delivery of the relevant Drawdown Notice (or such later date as the General Partner may determine) of its intention to avail itself of the provisions of this Section 5.4(a), and shall deliver to the General Partner an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, to the effect of paragraph (i) above of this Section 5.4(a) (other than as to materiality) as it relates to the determination by such Limited Partner, and such other information concerning the circumstances giving rise to the excuse as the General Partner may reasonably request; and

(iii)    in the case of a determination by the General Partner pursuant to paragraph (i) above of this Section 5.4(a), the General Partner shall advise such Limited Partner in writing, no later than five Business Days after delivery of the relevant Drawdown Notice, of its intention to invoke the provisions of this Section 5.4(a).

The General Partner and the affected Limited Partner shall use their respective commercially reasonable efforts to alleviate the circumstances described in clause (i) of this Section 5.4(a) and if, as a result of such efforts, such circumstances are alleviated, including through a reduction of such Limited Partner's Capital Contribution, the provisions of this Section 5.4 shall not apply or shall apply only to the affected portion of such Capital Contribution, as the case may be. Each Limited Partner agrees that its rights under this Section 5.4(a) will be exercised on an investment-by-investment basis and in good faith, and will not be exercised based on a judgment as to prospective investment results or for the purpose of improving the investment results of such Limited Partner relative to other Partners. A Limited Partner that is excused from a Portfolio Investment under this Section 5.4(a) shall have no right to receive any distributions in respect of such Portfolio Investment. The General Partner may waive all or any portion of the conditions applicable to Limited Partners set forth in this Section 5.4(a). If in connection with a particular Portfolio Investment a Feeder Fund is excused with respect to a portion of such Feeder Fund's limited partner interest in the Fund attributable to a separate interestholder in such Feeder Fund, the provisions of Section 5.4(a) shall be applied to such Feeder Fund only to the portion of the limited partner interest attributable to the interestholder that has been excused with respect to such Portfolio Investment and the General Partner shall not designate such Feeder Fund as an Excused Partner with respect to any other portion of the limited partner interest held by such Feeder Fund. The General Partner shall have full authority to interpret in good faith the remaining provisions of this Section 5.4 to give effect to the intent of the preceding sentence.

(b)    Effect of Excuse. If any Limited Partner is excused from a Portfolio Investment pursuant to Section 5.4(a), the General Partner may elect to make the investment without the participation of such Excused Partner or not to make the investment. If the General Partner elects to make the investment, the General Partner may (i) increase the Capital Contributions

with respect to such investment from the other Partners in proportion to, but not in excess of, their Remaining Capital Commitments to the extent necessary to fund the excused amount, as contemplated by Section 5.2(c), and/or (ii) offer to such other Partners, as the General Partner shall determine, the opportunity to co-invest (other than in their capacity as Partners) in such Portfolio Investment an aggregate amount equal to the excused amount. The operation of this Section 5.4 shall not limit the obligation of any Excused Partner to contribute to the Fund the full amount of its Remaining Capital Commitment in respect of all subsequent Portfolio Investments and all Organizational Expenses and Fund Expenses.

(c)     Sale of Interest. If at any time the General Partner reasonably determines, after consultation with the affected Limited Partner and counsel to the General Partner, that there is a reasonable likelihood that the continuing participation in the Fund by such Limited Partner would have a Material Adverse Effect on the General Partner, the Fund, any Portfolio Company or any of their respective Affiliates, and that such Material Adverse Effect can be prevented or remedied only by a disposition of all or a portion of such Limited Partner's interest in the Fund, such Limited Partner will, upon the written request and with the reasonable cooperation of the General Partner, use commercially reasonable efforts to dispose of such Limited Partner's entire interest in the Fund (or such portion of its interest as the General Partner shall determine is sufficient to prevent or remedy such Material Adverse Effect) to any other Person at a price reasonably acceptable to such Limited Partner, in a transaction that complies with Section 10.1. If a determination is made by the General Partner under this Section 5.4(c) that would apply to more than one Limited Partner in substantially the same manner, the General Partner shall request that all of the affected Limited Partners take the actions set forth in the preceding sentence in proportion to their respective Capital Commitments. The General Partner shall make such revisions to Schedule A hereto as may be necessary or appropriate to reflect the changes in Partners and Capital Commitments contemplated by this Section 5.4(c).

5.5     Partners that Default on Capital Contributions.

(a)     General. If any Limited Partner (other than an Excused Partner with respect to a Portfolio Investment) fails to make, in a timely manner, all or any portion of any Capital Contribution or any other amount required to be funded by such Limited Partner hereunder, and such failure continues for five Business Days after receipt of written notice thereof from the General Partner (a "Default"), then such Limited Partner may be designated by the General Partner as in default under this Agreement (a "Defaulting Partner") and shall thereafter be subject to the provisions of this Section 5.5. The General Partner may choose not to designate any Limited Partner as a Defaulting Partner and may agree to waive or permit the cure of any Default by a Partner, subject to such conditions as the General Partner and the Defaulting Partner may agree upon. Upon a Default by a Feeder Fund with respect to a portion of a particular Feeder Fund's limited partner interest in the Fund attributable to a separate interest holder in such Feeder Fund, the provisions of this Section 5.5(a) shall be applied to such Feeder Fund only to the portion of the limited partner interest attributable to the interestholder that has defaulted on its capital commitment to such Feeder Fund and the General Partner shall not designate such Feeder Fund as a Defaulting Limited Partner with respect to any other portion of the limited

43

partner interest held by such Feeder Fund.  The General Partner shall have full authority to interpret in good faith the remaining provisions of this Section 5.5 to give effect to the intent of the preceding sentence.

(b)   Funding of Defaulted Amount.  With respect to any amount (other than the Management Fee) that is in Default (the "Defaulted Amount"), the General Partner may (*i*) increase the Capital Contributions of the Partners that have funded the amount specified in the Drawdown Notice that is the subject of the Default (the "Non-Defaulting Partners") in proportion to, but not in excess of, their Remaining Capital Commitments to the extent necessary to fund the Defaulted Amount (up to an amount that would not cause such Non-Defaulting Partners, on an individual basis, to exceed any diversification requirements set forth in Section 4.2), as contemplated by Section 5.2(c), and/or (*ii*) if the Defaulted Amount was to be used to fund a Portfolio Investment, offer to such Non-Defaulting Partners as the General Partner shall determine the opportunity to co-invest (other than in their capacity as Partner) in such Portfolio Investment an aggregate amount equal to the Defaulted Amount.

(c)   Defaulted Capital Commitment.  With respect to the Remaining Capital Commitment of any Defaulting Partner (the "Defaulted Capital Commitment"), the General Partner may (*i*) admit to the Fund a Substitute Partner to assume all or a portion of the balance of such Defaulted Capital Commitment on such terms and upon the delivery of such documents as the General Partner shall determine to be appropriate and/or (*ii*) offer to all Non-Defaulting Partners the opportunity to increase their Remaining Capital Commitments *pro rata* in accordance with their Capital Commitments (with the right to increase proportionately their respective shares in the event that one or more Non-Defaulting Partners declines such offer), up to an amount equal in the aggregate to the Defaulted Capital Commitment.  The General Partner shall make such revisions to Schedule A hereto as may be necessary to reflect the change in Partners and Capital Commitments contemplated by this Section 5.5(c).

(d)   Forfeiture and Application of Forfeited Amounts.  The General Partner may take any or all of the following actions with respect to a Defaulting Partner:  (*i*) reduce amounts otherwise distributable to such Defaulting Partner by 50% as of the date of such Default and withhold the remaining 50% of any future distributions that otherwise would be payable to such Defaulting Partner pursuant to Article VI until the dissolution of the Fund and (*ii*) require such Defaulting Partner to remain fully liable for payment of up to its *pro rata* share of Organizational Expenses and Fund Expenses as if the Default had not occurred.  The General Partner may apply amounts otherwise distributable to such Defaulting Partner in satisfaction of all amounts payable by such Defaulting Partner.  In addition, such Defaulting Partner shall have no further right to make Capital Contributions to participate in any Portfolio Investment and shall be treated for purposes of Sections 5.2 and 5.4 as no longer a Partner.  The General Partner may charge such Defaulting Partner interest on the Defaulted Amount and any other amounts not timely paid at a rate per annum equal to the Prime Rate plus 4% from the date such amounts were due and payable through the date that full payment of such amounts is actually made or, if such amounts are not paid, through the end of the Term, and to the extent not paid such interest charge may be deducted from amounts otherwise distributable to such Defaulting Partner.  Amounts forfeited

44

and not otherwise applied to the payment of the expenses specified in clause (ii) of the first sentence of this Section 5.5(d) or in Section 5.5(e), plus any interest thereon, shall be distributed to the Non-Defaulting Partners in proportion to their Capital Commitments, *provided* that no Non-Defaulting Partner shall receive a distribution in respect of a Portfolio Investment with respect to which such Partner is an Excused Partner. The General Partner shall make such adjustments, including adjustments to the Capital Accounts of the Partners (including such Defaulting Partner), as it determines to be appropriate to give effect to the provisions of this Section 5.5.

(e)     Other Remedies; Payment of Expenses. The General Partner shall have the right to pursue all remedies at law or in equity available to it with respect to the Default of a Defaulting Partner. No course of dealing between the General Partner and any Defaulting Partner and no delay in exercising any right, power or remedy conferred in this Section 5.5 or now or hereafter existing at law or in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, waiver or remedy. Notwithstanding any other provision of this Agreement, each Limited Partner agrees to pay on demand all costs and expenses (including attorneys' fees) incurred by or on behalf of the Fund in connection with the enforcement of this Agreement against such Partner sustained as a result of a Default by such Partner and that any such payment shall not constitute a Capital Contribution to the Fund. Each Partner acknowledges by its execution hereof that it has been admitted to the Fund in reliance upon its agreement under this Agreement that the General Partner and the Fund may have no adequate remedy at law for a breach hereof and that damages resulting from a breach hereof may be impossible to ascertain at the time hereof or of such breach.

(f)     Consents. Whenever the vote, consent or decision of a Limited Partner is required or permitted pursuant to this Agreement or under the Partnership Law, a Defaulting Partner shall not be entitled to participate in such vote or consent, or to make such decision, and such vote, consent or decision shall be tabulated or made as if such Defaulting Partner were not a Partner.

5.6     Early Termination of Investment Period.

(a)     Key Person Termination.

(i)     The Investment Period will be suspended after the first to occur of *(A)* both Jonathan C. Farber and John T. Reynolds ceasing to be Principals or to be otherwise actively involved in the management of the Fund or *(B)* the number of Principals (including any Qualified Additions and Qualified Replacements) having been reduced below four. The General Partner shall promptly notify the Limited Partners in writing of the beginning of this Suspension Period. The Investment Period will be reinstated after the vote of at least a Majority in Interest.

(ii)     If any Principal ceases to be a Principal, whether due to death, retirement or otherwise, the General Partner may, by written notice to each member of the Advisory Committee, nominate a Qualified Replacement for such Principal. In addition, the General

Partner may, by written notice to each member of the Advisory Committee, nominate an individual to serve as an additional Principal (*i.e.*, not as a replacement for a Principal who has ceased to be a Principal). The General Partner will use commercially reasonable efforts *(A)* to provide information to the members of the Advisory Committee with respect to any such nominee and, if requested by such members, shall arrange for an interview of such nominee with such members at a mutually convenient time and place and *(B)* to schedule a vote by the Advisory Committee no sooner than five Business Days but no later than 30 days after the notice of nomination is given. A nominee's election shall be effective upon the affirmative vote of a majority of the voting members of the Advisory Committee and upon such election such nominee shall constitute a "Qualified Replacement" if such nominee is replacing a Principal who has ceased to be a Principal; otherwise, such nominee shall constitute a "Qualified Addition." If the Advisory Committee shall not have taken action to accept or reject a nominee within 60 days of the giving of the notice of such Person's nomination, the General Partner shall deliver a second written notice to each member of the Advisory Committee stating that if the Advisory Committee takes no action within five Business Days of the date of such second notice, then, if the General Partner shall have complied with the other provisions of this Section 5.6(a)(ii), such nominee shall become a Qualified Replacement or Qualified Addition, as applicable.

(b)     Removal Conduct Termination. The Investment Period will terminate upon, and the Fund will engage only in Runoff Activities after, the vote to terminate the Investment Period of a Majority in Interest obtained within any 120-day period after a determination by a court of competent jurisdiction that any of the General Partner, the Manager or the Principals has engaged in Removal Conduct in respect of the Fund.

(c)     No Fault Termination. The Investment Period will terminate upon, and the Fund will engage only in Runoff Activities after, the vote to terminate the Investment Period of 75% in Interest obtained within any 120-day period.

(d)     Ongoing Role of the General Partner. Except as expressly provided in this Section 5.6, from and after the date that the Investment Period ends as contemplated by this Section 5.6, the General Partner shall continue to act on behalf of the Fund and perform the functions of the General Partner and shall have all of the rights and privileges of the General Partner hereunder.

## ARTICLE VI

## CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

6.1     Capital Accounts. There shall be established on the books and records of the Fund a capital account (a "Capital Account") for each Partner.

6.2     Adjustments to Capital Accounts. As of the last day of each Period, the balance in each Partner's Capital Account shall be adjusted by (*a*) increasing such balance by (*i*) such

46

Partner's allocable share of each item of the Fund's income and gain for such Period (allocated in accordance with Section 6.10) and (ii) the Capital Contributions, if any, made by such Partner during such Period and (b) decreasing such balance by (i) the amount of cash or the Value of Securities or other property distributed to such Partner pursuant to this Agreement and (ii) such Partner's allocable share of each item of the Fund's loss and deduction for such Period (allocated in accordance with Section 6.10). Each Partner's Capital Account shall be further adjusted with respect to any special allocations or adjustments pursuant to this Agreement.

6.3    Distributions Attributable to Portfolio Investments. Except as otherwise provided herein, Distributable Cash attributable to any Portfolio Investment (other than a Bridge Investment) shall be distributed as soon as practicable after receipt by the Fund. Distributable Cash attributable to any such Portfolio Investment shall initially be apportioned among the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment. Except as otherwise provided herein, the amount apportioned to the General Partner and to each Affiliated Partner shall be distributed to the General Partner and such Affiliated Partner, respectively, and the amount apportioned to each other Limited Partner shall be distributed as follows:

(a)    *Return of Capital on Disposed of Deals, Net Unrealized Losses and Apportioned Expenses*: First, 100% to such Limited Partner until the cumulative amount distributed to such Limited Partner pursuant to this Section 6.3(a) is equal to the sum of:

(i)    the aggregate Capital Contributions of such Limited Partner used to fund the acquisition cost of each Portfolio Investment (other than a Bridge Investment) disposed of and the amount of such Limited Partner's Net Unrealized Loss at such time, and

(ii)    the aggregate Capital Contributions of such Limited Partner used to fund Organizational Expenses and Fund Expenses (other than Management Fees) that at the time of such distribution are apportioned pursuant to Section 6.6(c) to Portfolio Investments (other than Bridge Investments) disposed of at such time;

(b)    *Preferred Return*: Second, 100% to such Limited Partner until the cumulative amount distributed to such Limited Partner pursuant to this Section 6.3 is sufficient to provide such Limited Partner with a preferred return equal to 8% per annum, compounded annually, on (i) the Capital Contributions described in clause (a)(i) above made through the time of such distribution and (ii) the Capital Contributions described in clause (a)(ii) above made through the time of such distribution, in each case computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to this Section 6.3;

(c)    *Return of Management Fees*: Third, 100% to such Limited Partner until the cumulative amount distributed to such Limited Partner pursuant to this Section 6.3(c) is equal to the aggregate Capital Contributions of such Limited Partner used to fund Management Fees that at the time of such distribution are apportioned pursuant to Section 6.6(c) to Portfolio Investments (other than Bridge Investments) disposed of at such time;

47

(d)     *Catch Up*:  Fourth, 100% to the General Partner or 100% to such Limited Partner, as the case may be, until the cumulative amount distributed to the General Partner attributable to such Limited Partner pursuant to this Section 6.3 is equal to 20% of the excess of (*i*) the cumulative amounts distributed to such Limited Partner and to the General Partner attributable to such Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of such Limited Partner then described in paragraphs (a) and (c) above; and

(e)     *80/20 Split*:  Thereafter, 80% to such Limited Partner and 20% to the General Partner.

The General Partner shall annually make such determinations as may be required by the definition of "Net Unrealized Loss." Notwithstanding the foregoing, the General Partner may elect to defer the receipt of any portion of the amounts distributable to it pursuant to Sections 6.3(d) and (e), and instead distribute such portion to the Limited Partners (allocated among the Limited Partners in proportion to the amounts otherwise distributable to the General Partner with respect to each Limited Partner), *provided* that in such event the General Partner may subsequently elect to distribute to itself out of amounts otherwise distributable to the Limited Partners any amount previously deferred and not yet recovered pursuant to this proviso so long as the cumulative amount distributed to the General Partner with respect to any Limited Partner does not exceed the cumulative amount that would have been distributed to the General Partner with respect to such Limited Partner in the absence of this sentence. Prior to or concurrent with any distribution of Distributable Cash pursuant to this Section 6.3, the General Partner will provide a notice to each Limited Partner stating the amount to be distributed or deemed to be distributed to such Limited Partner and the source or sources of such Distributable Cash.

6.4     Other Distributions.

(a)     Distributions Not Attributable to Portfolio Investments.  Except as otherwise provided herein, Distributable Cash not attributable to a Portfolio Investment shall be distributed to the Partners in proportion to their Capital Contributions to the investment giving rise to such Distributable Cash or, in the discretion of the General Partner, in proportion to their Capital Commitments, at such times and in such amounts as the General Partner determines to be appropriate.

(b)     Distributions Attributable to Bridge Investments.  Except as otherwise provided herein, Distributable Cash attributable to any Bridge Investment shall be distributed to the Partners in proportion to their Sharing Percentages with respect to such Bridge Investment, at such times and in such amounts as the General Partner determines to be appropriate. Notwithstanding anything to the contrary in Section 4.1(b) or this Section 6.4(b), in the event that a Bridge Investment is not repaid, refinanced or otherwise disposed of before the 18-month anniversary of the date that such Bridge Investment was made, (*i*) such Bridge Investment shall cease to be treated as a Bridge Investment on such 18-month anniversary and shall thereafter be deemed to be part of the Portfolio Investment with respect to which such Bridge Investment was made for all purposes of this Agreement and (*ii*) any amounts theretofore distributed pursuant to this Section 6.4(b) with respect to such Bridge Investment shall thereafter be taken into account

48

in determining subsequent distributions under Section 6.3 with respect to such Portfolio Investment so that each Partner receives, to the extent possible, the aggregate amount of distributions that it would have received had such Bridge Investment been deemed to be a Portfolio Investment that is not a Bridge Investment for purposes of this Agreement from and after the date that such Bridge Investment was made.

6.5     Tax Distributions.  The Fund may, either prior to, together with or subsequent to any distribution of Distributable Cash attributable to a Portfolio Investment (other than a Bridge Investment) pursuant to Section 6.3, make distributions to all Partners (other than any Defaulting Partners or any Excused Partners with respect to such Portfolio Investment), regardless of their tax status, in amounts intended to enable such Partners (or any Person whose tax liability is determined by reference to the income of any such Partner) to discharge their U.S. federal, state and local (and, as the General Partner shall determine, non-U.S.) income tax liabilities arising from distributions and allocations made (or to be made) pursuant to Section 6.11 with respect to such Portfolio Investment.  The amounts distributable pursuant to this Section 6.5 shall be determined by the General Partner, taking into account the maximum combined U.S. federal tax rate (taking into account any applicable deduction for New York State and New York City income taxes) and the New York State and New York City tax rate applicable to individuals or corporations (whichever is higher) on ordinary income and capital gain (taking into account the applicable holding period), as the case may be, the amounts of ordinary income and capital gain allocated to the Partners pursuant to this Agreement, and otherwise based on such reasonable assumptions as the General Partner determines in good faith to be appropriate.  The amount distributable to any Partner pursuant to any clause of Section 6.3 shall be reduced by the amount distributed to such Partner pursuant to this Section 6.5, and the amount so distributed under this Section 6.5 shall also be deemed to have been distributed to the extent of such reduction pursuant to such clause of Section 6.3 for purposes of making the calculations required by this Agreement.  For purposes of the preceding sentence, the General Partner shall allocate in good faith any distributions received by it pursuant to this Section 6.5 among Distributable Cash apportioned to each Partner.

6.6     General Distribution Provisions.

(a)     Overriding Limitations on Distributions.  Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Partnership Law and other applicable law.

(b)     Distributions Relating to a Partial Disposition of a Portfolio Investment.  If less than all of a Portfolio Investment is disposed of by the Fund, the portion disposed of and the portion retained shall for purposes of Article VI and Section 9.2 (including for purposes of applying the defined terms used therein) be deemed to be separate Portfolio Investments.  Any Capital Contributions, allocations or distributions made with respect to such Portfolio Investment, and any amounts received or expenses paid by the Fund prior to such disposition that are attributable to such Portfolio Investment, shall be allocated between the portion disposed of and the portion retained in proportion to their respective acquisition costs.

(c)      Apportionment of Expenses.    For the purposes of Section 6.3, Capital Contributions shall be apportioned as follows:

(i)      *Fund Expenses Related to Portfolio Investments.*  Capital Contributions of a Partner used to pay Fund Expenses that were contributed to the Fund pursuant to Section 5.2(d)(i) in respect of a particular Portfolio Investment shall be apportioned to such Portfolio Investment.

(ii)      *Organizational Expenses and Fund Expenses (other than Management Fees).* Capital Contributions of a Partner used to pay Organizational Expenses or Fund Expenses (other than Management Fees) shall be apportioned among Portfolio Investments (other than Bridge Investments) such that, to the extent practicable, the amount of such Capital Contributions apportioned to each Portfolio Investment disposed of shall equal the product of such Capital Contributions made as of the date of disposition of such Portfolio Investment multiplied by the apportionment fraction (as defined below) for such Portfolio Investment as of such date.

(iii)      *Management Fees.*  Capital Contributions of a Limited Partner used to pay Management Fees shall be apportioned among Portfolio Investments (other than Bridge Investments) such that, to the extent practicable, the amount of such Capital Contributions apportioned to each Portfolio Investment disposed of shall equal the product of such Capital Contributions made as of the date of disposition of such Portfolio Investment multiplied by the apportionment fraction (as defined below) for such Portfolio Investment as of such date.

For purposes of this Section 6.6(c), the "apportionment fraction" shall mean, with respect to any Portfolio Investment (other than a Bridge Investment), a fraction, (*A*) the numerator of which is the aggregate Capital Contributions of the Partners used to fund the acquisition cost of such Portfolio Investment and (*B*) the denominator of which is (*1*) the Partners' aggregate Capital Contributions used to fund the acquisition cost of all Portfolio Investments (other than Bridge Investments) minus (*2*) the Partners' aggregate Capital Contributions used to fund the acquisition cost of Portfolio Investments (other than Bridge Investments) disposed of (but not including the Portfolio Investment that is the subject of the apportionment).    Notwithstanding Sections 6.6(c)(ii) and 6.6(c)(iii), in lieu of apportioning any amount of Management Fees not previously distributed pursuant to Section 6.3 to such Portfolio Investments then held by the Fund, the General Partner may apportion such amounts to such Portfolio Investments that have been disposed of.

(d)      Distributions to Persons Shown on Fund Records.  Any distribution by the Fund pursuant to Articles VI and XI to the Person shown on the Fund's records as a Partner or to such Person's legal representatives, or to the Transferee of such Person's right to receive such distributions as provided herein, shall acquit the Fund and the General Partner of all liability to any other Person that may be interested in such distribution by reason of any Transfer of such Person's interest in the Fund for any reason (including a Transfer of such interest by reason of the death, incompetence, bankruptcy or liquidation of such Person).

(e)     Reservation of Rights.  The Fund shall be entitled to have a reservation of rights for all distributions received by the Limited Partners, pursuant to the General Partner's right to require the Partners to return distributions to the Fund pursuant to Section 9.2.  The Fund and the Partners hereby agree that all distributions received by the Partners from the Fund shall automatically and without any further action be subject to such a reservation of rights.

6.7     Distributions in Kind.

(a)     General.  Prior to the dissolution and winding up of the Fund, the General Partner may distribute only Marketable Securities as distributions in kind.  In the event that a distribution of Marketable Securities or other Securities is made, such Securities shall be deemed to have been sold at their Value and the proceeds of such sale shall be deemed to have been distributed in the form of Distributable Cash to the Partners pursuant to Section 6.3.   Distributions of Marketable Securities and, upon dissolution, winding up and liquidation of the Fund, distributions of any other Securities or other property shall be made in proportion to the aggregate amounts that would be distributed to each Partner pursuant to Section 6.3, as determined by the General Partner.  If a distribution consists of both cash and Securities or Securities of more than one class (with each lot of Securities with a separate basis or holding period being treated as a separate class of Securities), each Partner receiving such distribution shall, to the extent practicable, receive the same proportion of cash and Securities of each class being distributed.  In the event that the General Partner distributes Securities in connection with the liquidation of the Fund, the General Partner may cause certificates evidencing any Securities to be distributed to be imprinted with legends as to such restrictions on Transfer as it may determine are necessary or appropriate, including legends as to applicable U.S. federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed, as a condition to such distribution, to agree in writing (*i*) that such Partner will not Transfer such Securities except in compliance with such restrictions and (*ii*) to such other matters as the General Partner may determine are necessary or appropriate, *provided* that the Value of any such Securities shall reflect a liquidity discount.

(b)     Election to Receive Cash in Lieu of Marketable Securities.  In connection with any distribution of Marketable Securities, the General Partner shall provide at least ten Business Days' written notice to each Partner of such distribution, which notice shall include a brief description of the business activities of the Portfolio Company to which such Securities relate, shall set forth the date on which the General Partner has determined to cause such distribution to be made and shall offer to each Partner the right to receive such distribution in the form of the proceeds of the disposition of the Securities that otherwise would have been distributed to such Partner, *provided* that any taxable gain or loss recognized by the Fund upon the disposition of such Securities shall be allocated equitably pursuant to Section 6.11 among only those Partners electing to receive proceeds instead of Securities and such Partners shall bear all of the expenses of such disposition, and *provided*, *further*, that any distributions to electing Partners pursuant to this Section 6.7(b) shall be deemed to have been distributed in the form of Distributable Cash to such Partners pursuant to Section 6.3, and *provided*, *finally*, that the calculations required by Sections 6.3 and 11.3 and the Capital Account adjustments in respect of such Partners

contemplated by Section 6.2 shall be made as if such Securities had been distributed as contemplated by the second sentence of Section 6.7(a). Any Limited Partner that fails to respond in writing to such notice within five Business Days following receipt thereof shall receive the distribution in kind.

(c)     Legal, Regulatory or Contractual Restrictions Relating to Distributions in Kind. If any Partner would otherwise be distributed an amount of any Securities that would cause such Partner to own or control in excess of the amount of such Securities that it may lawfully own or control, would subject such Partner to any material regulatory filing or would raise material contractual or regulatory issues for such Partner, the General Partner may cause the Fund, as agent for such Partner, to sell all or any portion of such Securities distributable to such Partner on behalf of (and at the expense of) such Partner as if such Partner had made the election described in Section 6.7(b).

6.8     Negative Capital Accounts. Except as otherwise expressly provided in Section 9.2, no Limited Partner shall be required to make up a negative balance in its Capital Account. Except as otherwise expressly provided in this Agreement or as required by law, the General Partner shall not be required to make up a negative balance in its Capital Account.

6.9     No Withdrawal of Capital. Except as otherwise expressly provided in this Agreement, no Partner shall have the right to withdraw capital from the Fund or to receive any distribution of or return on such Partner's Capital Contributions.

6.10     Allocations to Capital Accounts. Except as otherwise provided herein, each item of income, gain, loss or deduction of the Fund (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Capital Accounts of the Partners with respect to each Period, as of the end of such Period, in a manner that as closely as possible gives economic effect to the provisions of Articles VI and XI and the other relevant provisions of this Agreement, *provided* that (*a*) the Management Fee shall be allocated among the Limited Partners in accordance with the amount calculated with respect to each Limited Partner as provided in Section 7.2 and (*b*) Placement Fees payable by the Fund with respect to a Limited Partner's Capital Commitment shall be allocated to such Limited Partner.

6.11     Tax Allocations and Other Tax Matters.

(a)     Tax Allocations. Each item of income, gain, loss or deduction recognized by the Fund shall be allocated among the Partners for U.S. federal, state and local income tax purposes in the same manner that each such item is allocated to the Partners' Capital Accounts or as otherwise provided herein, *provided* that the General Partner may adjust such allocations as may be necessary or desirable to maintain substantial economic effect or to ensure that such allocations are in accordance with the interests of the Partners in the Fund, in each case within the meaning of the Code and the Treasury Regulations. Tax credits and tax credit recapture shall be allocated in accordance with the Partners' interests in the Fund as provided in Treasury Regulations section 1.704-1(b)(4)(ii). All matters concerning allocations for U.S. federal, state

and local and non-U.S. income tax purposes, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined in good faith by the General Partner.

(b)      Tax Matters Partner.  The General Partner is hereby designated as the tax matters partner of the Fund, in accordance with the Treasury Regulations promulgated pursuant to section 6231 of the Code and any similar provisions under any other state or local or non-U.S. tax laws. Each Partner hereby consents to such designation and agrees that, upon the request of the General Partner, it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may reasonably be necessary or appropriate to evidence such consent.

(c)      Partnership for Tax Purposes.  Either the General Partner shall have executed and filed a U.S. Internal Revenue Service Form 8832 prior to the date hereof electing to classify the Fund as a partnership for U.S. federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations as of a date no later than the date hereof, or the General Partner shall timely execute and file such Form 8832 on or after the date hereof electing to classify the Fund as a partnership for U.S. federal income tax purposes as of a date no later than the date hereof, and the General Partner is hereby authorized to execute and file such Form 8832 for all of the Partners.  The General Partner shall not subsequently elect to change such classification.  The General Partner is hereby authorized to execute and file for all of the Partners any comparable form or document required by any applicable U.S. state or local tax law in order for the Fund to be classified as a partnership under such tax law.  The Fund shall not participate in the establishment of an "established securities market" (within the meaning of section 1.7704-1(b) of the Treasury Regulations) or a "secondary market or the substantial equivalent thereof" (within the meaning of section 1.7704-1(c) of the Treasury Regulations) or, in either case, the inclusion of interests in the Fund thereon.

(d)      The General Partner confirms that it does not intend to, and will not knowingly, cause the Partnership to make an investment that would result in an a Tax-Exempt Partner becoming a party to any listed transaction or any prohibited reportable transaction within the meaning of Section 4965 of the Code pursuant to guidance published on or before the date the transaction is entered into.

6.12    Withholding.

(a)      General.  Each Partner shall, to the fullest extent permitted by applicable law, indemnify and hold harmless the Fund and each Person (other than a Limited Partner) that is a party to this Agreement against all claims, liabilities and expenses of whatever nature relating to the Fund's or such Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Fund or such Person as a result of such Partner's participation in the Fund.  Each Partner hereby agrees that the Fund may, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person who is or who is deemed to be the responsible withholding agent for U.S. federal, state or local or non-U.S. income tax purposes against all claims, liabilities and expenses of whatever nature relating to

such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by such Person as a result of any Partner's participation in the Fund and, if the Fund shall so indemnify any Covered Person, such Partner shall pay to the Fund promptly upon request the amount of any indemnity paid or required to be paid by the Fund.

(b)     Authority to Withhold; Treatment of Withheld Tax.  Notwithstanding any other provision of this Agreement, each Partner hereby authorizes the Fund and the General Partner to withhold and to pay over, or otherwise pay, any withholding or other taxes payable or required to be deducted by the Fund or any of its Affiliates (pursuant to the Code or any provision of U.S. federal, state or local or non-U.S. tax law) with respect to such Partner or as a result of such Partner's participation in the Fund (including as a result of a distribution in kind to such Partner). If and to the extent that the Fund shall be required to withhold or pay any such withholding or other taxes, such Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time that such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution of Distributable Cash with respect to such Partner's interest in the Fund to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding.  To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner.  The Fund may hold back from any such distribution in kind property having a Value equal to the amount of such taxes until the Fund has received payment of such amount.

(c)     Withholding Tax Rate.  Any withholdings referred to in this Section 6.12 shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel, or other evidence, satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.

(d)     Withholding from Distributions to the Fund.  In the event that the Fund receives a distribution or payment from or in respect of which tax has been withheld, the Fund shall be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time of such distribution equal to the portion of such amount that is attributable to such Partner's interest in the Fund as equitably determined by the General Partner, which payment shall be deemed to be a distribution of Distributable Cash pursuant to the relevant clause of Section 6.3 or Section 6.4 to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding. To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner.

54

In the event that the Fund anticipates receiving a distribution or payment from which tax will be withheld in kind, the General Partner may elect to prevent such in-kind withholding by paying such tax in cash and may require each Partner in advance of such distribution to make a prompt payment to the Fund by wire transfer of the amount of such tax attributable to such Partner's interest in the Fund as equitably determined by the General Partner, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner.

6.13    Notification; Assistance in Obtaining Refunds.   Subject to Section 6.12, the General Partner shall use commercially reasonable efforts to notify each Limited Partner (other than a Defaulting Partner) that is a "United States person" within the meaning of section 7701(a)(3) of the Code and is an ERISA Partner, a Public Plan Partner or other Tax-Exempt Partner (a "U.S. Tax-Exempt Partner") and each Non-U.S. Partner if a material amount of tax has been withheld in respect of such U.S. Tax-Exempt Partner or Non-U.S. Partner pursuant to Section 6.12(b) or is attributable to such U.S. Tax-Exempt Partner or Non-U.S. Partner pursuant to Section 6.12(d).   If such U.S. Tax-Exempt Partner or Non-U.S. Partner determines that a refund of any such tax is available, and that the General Partner is required to take action or provide information or documentation for such U.S. Tax-Exempt Partner or Non-U.S. Partner to realize such refund (which action may not be taken by such U.S. Tax-Exempt Partner or Non-U.S. Partner acting alone without the assistance of the General Partner), the General Partner shall, subject to Section 6.12 and to the rights of the General Partner concerning confidential information described in the last sentence of Section 13.10, use commercially reasonable efforts to take such action or provide such information or documentation (in each case at the expense of such U.S. Tax-Exempt Partner or Non-U.S. Partner).   Notwithstanding any other provision of this Section 6.13, (*a*) the General Partner shall not be required to take any action or provide any information or documentation if it would create an undue burden on the Fund or the General Partner, (*b*) nothing in this Section 6.13 shall require either the Fund or the General Partner to perform any act that the General Partner in good faith believes may not be in the best interests of the Fund or could damage the Fund or its business or that the Fund is required by law or by agreement with a third Person to refrain from doing and (*c*) for the avoidance of doubt, the General Partner shall not be required to take this Section 6.13 into account in structuring or disposing of any Portfolio Investment.

6.14    Segregated Reserve Accounts.   The Fund shall establish an account for each Limited Partner (a "Segregated Reserve Account") into which a portion of the amounts otherwise distributable to the General Partner with respect to such Limited Partner pursuant to Section 6.3(d) or (e) shall, subject to the terms of this Section 6.14, be deposited.   Prior to making any such distribution to the General Partner with respect to any Limited Partner, the Fund shall hold back, and shall not distribute to the General Partner, an amount equal to 33% of the amount otherwise distributable to the General Partner pursuant to Section 6.3(d) or (e) (excluding amounts described in clause (1), (2) or (3) of Section 11.3(b)(B)) and shall deposit such amounts in the Segregated Reserve Account for such Limited Partner, provided that in no event shall the Fund be required to so hold back and deposit any amount to the extent that it would cause the balance in the Segregated Reserve Account for such Limited Partner to exceed

the Maximum Segregated Reserve Amount. Unless the context otherwise requires, amounts deposited in the Segregated Reserve Accounts with respect to the General Partner shall be deemed to have been distributed to the General Partner for purposes of making the calculations required by Sections 6.3 and 11.2(b). The funds attributable to the Segregated Reserve Accounts shall be invested by the General Partner in Temporary Investments or other Marketable Securities selected by the General Partner, *provided* that, if the General Partner invests such funds in other Marketable Securities, the General Partner shall contribute cash to the Segregated Reserve Accounts to make up for any losses on such other Marketable Securities on a quarterly basis or, if earlier, on the date on which such losses exceed 20% of the amount required to be held in the Segregated Reserve Accounts pursuant to this Section 6.14. The Securities in the Segregated Reserve Accounts shall be valued on a marked to market basis and such valuation shall be included in the quarterly reports provided to the Limited Partners pursuant to Section 8.2(b). The income earned on the amounts held in the Segregated Reserve Accounts shall be distributed from time to time to the General Partner. Notwithstanding the foregoing provisions of this Section 6.14, (*i*) if at any time the amount in the Segregated Reserve Account for any Limited Partner exceeds the Maximum Segregated Reserve Amount, then, subject to applicable law, such excess shall be distributed to the General Partner and (*ii*) from time to time all or any portion of the funds attributable to the Segregated Reserve Accounts may be released with the consent of the Advisory Committee and distributed to the General Partner. The General Partner agrees to provide to the Advisory Committee such information concerning the Segregated Reserve Accounts as the Advisory Committee may from time to time request.

6.15    Operating Partnership Investments.

(a)    Use of Blocker Corporations. The General Partner shall structure the acquisition of each equity investment in an entity reasonably expected to be an Operating Partnership so that (i) all (or a portion) of the Fund's interest in such Portfolio Investment is held (directly or indirectly) by an entity (or entities) taxable as a partnership for U.S. federal income tax purposes (an "Intermediate Entity") and (ii) each such Intermediate Entity is held in part by the Fund and in part by an entity (or entities) taxable as a corporation for U.S. federal income tax purposes (a "Blocker Corporation"). The General Partner shall have full authority, without the consent of any Person, including any Partner, to amend this Agreement as may be necessary or appropriate as determined in the sole discretion of the General Partner to facilitate the formation and operation of Blocker Corporations, Intermediate Entities and Portfolio Investments in Operating Partnerships, and to interpret in its sole discretion any provision of this Agreement, whether or not so amended, to give effect to the intent of this Section 6.15.

(b)    Intermediate Entity Terms. If any Portfolio Investment is held, in part, through an Intermediate Entity in accordance with Section 6.15(a), the partnership agreement or other governing documents for such Intermediate Entity shall provide that any amount distributable by such Intermediate Entity in respect of such Portfolio Investment shall be made as follows: (i) the aggregate amount that would have been distributed by the Fund to the Electing Blocker Partners with respect to such Portfolio Investment under Section 6.3 in respect of such Portfolio Investment if such Portfolio Investment had been held directly by the Fund shall be distributable

to the Blocker Corporation or Blocker Corporations established pursuant to Section 6.15(a) in respect of such Portfolio Investment, (ii) the aggregate amount that would have been distributed to the General Partner from Distributable Cash apportioned to such Electing Blocker Partners in respect of such Portfolio Investment in such event shall be distributable to the Fund and (iii) the remaining distributable amount attributable to the Fund shall be distributable to the Fund.

(c)     Distributions by the Fund.  Notwithstanding Section 6.3, (i) amounts received by the Fund in accordance with Section 6.15(b)(ii) shall be distributed to the General Partner, (ii) amounts received by the Fund in accordance with Section 6.15(b)(iii) shall be apportioned pursuant to the second sentence of Section 6.3 solely among the Partners other than such Electing Blocker Partners and distributed thereafter to such Partners and the General Partner pursuant to Section 6.3, and (iii) amounts received by the Fund from or in respect of any Blocker Corporation shall be distributed to the Electing Blocker Partners in proportion to their Sharing Percentages with respect to the underlying Portfolio Investment.

(d)     Treatment of Electing Blocker Partners.  Except as otherwise contemplated by this Section 6.15, for purposes of making the computations required by Sections 6.3, 9.2 and 11.3, (i) any distributions made by an Intermediate Entity to a Blocker Corporation shall be treated as having actually been apportioned and distributed to the Electing Blocker Partners pursuant to Section 6.3 (based on their Sharing Percentages for the Portfolio Investment giving rise to such distribution), and (ii) any distributions actually made to such Electing Blocker Partner pursuant to Section 6.15(c)(iii) shall be disregarded.

(e)     Disposition of Blocker Corporation.  In the event the Fund disposes of the Blocker Corporation instead of the portion of the Portfolio Investment held through the Blocker Corporation, (i) the proceeds from such disposition shall be distributed to the Electing Blocker Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment and (ii) each Electing Blocker Partner's share of any discount from the amount the Intermediate Entity would have received if the portion of the Portfolio Investment held through the Blocker Corporation were disposed of (based on actual sales of direct and indirect interests in such Portfolio Investment by the Fund, or otherwise as determined by the General Partner in its sole discretion) and any Blocker Expenses shall, together with the amount actually distributed to the Electing Blocker Partners from such disposition, be treated as Distributable Cash that has actually been apportioned and distributed to such Electing Blocker Partners pursuant to Section 6.3, for purposes of making the computations required by Sections 6.3, 9.2 and 11.3.

(f)     Certain Determinations and Adjustments.  The General Partner shall determine in its sole discretion what portion of each distribution received by the General Partner in accordance with Section 6.15(c)(i) is attributable to each Electing Blocker Partner and the portion so determined shall be treated as Distributable Cash apportioned to such Limited Partner pursuant to Section 6.3.  Any Blocker Expenses of a Blocker Corporation or Intermediate Entity that are not paid out of cash flow to such Blocker Corporation or Intermediate Entity shall be treated as withholding taxes attributable to the Electing Blocker Partners subject to the provisions of Section 6.12.  Notwithstanding any other provision of this Agreement, adjustments

shall be made, as determined by the General Partner in good faith, to the amounts contributable and distributable pursuant to this Agreement so that, to the maximum extent possible, the Capital Contributions of the General Partner and the net distributions received and retained by the General Partner from the Fund with respect to each Limited Partner are the same as the General Partner would have made or received and retained if each Portfolio Investment were made directly by the Fund rather than through a Blocker Corporation and Intermediate Entity.

(g)     Allocations.  Notwithstanding any other provision in this Agreement, items of income, gain, loss and deduction realized by the Fund in respect of any Portfolio Investment held in part through a Blocker Corporation shall be specially allocated as follows:  (A) any such items attributable to the Fund's interest in such Blocker Corporation shall be specially allocated to the Electing Blocker Partners with respect to such Portfolio Investment and (B) the remaining items shall be specially allocated to the Partners other than such Electing Blocker Partners.

# ARTICLE VII

## THE MANAGER

7.1     Appointment of the Manager.  The Fund hereby appoints the Manager to provide portfolio management and administrative services to the Fund as follows:

(a)     The Manager shall manage the operations of the Fund, shall have the right to execute and deliver documents on behalf of the Fund in lieu of the General Partner and shall have discretionary authority with respect to investments of the Fund, including the authority to investigate, analyze, structure and negotiate potential investments and to evaluate, monitor, exercise voting rights, advise as to disposition opportunities and take other appropriate action with respect to investments on behalf of the Fund, *provided* that the management and the conduct of the activities of the Fund shall remain the ultimate responsibility of the General Partner and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement.  The appointment of the Manager by the Fund shall not relieve the General Partner from its obligations to the Fund hereunder or under the Partnership Law.

(b)     The Manager shall act in conformity with this Agreement and with the instructions and directions of the General Partner, and in no event shall the Manager be considered a general partner of the Fund by agreement, estoppel, as a result of the performance of its duties or otherwise.

The engagement by the Fund of the Manager contemplated hereby is set forth in a management agreement, the form of which is attached hereto as Exhibit 1, specifying in further detail the rights and duties of the Manager.

4209061_3 DOC

7.2     Management Fee.

(a)     Payment and Calculation of the Management Fee.  In consideration of the management and other services referred to in Section 7.1, the Fund shall pay the Manager an annual management fee (the "Management Fee") beginning as of the Initial Closing and continuing throughout the Term.   The Management Fee shall be payable in semi-annual installments in advance commencing on the Initial Closing (or such later date as may be specified in writing by the General Partner) and on each January 1 and July 1 thereafter (each a "Payment Date"), and any payment for a period of less than six months shall be adjusted on a *pro rata* basis according to the actual number of days during the period.  If the Initial Closing is less than 60 days before the next Payment Date, the first payment shall cover the period commencing on the Initial Closing and ending on the day before the next following Payment Date.  Through the first to occur of (*x*) the last day of the Investment Period or (*y*) the date on which the aggregate Remaining Capital Commitments of all the Partners is reduced below an amount equal to 10% of the Aggregate Capital Commitments of all the Partners (the "Fee Transition Date"), the annual Management Fee shall (*i*) be an aggregate amount, calculated with respect to each Limited Partner (other than an Affiliated Partner), equal to 2.0% per annum of the Capital Commitment of such Limited Partner and, thereafter beginning on the Payment Date immediately following the Fee Transition Date and continuing until the dissolution of the Fund as provided in Section 11.1, an aggregate amount, calculated with respect to each Limited Partner (other than an Affiliated Partner), equal to 2.0% per annum of the Capital Contributions of such Limited Partner that were used to fund the cost of, and remain invested in, Portfolio Investments that, as of the relevant Payment Date, have not (*1*) been written off or (*2*) written down with the result that the Value of such Portfolio Investments following such write down is less than (*I*) 10% of the aggregate Capital Commitments contributed with respect to such Portfolio Investments or, (*II*) if greater, $1 million and (*ii*) each semi-annual installment of the Management Fee shall be reduced, but not below zero, by the sum of:

(A)     an amount equal to such Limited Partner's *pro rata* share (based on the Capital Commitments of all the Limited Partners) of any Placement Fees paid or payable by the Fund with respect to such Limited Partner's Capital Commitment since the preceding Payment Date,

(B)     an amount equal to such Limited Partner's *pro rata* share (based on Capital Commitments of the Partners) of any Excess Organizational Expenses paid or payable by the Fund since the preceding Payment Date, and

(C)     an amount equal to such Limited Partner's *pro rata* share (based on Capital Commitments of the Partners) of all Fee Income received in the semi-annual period immediately preceding the last Payment Date.

To the extent that the Management Fee with respect to any Limited Partner is not reduced as of any given Payment Date by the amounts referred to in clause (ii) of the preceding sentence (or any portion thereof determined with respect to a previous Payment Date and carried over to the current Payment Date pursuant to this sentence) because the Management Fee with respect to

such Limited Partner has been reduced to zero, the excess shall be carried over to the next succeeding Payment Date (and, if necessary, to one or more subsequent Payment Dates) and applied as a reduction of the Management Fee with respect to such Limited Partner, but not below zero, for such succeeding Payment Date (or a subsequent Payment Date). In the event any such excess exists at the expiration of the Term, the General Partner shall notify each Limited Partner of the amount of such excess attributable to such Limited Partner's Capital Contributions, and the General Partner shall distribute such attributable amount to each Limited Partner that elects to receive same. Installments for any period other than a full semi-annual period shall be adjusted on a *pro rata* basis according to the actual number of days elapsed. The General Partner may at any time defer payment to the Manager of all or any part of any installment of the Management Fee.

(b)     Each Limited Partner's Share of the Management Fee. Each Limited Partner's share of the Management Fee shall be equal to (*i*) the amount calculated with respect to such Limited Partner pursuant to Section 7.2(a), which is payable as provided in Section 5.2(d), and (*ii*) in the case of a Subsequent Closing Partner, the additional amount calculated as provided in Section 10.2(b)(i)(C) as a retroactive installment of management fees, which is payable as provided in Section 10.2(c).

(c)     Management Fee Offset. Notwithstanding any other provision contained in this Agreement or the management agreement contemplated by Section 7.1, the Manager may from time to time elect to forego a portion of the Management Fee in favor of a right of the Manager or its designated Affiliate to receive an interest in future distributions of profits of the Fund. If the Manager makes any such election, the Limited Partners shall make Capital Contributions with respect to the Management Fee foregone by the Manager in the same manner and at the same time as would have been required to fund such Management Fee, and such contributions shall be treated as if they had actually been used to pay Management Fees for purposes of Sections 6.3, 6.6 and 11.3 of this Agreement. The amount so contributed by the Limited Partners shall be treated as a deemed Capital Contribution by the Manager or its designated Affiliate to fund Portfolio Investments, shall on dollar-for-dollar basis reduce the aggregate Capital Contributions to be made by the General Partner pursuant to this Agreement, and shall to such extent satisfy the Capital Contribution obligation of the General Partner, but shall not increase the Capital Account of the Manager or such Affiliate. Such deemed Capital Contribution shall entitle the Manager or its designated Affiliate to allocations (but only out of subsequent profits from Portfolio Investments), and related distributions, in amounts that reflect the returns that would have been allocated and distributed if each such deemed Capital Contribution had constituted an actual Capital Contribution that otherwise would have been made by the General Partner. Notwithstanding the provisions of Section 12.1, the General Partner may amend this Agreement, including the allocation and distribution provisions of Articles V and VI, so long as any such amendment does not affect any Limited Partner in a materially adverse manner, without any consent or approval of the Limited Partners, in order to give effect to the provisions of this Section 7.2(c).

4209061_3.DOC

## ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

8.1   Maintenance of Books and Records.  The General Partner shall keep or cause to be kept at the address of the General Partner (or at such other place as the General Partner or the Manager shall determine and, if during the Term, shall advise the Limited Partners in writing) full and accurate accounts of the transactions of the Fund in proper books and records of account, during the Term and for a period of at least four years thereafter, which shall set forth all information required by the Partnership Law.  Such books and records shall be maintained in accordance with U.S. generally accepted accounting principles, which shall be the basis for the preparation of the financial reports to be mailed to current and former Partners pursuant to this Article VIII.  Such books and records shall be available, upon five Business Days' notice to the General Partner, for inspection and copying at reasonable times during business hours by a Limited Partner or its duly authorized agents or representatives for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Fund.  The General Partner shall have no obligation to deliver to the Limited Partners any documents filed by the Fund or the General Partner on its behalf with the Registrar of Exempted Limited Partnerships of the Cayman Islands.

8.2   Audits and Reports.

(a)   Financial Reports.  The books and records of account of the Fund shall be audited as of the end of each Fiscal Year by such recognized independent public accounting firm as shall be selected by the General Partner.  The General Partner shall prepare and mail a financial report (audited in the case of a report sent as of the end of a Fiscal Year and unaudited in the case of a report sent as of the end of a quarter) to each Limited Partner within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter (and, upon the request of any Limited Partner, estimates as soon as reasonably practicable prior to the end of such 90-day period) (commencing after December 31 of the Fiscal Year in which the Initial Closing is held) and 45 days after the end of each of the first three quarters of each Fiscal Year, or as soon as practicable thereafter (commencing with the third full quarter after the Initial Closing), during the Term, setting forth for such Fiscal Year or quarter:

(i)   the assets and liabilities of the Fund as of the end of such Fiscal Year or quarter;

(ii)   the net profit or net loss of the Fund for such Fiscal Year or quarter; and

(iii)   such Limited Partner's closing Capital Account balance as of the end of such Fiscal Year or quarter.

(b)   Quarterly Reports.  The General Partner shall use commercially reasonable efforts to cause to be prepared and mailed or delivered by facsimile or other electronic means to each Limited Partner, with the financial reports described in Section 8.2(a), descriptive investment information for each Portfolio Company, including a description of material changes in the

61

financial condition or results of operations of each Portfolio Company, the amount that is required pursuant to Section 6.14 to be maintained in the Segregated Reserve Accounts and the Value of such Segregated Reserve Accounts, in each case as of the end of the relevant quarter, as provided in Section 6.14 and such other information concerning the Fund's investments as the General Partner may determine to provide.  Notwithstanding any obligation under this Section 8.2(b), the General Partner shall not provide information where disclosure thereof is prohibited under a confidentiality agreement with any Portfolio Company.

(c)     Other Information.  The General Partner shall use commercially reasonable efforts to provide to a Limited Partner such other information as is reasonably requested by such Limited Partner for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Fund to the extent that any such efforts shall not impose any undue cost or burden on the General Partner or the Fund, subject in each case to the rights of the General Partner concerning confidential information described in the penultimate sentence of Section 13.10.

(d)     Right to Account.  The Limited Partners hereby waive any and all right to account that they have under the Partnership Law.

8.3     Annual Meeting.  The General Partner shall cause the Fund to have a meeting of the Limited Partners once each year beginning in the year after the year of Initial Closing (the "Annual Meeting").  At the Annual Meeting the General Partner will review the investment performance of the Fund.  The Fund's potential investments will not be submitted for discussion and none of the Limited Partners shall play any role in the Fund's governance or participate in the control of the investment or other activities of the Fund.

8.4     Tax Information.  The General Partner shall use commercially reasonable efforts to prepare and mail within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter, to each Limited Partner (and each other Person that was a Limited Partner during such Fiscal Year or its legal representatives), U.S. Internal Revenue Service Schedule K-1, "Partner's Share of Income, Credits, Deductions, Etc.", or any successor schedule or form, for such Person.

## ARTICLE IX

## INDEMNIFICATION

9.1     Indemnification of Covered Persons.

(a)     General.  The Fund shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment

or other activities of the Fund, activities undertaken in connection with the Fund, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to in this Section 9.1 are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction that such Damages arose from Disabling Conduct of such Covered Person.   The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Person.   For the avoidance of doubt, Claims among the Principals or other employees of the Manager solely relating to or arising out of the internal affairs of the Manager or the General Partner shall not be considered investment or other activities of the Fund and such claims shall not be covered by the indemnification provisions of this Section 9.1.

(b)     Expenses.   Reasonable expenses incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder (other than in defense of a derivative action brought by at least a Majority in Interest) may be advanced by the Fund to such Covered Person prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified hereunder.   All judgments against the Fund and either or both of the General Partner or the Manager, in respect of which the General Partner or the Manager is entitled to indemnification, shall first be satisfied from Fund assets, including Capital Contributions and any payments under Section 9.2, before the General Partner or the Manager, as the case may be, is responsible therefor.

(c)     Notices of Claims, etc.   Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Fund, give written notice to the Fund of the commencement of such Proceeding, *provided* that the failure of any Covered Person to give such notice as provided herein shall not relieve the Fund of its obligations under this Section 9.1 except to the extent that the Fund is actually prejudiced by such failure to give such notice.   If any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Fund), the Fund will be entitled to participate in and to assume the defense thereof to the extent that the Fund may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Fund to such Covered Person of the Fund's election to assume the defense of such Proceeding, the Fund will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof.   The Fund will not consent to entry of any judgment or enter into any settlement of such Proceeding that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Proceeding and the related Claim.

(d)    Survival of Protection.  The provisions of this Section 9.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.1 and regardless of any subsequent amendment to this Agreement, and no amendment to this Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

(e)    Reserves.  If the General Partner determines that it is appropriate or necessary to do so, the General Partner may cause the Fund to establish reasonable reserves, escrow accounts or similar accounts to fund its obligations under this Section 9.1.

(f)    Rights Cumulative.  The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns, heirs and legal representatives.

9.2    Return of Certain Distributions to Fund Indemnification.  Notwithstanding any other provision of this Agreement, the General Partner may require the Partners to return distributions to the Fund in an amount sufficient to satisfy all or any portion of the indemnification obligations of the Fund pursuant to Section 9.1 or other liabilities of the Fund, whether such obligations arise before or after the last day of the Term or, with respect to any Partner, before or after such Partner's withdrawal from the Fund, *provided* that each Partner shall first return distributions in respect of its share of any such indemnification payment as follows:

(a)    if the Claims or Damages arise out of a Portfolio Investment, first, by each Partner to which Distributable Cash was distributed in connection with such Portfolio Investment, in such amounts as shall result in each Partner retaining cumulative distributions from the Fund (net of any returns of distributions under this Section 9.2) equal to the cumulative amount that would have been distributed to such Partner had the amount of such Distributable Cash been, at the time of such distribution, reduced by the amount of such obligations, as equitably determined by the General Partner; and

(b)    thereafter, or in any other circumstances, by the Partners in proportion to their Capital Commitments.

Notwithstanding anything in this Section 9.2 to the contrary, a Partner's liability under the first sentence of this Section 9.2 is limited to an amount equal to 25% of such Partner's Capital Commitment.  In addition to the foregoing, no Partner shall be required to return distributions to the Fund (*i*) relating to a Portfolio Investment with respect to which such Limited Partner was treated as an Excused Partner or (*ii*) later than the second anniversary of the distribution of amounts relating to the Portfolio Investment with respect to which such liability arose, *provided* that if at the end of such period there are any Proceedings pending or Claims outstanding, the General Partner shall notify the Limited Partners in writing of the general nature of such Proceedings or Claims and an estimate of the amount of distributions that may be required to be returned pursuant to this Section 9.2 and the obligation of the Partners to return distributions

64

pursuant to clause (ii) of this Section 9.2 shall be extended with respect to each such Proceeding or Claim until the date such Proceedings or Claims are ultimately resolved and distributions are returned to the Fund in respect thereof pursuant to this Section 9.2. Any distributions returned pursuant to this Section 9.2 shall not be treated as Capital Contributions, but shall be treated as returns of distributions and reductions in Distributable Cash, in making subsequent distributions pursuant to Sections 6.3 and 11.2 and in determining the amount that the General Partner is required to contribute to the Fund pursuant to Section 11.3 (other than for purposes of computing a Limited Partner's preferred return, which shall be computed based on actual Capital Contributions made and distributions received). Nothing in this Section 9.2, express or implied, is intended or shall be construed to give any Person other than the Fund or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 9.2 or any provision contained herein.

     9.3    <u>Other Sources of Recovery</u>. The General Partner shall cause the Fund to use its commercially reasonable efforts to obtain the funds needed to satisfy its indemnification obligations under Section 9.1 from Persons other than the Partners (for example, out of Fund assets or reserves not set aside for other purposes or pursuant to insurance policies or Portfolio Company indemnification arrangements) before causing the Fund to make payments pursuant to Section 9.1 and before requiring the Partners to return distributions to the Fund pursuant to Section 9.2. Notwithstanding the foregoing, nothing in this Section 9.3 shall prohibit the General Partner from causing the Fund to make such payments or requiring the Partners to return such distributions if the General Partner determines that the Fund is not likely to obtain sufficient funds from such other sources in a timely fashion, or that attempting to obtain such funds would be futile or not in the best interests of the Fund (for example, nothing in this Section 9.3 shall require the General Partner to cause the Fund to sell any Portfolio Investment before such time as the General Partner shall determine is advisable).

     9.4    <u>Indemnification Agreements for Covered Persons</u>. The General Partner is hereby instructed to cause the Fund to indemnify, hold harmless and release each Covered Person, and authorized to cause the Fund to indemnify, hold harmless and release any other Person, in each case pursuant to a separate indemnification agreement providing indemnification to the parties thereof on terms no more favorable to such Covered Person than provided in this Agreement, the form of which is attached hereto as Exhibit 2. It is the express intention of the parties hereto that (*a*) the provisions of this Article IX for the indemnification of Covered Persons may be relied upon by such Covered Persons and may be enforced by such Covered Persons (or by the General Partner on behalf of any such Covered Person, *provided* that the General Partner shall not have any obligation to so act for or on behalf of any such Covered Person) against the Fund pursuant to this Agreement or to a separate indemnification agreement, as if such Covered Persons were parties hereto, and (*b*) notwithstanding the provisions of Section 13.9, the term "gross negligence" shall have the meaning given such term under the laws of the State of Delaware.

## ARTICLE X

## TRANSFERS; SUBSEQUENT CLOSING PARTNERS

10.1    <u>Transfers by Partners</u>.

(a)    <u>Transfers by Limited Partners</u>.   Except as set forth in this Article X or in Sections 3.4, 3.6, 5.4(c) and 5.5(c), no Limited Partner may Transfer all or any part of its interest in the Fund (and for these purposes, a Limited Partner's interest in the Fund shall include any interest in the capital or profits of the Fund, including the right to receive distributions from the Fund), *provided* that a Limited Partner may, with the prior written consent of the General Partner and upon compliance with Sections 10.1(b), Transfer all or a portion of such Limited Partner's interest in the Fund.   The consent of the General Partner to any such Transfer by a Limited Partner may be withheld by the General Partner in its sole discretion, *provided* that such consent will not be unreasonably withheld if such Transfer is (*i*) in connection with a merger of an ERISA Partner that is a trust subject to ERISA into another trust that is subject to ERISA, (*ii*) to an Affiliate of such Limited Partner or (*iii*) to another Partner that is not a Defaulting Partner, *provided further* that any purported Transfer by a Limited Partner of all or any part of its interest in the Fund (other than a Transfer described in the preceding clauses (i), (ii) and (iii) of this Section 10.1(a)) must first be offered by such Limited Partner to any other interested Partners in proportion to their respective Capital Commitments, but such Limited Partner shall not be required to Transfer less than its entire interest in the Fund nor shall such Limited Partner be required to Transfer its interest in the Fund at the price offered by the interested Partners. Notwithstanding the foregoing, no Limited Partner may enter into, create, sell or Transfer any financial instrument or contract the value of which is determined in whole or in part by reference to the Fund (including the amount of Fund distributions, the value of Fund assets, or the results of Fund operations), within the meaning of section 1.7704-1(a)(2)(i)(B) of the Treasury Regulations.

(b)    <u>Conditions to Transfer</u>.  Any purported Transfer by a Limited Partner pursuant to the terms of this Article X shall, in addition to requiring the prior written consent referred to in Section 10.1(a) and, where applicable, compliance with the right of first offer procedure described in the second proviso thereof, be subject to the satisfaction of the following conditions:

(i)    the Limited Partner that proposes to effect such Transfer (a "<u>Transferor</u>") or the Person to whom such Transfer is to be made (a "<u>Transferee</u>") shall have undertaken to pay all reasonable expenses incurred by the Fund, the General Partner or the Manager in connection therewith;

(ii)    the General Partner shall have been given at least 30 days' prior written notice of the proposed Transfer;

(iii)    the Fund shall have received from the Transferee and, in the case of clause (C) below, from the Transferor to the extent specified by the General Partner, (*A*) such assignment agreement and other documents, instruments and certificates as may be

66

reasonably requested by the General Partner, pursuant to which such Transferee shall have agreed to be bound by this Agreement, including if requested a counterpart of this Agreement executed by or on behalf of such Transferee, (*B*) a certificate or representation to the effect that the representations set forth in the Subscription Agreement of such Transferor are (except as otherwise disclosed to and consented to by the General Partner) true and correct with respect to such Transferee as of the date of such Transfer and (*C*) such other documents, opinions, instruments and certificates as the General Partner shall have reasonably requested;

(iv)   such Transferor or Transferee shall have delivered to the Fund the opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, described in Section 10.1(c);

(v)   each of the Transferor and the Transferee shall have provided a certificate or representation to the effect that (*A*) the proposed Transfer will not be effected on or through (*1*) a U.S. national, regional or local securities exchange, (*2*) a non-U.S. securities exchange or (*3*) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers and (*B*) it is not, and its proposed Transfer or acquisition (as the case may be) will not be made by, through or on behalf of, (*1*) a Person, such as a broker or a dealer, making a market in interests in the Fund or (*2*) a Person that makes available to the public bid or offer quotes with respect to interests in the Fund;

(vi)   such Transfer will not be effected on or through an "established securities market" or a "secondary market or the substantial equivalent thereof", as such terms are used in section 1.7704-1 of the Treasury Regulations; and

(vii)   such Transfer would not result in the Fund at any time during its taxable year having more than 100 partners, within the meaning of section 1.7704-1(h)(1)(ii) of the Treasury Regulations (taking into account section 1.7704-1(h)(3) of the Treasury Regulations).

The General Partner may waive any or all of the conditions set forth in this Section 10.1(b), other than clause (vi) of the preceding sentence, if the General Partner determines that such waiver is in the best interest of the Fund.

(c)   <u>Opinion of Counsel</u>.   The opinion of counsel referred to in Section 10.1(b)(iv) with respect to a proposed Transfer shall, unless otherwise specified by the General Partner, be substantially to the effect that:

(i)   such Transfer will not require registration under the Securities Act or violate any provision of any applicable non-U.S. securities laws;

(ii)   the Transferee is a Person that is a "qualified purchaser" as such term is defined in Section 2(a)(51) of the Investment Company Act;

67

(iii)     such Transfer will not require any of the Manager, the General Partner or any Affiliate of the Manager or the General Partner to register as an investment adviser under the Advisers Act if such Person is not already so registered;

(iv)     such Transfer will not cause the Fund to be treated as a corporation under the Code;

(v)     such Transfer will not violate either this Agreement or the laws, rules or regulations of any state or any governmental authority applicable to the Transferor, the Transferee or such Transfer; and

(vi)     such Transfer will not cause the Fund to hold "plan assets" for purposes of ERISA.

In giving such opinion, counsel may, with the consent of the General Partner, rely as to factual matters on certificates of the Transferor, the Transferee and the General Partner and may include in its opinion customary qualifications and limitations.

(d)     Substitute Partners.  Notwithstanding any other provision of this Agreement, a Transferee may be admitted to the Fund as a substitute Limited Partner of the Fund (a "Substitute Partner") only with the consent of the General Partner.  Unless the General Partner, the Transferor and the Transferee otherwise agree, in the event of the admission of a Transferee as a Substitute Partner, all references herein to the Transferor shall be deemed to apply to such Substitute Partner, and such Substitute Partner shall succeed to all of the rights and obligations of the Transferor hereunder.  A Person shall be deemed admitted to the Fund as a Substitute Partner and shall be listed by the General Partner as a limited partner of the Fund on Schedule A hereto at the time that the foregoing conditions are satisfied.

(e)     Transfers Involving the General Partner.

(i)     The General Partner may not Transfer all or any part of its interest in the Fund, *provided* that the General Partner may Transfer all or a portion of its interest in the Fund to a Person formed under the laws of the Cayman Islands or a company registered pursuant to Part IX of the Companies Law (2004 Revision) of the Cayman Islands directly or indirectly controlled by the General Partner, by the Principals, other full-time employees of the Manager or the Sub Manager and trusts or other entities formed by the foregoing for customary estate planning so long as such Persons retain an economic interest equal to at least 75% of the General Partner's economic interest in the Fund.  If the General Partner Transfers its entire interest in the Fund pursuant to this Section 10.1(e)(i), the transferee shall automatically be admitted to the Fund as the replacement general partner immediately prior to such Transfer upon execution of a counterpart of this Agreement and such transferee shall continue the business of the Fund without dissolution of the Fund.

(ii)     The General Partner shall ensure that, at all times during the Term, the Principals, other full-time employees of the Manager or the Sub Manager and trusts or other entities

formed by the foregoing for customary estate planning hold, beneficially and of record, directly or indirectly, at least 75% of the economic interests of the General Partner (and for these purposes, economic interests shall include any interest in the capital or profits of the General Partner, including the right to receive distributions from the General Partner).

(f)     Transfers in Violation of Agreement Not Recognized.    Unless effected in accordance with and as permitted by this Agreement, no attempted Transfer or substitution shall be recognized by the Fund, any purported Transfer or substitution not effected in accordance with and as permitted by this Agreement shall, to the fullest extent permitted by law, be void and the Fund shall recognize no rights of the purported Transferee, including the right to receive distributions (directly or indirectly) from the Fund or to acquire an interest in the capital or profits of the Fund.

(g)     Certain Changes in Record Ownership.    A change in record ownership of an interest in the Fund by reason of a change in the identity of the trustee or other fiduciary of an ERISA Partner or Public Plan Partner shall not be deemed a Transfer within the meaning of this Section 10.1, *provided* that the Limited Partner affected by such change shall notify the General Partner in writing of such change promptly and in no event later than 30 days after such event. The records of the Fund and Schedule A hereto shall be changed by the General Partner to reflect the identity of the new trustee or other fiduciary upon receipt of such notice and the execution and delivery of such documents as the General Partner shall require in connection with such change. Pending the receipt of such notice and documentation, the Fund and the General Partner shall be entitled to rely on the records of the Fund for all purposes in connection with the affected interest.

10.2    Subsequent Closing Partners.

(a)     Conditions to Admission.    Notwithstanding any provision to the contrary in the Agreement, the General Partner shall have full power and authority to schedule one or more additional Closings on any date not later than the Final Admission Date to admit Additional Partners to the Fund or to permit previously admitted Partners to increase their Capital Commitments (Additional Partners and Partners increasing their Capital Commitments being collectively referred to as "Subsequent Closing Partners", and all references to the admission to the Fund and the Capital Commitment of a Subsequent Closing Partner being understood to include the increase in the Capital Commitment and the increased amount of the Capital Commitment, respectively, of a previously admitted Partner), *provided* that the admission of any Subsequent Closing Partners shall not cause the total Capital Commitments of all of the Limited Partners to exceed $1.4 billion. Prior to admitting any Subsequent Closing Partner to the Fund, the General Partner shall have determined that the following conditions have been satisfied:

(i)     The Subsequent Closing Partner shall have executed and delivered such documents, instruments and certificates and shall have taken such actions as the General Partner shall deem necessary or desirable to effect such admission, including, if requested, the execution of (*A*) a Subscription Agreement containing representations and warranties by the Subsequent Closing Partner that are substantially the same as those made by the

69

previously admitted Limited Partners in the Subscription Agreements executed at the Initial Closing and (*B*) a counterpart of this Agreement.

(ii)     (*A*) The admission of the Subsequent Closing Partner shall not result in a violation of any applicable law, including Cayman Islands and U.S. federal securities laws and ERISA, or any term or condition of this Agreement and (*B*) as a result of such admission, (I) the Fund shall not be required to register under the Investment Company Act, or any law of similar import of the Cayman Islands, and none of the General Partner, the Manager or any of their respective Affiliates that is not already registered under the Advisers Act or any law of similar import of the Cayman Islands shall be required to register as an investment adviser under the Advisers Act, and (II) the Fund shall not become taxable as a corporation or association.

(iii)     The Subsequent Closing Partner shall have paid or unconditionally agreed to pay to the Fund the amounts specified in Section 10.2(b)(i).

(b)     Payments by Subsequent Closing Partners.  On the date of its admission to the Fund, each Subsequent Closing Partner shall pay or, with the consent of the General Partner, unconditionally agree to pay the following amounts:

(i)     *Retroactive Capital Contributions.*  Each Subsequent Closing Partner shall contribute to the Fund as its initial Capital Contribution, an amount equal to the sum of:

(A)     in the case of each Portfolio Investment then held by the Fund with respect to which such Subsequent Closing Partner is not an Excused Partner, the amount that would have previously been contributed by such Subsequent Closing Partner had such Subsequent Closing Partner been admitted at the Initial Closing, less such amount as is necessary to take into account any distributions theretofore made;

(B)     the amount that would have previously been contributed by such Subsequent Closing Partner with respect to Organizational Expenses and Fund Expenses (other than the Management Fee and Placement Fees) had such Subsequent Closing Partner been admitted at the Initial Closing, less such amount as is necessary to take into account any amounts theretofore returned;

(C)     the Management Fee that would have previously been paid by such Subsequent Closing Partner had such Subsequent Closing Partner been admitted to the Fund at the Initial Closing, less such amount as necessary to take into account such Subsequent Closing Partner's *pro rata* share of any Fee Income or Excess Organizational Expenses, as provided in Section 7.2(a)(ii) and any Placement Fees referred to in clause (D) below; and

(D)     the amount of such Subsequent Closing Partner's pro rata share (based on the Capital Commitments of all the Limited Partners) of any Placement Fees paid or

amount necessary to make the Manager whole in respect of such reallocated reduction (or, if necessary, carried forward to the next installment of the Management Fee), and, if so reduced such amount shall be deemed to have been distributed to such previously admitted Partner and then recontributed by such previously admitted Partner to the Fund as a Capital Contribution to pay such additional Management Fee amount (and shall be paid by the Fund to the Manager). Any amount paid by a Subsequent Closing Partner pursuant to Section 10.2(b)(i)(D) relating to Placement Fees shall be paid to the Fund's placement agent. All payments that are paid to previously admitted Partners pursuant to this Section 10.2 shall, in accordance with section 707(a) of the Code, be treated for all purposes of this Agreement and for all accounting and tax reporting purposes as payments made directly from the Subsequent Closing Partner to the previously admitted Partners and not as items of Fund income, gain, loss, deduction, contribution or distribution. Each Subsequent Closing Partner shall succeed to the Capital Contributions of the previously admitted Partners attributable to the portion of the amount remitted to such previously admitted Partners pursuant to Sections 10.2(b)(i)(A) and 10.2(b)(i)(B) and its Remaining Capital Commitment shall be adjusted accordingly. In addition, the Capital Contributions of the previously admitted Partners shall be decreased and their Remaining Capital Commitments increased accordingly.

(d)   Amendment of Schedule A. Schedule A hereto shall be amended by the General Partner as appropriate to show the name of each Subsequent Closing Partner and the amount of its Capital Commitment.

## ARTICLE XI

## DISSOLUTION AND WINDING UP OF THE FUND

11.1   Dissolution. There will be a dissolution of the Fund and its affairs shall be wound up upon the first to occur of any of the following events:

(a)   the expiration of the Term as provided in Section 1.4; or

(b)   the last Business Day of the first Fiscal Year following the end of the Investment Period in which all assets acquired or agreed to be acquired by the Fund have been sold or otherwise disposed of; or

(c)   the withdrawal, removal (unless a replacement general partner is admitted to the Fund in accordance with Section 2.5), bankruptcy or dissolution and commencement of winding up of the General Partner, or the assignment by the General Partner of its entire interest in the Fund (other than as contemplated by Section 10.1(e)), or the occurrence of any other event that causes the General Partner to cease to be a General Partner of the Fund under the Partnership Law; or

(d)   the determination by the General Partner to dissolve the Fund because it has determined that there is a substantial likelihood that due to a change in the text, application or

interpretation of the provisions of the U.S. federal securities laws (including the Securities Act, the Investment Company Act and the Advisers Act) or the provisions of ERISA (including the applicable DOL Regulations), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Fund being taxable as a corporation or association under U.S. federal income tax law), the Fund cannot operate effectively in the manner contemplated herein or will not or does not satisfy the requirements of Section 4.3 (including with respect to the General Partner's ability to receive the amounts distributable to it with respect to any Limited Partner pursuant to Sections 6.3 and 11.2); or

(e)     the entry of a decree of judicial dissolution under the Partnership Law; or

(f)     the determination by the General Partner to dissolve the Fund pursuant to clause (v) of the third sentence of Section 3.4(b); or

(g)     at such time as there are no Limited Partners, unless the business of the Fund is continued in accordance with the Partnership Law; or

(h)     the election to dissolve the Fund made by 80% in Interest within 120 days following the removal of the General Partner in accordance with Section 2.5.

11.2   <u>Winding Up</u>.

(a)     <u>Liquidation of Assets</u>.  Upon the dissolution of the Fund, the General Partner (or, if dissolution of the Fund should occur by reason of Section 11.1(c), the General Partner is unable to act as liquidator, or the General Partner has been removed as the general partner of the Fund pursuant to Section 2.5, a duly elected liquidating trustee of the Fund or other representative designated by a Majority in Interest) shall use its reasonable best efforts to liquidate all of the assets of the Fund in an orderly manner, *provided* that if in the judgment of the General Partner (or such liquidating trustee or other representative) an asset of the Fund should not be liquidated, the General Partner (or such liquidating trustee or other representative) shall allocate, on the basis of the Value of any assets of the Fund not sold or otherwise disposed of, any unrealized gain or loss based on such Value to the Partners' Capital Accounts as though the assets in question had been sold on the date of such allocation and, promptly after giving effect to any such adjustment, distribute such assets in accordance with Section 11.2(b), and *provided, further*, that the General Partner (or such liquidating trustee or other representative) shall attempt to liquidate sufficient assets of the Fund to satisfy in cash (or make reasonable provision in cash for) the debts and liabilities referred to in clauses (i) and (ii) of Section 11.2(b).

(b)     <u>Application and Distribution of Proceeds of Liquidation and Remaining Assets</u>. The General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall apply the proceeds of the liquidation referred to in Section 11.2(a) and any remaining Fund assets, and shall distribute any such proceeds and assets, as follows and in the following order of priority:

(i)     First, to (A) creditors in satisfaction of the debts and liabilities of the Fund, whether by payment thereof or the making of reasonable provision for payment thereof (other than any loans or advances that may have been made by any of the Partners to the Fund), and (B) the expenses of liquidation, whether by payment thereof or the making of reasonable provision for payment thereof, and (C) the establishment of any reasonable reserves (which may be funded by a liquidating trust) to be established by the General Partner (or liquidating trustee or other representative) in amounts determined by it to be necessary for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent);

(ii)    Second, to the Partners, if any, that made loans or advances to the Fund in satisfaction of such loans and advances, whether by payment thereof or the making of reasonable provision for payment thereof; and

(iii)   Third, to the Partners in accordance with Article VI.

If the General Partner has received a prior written notice that a distribution of Securities to be made pursuant to clause (iii) of the preceding sentence of this Section 11.2(b) would cause a Material Adverse Effect on any Limited Partner, the General Partner shall distribute such Securities to a third Person designated in such notice by the requesting Limited Partner.

(c)     Distribution of Segregated Reserve Accounts. Subject to Sections 3.4, 5.4, 5.5, 5.6 and 10.2, after giving effect to all distributions made pursuant to Article VI and Section 11.2(b), the assets, if any, remaining in the Segregated Reserve Account for each Limited Partner shall be sold and the proceeds of such sale, subject to applicable law, shall be distributed to such Limited Partner (other than any Defaulting Partner) to the extent, and only to the extent, that distribution of such proceeds to the General Partner would result in either (i) such Limited Partner receiving distributions pursuant to Section 6.3, Section 11.2(b) and this Section 11.2(c) that are less than the amount required in order for such Limited Partner to receive, in addition to its Capital Contributions, a preferred return of 8% per annum, compounded annually on (A) the Capital Contributions of such Limited Partner used to fund the acquisition cost of Portfolio Investments (other than Bridge Investments) (computed from the due date specified in the applicable Drawdown Notice until the dates distributions are made pursuant to Sections 6.3 and 11.2) and (B) the Capital Contributions of such Limited Partner used to fund Organizational Expenses and Fund Expenses (other than Management Fees) (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2), or (ii) the General Partner receiving distributions attributable to such Limited Partner pursuant to Section 6.3, Section 11.2(b) and this Section 11.2(c) that exceed 20% of the excess of (A) Distributable Cash attributable to Portfolio Investments apportioned to such Limited Partner pursuant to the second sentence of Section 6.3 over (B) the Capital Contributions of such Limited Partner used to fund the acquisition cost of Portfolio Investments (other than Bridge Investments), Organizational Expenses or Fund Expenses, and the remainder shall be distributed to the General Partner.

(d)    Time for Liquidation, etc.  A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Fund and the discharge of liabilities to creditors so as to enable the General Partner to seek to minimize potential losses upon such liquidation.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships as provided in Section 11.4.

11.3    Clawback.    Subject to Sections 2.5 and 9.2, if, after giving effect to all distributions made pursuant to Article VI and Section 11.2, but before giving effect to this Section 11.3, either

(a)    the General Partner has received distributions pursuant to Section 6.3 attributable to any Limited Partner (other than a Defaulting Partner or an Affiliated Partner) that exceed 20% of the excess of (i) Distributable Cash attributable to Portfolio Investments apportioned to such Limited Partner pursuant to the second sentence of Section 6.3 over (ii) the Capital Contributions of such Limited Partner used to fund the acquisition cost of Portfolio Investments (other than Bridge Investments), Organizational Expenses or Fund Expenses, or

(b)    the distributions received by such Limited Partner pursuant to Section 6.3 are not sufficient to provide such Limited Partner with, in addition to its Capital Contributions, a preferred return equal to 8% per annum, compounded annually, on (i) the Capital Contributions of such Limited Partner used to fund the acquisition cost of Portfolio Investments (other than Bridge Investments) and (ii) the Capital Contributions of such Limited Partner used to fund Organizational Expenses and Fund Expenses (other than Management Fees), in each case computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2,

then the General Partner shall contribute to the Fund the lesser of

(A)    the greater of the amount of the excess of such distributions over such 20% described in clause (a) and the amount of the shortfall described in clause (b), and

(B)    the amount of distributions received by the General Partner pursuant to Section 6.3(d) and (e) attributable to such Limited Partner, less the sum of (1) the amount of distributions that were made or that could have been made to the General Partner pursuant to Section 6.5, (2) the amount that could have been distributed to the General Partner pursuant to Section 6.5 if each Security distributed in kind had been sold by the Fund as of the date of distribution and the proceeds were distributed instead of the Security, and (3) the amount of any payment made by, or distributions deemed to have been distributed to, the General Partner pursuant to Section 6.12, in the case of each of subclauses (1), (2) and (3) attributable to Distributable Cash apportioned to such Limited Partner,

and the Fund shall, subject to Section 6.12 and applicable law, distribute such amount to such Limited Partner.  The obligations of the General Partner hereunder are guaranteed pursuant to a

separate guarantee provided by the Principals to the Fund, the form of which is attached hereto as Exhibit 3.

11.4    Dissolution.    Upon completion of the foregoing, the General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall execute, acknowledge and cause to be filed a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships of the Cayman Islands, *provided* that the winding up of the Fund will not be deemed complete and such Notice of Dissolution will not be filed by the General Partner (or such liquidating trustee or other representative) prior to the second anniversary of the last day of the Term unless otherwise required by law.

## ARTICLE XII

## AMENDMENTS; POWER OF ATTORNEY

12.1    Amendments.

(a)    General.    Any modifications of or amendments to this Agreement duly adopted in accordance with the terms of this Agreement may be executed in accordance with Section 12.2. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of the General Partner and a Majority in Interest, *provided* that the General Partner may, without the consent of any of the Limited Partners:

(i)    enter into agreements with Persons that are Transferees pursuant to the terms of this Agreement, providing in substance that such Transferees will be bound by this Agreement and will become Substitute Partners;

(ii)    amend this Agreement as may be required to implement Transfers of interests of Limited Partners or the admission of any Substitute Partner or any Subsequent Closing Partner in accordance with the terms of this Agreement;

(iii)    amend this Agreement (*A*) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the Securities and Exchange Commission, the Internal Revenue Service or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund, or (*B*) to change the name of the Fund;

(iv)    amend this Agreement as may be necessary or advisable to comply with the Advisers Act if the Manager registers thereunder with the Securities and Exchange Commission, and any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures;

76

(v)      amend this Agreement to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision hereof, so long as such amendment under this clause (v) does not adversely affect the interests of the Limited Partners; and

(vi)     amend this Agreement in accordance with Sections 2.5, 4.6, 5.4, 5.5, 6.15(a) and 10.2.

(b)      <u>Certain Amendments Requiring Special Consent</u>. Notwithstanding the provisions of Section 12.1(a), no modification of or amendment to this Agreement shall be made that will:

(i)      change the definition of "ERISA Partner" or modify or amend Section 3.4, 4.3, 4.4 or 5.4, without the written consent of non-defaulting ERISA Partners having Capital Commitments aggregating in excess of $66^2/_3\%$ of the Capital Commitments of all non-defaulting ERISA Partners,

(ii)     change the definition of "Public Plan Partner" or modify or amend Section 3.4, 4.3, 4.4 or 5.4, without the written consent of non-defaulting Public Plan Partners having Capital Commitments aggregating in excess of 75% of the Capital Commitments of all non-defaulting Public Plan Partners,

(iii)    change the definition of "BHC Partner" or modify or amend Section 3.5 without the written consent of BHC Partners having Capital Commitments aggregating in excess of $66^2/_3\%$ of the Capital Commitments of all BHC Partners,

(iv)     change the definition of "Tax-Exempt Partner" or modify or amend Section 4.4 without the written consent of Tax Exempt Partners having Capital Commitments aggregating in excess of $66^2/_3\%$ of the Capital Commitments of all Tax-Exempt Partners,

(v)      change the definition of "Foundation Partner" or modify or amend Section 3.6 without the written consent of Foundation Partners having Capital Commitments aggregating in excess of $66^2/_3\%$ of the Capital Commitments of all Foundation Partners,

(vi)     except as expressly permitted by Section 6.15 or Section 7.2, modify or amend the provisions of Article VI in a manner that would alter the amount or timing of distributions or the allocations of items of income, gain, loss and deduction, or the provisions of Section 7.2 or 11.3, in each case, without the written consent of in excess of 75% in Interest,

(vii)    materially and adversely affect the rights of a Limited Partner in a manner that discriminates against such Limited Partner vis-à-vis the other Limited Partners,

(viii)   increase the amount of a Limited Partner's Capital Commitment without the written consent of such Limited Partner,

(ix)    modify or amend the requirement in any provision of this Agreement calling for the consent, vote or approval of a Majority in Interest or other specified percentage in Interest of the Limited Partners, without the written consent of a Majority in Interest or such specified percentage in Interest, as the case may be, of the Limited Partners, or

(x)    increase the amount of the Management Fee or change the provisions of this Section 12.1 without the consent of each Limited Partner.

(c)    Safe Harbor Election.   The terms and provisions of this Agreement may be amended or waived by the General Partner at its option and in its sole discretion without the consent of the Limited Partners, on or before the effective date of final regulations, to provide for (i) the election of a safe harbor under Treasury Regulation Section 1.83-3(1) (or any similar provision) under which the fair market value of an interest in the Fund that is transferred in connection with the performance of services is treated as being equal to the liquidation value of that interest, (ii) an agreement by the Fund and all Partners to comply with the requirements set forth in such regulations and Internal Revenue Service Notice 2005-43 (and any other guidance provided by the Internal Revenue Service with respect to such election) with respect to all interests in the Fund transferred in connection with the performance of services while the election remains effective, and (iii) any other related amendments.

(d)    Notices of Amendments.   The General Partner shall send to each Limited Partner a copy of any amendments adopted in accordance with this Section 12.1 or any other provision of this Agreement.

12.2    Power of Attorney.   Each Limited Partner does hereby irrevocably constitute and appoint the General Partner and its officers, or the successor thereof as general partner of the Fund and its officers, with full power of substitution, the true and lawful attorney-in-fact and agent of such Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents and certificates that may from time to time be required by the laws of the Cayman Islands, the United States, the State of Delaware, the State of New York, any other jurisdiction in which the Fund conducts or plans to conduct business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid existence and investment and other activities of the Fund, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)    all certificates and other instruments, including any amendments to this Agreement or to the Certificate, that the General Partner determines to be appropriate to (i) form, qualify or continue the Fund as a limited partnership (or a partnership in which the limited partners have limited liability) in the Cayman Islands and all other jurisdictions in which the Fund conducts or plans to conduct business and (ii) admit such Partner as a Limited Partner in the Fund;

(b)    all instruments that the General Partner determines to be appropriate to reflect any amendment to this Agreement or the Certificate (i) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the

Securities and Exchange Commission, the Internal Revenue Service, or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund, (*ii*) to change the name of the Fund or (*iii*) to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision herein contained so long as such amendment under this clause (iii) does not adversely affect the interests of the Limited Partners;

(c)     all instruments that the General Partner determines to be appropriate in connection with the formation or operation of any Parallel Fund or Alternative Investment Fund;

(d)     all conveyances and other instruments that the General Partner determines to be appropriate to reflect and effect the dissolution, winding up and termination of the Fund in accordance with the terms of this Agreement, including the filing of a Notice of Dissolution as provided for in Article XI;

(e)     all instruments relating to (*i*) Transfers of interests in the Fund or the admission of Substitute Partners or Subsequent Closing Partners, (*ii*) the treatment of a Defaulting Partner or an Excused Partner or (*iii*) any change in the Capital Commitment of any Limited Partner, all in accordance with the terms of this Agreement;

(f)     all amendments to this Agreement duly approved and adopted in accordance with Section 12.1;

(g)     certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the Cayman Islands and in all jurisdictions in which the Fund conducts or plans to conduct business; and

(h)     any other instruments determined by the General Partner to be necessary or appropriate in connection with the proper conduct of the business of the Fund and that do not adversely affect the interests of the Limited Partners.

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement, when acting in such capacities, except to the extent authorized herein. This power of attorney shall not be affected by the subsequent disability or incompetence of the principal.   This power of attorney shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy or legal disability of any Limited Partner and shall extend to such Limited Partner's successors and assigns.   This power of attorney may be exercised by such attorney-in-fact and agent for all Limited Partners (or any of them) by a single signature of the General Partner acting as attorney-in-fact with or without listing all of the Limited Partners executing an instrument.   Any Person dealing with the Fund may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized and binding, without further inquiry. If required, each Limited Partner shall execute and deliver to the General Partner, within five

Business Days after receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall reasonably determine to be necessary for the purposes hereof consistent with the provisions of this Agreement.

## ARTICLE XIII

### MISCELLANEOUS

13.1   Notices.  Each notice relating to this Agreement shall be in writing and shall be delivered (*a*) in person, by registered or certified mail or by private courier or (*b*) by facsimile or other electronic means, with such confirmation as the General Partner deems appropriate under the circumstances, including confirmation by telephone to an officer or other representative of the recipient.  All notices to any Limited Partner shall be delivered to such Limited Partner at its last known address as set forth in the records of the Fund.  All notices to the General Partner shall be delivered to the General Partner at its address set forth in the first sentence of Section 1.2(b), with a copy to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention:  Bruce C. Herzog, Esq.  Any Limited Partner may designate a new address for notices by giving written notice to that effect to the General Partner.  The General Partner may designate a new address for notices by giving written notice to that effect to each of the Limited Partners.  Unless otherwise specifically provided in this Agreement, a notice given in accordance with the foregoing clause (a) shall be deemed to have been effectively given upon receipt after such notice is mailed by registered or certified mail, return receipt requested, or after such notice is sent by Federal Express or other one-day service provider, to the proper address, or at the time delivered when delivered in person or by private courier.  Any notice to the General Partner or to a Limited Partner by facsimile or other electronic means shall be deemed to have been effectively given when sent and confirmed by telephone in accordance with the foregoing clause (b).

13.2   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

13.3   Table of Contents and Headings.  The table of contents and the headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof.

13.4   Successors and Assigns.  This Agreement shall inure to the benefit of the Partners, the Initial Limited Partner and the Covered Persons, and shall be binding upon the parties, and, subject to Section 10.1, their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

13.5   Severability.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such

term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

13.6    Further Actions.   Each Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the General Partner in connection with the formation of the Fund and the achievement of its purposes or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the General Partner determines to be necessary or appropriate to form, qualify or continue the Fund as a limited partnership in all jurisdictions in which the Fund conducts or plans to conduct its investment and other activities and all such agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Fund.

13.7    Determinations of the Partners.   Unless otherwise specified in this Agreement and notwithstanding any provisions of law or equity to the contrary, any determination, decision, consent, vote or judgment of, or exercise of discretion by, or action taken or omitted to be taken by, a Partner under this Agreement shall be made, given, exercised, taken or omitted as such Partner shall determine in its sole and absolute discretion, and in connection with the foregoing, such Partner shall be entitled to consider only such interests and factors as it deems appropriate, including its own interests, and shall act in good faith.  If any questions should arise with respect to the operation of the Fund that are not specifically provided for in this Agreement or the Partnership Law, or with respect to the interpretation of this Agreement, the General Partner is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in each case in good faith, and its determination and interpretation so made shall be final and binding on all parties.

13.8    Non-Waiver.   No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor such waiver was given.

13.9    Applicable Law.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS.  The General Partner hereby submits to the nonexclusive jurisdiction in which the principal office of the Fund is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters pertaining to the enforcement and interpretation of the Agreement.

13.10   Confidentiality.   Each Limited Partner shall keep confidential and shall not disclose without the prior written consent of the General Partner any information with respect to the Fund, any Portfolio Company or any Affiliate of any Portfolio Company, *provided* that a Limited Partner may disclose any such information (*a*) as has become generally available to the public other than as a result of the breach of this Section 13.10 by such Limited Partner or any agent or Affiliate of such Limited Partner, (*b*) as may be required to be included in any report,

81

statement or testimony required to be submitted to any municipal, state or national regulatory body having jurisdiction over such Limited Partner, (c) as may be required in response to any summons or subpoena or in connection with any litigation, (d) to the extent necessary in order to comply with any law, order, regulation, ruling applicable to such Limited Partner, (e) to its employees and professional advisors (including such Limited Partner's auditors and counsel and, for an ERISA Partner, such Persons as are necessary for the proper administration of the ERISA plan), so long as such Persons are advised of the confidentiality obligations contained herein and (f) as may be required in connection with an audit by any taxing authority. Notwithstanding any other provision of this Agreement, the General Partner shall have the right to keep confidential from Limited Partners for such period of time as the General Partner determines is reasonable (i) any information that the General Partner reasonably believes to be in the nature of trade secrets and (ii) any other information (A) the disclosure of which the General Partner in good faith believes is not in the best interest of the Fund or could damage the Fund or its investments or (B) that the Fund is required by law or by agreement with a third Person to keep confidential. The General Partner may disclose any information concerning the Fund or the Limited Partners necessary to comply with applicable laws and regulations, including any money laundering or anti-terrorist laws or regulations, and each Limited Partner shall provide the General Partner, promptly upon request, all information that the General Partner reasonably deems necessary to comply with such laws and regulations. Notwithstanding anything contained in this Agreement or otherwise, the "tax treatment" and "tax structure" (as those terms are defined in Treasury Regulations section 1.6011-4) of any transactions of the Fund shall not be confidential, and nothing herein shall prohibit any Limited Partner from disclosing to any and all persons, without limitation of any kind, such tax treatment or tax structure; *provided* that the foregoing does not extend to disclosure of the identity of the Fund, the General Partner and their Affiliates or any other party, including any Portfolio Company (or any representative of any of them) or any financial, business, legal or personal information of or regarding any of the foregoing (or any of their representatives), to the extent not related to the tax treatment or tax structure of transactions of the Fund.

13.11   Survival of Certain Provisions.   The obligations of each Partner pursuant to Sections 6.12 and 13.10 and Article IX shall survive the termination or expiration of this Agreement and the dissolution, winding up and termination of the Fund.

13.12   Waiver of Partition.   Except as may otherwise be provided by law in connection with the dissolution, winding up and liquidation of the Fund, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Fund's property.

13.13   Entire Agreement; Most Favored Nations Provision.   This Agreement and the Subscription Agreements constitute the entire agreement among the Partners and between the Partners and the Initial Limited Partner with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter.   The representations and warranties of the Fund and the Limited Partners in and the other provisions of the Subscription Agreements shall survive the execution and delivery of this Agreement.

Notwithstanding any other provision of this Agreement or any Subscription Agreement, in addition to this Agreement and the Subscription Agreements, the Limited Partners hereby acknowledge and agree that the General Partner, on its own behalf or on behalf of the Fund, may enter into side letters or other written agreements to or with any Limited Partner without the consent of any Person, including any other Limited Partner that has the effect of establishing rights under, or altering or supplementing the terms hereof and of any Subscription Agreement. The Limited Partners hereby further agree that the terms of any such side letter or other agreement to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or any of the Subscription Agreements. If the General Partner enters into any such side letter or other agreement on or after the date hereof to or with any Limited Partner (other than an Affiliated Partner) that establishes rights or benefits in favor of such Limited Partner that are more favorable in any material respect to such Limited Partner than the rights and benefits established in favor of the other Limited Partners, the General Partner shall offer to each other Limited Partner, within 30 days after the Final Admission Date, the opportunity to elect within 30 days after receipt of such offer to receive such rights and benefits established by each such side letter or other agreement to the extent reasonably applicable to such other Limited Partner, and in connection with such offer the General Partner shall provide a copy of each such side letter or other agreement to such other Limited Partner, *provided* that the provisions of the foregoing sentence, however, shall not apply to any agreement to appoint any representative of a Limited Partner to serve as a member of the Advisory Committee.

13.14   No Third Party Beneficiaries.   The provisions of this Agreement, including Section 5.2, are intended solely to benefit the Fund and the Partners and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Fund (and no such creditor shall be a third party beneficiary of this Agreement), and no Partner shall have any duty or obligation to any creditor of the Fund to make any contributions to the Fund pursuant to Section 5.2 or to cause the General Partner to deliver to any Partner a Drawdown Notice; *provided, however*, that the provisions of Article IX shall also be for the benefit of the Covered Persons.

13.15   Compliance with Anti-Money Laundering Requirements.   The General Partner shall be authorized without the consent of any Person, including any other Partner, to take such action as it determines to be necessary or advisable to comply, or to cause the Fund to comply, with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures.

13.16   Fund Counsel.   Each Limited Partner hereby acknowledges and agrees that Willkie Farr & Gallagher LLP and any other law firm retained by the General Partner in connection with the organization of the Fund, the offering of interests in the Fund, the management and operation of the Fund, or any dispute between the General Partner and any Limited Partner, is acting as counsel to the General Partner and as such does not represent or owe any duty to such Limited Partner or to the Limited Partners as a group.

13.17  _Currency_.   The term "dollar" and the symbol "$," wherever used in this Agreement, shall mean the United States dollar.

*Signature pages follow*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as a deed as of the day and year first above written.

GENERAL PARTNER:

Lime Rock Partners GP V, L.P.

In the presence of:

Name: Eunice Tavolacci

By:  LRP GP V, Inc.,
     its general partner

By:  _____
     Name: Mark A. McCall
     Title: Authorized Signatory

INITIAL LIMITED PARTNER:
*Solely to reflect the withdrawal of the Initial Limited Partner for purposes of Section 1.8*

In the presence of:

Name: Eunice Tavolacci

Mark A. McCall

LIMITED PARTNERS:

Each Limited Partner has joined in, and become a party to, this Agreement by its execution and delivery of its Subscription Agreement, the signature page of which also expressly serves as such Partner's signature page to this Agreement. The General Partner shall maintain at its principal offices a counterpart of this Agreement which attaches all such signature pages.

Signature page to Amended
and Restated Limited
Partnership Agreement of
Lime Rock Partners V, L.P.

The undersigned is hereby executing and delivering this Agreement as a deed solely for the purpose of agreeing to the provisions of Sections 2 3, 2 4, 7 1 and 7 2, but shall not thereby become or be deemed a partner of the Fund

MANAGER:

Lime Rock Management LP

In the Presence of:                    By: Lime Rock Management GP LLC
                                           its general partner

Name: Eunice Tavolacci             By: _____
                                   Name: mark A. McCall
                                   Title: C F O

**Schedule A**

**PARTNERS; CAPITAL COMMITMENTS**

| | Capital Commitment | Admission Date | Limited Partner Classification |
|---|---|---|---|
| **General Partner:** | | | |
| Lime Rock Partners GP V, L.P. | $34.5 million | _____ | N/A |
| **Limited Partners:** | | | |

**TOTAL:**

**Schedule A**

4209061_3.DOC

**Exhibit 1**

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (this "Agreement") is entered into on April 17, 2008 among Lime Rock Management LP, a Delaware limited partnership (the "Manager"), and Lime Rock Partners V, L.P., a Cayman Islands exempted limited partnership (the "Fund"). All capitalized terms not defined herein shall have the meanings set forth in the Partnership Agreement (defined below).

### W I T N E S S E T H:

WHEREAS, the Fund has been formed to make investments in accordance with the Investment Objectives as set forth in the Partnership Agreement;

WHEREAS, the Manager is controlled by individuals with substantial experience and expertise in transactions involving such investments;

WHEREAS, the Amended and Restated Limited Partnership Agreement of the Fund, dated April 17, 2008, as amended from time to time (the "Partnership Agreement"), provides that the Fund shall appoint the Manager to provide portfolio management and administrative services to and to act as the manager of the Fund; and

WHEREAS, the Manager desires to render such services to the Fund as set forth in the Partnership Agreement;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the Fund and the Manager agree as follows:

1.      Services and Duties.

(a)     To the extent permitted under the Partnership Agreement, the General Partner hereby engages and delegates the powers of the General Partner to the Manager, and the Manager hereby agrees, as an independent contractor, to accept such delegation and to assist the General Partner in the performance of its duties under the Partnership Agreement. The duties of the Manager, subject to the supervision of the General Partner and to the terms of the Partnership Agreement shall include, but shall not be limited to, the following: (i) maintaining the books and records of the Fund; (ii) providing office space to the Fund and the General Partner; (iii) screening and evaluating prospective investment proposals and submitting such proposals to the Fund; (iv) assisting the General Partner in transactions in which the Fund makes investments; (v) monitoring the management and operations of Portfolio Companies; and (vi) providing personnel to serve on the boards of directors or other governing bodies of Portfolio Companies, in each case, if and to the extent requested by the General Partner. The Manager hereby

Exhibit 1

**Exhibit 1**

agrees to comply with the investment restrictions and other provisions as set forth in the Partnership Agreement.

(b)     It is expressly understood that the management and the conduct of the activities of the Fund shall remain the sole responsibility of the General Partner and that all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner.

(c)     In discharging any of its duties under this Agreement, the Manager may utilize the services of attorneys, accountants, investment bankers, brokers, appraisers and others.

(d)     The Manager agrees to be bound by, and will use its reasonable best efforts to cause its partners and professional employees to comply with, all terms and provisions of the Partnership Agreement applicable to the Manager, including sections 2.3, 2.4, 7.1 and 7.2 thereof.

2.     <u>Management Fee, etc</u>.  The Fund shall pay the Manager a Management Fee in the amounts and at the times provided in section 7.2 of the Partnership Agreement. The Manager hereby represents that it is familiar with the Partnership Agreement and agrees to all arrangements stated therein regarding the Management Fee.

3.     <u>Expenses to be Paid by the Manager</u>.  All Manager Expenses shall be borne by the Manager.  As soon as practicable after the date of the Initial Closing, the Fund will reimburse the Manager for expenditures that constitute Organizational Expenses and Fund Expenses paid by the Manager on or prior to the date hereof.

4.     <u>Co-Investment Right</u>.  The Manager shall have the right to designate certain employees and other persons to co-invest with the Fund in Portfolio Companies as provided in and subject to section 4.6(b)(ii) of the Partnership Agreement.

5.     <u>Indemnification and Exculpation</u>.  The Manager and its agents, partners, directors, officers, employees, controlling Persons and Affiliates (*a*) shall be and hereby are indemnified and held harmless by the Fund in accordance with the terms of Section 9.1 of the Partnership Agreement and (*b*) shall not be liable to the Fund except as provided in section 2.4 of the Partnership Agreement.

6.     <u>Duration and Termination</u>.  This Agreement may be terminated (*a*) by the Fund at any time after 60 days' written notice to the Manager without the payment of any penalty by the General Partner or the Fund, (*b*) by the Manager after 60 days' written notice to the General Partner, without the payment of any penalty by the Manager, or (*c*) by the Manager or the Fund immediately upon notice to the other, without payment of penalty by the Manager or the Fund, as the case may be, if the General Partner for any reason is no longer the general partner of the Fund.  Upon termination of this Agreement,

Exhibit 1-2

**Exhibit 1**

the Manager shall repay to the Fund or to a replacement manager, as directed by the General Partner, the unearned portion (computed on the basis of the number of days elapsed), if any, of any Management Fees previously paid to the Manager.

    7.    <u>Miscellaneous</u>.

    (a)    <u>Services Not Exclusive</u>. The services of the Manager are not exclusive to the General Partner and the Fund. The Manager and any partner, employee or agent of the Manager may, to the extent not prohibited by the Partnership Agreement, render similar services to others and engage in additional activities so long as the Manager performs its obligations hereunder.

    (b)    <u>Applicable Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION. Each of the parties hereto hereby irrevocably and unconditionally agrees to be subject to the jurisdiction of the courts of the Cayman Islands.

    (c)    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of the parties hereto and the Covered Persons, and shall be binding upon the parties, and their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

    (d)    <u>Severability</u>. Every term and provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

    (e)    <u>Entire Agreement</u>. This Agreement and the Partnership Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter.

    (f)    <u>Headings</u>. The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof or affect the interpretation thereof.

    (g)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

Exhibit 1-3

**Exhibit 1**

    (h)   <u>Survival of Certain Provisions</u>.  The provisions of Section 6 of this Agreement shall survive any termination or expiration of this Agreement and the dissolution, termination and winding up of the Fund.

    (i)   <u>Waiver</u>.  No waiver of the provisions of this Agreement shall be valid unless in writing and signed by the party to be bound.  No failure or delay by any party in exercising any right or remedy hereunder shall operate as a waiver thereof, and a waiver of a particular right or remedy on one occasion shall not be deemed a waiver of any other right or remedy or a waiver on any subsequent occasion.

    (j)   <u>Intent</u>.  This Agreement is intended to confirm the arrangements provided for in the Partnership Agreement for the services and duties of the Manager to the Fund. Accordingly, the Partnership Agreement shall govern in the event of any conflict, ambiguity or inconsistency between this Agreement and the Partnership Agreement.

*Signature page follows*

Exhibit 1-4

<u>**Exhibit 1**</u>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective representatives hereunto duly authorized as of the date first above written.

<u>MANAGER</u>:

LIME ROCK MANAGEMENT LP

In the presence of:

By:  LIME ROCK MANAGEMENT GP, LLC,
     its general partner

_____

        By:_____
           Mark A. McCall
           Chief Financial Officer


<u>FUND</u>:

LIME ROCK PARTNERS V, L.P.

By:  LIME ROCK PARTNERS GP V, L.P.,
     its general partner

In the presence of:

      By:  LRP GP V, Inc.,
         its general partner

_____

        By: _____
Name:
           Mark A. McCall
           Chief Financial Officer

**Exhibit 2**

## LIME ROCK PARTNERS V, L.P.

### Indemnification Agreement

This indemnification agreement ("Indemnification Agreement") is made and entered into as a deed on April 17, 2008 by and among Lime Rock Partners V, L.P., a Cayman Islands exempted limited partnership (the "Fund"), acting through its general partner, Lime Rock Partners GP V, L.P. (the "General Partner"), and each of the Covered Persons who are listed as signatories to this Indemnification Agreement on the execution pages hereto. Capitalized terms used herein without definition shall, unless otherwise specified, have the meanings set forth in the Amended and Restated Limited Partnership Agreement of the Fund, dated April 17, 2008 (as amended from time to time, the "Fund Agreement").

## W I T N E S S E T H:

WHEREAS, section 9.1 of the Fund Agreement provides that the Fund will indemnify and hold harmless and release each Covered Person from and against any and all Claims; and

WHEREAS, pursuant to section 9.4 of the Fund Agreement, the Fund wishes to arrange for the indemnification by the Fund of Covered Persons in exchange for the agreement of such Covered Persons to provide services to the Fund;

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto intending to be legally bound hereby, hereby agree and covenant as follows:

1.    Indemnification of Covered Persons.  The Fund shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person from and against any and all Claims that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Fund, activities undertaken in connection with the Fund, or otherwise relating to or arising out of this Indemnification Agreement or the Fund Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any and all Proceedings, whether civil or criminal, except to the extent that it shall have been determined ultimately by a court of competent jurisdiction that such Damages arose from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement shall not, of itself, create a

Exhibit 2

4209061_3.DOC

**Exhibit 2**

presumption that any Damages relating to such settlement or otherwise relating to such Proceeding arose primarily from the Disabling Conduct of any Covered Person.

2.   Liability of Covered Persons.  No Covered Person shall be liable to the Fund or any Partner for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Fund and is within the scope of authority granted to such Covered Person by this Indemnification Agreement and the Fund Agreement, *provided* that such act or omission does not constitute Disabling Conduct by the Covered Person.  No Partner shall be liable to the Fund or any Partner for any action taken by any other Partner.  To the extent that, at law or in equity, a Covered Person has duties and liabilities relating thereto to the Fund or to the Partners, such Covered Person shall not be liable to the Fund or any Partner for its good faith reliance on the provisions of this Indemnification Agreement and the Fund Agreement.  The provisions of this Indemnification Agreement and the Fund Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity and to the extent permitted by law, are agreed by the Fund to replace, to the extent permitted by law, such other duties and liabilities of such Covered Person.

3.   Expenses of Covered Persons.  Reasonable expenses incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder (other than in defense of a derivative action brought by at least a Majority in Interest) may be advanced by the Fund prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount, if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  All judgments against the Fund and either or both of the General Partner or the Manager, in respect of which the General Partner or the Manager is entitled to indemnification, shall first be satisfied from Fund assets (including Capital Contributions), including any payments under section 9.2 of the Fund Agreement, before the General Partner or the Manager, as the case may be, is responsible therefor.

4.   Notices of Claims, etc.  Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Fund, give written notice to the Fund of the commencement of such Proceeding, *provided* that the failure of any Covered Person to give notice as provided herein shall not relieve the Fund of its obligations under this Indemnification Agreement, except to the extent that the Fund is actually prejudiced by such failure to give such notice.  If any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Fund), the Fund will be entitled to participate in and to assume the defense thereof to the extent that the Fund may wish, with counsel reasonably satisfactory to such Covered Person.  After notice

Exhibit 2-2

Exhibit 2

from the Fund to such Covered Person of the Fund's election to assume the defense of such Proceeding, the Fund will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Fund will not consent to entry of any judgment or enter into any settlement of such Proceeding that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect of such Proceeding and the related Claim.

5.    Reliance by Covered Persons. A Covered Person shall incur no liability in acting upon any signature or writing believed by such Covered Person to be genuine, may rely on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely on an opinion of counsel selected by such Covered Person with respect to legal matters. Each Covered Person may act directly or through its agents or attorneys. Each Covered Person may consult with counsel, appraisers, engineers, accountants and other skilled Persons selected by such Covered Person and shall not be liable for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons. No Covered Person shall be liable to the Fund or any Partner for any error of judgment made in good faith by an officer or employee of such Covered Person, *provided* that such error does not constitute Disabling Conduct of such Covered Person.

6.    Withholding Agent Indemnification. The Fund shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person who is or who is deemed to be the responsible withholding agent for U.S. federal, state or local or non-U.S. income tax purposes against all claims, liabilities and expenses of whatever nature relating to such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by such Covered Person as a result of any Partner's participation in the Fund and, if the Fund shall so indemnify any Covered Person, such Partner shall pay to the Fund promptly upon request the amount of any indemnity paid or required to be paid by the Fund.

7.    Survival of Protection. This Indemnification Agreement shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Indemnification Agreement and regardless of any subsequent amendment to this Indemnification Agreement, and no amendment to this Indemnification Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

8.    Rights Cumulative. The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter

Exhibit 2-3

Exhibit 2

of law or equity and shall extend to such Covered Person's successors, assigns, heirs and legal representatives.

9. GOVERNING LAW. THIS INDEMNIFICATION AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE INTERPRETED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE CAYMAN ISLANDS APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.

10. Intent. This Indemnification Agreement is intended to indemnify and hold harmless and release each Covered Person, including the officers, directors, employees, shareholders, partners, members, managers and agents of the General Partner, the Manager and each of their respective Affiliates; the members of the Advisory Committee and any other Person designated by the General Partner or the Manager on behalf of the Fund as an officer, director, employee, partner, member or agent of any other Person that is an Affiliate of the General Partner or the Fund from and against any and all Claims as if such Covered Person were a party to the Fund Agreement. This Indemnification Agreement is not intended either to expand or narrow the rights granted to Covered Persons under the Fund Agreement. In the event of any discrepancy between the rights granted to Covered Persons as set forth in the Fund Agreement and the rights granted to Covered Persons pursuant to this Indemnification Agreement, the rights of Covered Persons set forth in the Fund Agreement shall control. The Fund agrees that this Indemnification Agreement constitutes a legal, valid and binding agreement of the Fund and is enforceable against the Fund by the Covered Persons in accordance with its terms.

11. Amendments. Any amendment to this Indemnification Agreement shall require the consent of the parties to this Indemnification Agreement affected thereby. All amendments to this Indemnification Agreement shall be in writing.

12. Miscellaneous. Except as otherwise specifically provided herein, this Indemnification Agreement shall be binding upon and inure to the benefit of the parties to this Indemnification Agreement and their respective legal representatives, heirs, successors and permitted assigns, and inure to the benefit of all intended beneficiaries and their respective legal representatives, heirs, successors and permitted assigns. If any provision of this Indemnification Agreement or the application of such provision to any Person or circumstance shall be held illegal or invalid, the remainder of this Indemnification Agreement or the application of such provision to other Persons or circumstances shall not be affected thereby. This Indemnification Agreement and the Fund Agreement constitute the entire agreement among the parties hereto and thereto and any intended beneficiaries hereof or thereof, whether or not a party hereto or thereto, with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter. Subject to Section 11, no provision of this Indemnification Agreement shall be deemed to have been waived except if the giving

Exhibit 2-4

**Exhibit 2**

of such waiver is contained in a written notice given to the Person claiming such waiver, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the Person or Persons in whose favor the waiver was given.    This Indemnification Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*Signature pages follow*

Exhibit 2-5

**Exhibit 2**

IN WITNESS WHEREOF, the undersigned have duly executed this Indemnification Agreement as a deed on the day and year first above written.

FUND:

LIME ROCK PARTNERS V, L.P.

By:  LIME ROCK PARTNERS GP V, L.P.,
     its general partner

In the presence of:                    By:  LRP GP V, Inc.,
                                            its general partner

_____         By:  _____
Name:                                  Mark A. McCall
                                       Chief Financial Officer

COVERED PERSONS:

GENERAL PARTNER:

LIME ROCK PARTNERS GP V, L.P.,

In the presence of:                    By:  LRP GP V, Inc.,
                                            its general partner

_____         By:  _____
Name:                                  Mark A. McCall
                                       Chief Financial Officer

**Exhibit 2**

MANAGER:

LIME ROCK MANAGEMENT LP

In the presence of:

By:  LIME ROCK MANAGEMENT GP, LLC,
its general partner

By:_____
Mark A. McCall
Chief Financial Officer

**Exhibit 3**

GUARANTEE

GUARANTEE, dated April 17, 2008 by and among the undersigned guarantors (together, with any person who may hereafter agree to become a guarantor under this Guarantee by signing a written instrument expressly agreeing to be so bound, the "Guarantors") and Lime Rock Partners GP V, L.P., a Cayman Islands exempted limited partnership (the "Obligor"), for the benefit of Lime Rock Partners V, L.P., a Cayman Islands exempted limited partnership acting through its general partner (the "Beneficiary").

W I T N E S S E T H:

WHEREAS, the Obligor is the sole general partner of the Beneficiary;

WHEREAS, pursuant to section 11.3 of the Amended and Restated Limited Partnership Agreement of the Beneficiary, dated April 17, 2008 (as it may be amended from time to time, the "Partnership Agreement"), the Obligor may be required to contribute capital to the Beneficiary, at such times and in such amounts as are provided for therein (the obligations of the Obligor thereunder, the "Obligations");

WHEREAS, the Guarantors are the partners of the Obligor; and

WHEREAS, in consideration of the mutual benefits derived from the Guarantors' ownership of the Obligor, the Guarantors wish to guarantee the Obligations;

NOW, THEREFORE, in consideration of the premises and the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Guarantee.

(a)    Subject to the last sentence of this Section 1(a), each Guarantor hereby unconditionally and irrevocably guarantees to the Beneficiary the prompt payment, when due, of a portion of the Obligations, calculated as follows:

If the Obligor shall be required, pursuant to the Obligations, to make a capital contribution or other payment to or for the account of the Beneficiary, then the portion of such contribution or other payment guaranteed by each Guarantor shall equal the product of ($a$) the amount of such contribution or other payment and ($b$) a fraction the numerator of which is the total amount of distributions received by such Guarantor from the Obligor as carried interest payments and the denominator of which is the total amount of distributions made by the Obligor to the Guarantors as carried interest payments.

Exhibit 3

**Exhibit 3**

Each Guarantor's liability under this Guarantee shall not exceed in the aggregate an amount equal to the sum of the aggregate amount of distributions received by such Guarantor from the Obligor as carried interest payments.

(b)     This Guarantee is a several, and not a joint, guarantee by each of the Guarantors of a portion of the Obligations as set forth herein.  Nothing in this Guarantee, express or implied, is intended or shall be construed to require any Guarantor to bear any amount of the Obligations in excess of the portion guaranteed by such Guarantor pursuant to Section 1(a).

(c)     This Guarantee is an absolute, unconditional and continuing guarantee of the payment of the Obligations and not of collectibility of the Obligations, and is in no way conditioned upon any requirement that the Beneficiary first attempt to collect any portion of the Obligations from the Obligor or resort to any security or other means of obtaining payment of any portion of the Obligations which the Beneficiary now have or may acquire after the date hereof, or upon any other contingency whatsoever.

2.     Waiver of Notice, Presentment, etc.  Each Guarantor hereby acknowledges that the Beneficiary has relied and will rely on this Guarantee.  Each Guarantor hereby expressly waives, to the fullest extent permitted by law, presentment for payment, notice of presentment, nonperformance, nonpayment or breach, and protest and notice of protest of any of the Obligations.

3.     Obligations Unconditional, etc.  The obligations of each Guarantor under this Guarantee shall, to the fullest extent permitted by law, be unconditional and primary (as though the Guarantor were the maker of the Obligations), irrespective of the validity, regularity or enforceability of any Obligation, and shall not be affected by any action taken under the Obligations in the exercise of any right or remedy therein conferred, or by any failure or omission on the part of the Beneficiary to enforce any right given thereunder or hereunder or any remedy conferred thereby or hereby, or by any waiver of any term, covenant, agreement or condition of the Obligations or this Guarantee, or by any release of any security or any other guaranty at any time existing for the benefit of the Obligations, or by the merger or consolidation of the Obligor, or by sale, lease or transfer by the Obligor to any person of any or all of its properties, or by any action of the Beneficiary granting indulgence or extension to, or waiving or acquiescing in any default by the Obligor, or any successor to the Obligor or by any other party which shall have assumed its obligations, or by reason of any disability or other defense of the Obligor or any successor to the Obligor, or by any modification, alteration, or by any circumstance whatsoever (with or without notice to or knowledge of a Guarantor) which may or might in any manner or to any extent vary the risk of a Guarantor hereunder, it being the purpose and intent of each Guarantor that the obligations of such Guarantor hereunder shall be absolute and unconditional under any and all circumstances and shall not be discharged except by payment or performance or by release as herein provided, and then

Exhibit 3-2

Exhibit 3

only to the extent of such payment, performance or release.  Without limiting the generality of the foregoing, each Guarantor shall be liable for any reasonable costs of collection with respect to the Obligations even though such costs of collection may not be enforceable against a party primarily liable because of the bankruptcy or insolvency of such party.

4.     Certain Claims Subordinated.  Any claim against the Beneficiary to which a Guarantor may be or become entitled (including claims by subrogation or otherwise by reason of any payment or performance by such Guarantor in satisfaction and discharge, in whole or in part, of its obligations under this Guarantee) shall be and hereby is made subject and subordinate to the prior payment or performance in full of the Obligations.

5.     No Other Beneficiaries.  The provisions of this Guarantee are solely for the benefit of the Beneficiary and Limited Partners (as defined in the Partnership Agreement).  Except as expressly provided in Section 7, nothing in this Guarantee, express or implied, is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Guarantee or any provision contained herein.

6.     Governing Law, etc.  THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS.  Each of the parties hereto hereby irrevocably and unconditionally agrees (*i*) to be subject to the jurisdiction of the courts of the Cayman Islands, and (*ii*) to the extent that such party is not otherwise subject to service of process in the Cayman Islands, to appoint and maintain an agent in the Cayman Islands as such party's agent for acceptance of legal process.  For purposes of implementing the parties' agreement to appoint and maintain an agent for service of process in the Cayman Islands, each such party does hereby appoint LRP GP V, Inc., as such agent.

7.     Binding Effect; Assignment; Amendments; Counterparts.  This Guarantee shall be binding on the parties hereto and their respective successors and permitted assigns, and shall inure to the benefit of the Beneficiary and its successors and permitted assigns.  This Guarantee may not be amended except by an agreement in writing signed by each of the parties hereto and at least 75% in Interest (as defined in the Partnership Agreement).  This Guarantee may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

8.     Term.  This Guarantee shall be effective as of the date first above written as to each original Guarantor on such date, and shall become effective as to any other person who subsequently becomes a Guarantor as of the date that such Guarantor first becomes a member of the Obligor and signs the written instrument described in the

Exhibit 3-3

**Exhibit 3**

preamble of this Guarantee.  This Guarantee shall remain in full force and effect until such time as the Obligations have been satisfied.

9.      <u>Severability</u>.  If a court of competent jurisdiction shall hold any provision of this Guarantee to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

*Signature page follows*

Exhibit 3-4

4209061_3.DOC

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as a deed as of the day and year first above written.

GENERAL PARTNER:

Lime Rock Partners GP V, L.P.

By: LRP GP V, Inc.,
     its general partner

In the presence of:

Name: _Eunice Tavolacci_

By: _____
     Name: Mark A. McCall
     Title: Authorized Signatory

INITIAL LIMITED PARTNER:
*Solely to reflect the withdrawal of the Initial Limited Partner for purposes of Section 1.8*

In the presence of:

Name: _Eunice Tavolacci_

Mark A. McCall

LIMITED PARTNERS:

Each Limited Partner has joined in, and become a party to, this Agreement by its execution and delivery of its Subscription Agreement, the signature page of which also expressly serves as such Partner's signature page to this Agreement. The General Partner shall maintain at its principal offices a counterpart of this Agreement which attaches all such signature pages.

Signature page to Amended and Restated Limited Partnership Agreement of Lime Rock Partners V, L.P.

The undersigned is hereby executing and delivering this Agreement as a deed solely for the purpose of agreeing to the provisions of Sections 2.3, 2.4, 7.1 and 7.2, but shall not thereby become or be deemed a partner of the Fund.

MANAGER:

Lime Rock Management LP

In the Presence of:

By: Lime Rock Management GP LLC
    its general partner

Name: _Eunice Tavolacci_

By: _____
    Name: _Mark A. McCall_
    Title: _CFO_

Signature page to Amended
and Restated Limited
Partnership Agreement of
Lime Rock Partners V, L.P.

# EXHIBIT 15

**FORM D**



143375ə

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM D**

**NOTICE OF SALE OF SECURITIES**
**PURSUANT TO REGULATION D,**
**SECTION 4(6), AND/OR**
**UNIFORM LIMITED OFFERING EXEMPTION**

| OMB APPROVAL | |
|---|---|
| OMB Number | 3235-0076 |
| Expires: | April 30, 2008 |
| Estimated average burden | |
| hours per response ……… | 16.00 |

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEIVED | |

---

Name of Offering (☐ check if this is an amendment and name has changed, and indicate change.)
**Limited Partnership Interests of Lime Rock Partners V, L.P.**

Filing Under (Check box(es) that apply):   ☐ Rule 504   ☐ Rule 505   ☒ Rule 506   ☐ Section 4(6)   ☐ ULOE
Type of Filing:   ☒ New Filing   ☐ Amendment

### A. BASIC IDENTIFICATION DATA

1.   Enter the information requested about the issuer

Name of Issuer (☐ check if this is an amendment and name has changed, and indicate change.)
**Lime Rock Partners V, L.P.**

| Address of Executive Offices           (Number and Street, City, State, Zip Code) | Telephone Numb |
|---|---|
| **c/o Lime Rock Management LP, 518 Riverside Ave, Westport, Connecticut 06880** | (203) 293-2750 |

08046001

| Address of Principal Business Operations           (Number and Street, City, ~~State~~ ...~~Telephone Numb~~ | |
| (if different from Executive Offices) | |

Brief Description of Business
**Private Equity Investment Fund**

PROCESSED
APR 30 2008
THOMSON REUTERS

Type of Business Organization
☐ corporation   ☐ limited partnership, already formed   ☒ other (please specify): **Cayman Islands exempted limited partnership, already formed**
☐ business trust   ☐ limited partnership, to be formed

|  | Month | Year | | |
|---|---|---|---|---|
| Actual or Estimated Date of Incorporation or Organization: | 03 | 08 | ☒ Actual | ☐ Estimated |
| Jurisdiction of Incorporation or Organization: | (Enter two-letter U.S. Postal Service abbreviation for State:  CN for Canada; FN for other foreign jurisdiction)   FN | | | |

**GENERAL INSTRUCTIONS**

**Federal:**

*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

*When To File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

*Where to File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

**ATTENTION**

**Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.**

| SEC 1972 (6-02) | Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number. | 1 of 8 |
|---|---|---|

Form D- Lime Rock Partners V L P .DOC

| A. BASIC IDENTIFICATION DATA |
|---|

2. Enter the information requested for the following: •

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☒* General and/or |
|---|---|---|---|
| *the "General Partner" | | | Managing Partner |
| Full Name (Last name first, if individual) |
| Lime Rock Partners GP V, L.P. |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| Maples Corporate Services Limited, Ugland House, P.O. Box 309 GT, George Town, Grand Cayman, Cayman Islands |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☒* General and/or |
|---|---|---|---|
| *"the General Partner of the General Partner" | | | Managing Partner |
| Full Name (Last name first, if individual) |
| LRP GP V, Inc. |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| Maples Corporate Services Limited, Ugland House, P.O. Box 309 GT, George Town, Grand Cayman, Cayman Islands |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☒* Director | ☐ General and/or |
|---|---|---|---|
| *Director of the General Partner of the General Partner | | | Managing Partner |
| Full Name (Last name first, if individual) |
| Farber, Jonathan |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| 518 Riverside Ave. Westport, Connecticut 06880 |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☒* Director | ☐ General and/or |
|---|---|---|---|
| *Director of the General Partner of the General Partner | | | Managing Partner |
| Full Name (Last name first, if individual) |
| Reynolds, John |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| 518 Riverside Ave. Westport, Connecticut 06880 |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☒* Executive Officer | ☐ Director | ☐ General and/or |
|---|---|---|---|
| * Chief Financial Officer and Secretary of the General Partner of the General Partner | | | Managing Partner |
| Full Name (Last name first, if individual) |
| McCall, Mark A. |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| 518 Riverside Ave. Westport, Connecticut 06880 |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or |
|---|---|---|---|
| | | | Managing Partner |
| Full Name (Last name first, if individual) |
| |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| |

| Check Box(es) that Apply: ☐ Promoter ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or |
|---|---|---|---|
| | | | Managing Partner |
| Full Name (Last name first, if individual) |
| |
| Business or Residence Address (Number and Street, City, State, Zip Code) |
| |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary)

### B. INFORMATION ABOUT OFFERING

1. Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering? ........................................................ Yes ☐  No ☒

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual? ........................................................................... $5,000,000*

**\*The minimum investment is $5 million. The General Partner reserves the right to accept investments of a lesser amount.**

3. Does the offering permit joint ownership of a single unit?...................................................................................................... Yes ☒  No ☐

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................................................. ☐ All States

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................................................. ☐ All States

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................................................. ☐ All States

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold.   Enter "0" if answer is "none" or "zero."   If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt | $ | $ |
| Equity | $ | $ |
| ☐ Common  ☐ Preferred | | |
| Convertible Securities (including warrants) | $ | $ |
| Partnership Interests | $1,400,000,000 | $1,300,000,000 |
| Other (Specify_____) | $ | $ |
| Total | $1,400,000,000 | $1,300,000,000 |

Answer also in Appendix, Column 3, if filing under ULOE.

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases.   For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines.   Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors | 100 | $1,300,000,000 |
| Non-accredited Investors | | $ |
| Total (for filings under Rule 504 only) | | $ |

Answer also in Appendix, Column 4, if filing under ULOE.

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering.  Classify securities by type listed in Part C – Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 | | $ |
| Regulation A | | $ |
| Rule 504 | | $ |
| Total | | $ |

4. a. Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering.  Exclude amounts relating solely to organization expenses of the issuer.  The information may be given as subject to future contingencies.  If the amount of expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees | ☐ | $ |
| Printing and Engraving Costs | ☐ | $ |
| Legal Fees | ☒ | $100,000 |
| Accounting Fees | ☐ | $ |
| Engineering Fees | ☐ | $ |
| Sales Commissions (specify finder's fees separately) | ☐ | $ |
| Other Expenses (identify)_____ | ☐ | $ |
| Total | ☐ | $ |

b. Enter the difference between the aggregate offering price given in response to Part C — Question 1 and total expenses furnished in response to Part C — Question 4.a.  This difference is the "adjusted gross proceeds to the issuer."  ....   $1,399,900,000

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

5.  Indicate below the amount of the adjusted gross proceed to the issuer used or proposed to be used for each of the purposes shown. If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate. The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C – Question 4.b above.

| | Payments to Officers, Directors, & Affiliates | Payments to Others |
|---|---|---|
| Salaries and fees .................................................................. | ☐ $_____ | ☐ $_____ |
| Purchase of real estate ......................................................... | ☐ $_____ | ☐ $_____ |
| Purchase, rental or leasing and installation of machinery and equipment .......... | ☐ $_____ | ☐ $_____ |
| Construction or leasing of plant buildings and facilities..................................... | ☐ $_____ | ☐ $_____ |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets of securities of another issuer pursuant to a merger) ......................................... | ☐ $_____ | ☐ $_____ |
| Repayment of indebtedness .............................................................. | ☐ $_____ | ☐ $_____ |
| Working capital .............................................................................. | ☐ $_____ | ☐ $_____ |
| Other (specify): **Investment Capital** _____ | ☐ $_____ | ☒ $1,399,900,000 |
| Column Totals .............................................................................. | ☐ $_____ | ☒ $1,399,900,000 |
| Total Payments Listed (column totals added).................................................... | ☒ $1,399,900,000 | |

### D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person. If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) **Lime Rock Partners V, L.P.** | Signature  | Date 4/21/08 |
|---|---|---|
| Name of Signer (Print or Type) **Mark A. McCall** | Title of Signer (Print or Type) **Chief Financial Officer and Secretary of LRP GP V, Inc., the General Partner of Lime Rock Partners GP V, L.P., the General Partner of the Issuer, Lime Rock Partners V, L.P.** | |

# END

**ATTENTION**

Intentional misstatements or omissions of fact constitute federal criminal violations. (See 18 U.S.C. 1001.)

# EXHIBIT 16

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: LIME ROCK** | **CRD Number: 157127** |
| **Annual Amendment - All Sections** | **Rev. 10/2017** |
| **3/29/2019 6:36:03 PM** | |

---

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**LIME ROCK MANAGEMENT LP**

B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**LIME ROCK**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-73847**

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:
No Information Filed

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **157127**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F.  *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| | |
|---|---|
| Number and Street 1: | Number and Street 2: |
| 274 RIVERSIDE AVENUE | 3RD FLOOR |
| City: State: | Country: ZIP+4/Postal Code: |
| WESTPORT Connecticut | United States 06880 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:
⦿ Monday - Friday ◯ Other:

Normal business hours at this location:
9 AM - 5 PM

(3) Telephone number at this location:
203-293-2750

(4) Facsimile number at this location, if any:
203-293-2760

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of

the end of your most recently completed fiscal year?
2

G.   Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                         Number and Street 2:
City:                    State:              Country:                    ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.   If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                         Number and Street 2:
City:                    State:              Country:                    ZIP+4/Postal Code:

|  |  | Yes | No |
|---|---|---|---|

I.   Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?    ⦿   ○

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.   Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                        Other titles, if any:
Telephone number:                            Facsimile number, if any:
Number and Street 1:                         Number and Street 2:
City:                    State:              Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):
Name:
IRS Employer Identification Number:

K.   Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                        Titles:
Telephone number:                            Facsimile number, if any:
Number and Street 1:                         Number and Street 2:
City:                    State:              Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  |  | Yes | No |
|---|---|---|---|

L.   Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?    ⦿   ○

*If "yes," complete Section 1.L. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|

M.   Are you registered with a *foreign financial regulatory authority*?    ○   ⦿

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|

N.   Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?    ○   ⦿

|  |  | Yes | No |
|---|---|---|---|

O.   Did you have $1 billion or more in assets on the last day of your most recent fiscal year?    ○   ⦿
If yes, what is the approximate amount of your assets:

○  $1 billion to less than $10 billion
○  $10 billion to less than $50 billion

○ $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.   Provide your *Legal Entity Identifier* if you have one:

*A legal entity identifier is a unique number that companies use to identify each other in the financial marketplace. You may not have a legal entity identifier.*

---

**SECTION 1.B. Other Business Names**

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D Section 1.B. for each business name.

Name: LIME ROCK PARTNERS

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☐ NY | ☐ VT |
| ☑ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | ☐ Other: |
| ☐ ID | ☐ MT | ☐ RI | |

---

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D Section 1.B. for each business name.

Name: LIME ROCK RESOURCES

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☐ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | ☐ Other: |
| ☐ ID | ☐ MT | ☐ RI | |

---

**SECTION 1.F. Other Offices**

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Section 1.F. for each location. If you are applying for SEC registration, if you are registered only with the SEC, or if you are an *exempt reporting adviser*, list only the largest twenty-five offices (in terms of numbers of *employees*).

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| HERITAGE PLAZA, 1111 BAGBY STREET | | SUITE 4600 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| HOUSTON | Texas | United States | 77002-2551 |

If this address is a private residence, check this box: ☐

| Telephone Number: | Facsimile Number, if any: |
|---|---|
| 713-292-9500 | 713-292-9550 |

If this office location is also required to be registered with FINRA or a *state securities authority* as a branch office location for a broker-dealer or investment adviser on the Uniform Branch Office Registration Form (Form BR), please provide the *CRD* Branch Number here:

How many *employees* perform investment advisory functions from this office location?
41

Are other business activities conducted at this office location? (check all that apply)
☐ (1) Broker-dealer (registered or unregistered)
☐ (2) Bank (including a separately identifiable department or division of a bank)
☐ (3) Insurance broker or agent
☐ (4) Commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (5) Registered municipal advisor
☐ (6) Accountant or accounting firm
☐ (7) Lawyer or law firm

Describe any other *investment-related* business activities conducted from this office location:

---

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Section 1.F. for each location. If you are applying for SEC registration, if you are registered only with the SEC, or if you are an *exempt reporting adviser*, list only the largest twenty-five offices (in terms of numbers of *employees*).

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| City: | State: | Country: | ZIP+4/Postal Code: |

If this address is a private residence, check this box: ☑

| Telephone Number: | Facsimile Number, if any: |
|---|---|
| 44 7787916376 | |

If this office location is also required to be registered with FINRA or a *state securities authority* as a branch office location for a broker-dealer or investment adviser on the Uniform Branch Office Registration Form (Form BR), please provide the *CRD* Branch Number here:

How many *employees* perform investment advisory functions from this office location?
1

Are other business activities conducted at this office location? (check all that apply)
☐ (1) Broker-dealer (registered or unregistered)
☐ (2) Bank (including a separately identifiable department or division of a bank)
☐ (3) Insurance broker or agent
☐ (4) Commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (5) Registered municipal advisor
☐ (6) Accountant or accounting firm
☐ (7) Lawyer or law firm

Describe any other *investment-related* business activities conducted from this office location:

## SECTION 1.I. Website Addresses

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:   HTTP://WWW.LRPARTNERS.COM

Address of Website/Account on Publicly Available Social Media Platform:   HTTP://WWW.LIMEROCKRESOURCES.COM

## SECTION 1.L. Location of Books and Records

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
LIME ROCK RESOURCES

| Number and Street 1: | | Number and Street 2: | |
| --- | --- | --- | --- |
| HERITAGE PLAZA, SUITE 4600 | | 1111 BAGBY STREET | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| HOUSTON | Texas | United States | 77002 |

If this address is a private residence, check this box:  ☐

| Telephone Number: | Facsimile number, if any: |
| --- | --- |
| 713-292-9500 | 713-292-9550 |

This is (check one):
◉ one of your branch offices or affiliates.
○ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
COPIES OF GOVERNING DOCUMENTS AND ACCOUNTING RECORDS.

Name of entity where books and records are kept:
SMARSH

| Number and Street 1: | | Number and Street 2: | |
| --- | --- | --- | --- |
| 851 SW 6TH AVE SUITE 800 | | | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| PORTLAND | Oregon | United States | 97204 |

If this address is a private residence, check this box:  ☐

| Telephone Number: | Facsimile number, if any: |
| --- | --- |
| 1-866-SMARSH-1 | 971-998-9967 |

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
EMAIL ARCHIVES

Name of entity where books and records are kept:

IRON MOUNTAIN INCORPORATED

Number and Street 1:                          Number and Street 2:
202 WEST 38TH ST

City:                        State:           Country:              ZIP+4/Postal Code:
HOUSTON                      Texas            United States         77018

If this address is a private residence, check this box: ☐

Telephone Number:                     Facsimile number, if any:
800-934-5348                          713-592-6049

This is (check one):
◦ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
◦ other.

Briefly describe the books and records kept at this location.
LIME ROCK RESOURCES FUND ACCOUNTING RECORDS (VOUCHERS, PRODUCTIONS REPORTS AND FILES, BANK RECONCILIATIONS, JOINT INTEREST BILLING DATA, ACCOUNT PAYABLES, JOURNAL ENTRIES AND OTHER FINANCIAL RECORDS).

---

Name of entity where books and records are kept:
VERITRUST

Number and Street 1:                          Number and Street 2:
2000 AFTON ST

City:                        State:           Country:              ZIP+4/Postal Code:
HOUSTON                      Texas            United States         77055

If this address is a private residence, check this box: ☐

Telephone Number:                     Facsimile number, if any:
713-263-9000

This is (check one):
◦ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
◦ other.

Briefly describe the books and records kept at this location.
BACKUP EMAIL TAPES

---

Name of entity where books and records are kept:
IRON MOUNTAIN WATERTOWN

Number and Street 1:                          Number and Street 2:
200 COMMERCIAL ST

City:                        State:           Country:              ZIP+4/Postal Code:
WATERTOWN                    Connecticut      United States         06975

If this address is a private residence, check this box: ☐

Telephone Number:                     Facsimile number, if any:
800-899-4766

This is (check one):
◦ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
◦ other.

Briefly describe the books and records kept at this location.
EMAIL BACKUP TAPES

Name of entity where books and records are kept:
VERTICE (ALTARETURN)

Number and Street 1:
9350 SOUTH DIXIE HIGHWAY

Number and Street 2:
SUITE 1420

City:
MIAMI

State:
Florida

Country:
United States

ZIP+4/Postal Code:
33156

If this address is a private residence, check this box: ☐

Telephone Number:
305.925.0500

Facsimile number, if any:
786.513.0460

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
FUND ACCOUNTING RECORDS. NOTE: ALTARETURN RUNS OFF MICROSOFT SHAREPOINT. THE DATACENTER IS A MICROSOFT OWNED DATACENTER AND THEY DO NOT DISCLOSE THE PHYSICAL ADDRESS FOR SECURITY PURPOSES.

Name of entity where books and records are kept:
COMPLIANCE SCIENCE

Number and Street 1:
25 HARTZ WAY

Number and Street 2:

City:
SECAUCUS

State:
New Jersey

Country:
United States

ZIP+4/Postal Code:
07094

If this address is a private residence, check this box: ☐

Telephone Number:
646-787-9370

Facsimile number, if any:

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
SECURITIES RECORDS OF ACCESS PERSONS.

Name of entity where books and records are kept:
LIME ROCK MANAGEMENT UK LLC

Number and Street 1:

Number and Street 2:

City:

State:

Country:

ZIP+4/Postal Code:

If this address is a private residence, check this box: ☑

Telephone Number:
44 7787916376

Facsimile number, if any:

This is (check one):
◉ one of your branch offices or affiliates.

○ a third-party unaffiliated recordkeeper.

○ other.

Briefly describe the books and records kept at this location.
CERTAIN BUSINESS INFORMATION ON EMPLOYEE'S LAPTOP

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

---

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑   (1)   are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐   (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.

(3)   Reserved

☐   (4)   have your *principal office and place of business* **outside the United States**;

☐   (5)   are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐   (6)   are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐   (7)   are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐   (8)   are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

If you check this box, complete Section 2.A.(8) of Schedule D.

☐   (9)   are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

If you check this box, complete Section 2.A.(9) of Schedule D.

☐   (10)   are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

If you check this box, complete Section 2.A.(10) of Schedule D.

☐   (11)   are an **Internet adviser** relying on rule 203A-2(e);

☐   (12)   have **received an SEC order** exempting you from the prohibition against registration with the SEC;

If you check this box, complete Section 2.A.(12) of Schedule D.

☐   (13)   are **no longer eligible** to remain registered with the SEC.

---

***State Securities Authority Notice Filings** and State Reporting by **Exempt Reporting Advisers***

C.   Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to

the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

**Jurisdictions**

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☐ TX |
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☐ NY | ☐ VT |
| ☑ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.   How are you organized?
- ○  Corporation
- ○  Sole Proprietorship
- ○  Limited Liability Partnership (LLP)
- ○  Partnership
- ○  Limited Liability Company (LLC)
- ◉  Limited Partnership (LP)
- ○  Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B.   In what month does your fiscal year end each year?
DECEMBER

C.   Under the laws of what state or country are you organized?
State       Country
Delaware  United States

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

|  | Yes | No |
|---|---|---|
| A.   Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B.   Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

**SECTION 4 Successions**

No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

*Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A.   Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.
237

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

48

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

### Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

68%

D. For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.
The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (d)(1) or (d)(3) below.

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of Client | (1) Number of Client(s) | (2) Fewer than 5 Clients | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | ☐ | $ |
| (b) *High net worth individuals* | | ☐ | $ |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 19 | | $ 7,079,895,867 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | ☐ | $ |
| (h) Charitable organizations | | ☐ | $ |
| (i) State or municipal *government entities* (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☐ | $ |

| (n) Other: | | | $ |
|---|---|---|---|

**Compensation Arrangements**

E.   You are compensated for your investment advisory services by (check all that apply):

- ☑ (1)   A percentage of assets under your management
- ☐ (2)   Hourly charges
- ☐ (3)   Subscription fees (for a newsletter or periodical)
- ☐ (4)   Fixed fees (other than subscription fees)
- ☐ (5)   Commissions
- ☑ (6)   *Performance-based fees*
- ☐ (7)   Other (specify):

---

**Item 5 Information About Your Advisory Business – Regulatory Assets Under Management**

**Regulatory Assets Under Management**

|  |  | Yes | No |
|---|---|---|---|

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?     ◉  ○

(2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

|  | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a) $ 7,079,895,867 | (d) | 19 |
| Non-Discretionary: | (b) $ 0 | (e) | 0 |
| Total: | (c) $ 7,079,895,867 | (f) | 19 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3)   What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 4,570,153,143

---

**Item 5 Information About Your Advisory Business – Advisory Activities**

**Advisory Activities**

G.   What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1)   Financial planning services
- ☐ (2)   Portfolio management for individuals and/or small businesses
- ☐ (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4)   Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6)   Pension consulting services
- ☐ (7)   Selection of other advisers (including *private fund* managers)
- ☐ (8)   Publication of periodicals or newsletters
- ☐ (9)   Security ratings or pricing services
- ☐ (10)   Market timing services
- ☐ (11)   Educational seminars/workshops
- ☐ (12)   Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○   0
- ○   1 - 10
- ○   11 - 25
- ○   26 - 50
- ○   51 - 100
- ○   101 - 250
- ○   251 - 500
- ○   More than 500
  If more than 500, how many?
  (round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship*

*with those investors.*

|  |  | Yes | No |
|---|---|---|---|

I. (1) Do you participate in a *wrap fee program*?  ○ ●

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

    (a) *sponsor* to a *wrap fee program*
        $

    (b) portfolio manager for a *wrap fee program*?
        $

    (c) *sponsor* to and portfolio manager for the same *wrap fee program*?
        $

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

|  | Yes | No |
|---|---|---|

J. (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments?  ● ○

(2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management?  ○ ●

K. Separately Managed Account *Clients*

|  | Yes | No |
|---|---|---|

(1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)?  ○ ●

*If yes, complete Section 5.K.(1) of Schedule D.*

(2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise?  ○ ○

*If yes, complete Section 5.K.(2) of Schedule D.*

(3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise?  ○ ○

*If yes, complete Section 5.K.(2) of Schedule D.*

(4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management?  ○ ○

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

---

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

---

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

---

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of

deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % |
| (xi) | Cash and Cash Equivalents | % |
| (xii) | Other | % |

Generally describe any assets included in "Other"

## SECTION 5.K.(2) Separately Managed Accounts – Use of *Borrowings* and Derivatives

☐ No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts

included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) Borrowings | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) Interest Rate Derivative | (b) Foreign Exchange Derivative | (c) Credit Derivative | (d) Equity Derivative | (e) Commodity Derivative | (f) Other Derivative |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) Borrowings | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) Interest Rate Derivative | (b) Foreign Exchange Derivative | (c) Credit Derivative | (d) Equity Derivative | (e) Commodity Derivative | (f) Other Derivative |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b) In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) Borrowings |
|---|---|---|
| Less than 10% | $ | $ |
| 10-149% | $ | $ |
| 150% or more | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

## Item 6 Other Business Activities

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):

- ☐ (1)  broker-dealer (registered or unregistered)
- ☐ (2)  registered representative of a broker-dealer
- ☐ (3)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4)  futures commission merchant
- ☐ (5)  real estate broker, dealer, or agent
- ☐ (6)  insurance broker or agent
- ☐ (7)  bank (including a separately identifiable department or division of a bank)
- ☐ (8)  trust company
- ☐ (9)  registered municipal advisor
- ☐ (10)  registered security-based swap dealer
- ☐ (11)  major security-based swap participant
- ☐ (12)  accountant or accounting firm
- ☐ (13)  lawyer or law firm
- ☐ (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ● |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

### SECTION 6.A. Names of Your Other Businesses

No Information Filed

---

### SECTION 6.B.(2) Description of Primary Business

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

---

### SECTION 6.B.(3) Description of Other Products and Services

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

## Item 7 Financial Industry Affiliations

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.  This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1)  broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☑ (2)  other investment adviser (including financial planners)
- ☐ (3)  registered municipal advisor
- ☐ (4)  registered security-based swap dealer
- ☐ (5)  major security-based swap participant
- ☐ (6)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7)  futures commission merchant
- ☐ (8)  banking or thrift institution
- ☐ (9)  trust company
- ☐ (10)  accountant or accounting firm
- ☐ (11)  lawyer or law firm
- ☐ (12)  insurance company or agency
- ☐ (13)  pension consultant

☐ (14)  real estate broker or dealer
☐ (15)  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
☑ (16)  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

**SECTION 7.A. Financial Industry Affiliations**

Complete a separate Schedule D Section 7.A. for each *related person* listed in Item 7.A.

1.  Legal Name of *Related Person*:
    LIME ROCK PARTNERS GP III, L.P.

2.  Primary Business Name of *Related Person*:
    LIME ROCK

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, or 802-)
    -
    or
    Other

4.  *Related Person's*
    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):                                    No Information Filed

5.  *Related Person* is: (check all that apply)
    (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
    (b)  ☐  other investment adviser (including financial planners)
    (c)  ☐  registered municipal advisor
    (d)  ☐  registered security-based swap dealer
    (e)  ☐  major security-based swap participant
    (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    (g)  ☐  futures commission merchant
    (h)  ☐  banking or thrift institution
    (i)  ☐  trust company
    (j)  ☐  accountant or accounting firm
    (k)  ☐  lawyer or law firm
    (l)  ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

                                                                                            **Yes  No**

6.  Do you *control* or are you *controlled* by the *related person*?                         ○    ●

7.  Are you and the *related person* under common *control*?                                  ●    ○

8.  (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?   ○    ●
    (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the   ○    ○

presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

Number and Street 1:                        Number and Street 2:

City:                State:                Country:                ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority* ? | ○ | ● |
| (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. | | |

No Information Filed

|  | Yes | No |
|---|---|---|
| 11. Do you and the *related person* share any *supervised persons*? | ● | ○ |
| 12. Do you and the *related person* share the same physical location? | ● | ○ |

---

1. Legal Name of *Related Person*:
   LIME ROCK PARTNERS GP IV, L.P.

2. Primary Business Name of *Related Person*:
   LIME ROCK

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4. *Related Person's*
   (a) *CRD* Number (if any):

   (b) CIK Number(s) (if any):

No Information Filed

5. *Related Person* is: (check all that apply)
   (a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b) ☐ other investment adviser (including financial planners)
   (c) ☐ registered municipal advisor
   (d) ☐ registered security-based swap dealer
   (e) ☐ major security-based swap participant
   (f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g) ☐ futures commission merchant
   (h) ☐ banking or thrift institution
   (i) ☐ trust company
   (j) ☐ accountant or accounting firm
   (k) ☐ lawyer or law firm
   (l) ☐ insurance company or agency
   (m) ☐ pension consultant
   (n) ☐ real estate broker or dealer
   (o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do you *control* or are you *controlled* by the *related person*? | ○ | ● |
| 7. Are you and the *related person* under common *control*? | ● | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ● |

(b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

Number and Street 1:                        Number and Street 2:

City:                State:                Country:                ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|

9.  (a)  If the *related person* is an investment adviser, is it exempt from registration?    ○ ○

    (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority* ?    ○ ●

    (b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.

    No Information Filed

11. Do you and the *related person* share any *supervised persons*?    ● ○

12. Do you and the *related person* share the same physical location?    ● ○

---

1.  Legal Name of *Related Person*:
    LIME ROCK PARTNERS GP V, L.P.

2.  Primary Business Name of *Related Person*:
    LIME ROCK

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
    -
    or
    Other
    CIK 0001467626

4.  *Related Person's*
    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):

    No Information Filed

5.  *Related Person* is: (check all that apply)
    (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
    (b)  ☐  other investment adviser (including financial planners)
    (c)  ☐  registered municipal advisor
    (d)  ☐  registered security-based swap dealer
    (e)  ☐  major security-based swap participant
    (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    (g)  ☐  futures commission merchant
    (h)  ☐  banking or thrift institution
    (i)  ☐  trust company
    (j)  ☐  accountant or accounting firm
    (k)  ☐  lawyer or law firm
    (l)  ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|

6.  Do you *control* or are you *controlled* by the *related person*?    ○ ●

7.  Are you and the *related person* under common *control*?    ● ○

8.  (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?    ○ ●

    (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the    ○ ○
         presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required
         to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?

    (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
         Number and Street 1:                          Number and Street 2:
         City:                State:                    Country:              ZIP+4/Postal Code:
         If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|

9.  (a)  If the *related person* is an investment adviser, is it exempt from registration?    ○ ○

    (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority* ?    ○ ●

(b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
<div align="center">No Information Filed</div>

11. Do you and the *related person* share any *supervised persons*?

12. Do you and the *related person* share the same physical location?

---

1.  Legal Name of *Related Person*:
    LIME ROCK PARTNERS GP VI, L.P.

2.  Primary Business Name of *Related Person*:
    LIME ROCK

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
    -
    or
    Other

4.  *Related Person's*
    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):
    <div align="center">No Information Filed</div>

5.  *Related Person* is: (check all that apply)
    (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
    (b)  ☐  other investment adviser (including financial planners)
    (c)  ☐  registered municipal advisor
    (d)  ☐  registered security-based swap dealer
    (e)  ☐  major security-based swap participant
    (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    (g)  ☐  futures commission merchant
    (h)  ☐  banking or thrift institution
    (i)  ☐  trust company
    (j)  ☐  accountant or accounting firm
    (k)  ☐  lawyer or law firm
    (l)  ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

                                                                                            **Yes  No**

6.  Do you *control* or are you *controlled* by the *related person*?

7.  Are you and the *related person* under common *control*?

8.  (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?
    (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?
    (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
         Number and Street 1:                    Number and Street 2:
         City:                    State:          Country:            ZIP+4/Postal Code:
         If this address is a private residence, check this box: ☐

                                                                                            **Yes  No**

9.  (a)  If the *related person* is an investment adviser, is it exempt from registration?
    (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority*?
    (b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
    <div align="center">No Information Filed</div>

11. Do you and the *related person* share any *supervised persons*?

12. Do you and the *related person* share the same physical location?

1. Legal Name of *Related Person*:
   LIME ROCK RESOURCES II-A GP, LLC

2. Primary Business Name of *Related Person*:
   LIME ROCK RESOURCES

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

   or
   Other

4. *Related Person's*
   (a)  *CRD* Number (if any):

   (b)  CIK Number(s) (if any):

                                        No Information Filed

5. *Related Person* is: (check all that apply)
   (a) ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b) ☐  other investment adviser (including financial planners)
   (c) ☐  registered municipal advisor
   (d) ☐  registered security-based swap dealer
   (e) ☐  major security-based swap participant
   (f) ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g) ☐  futures commission merchant
   (h) ☐  banking or thrift institution
   (i) ☐  trust company
   (j) ☐  accountant or accounting firm
   (k) ☐  lawyer or law firm
   (l) ☐  insurance company or agency
   (m) ☐  pension consultant
   (n) ☐  real estate broker or dealer
   (o) ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p) ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

                                                                                          **Yes No**
6. Do you *control* or are you *controlled* by the *related person*?                        ○ ◉

7. Are you and the *related person* under common *control*?                                 ◉ ○

8. (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?   ○ ◉
   (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the   ○ ○
        presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required
        to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?
   (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
        Number and Street 1:                      Number and Street 2:
        City:                   State:            Country:            ZIP+4/Postal Code:
        If this address is a private residence, check this box: ☐
                                                                                          **Yes No**
9. (a)  If the *related person* is an investment adviser, is it exempt from registration?   ○ ○
   (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority* ?   ○ ◉
    (b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
                                        No Information Filed

11. Do you and the *related person* share any *supervised persons*?                         ◉ ○

12. Do you and the *related person* share the same physical location?                       ◉ ○

---

1. Legal Name of *Related Person*:
   LIME ROCK RESOURCES II-C GP, LLC

2. Primary Business Name of *Related Person*:

LIME ROCK RESOURCES

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

    -

    or

    Other

4. *Related Person's*

    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):                                    No Information Filed

5. *Related Person* is: (check all that apply)

    (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
    (b)  ☐  other investment adviser (including financial planners)
    (c)  ☐  registered municipal advisor
    (d)  ☐  registered security-based swap dealer
    (e)  ☐  major security-based swap participant
    (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    (g)  ☐  futures commission merchant
    (h)  ☐  banking or thrift institution
    (i)  ☐  trust company
    (j)  ☐  accountant or accounting firm
    (k)  ☐  lawyer or law firm
    (l)  ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

                                                                              **Yes  No**

6. Do you *control* or are you *controlled* by the *related person*?                    ○    ⦿

7. Are you and the *related person* under common *control*?                           ⦿    ○

8. (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?    ○    ⦿

    (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the     ○    ○
         presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required
         to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?

    (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

         Number and Street 1:                          Number and Street 2:
         City:                 State:                   Country:          ZIP+4/Postal Code:
         If this address is a private residence, check this box: ☐

                                                                              **Yes  No**

9. (a)  If the *related person* is an investment adviser, is it exempt from registration?     ○    ○

    (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority* ?    ○    ⦿

    (b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
                                    No Information Filed

11. Do you and the *related person* share any *supervised persons*?                    ⦿    ○

12. Do you and the *related person* share the same physical location?                    ⦿    ○

---

1. Legal Name of *Related Person*:
   LIME ROCK RESOURCES III-A GP, LLC

2. Primary Business Name of *Related Person*:
   LIME ROCK RESOURCES

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

   -

   or

   Other

4.  *Related Person's*
    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):                                    No Information Filed

5.  *Related Person* is: (check all that apply)
    (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
    (b)  ☐  other investment adviser (including financial planners)
    (c)  ☐  registered municipal advisor
    (d)  ☐  registered security-based swap dealer
    (e)  ☐  major security-based swap participant
    (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    (g)  ☐  futures commission merchant
    (h)  ☐  banking or thrift institution
    (i)  ☐  trust company
    (j)  ☐  accountant or accounting firm
    (k)  ☐  lawyer or law firm
    (l)  ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

                                                                                              **Yes  No**
6.  Do you *control* or are you *controlled* by the *related person*?                           ○    ◉

7.  Are you and the *related person* under common *control*?                                    ◉    ○

8.  (a)  Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?   ○  ◉
    (b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the   ○  ○
         presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required
         to obtain a surprise examination for your *clients*' funds or securities that are maintained at the *related person*?
    (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients*' assets:
         Number and Street 1:                          Number and Street 2:
         City:          State:                          Country:              ZIP+4/Postal Code:
         If this address is a private residence, check this box: ☐

                                                                                              **Yes  No**
9.  (a)  If the *related person* is an investment adviser, is it exempt from registration?      ○    ○
    (b)  If the answer is yes, under what exemption?

10. (a)  Is the *related person* registered with a *foreign financial regulatory authority*?    ○    ◉
    (b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
                                                   No Information Filed

11. Do you and the *related person* share any *supervised persons*?                             ◉    ○

12. Do you and the *related person* share the same physical location?                           ◉    ○

1.  Legal Name of *Related Person*:
    LIME ROCK RESOURCES III-C GP, LLC

2.  Primary Business Name of *Related Person*:
    LIME ROCK RESOURCES

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

    or
    Other

4.  *Related Person's*
    (a)  *CRD* Number (if any):

    (b)  CIK Number(s) (if any):                                    No Information Filed

5.  *Related Person* is: (check all that apply)
   (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b)  ☐  other investment adviser (including financial planners)
   (c)  ☐  registered municipal advisor
   (d)  ☐  registered security-based swap dealer
   (e)  ☐  major security-based swap participant
   (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g)  ☐  futures commission merchant
   (h)  ☐  banking or thrift institution
   (i)  ☐  trust company
   (j)  ☐  accountant or accounting firm
   (k)  ☐  lawyer or law firm
   (l)  ☐  insurance company or agency
   (m)  ☐  pension consultant
   (n)  ☐  real estate broker or dealer
   (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ● |
| 7. | Are you and the *related person* under common *control*? | ● | ○ |
| 8. (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ● |
| (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

   (c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
   Number and Street 1:                    Number and Street 2:
   City:                State:             Country:              ZIP+4/Postal Code:
   If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ● |
| (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. | | |

<div align="center">No Information Filed</div>

|  |  | | |
|---|---|---|---|
| 11. | Do you and the *related person* share any *supervised persons*? | ● | ○ |
| 12. | Do you and the *related person* share the same physical location? | ● | ○ |

---

1.  Legal Name of *Related Person*:
   LIME ROCK PARTNERS GP VII, L.P.

2.  Primary Business Name of *Related Person*:
   LIME ROCK

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4.  *Related Person's*
   (a)  *CRD* Number (if any):

   (b)  CIK Number(s) (if any):                    No Information Filed

5.  *Related Person* is: (check all that apply)
   (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b)  ☐  other investment adviser (including financial planners)
   (c)  ☐  registered municipal advisor
   (d)  ☐  registered security-based swap dealer

(e) ☐ major security-based swap participant
(f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g) ☐ futures commission merchant
(h) ☐ banking or thrift institution
(i) ☐ trust company
(j) ☐ accountant or accounting firm
(k) ☐ lawyer or law firm
(l) ☐ insurance company or agency
(m) ☐ pension consultant
(n) ☐ real estate broker or dealer
(o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
(p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do you *control* or are you *controlled* by the *related person*? | ○ | ● |
| 7. Are you and the *related person* under common *control*? | ● | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ● |
| (b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
Number and Street 1:        Number and Street 2:
City:            State:        Country:        ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|
| 9. (a) If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) If the answer is yes, under what exemption? | | |
| 10. (a) Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ● |

(b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
No Information Filed

| | Yes | No |
|---|---|---|
| 11. Do you and the *related person* share any *supervised persons*? | ● | ○ |
| 12. Do you and the *related person* share the same physical location? | ● | ○ |

---

1. Legal Name of *Related Person*:
LIME ROCK RESOURCES IV-A GP, LLC

2. Primary Business Name of *Related Person*:
LIME ROCK RESOURCES

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
-
or
Other

4. *Related Person's*
(a) *CRD* Number (if any):

(b) CIK Number(s) (if any):                No Information Filed

5. *Related Person* is: (check all that apply)
(a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
(b) ☐ other investment adviser (including financial planners)
(c) ☐ registered municipal advisor
(d) ☐ registered security-based swap dealer
(e) ☐ major security-based swap participant
(f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g) ☐ futures commission merchant
(h) ☐ banking or thrift institution
(i) ☐ trust company
(j) ☐ accountant or accounting firm

    (k)  ☐  lawyer or law firm
    (l)   ☐  insurance company or agency
    (m)  ☐  pension consultant
    (n)  ☐  real estate broker or dealer
    (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
    (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ◉ |
| 7. | Are you and the *related person* under common *control*? | ◉ | ○ |
| 8. (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ◉ |
| (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

    Number and Street 1:            Number and Street 2:
    City:         State:         Country:         ZIP+4/Postal Code:
    If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ◉ |
| (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. | | |

<p align="center">No Information Filed</p>

| | | Yes | No |
|---|---|---|---|
| 11. | Do you and the *related person* share any *supervised persons*? | ◉ | ○ |
| 12. | Do you and the *related person* share the same physical location? | ◉ | ○ |

---

1. Legal Name of *Related Person*:
   LIME ROCK RESOURCES IV-C GP, LLC

2. Primary Business Name of *Related Person*:
   LIME ROCK RESOURCES

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4. *Related Person's*
   (a) *CRD* Number (if any):

   (b) CIK Number(s) (if any):
                                         No Information Filed

5. *Related Person* is: (check all that apply)
       (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
       (b)  ☐  other investment adviser (including financial planners)
       (c)  ☐  registered municipal advisor
       (d)  ☐  registered security-based swap dealer
       (e)  ☐  major security-based swap participant
       (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
       (g)  ☐  futures commission merchant
       (h)  ☐  banking or thrift institution
       (i)  ☐  trust company
       (j)  ☐  accountant or accounting firm
       (k)  ☐  lawyer or law firm
       (l)   ☐  insurance company or agency
       (m)  ☐  pension consultant
       (n)  ☐  real estate broker or dealer
       (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
       (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do you *control* or are you *controlled* by the *related person*? | ○ | ◉ |
| 7. Are you and the *related person* under common *control*? | ◉ | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ◉ |
| (b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

Number and Street 1:                          Number and Street 2:
City:                    State:               Country:              ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|
| 9. (a) If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) If the answer is yes, under what exemption? | | |
| 10. (a) Is the *related person* registered with a *foreign financial regulatory authority* ? | ○ | ◉ |

(b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
<div align="center">No Information Filed</div>

|  | Yes | No |
|---|---|---|
| 11. Do you and the *related person* share any *supervised persons*? | ◉ | ○ |
| 12. Do you and the *related person* share the same physical location? | ◉ | ○ |

---

1. Legal Name of *Related Person*:
SEARS POINT CAPITAL, LLC

2. Primary Business Name of *Related Person*:
SEARS POINT

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
-  |
or
Other

4. *Related Person's*
(a) *CRD* Number (if any):

(b) CIK Number(s) (if any):
<div align="center">No Information Filed</div>

5. *Related Person* is: (check all that apply)
(a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
(b) ☐ other investment adviser (including financial planners)
(c) ☐ registered municipal advisor
(d) ☐ registered security-based swap dealer
(e) ☐ major security-based swap participant
(f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g) ☐ futures commission merchant
(h) ☐ banking or thrift institution
(i) ☐ trust company
(j) ☐ accountant or accounting firm
(k) ☐ lawyer or law firm
(l) ☐ insurance company or agency
(m) ☐ pension consultant
(n) ☐ real estate broker or dealer
(o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
(p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do you *control* or are you *controlled* by the *related person*? | ○ | ◉ |
| 7. Are you and the *related person* under common *control*? | ◉ | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ◉ |

(b)  If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?

(c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

Number and Street 1:                          Number and Street 2:
City:                        State:            Country:                ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority* ? | ○ | ● |
| (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. | | |
| | No Information Filed | | |
| 11. | Do you and the *related person* share any *supervised persons*? | ○ | ● |
| 12. | Do you and the *related person* share the same physical location? | ● | ○ |

---

1.  Legal Name of *Related Person*:
SEARS POINT CAPITAL MANAGEMENT, LP

2.  Primary Business Name of *Related Person*:
SEARS POINT

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
-
or
Other

4.  *Related Person's*
(a)  *CRD* Number (if any):

(b)  CIK Number(s) (if any):

No Information Filed

5.  *Related Person* is: (check all that apply)
(a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
(b)  ☑  other investment adviser (including financial planners)
(c)  ☐  registered municipal advisor
(d)  ☐  registered security-based swap dealer
(e)  ☐  major security-based swap participant
(f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g)  ☐  futures commission merchant
(h)  ☐  banking or thrift institution
(i)  ☐  trust company
(j)  ☐  accountant or accounting firm
(k)  ☐  lawyer or law firm
(l)  ☐  insurance company or agency
(m)  ☐  pension consultant
(n)  ☐  real estate broker or dealer
(o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
(p)  ☐  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ● |
| 7. | Are you and the *related person* under common *control*? | ● | ○ |
| 8. (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ● |
| (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |
| (c) | If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets: | | |

Number and Street 1:                          Number and Street 2:
City:                        State:            Country:                ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

|  | | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ⦿ | ○ |
| (b) | If the answer is yes, under what exemption? SECTION 203(M)(1) | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ⦿ |
| (b) | If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. No Information Filed | | |
| 11. | Do you and the *related person* share any *supervised persons*? | ○ | ⦿ |
| 12. | Do you and the *related person* share the same physical location? | ⦿ | ○ |

---

1. Legal Name of *Related Person*:
   LIME ROCK PARTNERS GP VIII, L.P.

2. Primary Business Name of *Related Person*:
   LIME ROCK

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4. *Related Person's*
   (a) *CRD* Number (if any):

   (b) CIK Number(s) (if any):
   
   No Information Filed

5. *Related Person* is: (check all that apply)
   (a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b) ☐ other investment adviser (including financial planners)
   (c) ☐ registered municipal advisor
   (d) ☐ registered security-based swap dealer
   (e) ☐ major security-based swap participant
   (f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g) ☐ futures commission merchant
   (h) ☐ banking or thrift institution
   (i) ☐ trust company
   (j) ☐ accountant or accounting firm
   (k) ☐ lawyer or law firm
   (l) ☐ insurance company or agency
   (m) ☐ pension consultant
   (n) ☐ real estate broker or dealer
   (o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ⦿ |
| 7. | Are you and the *related person* under common *control*? | ⦿ | ○ |
| 8. (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ⦿ |
| (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |
| (c) | If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets: | | |

Number and Street 1:                    Number and Street 2:
City:                State:             Country:            ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

|  | | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |

10. (a)   Is the *related person* registered with a *foreign financial regulatory authority* ?   ○ ●

(b)   If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
No Information Filed

11. Do you and the *related person* share any *supervised persons*?   ● ○

12. Do you and the *related person* share the same physical location?   ● ○

---

1.   Legal Name of *Related Person*:
LIME ROCK PARTNERS GP IV AF, L.P.

2.   Primary Business Name of *Related Person*:
LIME ROCK

3.   *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

or
Other

4.   *Related Person's*
(a)   *CRD* Number (if any):

(b)   CIK Number(s) (if any):
No Information Filed

5.   *Related Person* is: (check all that apply)
(a)   ☐   broker-dealer, municipal securities dealer, or government securities broker or dealer
(b)   ☐   other investment adviser (including financial planners)
(c)   ☐   registered municipal advisor
(d)   ☐   registered security-based swap dealer
(e)   ☐   major security-based swap participant
(f)   ☐   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g)   ☐   futures commission merchant
(h)   ☐   banking or thrift institution
(i)   ☐   trust company
(j)   ☐   accountant or accounting firm
(k)   ☐   lawyer or law firm
(l)   ☐   insurance company or agency
(m)   ☐   pension consultant
(n)   ☐   real estate broker or dealer
(o)   ☐   sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
(p)   ☑   sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

**Yes No**

6.   Do you *control* or are you *controlled* by the *related person*?   ○ ●

7.   Are you and the *related person* under common *control*?   ● ○

8.   (a)   Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?   ○ ●

(b)   If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the
presumption that you are not operationally independent (pursuant to rule 206-2(d)(5)) from the *related person* and thus are not required
to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?   ○ ○

(c)   If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
Number and Street 1:                              Number and Street 2:
City:                   State:                           Country:                   ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

**Yes No**

9.   (a)   If the *related person* is an investment adviser, is it exempt from registration?   ○ ○

(b)   If the answer is yes, under what exemption?

10. (a)   Is the *related person* registered with a *foreign financial regulatory authority* ?   ○ ●

(b)   If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
No Information Filed

11. Do you and the *related person* share any *supervised persons*?   ● ○

12. Do you and the *related person* share the same physical location?   ● ○

**Item 7 _Private Fund_ Reporting**

Yes No

B. Are you an adviser to any _private fund_?   ⊙   ○

_If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D._

_In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name._

---

**SECTION 7.B.(1) _Private Fund_ Reporting**

A. PRIVATE FUND

**Information About the _Private Fund_**

1.  (a) Name of the _private fund_:
    LIME ROCK PARTNERS III, L.P.
    (b) _Private fund_ identification number:
    (include the "805-" prefix also)
    805-5731633019

2.  Under the laws of what state or country is the _private fund_ organized:
    State:                          Country:
                                    Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or _persons_ serving in a similar capacity):

    | Name of General Partner, Manager, Trustee, or Director |
    | --- |
    | LIME ROCK PARTNERS GP III, L.P. |

    (b) If filing an _umbrella registration_, identify the _filing adviser_ and/or _relying adviser(s)_ that sponsor(s) or manage(s) this _private fund_.

    | No Information Filed |
    | --- |

4.  The _private fund_ (check all that apply; you must check at least one):
    ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each _foreign financial regulatory authority_ with which the _private fund_ is registered.

    | No Information Filed |
    | --- |

                                                                        Yes No
6.  (a) Is this a "master fund" in a master-feeder arrangement?          ○   ⊙
    (b) If yes, what is the name and _private fund_ identification number (if any) of the feeder funds investing in this _private fund_?

    | No Information Filed |
    | --- |

                                                                        Yes No
    (c) Is this a "feeder fund" in a master-feeder arrangement?          ○   ⊙
    (d) If yes, what is the name and _private fund_ identification number (if any) of the master fund in which this _private fund_ invests?
    Name of _private fund_:

    _Private fund_ identification number:
    (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

> No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  |  | Yes | No |
|---|---|:---:|:---:|
| 8. | (a) Is this *private fund* a "fund of funds"? | ○ | ⊙ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  |  | Yes | No |
|---|---|:---:|:---:|
| | (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  |  | Yes | No |
|---|---|:---:|:---:|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ⊙ |

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ⊙ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 7,935,474

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 5,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

46

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

1%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

20%

|  |  | Yes | No |
|---|---|:---:|:---:|
| | (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ⊙ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

11%

**Your Advisory Services**

|  |  | Yes | No |
|---|---|:---:|:---:|
| 17. | (a) Are you a subadviser to this *private fund*? | ○ | ⊙ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

> No Information Filed

Yes No

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?  ○ ⦿

   (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

                                            **Yes No**

19. Are your *clients* solicited to invest in the *private fund*?  ○ ⦿

   *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

   0%

## Private Offering

                                            **Yes No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?  ⦿ ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
| --- |
| 021-71661 |

B. SERVICE PROVIDERS

## Auditors

                                            **Yes No**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?  ⦿ ○

      (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?  ⦿ ○

   If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

   (b) Name of the auditing firm:

      ERNST, & YOUNG

   (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| NEW YORK | New York | United States |

                                            **Yes No**

   (d) Is the auditing firm an *Independent public accountant*?  ⦿ ○

   (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?  ⦿ ○

      If yes, Public Company Accounting Oversight Board-Assigned Number:

      42

   (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  ⦿ ○

---

                                            **Yes No**

   (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  ⦿ ○

   (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

      ⦿ Yes ○ No ○ Report Not Yet Received

   *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

                                            **Yes No**

24. (a) Does the *private fund* use one or more prime brokers?

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
| --- |

**Custodian**

                                                                                     **Yes No**

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?         ◉  ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 5 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
COMERICA BANK

(c)  Primary business name of custodian:
COMERICA BANK

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| BOSTON | Massachusetts | United States |

                                                                                     **Yes No**

(e)  Is the custodian a *related person* of your firm?        ○  ◉

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
JP MORGAN CHASE BANK, NA

(c)  Primary business name of custodian:
JP MORGAN CHASE BANK, NA

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| NEWARK | Delaware | United States |

                                                                                      **Yes No**

(e)  Is the custodian a *related person* of your firm?        ○  ◉

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
PETERS & CO. LIMITED

(c) Primary business name of custodian:
PETERS & CO. LIMITED

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                          State:                    Country:
CALGARY                                                  Canada

                                                                              Yes  No
(e) Is the custodian a *related person* of your firm?                          ○   ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
RBC CAPITAL MARKETS, LLC

(c) Primary business name of custodian:
RBC CAPITAL MARKETS, LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                          State:                    Country:
NEW YORK                       New York                  United States

                                                                              Yes  No
(e) Is the custodian a *related person* of your firm?                          ○   ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 45411

CRD Number (if any):
31194

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(c) Primary business name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                          State:                    Country:

LUXEMBOURG

Luxembourg

**Yes No**

(e) Is the custodian a *related person* of your firm?   ○ ●

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

## Administrator

**Yes No**

26. (a) Does the *private fund* use an administrator other than your firm?   ○ ●

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

---

## Marketers

**Yes No**

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?   ○ ●

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

---

## A. PRIVATE FUND

## Information About the *Private Fund*

1. (a) Name of the *private fund*:

LIME ROCK PARTNERS IV AF, L.P.

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-8062204851

2. Under the laws of what state or country is the *private fund* organized:

State:          Country:
Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK PARTNERS GP IV AF, L.P. |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):
    ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

    | No Information Filed |
    |---|

|  | Yes | No |
|---|---|---|
| 6.  (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ⦿ |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ⦿ |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

    | No Information Filed |
    |---|

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8.  (a) Is this *private fund* a "fund of funds"? | ○ | ⦿ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
|---|---|---|
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ⦿ |

10. What type of fund is the *private fund*?

    ○ hedge fund  ○ liquidity fund  ⦿ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

    NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
    $ 1,744,497,939

### Ownership

12. Minimum investment commitment required of an investor in the *private fund*:
    $ 5,000,000
    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
    172

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

19%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

34%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

13%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-316120 |

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

Yes  No

(d) Is the auditing firm an *independent public accountant*?  ⦿ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?  ⦿ ○

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  ⦿ ○

                                                                                          Yes  No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  ⦿ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**
                                                                                          Yes  No

24. (a) Does the *private fund* use one or more prime brokers?  ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

**Custodian**
                                                                                          Yes  No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?  ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> **Additional Custodian Information : 1 Record(s) Filed.**
>
> If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.
>
> (b) Legal name of custodian:
> COMERICA BANK
>
> (c) Primary business name of custodian:
> COMERICA BANK
>
> (d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | BOSTON | Massachusetts | United States |
>
>                                                                                Yes  No
>
> (e) Is the custodian a *related person* of your firm?  ○ ⦿
>
> (f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
> -
>
> CRD Number (if any):
>
> (g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

**Yes No**

26. (a) Does the *private fund* use an administrator other than your firm?  ○ ⊙

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

**Yes No**

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?  ○ ⊙

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a) Name of the *private fund*:

    LIME ROCK PARTNERS IV, L.P.

    (b) *Private fund* identification number:
    (include the "805-" prefix also)

    805-8708174544

2.  Under the laws of what state or country is the *private fund* organized:

    State:                          Country:
                                    Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK PARTNERS GP IV, L.P. |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

> No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):

    ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

    ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

> No Information Filed

**Yes No**

6.  (a) Is this a "master fund" in a master-feeder arrangement?  ○ ⊙

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

> No Information Filed

**Yes No**

(c)  Is this a "feeder fund" in a master-feeder arrangement? ○ ◉

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
| --- | --- | --- |

8.  (a)  Is this *private fund* a "fund of funds"? ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*? ○ ○

|  | Yes | No |
| --- | --- | --- |

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? ○ ◉

10.  What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 50,187,169

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 5,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

75

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

2%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

12%

|  | Yes | No |
| --- | --- | --- |

(b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? ○ ○

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

9%

**Your Advisory Services**

17. (a) Are you a subadviser to this *private fund*?  Yes ○  No ●

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?  Yes ○  No ●

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

19. Are your *clients* solicited to invest in the *private fund*?  Yes ○  No ●

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?  Yes ●  No ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
| --- |
| 021-95935 |

B. SERVICE PROVIDERS

**Auditors**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?  Yes ●  No ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?  Yes ●  No ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

City:  State:  Country:
NEW YORK  New York  United States

(d) Is the auditing firm an *independent public accountant*?  Yes ●  No ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?  Yes ●  No ○

If yes, Public Company Accounting Oversight Board-Assigned Number:

42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  Yes ●  No ○

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  Yes ●  No ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

<div style="border:1px solid #000; padding:20px; text-align:center;">No Information Filed</div>

## Custodian

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 4 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for custody of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
JP MORGAN CHASE BANK, NA

(c) Primary business name of custodian:
JP MORGAN CHASE BANK, NA

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEWARK | Delaware | United States |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
PETERS & CO. LIMITED

(c) Primary business name of custodian:
PETERS & CO. LIMITED

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| CALGARY | | Canada |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⦿ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(c) Primary business name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| LUXEMBOURG | | Luxembourg |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⦿ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ⦿ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ⦿ | ○ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

---

**Additional Marketer Information : 1 Record(s) Filed.**

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer, you must complete questions (b) through (g) separately for each marketer.

|  | Yes | No |
|---|---|---|
| (b) Is the marketer a *related person* of your firm? | ○ | ⦿ |

(c) Name of the marketer:
EVERCORE GROUP L.L.C.

(d) If the marketer is registered with the SEC, its file number (*e.g.*, 801-, 8-, or 866-):
8 - 49830
and CRD Number (if any):
42405

(e) Location of the marketer's office used principally by the *private fund* (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

|  | Yes | No |
|---|---|---|
| (f) Does the marketer market the *private fund* through one or more websites? | ○ | ⦿ |

(g) If the answer to question 28.(f) is "yes," list the website address(es):

No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
LIME ROCK PARTNERS V, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)
   805-3907527410

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
|  | Cayman Islands |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| LIME ROCK PARTNERS GP V, L.P. |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.   The *private fund* (check all that apply; you must check at least one):

☐   (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑   (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.   List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

|  | Yes | No |
| --- | --- | --- |
| 6.   (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

|  | Yes | No |
| --- | --- | --- |
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.   If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
| --- | --- | --- |
| 8.   (a) Is this *private fund* a "fund of funds"? | ○ | ◉ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
| --- | --- | --- |
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
| --- | --- | --- |
| 9.   During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10.  What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 423,171,837

## Ownership

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 5,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

94

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

2%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

11%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

10%

### Your Advisory Services

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately, what percentage of your *clients* has invested in the *private fund*?

0%

### Private Offering

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-117622 |

B. SERVICE PROVIDERS

### Auditors

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| Additional Auditor Information : 1 Record(s) Filed. |
|---|

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

City:
NEW YORK

State:
New York

Country:
United States

|  | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *Independent public accountant*? | ⊙ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ⊙ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ⊙    ○

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ⊙ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⊙ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ⊙ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ⊙ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 7 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
ALTACORP CAPITAL (USA) INC.

(c) Primary business name of custodian:
ALTACORP CAPITAL (USA) INC.

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:
CALGARY

State:

Country:
Canada

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⊙ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 68692

CRD Number (if any):
155053

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⊙ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
JEFFERIES LLC

(c) Primary business name of custodian:
JEFFERIES LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⊙ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 15074
CRD Number (if any):
2347

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
JP MORGAN CHASE BANK, NA

(c) Primary business name of custodian:
JP MORGAN CHASE BANK, NA

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                State:               Country:
NEWARK               Delaware             United States

                                                                                    Yes  No

(e) Is the custodian a *related person* of your firm?                                ○    ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SILICON VALLEY BANK

(c) Primary business name of custodian:
SILICON VALLEY BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                State:               Country:
NEWTON               Massachusetts        United States

                                                                                    Yes  No

(e) Is the custodian a *related person* of your firm?                                ○    ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(c) Primary business name of custodian:
SOCIETE GENERALE BANK & TRUST SA

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:                State:               Country:
LUXEMBOURG                                Luxembourg

                                                                                    Yes  No

(e) Is the custodian a *related person* of your firm?                                ○    ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SWEDBANK FIRST SECURITIES

(c) Primary business name of custodian:
SWEDBANK FIRST SECURITIES

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| OSLO | | Norway |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

|  | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ◉ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

| No Information Filed |
|---|

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
|---|

## A. PRIVATE FUND

## Information About the *Private Fund*

1. (a) Name of the *private fund*:
LIME ROCK PARTNERS VI, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

805-4139211061

2. Under the laws of what state or country is the *private fund* organized:

    State:               Country:
                             Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| LIME ROCK PARTNERS GP VI, L.P. |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4. The *private fund* (check all that apply; you must check at least one):
   - ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - ☒ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                 **Yes No**

6. (a) Is this a "master fund" in a master-feeder arrangement?                  ○  ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                  **Yes No**

   (c) Is this a "feeder fund" in a master-feeder arrangement?            ○  ◉

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                           **Yes No**

8. (a) Is this *private fund* a "fund of funds"?                   ○  ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

   (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?    ○  ○

                                                           **Yes No**

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?    ○  ◉

10. What type of fund is the *private fund*?
   ○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 305,947,753

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

$ 5,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

56

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

4%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

14%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

9%

## Your Advisory Services

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

## Private Offering

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-171867 |

B. SERVICE PROVIDERS

## Auditors

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| NEW YORK | New York | United States |

|  | Yes | No |
| --- | --- | --- |
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

| | Yes | No |
| --- | --- | --- |
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

---

| | Yes | No |
| --- | --- | --- |
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
| --- | --- | --- |
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

---

No Information Filed

---

**Custodian**

| | Yes | No |
| --- | --- | --- |
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 5 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| BOSTON | Massachusetts | United States |

| | Yes | No |
|---|---|---|

(e) Is the custodian a *related person* of your firm?     ○  ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

‒

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
JP MORGAN CHASE BANK, N.A.

(c) Primary business name of custodian:
JP MORGAN CHASE BANK, N.A.

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEWARK | Delaware | United States |

| | Yes | No |
|---|---|---|

(e) Is the custodian a *related person* of your firm?     ○  ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

‒

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
RBC CAPITAL MARKETS, LLC

(c) Primary business name of custodian:
RBC CAPITAL MARKETS, LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

| | Yes | No |
|---|---|---|

(e) Is the custodian a *related person* of your firm?     ○  ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 45411

CRD Number (if any):
31194

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
   SILICON VALLEY BANK

(c) Primary business name of custodian:
   SILICON VALLEY BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEWTON | Massachusetts | United States |

                                                                                            Yes  No
(e) Is the custodian a *related person* of your firm?                                        ○    ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
   -

   CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
   SOCIETE GENERALE BANK AND TRUST

(c) Primary business name of custodian:
   SOCIETE GENERALE BANK AND TRUST

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| LUXEMBOURG | | Luxembourg |

                                                                                            Yes  No
(e) Is the custodian a *related person* of your firm?                                        ○    ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
   -

   CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

## Administrator

                                                                                            Yes  No
26. (a) Does the *private fund* use an administrator other than your firm?                    ○    ◉

   If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

   | No Information Filed |
   |---|

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
   0%
   Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any

relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | | Yes | No |
|---|---|---|---|

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?        ○   ●

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| |
|---|
| No Information Filed |

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
       LIME ROCK PARTNERS VII, L.P.
   (b) *Private fund* identification number:
       (include the "805-" prefix also)
       805-5010140843

2. Under the laws of what state or country is the *private fund* organized:
       State:                              Country:
                                           Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK PARTNERS GP VII, L.P. |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| |
|---|
| No Information Filed |

4. The *private fund* (check all that apply; you must check at least one):
   ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   ☒ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| |
|---|
| No Information Filed |

| | | Yes | No |
|---|---|---|---|

6. (a) Is this a "master fund" in a master-feeder arrangement?        ○   ●

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| |
|---|
| No Information Filed |

| | | Yes | No |
|---|---|---|---|

   (c) Is this a "feeder fund" in a master-feeder arrangement?        ○   ●

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
       Name of *private fund*:

       *Private fund* identification number:
       (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | | Yes | No |
|---|---|---|---|
| 8. | (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | | Yes | No |
|---|---|---|---|
| | (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

   ○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

   NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
   $ 498,803,465

### Ownership

12. Minimum investment commitment required of an investor in the *private fund*:
   $ 5,000,000
   NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
   21

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
   5%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
   5%

|  | | Yes | No |
|---|---|---|---|
| | (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
   0%

### Your Advisory Services

|  | | Yes | No |
|---|---|---|---|
| 17. | (a) Are you a subadviser to this *private fund*? | ○ | ● |

   (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

   No Information Filed

|  | | Yes | No |
|---|---|---|---|
| 18. | (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

   (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

   No Information Filed

|  | | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

### Private Offering

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-242842 |

## B. SERVICE PROVIDERS

### Auditors

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
> ERNST & YOUNG
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | NEW YORK | New York | United States |
>
> |  | Yes | No |
> |---|---|---|
> | (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
> | (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |
>
> If yes, Public Company Accounting Oversight Board-Assigned Number:
> 42
>
> |  | Yes | No |
> |---|---|---|
> | (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

### Prime Broker

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

**Custodian**

Yes  No

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ◉   ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 2 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
COMERICA BANK

(c)  Primary business name of custodian:
COMERICA BANK

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

Yes  No

(e)  Is the custodian a *related person* of your firm?   ○   ◉

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
JPMORGAN CHASE BANK, N.A.

(c)  Primary business name of custodian:
JPMORGAN CHASE

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEWARK | Delaware | United States |

Yes  No

(e)  Is the custodian a *related person* of your firm?   ○   ◉

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

Yes  No

26.  (a)  Does the *private fund* use an administrator other than your firm?   ○   ◉

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you

must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

**A. PRIVATE FUND**

**Information About the *Private Fund***

1.  (a) Name of the *private fund*:
    LIME ROCK PARTNERS VIII, L.P.

    (b) *Private fund* identification number:
    (Include the "805-" prefix also)
    805-1795939829

2.  Under the laws of what state or country is the *private fund* organized:
    State:                    Country:
                              Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK PARTNERS GP VIII, L.P. |

    (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

> No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):
    ☐ (1) qualifies for the exclusion from the definition of Investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

> No Information Filed

|  | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

> No Information Filed

|  | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
    Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

|  |
|---|
| No Information Filed |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ◉ |
| NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies. | | |
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10. What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
    $ 307,453,137

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
    $ 5,000,000
    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
    64

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
    5%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
    16%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
    4%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |
| (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to | | |

question 17.(a) is "no," leave this question blank.

No Information Filed

|  | Yes | No |
|---|---|---|

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?   ○ ⦿

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

19. Are your *clients* solicited to invest in the *private fund*?   ○ ⦿

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%



## Private Offering

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ⦿ ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-286515 |

B. SERVICE PROVIDERS

## Auditors

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ⦿ ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ⦿ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

(d) Is the auditing firm an *independent public accountant*?   ⦿ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ⦿ ○

If yes, Public Company Accounting Oversight Board-Assigned Number:

42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ⦿ ○

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ⦿ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|

24. (a) Does the *private fund* use one or more prime brokers?    ○ ●

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

**Custodian**

|  | Yes | No |
|---|---|---|

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?    ● ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> **Additional Custodian Information : 1 Record(s) Filed.**
>
> If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.
>
> (b) Legal name of custodian:
> COMERICA BANK
>
> (c) Primary business name of custodian:
> COMERICA BANK
>
> (d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | BOSTON | Massachusetts | United States |
>
> |  | Yes | No |
> |---|---|---|
> (e) Is the custodian a *related person* of your firm?    ○ ●
>
> (f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
>
> CRD Number (if any):
>
> (g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

|  | Yes | No |
|---|---|---|

26. (a) Does the *private fund* use an administrator other than your firm?    ○ ●

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?      ○  ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| |
|---|
| No Information Filed |

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

   LIME ROCK RESOURCES II-A, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-2695773977

2. Under the laws of what state or country is the *private fund* organized:

   State:                          Country:
   Delaware                        United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director |
   |---|
   | LIME ROCK RESOURCES II-A GP, LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   | |
   |---|
   | No Information Filed |

4. The *private fund* (check all that apply; you must check at least one):

   ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   | |
   |---|
   | No Information Filed |

                                                                                            Yes No
6. (a) Is this a "master fund" in a master-feeder arrangement?                               ○  ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   | |
   |---|
   | No Information Filed |

                                                                                            Yes No
   (c) Is this a "feeder fund" in a master-feeder arrangement?                               ○  ◉

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

   Name of *private fund*:


   *Private fund* identification number:
   (include the "805-" prefix also)


   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

   | |
   |---|
   | No Information Filed |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
|---|---|---|
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ● private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 29,997,437

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 5,000,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
12

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
3%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
7%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ● |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

**Private Offering**

| | Yes | No |
|---|---|---|

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ○ Yes  ● No

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

| | Yes | No |

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ● Yes  ○ No

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ● Yes  ○ No

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
> PRICEWATERHOUSECOOPERS LLP
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | HOUSTON | Texas | United States |
>
> | | Yes | No |
> |---|---|---|
>
> (d) Is the auditing firm an *independent public accountant*?   ● Yes  ○ No
>
> (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ● Yes  ○ No
>
> If yes, Public Company Accounting Oversight Board-Assigned Number:
> 238
>
> (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ● Yes  ○ No

| | Yes | No |

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ● Yes  ○ No

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

● Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |

24. (a) Does the *private fund* use one or more prime brokers?   ○ Yes  ● No

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

| | Yes | No |

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
BANK OF TEXAS, N.A.

(c) Primary business name of custodian:
BANK OF TEXAS, N.A.

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ● |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ● |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ● |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

**A. PRIVATE FUND**

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
LIME ROCK RESOURCES II-C, L.P.

(b) *Private fund* identification number:

(include the "805-" prefix also)
805-9346547682

2.  Under the laws of what state or country is the *private fund* organized:

    State:                                 Country:
    Delaware                          United States

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| **Name of General Partner, Manager, Trustee, or Director** |
|---|
| LIME ROCK RESOURCES II-C GP, LLC |

    (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
|---|

4.  The *private fund* (check all that apply; you must check at least one):
   - [x] (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - [ ] (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
|---|

                                                      **Yes   No**

6.  (a) Is this a "master fund" in a master-feeder arrangement?         ○  ◉

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

                                                      **Yes   No**

    (c) Is this a "feeder fund" in a master-feeder arrangement?        ○  ◉

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
    Name of *private fund*:

    *Private fund* identification number:
    (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                      **Yes   No**

8.  (a) Is this *private fund* a "fund of funds"?        ○  ◉

    NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

    (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?        ○  ○

                                                      **Yes   No**

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?    ○  ◉

10. What type of fund is the *private fund*?

    ○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

   $ 153,002,563

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

   $ 5,000,000

   NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

   31

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

   3%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

   18%

   |  | Yes | No |
   |---|---|---|

   (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?   ⦿ Yes   ◯ No

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

   0%

**Your Advisory Services**

   Yes   No

17. (a) Are you a subadviser to this *private fund*?   ◯ Yes   ⦿ No

   (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

   | No Information Filed |
   |---|

   Yes   No

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?   ◯ Yes   ⦿ No

   (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

   | No Information Filed |
   |---|

   Yes   No

19. Are your *clients* solicited to invest in the *private fund*?   ◯ Yes   ⦿ No

   NOTE: For purposes of this question, do not consider feeder funds of the *private fund*.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

   0%

**Private Offering**

   Yes   No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ◯ Yes   ⦿ No

22. If yes, provide the *private fund's* Form D file number (if any):

   | No Information Filed |
   |---|

B. SERVICE PROVIDERS

**Auditors**

   Yes   No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ⦿ Yes   ◯ No

   (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ⦿ Yes   ◯ No

   If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm,

you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

PRICEWATERHOUSECOOPERS LLP

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

|  | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *Independent public accountant*? | ⦿ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ⦿ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:

238

|  | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ⦿ | ○ |

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ⦿ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ⦿ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ⦿ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
BANK OF TEXAS, N.A.

(c) Primary business name of custodian:
BANK OF TEXAS, N.A.

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

|  | Yes | No |
|---|---|---|

(e)  Is the custodian a *related person* of your firm?

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

## Administrator

**Yes  No**

26.  (a)  Does the *private fund* use an administrator other than your firm?

If the answer to question.26.(a) is "yes," respond to questions (b) through (f) below..If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

**Yes  No**

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

## Information About the *Private Fund*

1.  (a)  Name of the *private fund*:
        LIME ROCK RESOURCES III-A, L.P.

    (b)  *Private fund* identification number:
        (include the "805-" prefix also)
        805-4698566128

2.  Under the laws of what state or country is the *private fund* organized:
        State:                          Country:
        Delaware                        United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK RESOURCES III-A GP, LLC |

    (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

> No Information Filed

4. The *private fund* (check all that apply; you must check at least one):

    ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
|---|

                                               **Yes No**

6. (a) Is this a "master fund" in a master-feeder arrangement?     ◯ ◉

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

                                               **Yes No**

    (c) Is this a "feeder fund" in a master-feeder arrangement?     ◯ ◉

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

        Name of *private fund*:

        *Private fund* identification number:

        (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                               **Yes No**

8. (a) Is this *private fund* a "fund of funds"?     ◯ ◉

    NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

    (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?     ◯ ◯

                                               **Yes No**

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?     ◯ ◉

10. What type of fund is the *private fund*?

    ◉ hedge fund ◯ liquidity fund ◯ private equity fund ◯ real estate fund ◯ securitized asset fund ◯ venture capital fund ◯ Other *private fund*:

    NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

    $ 633,873,333

### Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

    $ 5,000,000

    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

    21

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
2%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
2%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ◉ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ◉ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| Additional Auditor Information : 1 Record(s) Filed. |
|---|
| If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm. |

(b) Name of the auditing firm:
PRICEWATERHOUSECOOPERS LLP

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

|  | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *Independent public accountant*? | ◉ | ○ |

(e)  Is the auditing firm registered with the Public Company Accounting Oversight Board?      ⊙  ○

If yes, Public Company Accounting Oversight Board-Assigned Number:
238

(f)  If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in      ⊙  ○
accordance with its rules?

                                                                                                     **Yes  No**

(g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's*      ⊙  ○
investors?

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⊙ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

                                                                                                     **Yes  No**

24.  (a)  Does the *private fund* use one or more prime brokers?      ○  ⊙

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
| --- |

## Custodian

                                                                                                     **Yes  No**

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?      ⊙  ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
CADENCE BANK

(c)  Primary business name of custodian:
CADENCE BANK

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| HOUSTON | Texas | United States |

                                                                                                     **Yes  No**

(e)  Is the custodian a *related person* of your firm?      ○  ⊙

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

## Administrator

                                                                                                     **Yes  No**

26.  (a)  Does the *private fund* use an administrator other than your firm?      ○  ⊙

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

   LIME ROCK RESOURCES III-C, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-8306967767

2. Under the laws of what state or country is the *private fund* organized:

   State:                               Country:
   Delaware                             United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director |
   |---|
   | LIME ROCK RESOURCES III-C GP, LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   > No Information Filed

4. The *private fund* (check all that apply; you must check at least one):

   ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   > No Information Filed

|  | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   > No Information Filed

|  | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

> No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |
| NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies. | | |
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

● hedge fund  ○ liquidity fund  ○ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 556,126,667

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 5,000,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
37

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
2%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
11%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ○ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

**Yes No**

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?   ○ ◉

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

**Yes No**

19. Are your *clients* solicited to invest in the *private fund*?   ○ ◉

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

**Private Offering**

**Yes No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ○ ◉

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
| --- |

B. SERVICE PROVIDERS

**Auditors**

**Yes No**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ◉ ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ◉ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
PRICEWATERHOUSECOOPERS LLP

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| HOUSTON | Texas | United States |

**Yes No**

(d) Is the auditing firm an *independent public accountant*?   ◉ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ◉ ○

If yes, Public Company Accounting Oversight Board-Assigned Number:
238

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ◉ ○

**Yes No**

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ◉ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.

**Prime Broker**

Yes No

24. (a) Does the *private fund* use one or more prime brokers?   ○ ◉

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

**Custodian**

Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ◉ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> **Additional Custodian Information : 1 Record(s) Filed.**
>
> If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.
>
> (b) Legal name of custodian:
>     CADENCE BANK
>
> (c) Primary business name of custodian:
>     CADENCE BANK
>
> (d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | HOUSTON | Texas | United States |
>
> Yes No
>
> (e) Is the custodian a *related person* of your firm?   ○ ◉
>
> (f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
>
>     CRD Number (if any):
>
> (g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

Yes No

26. (a) Does the *private fund* use an administrator other than your firm?   ○ ◉

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

Yes No

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?   ○  ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a) Name of the *private fund*:
    LIME ROCK RESOURCES IV-A, L.P.

    (b) *Private fund* identification number:
    (include the "805-" prefix also)
    805-1355187030

2.  Under the laws of what state or country is the *private fund* organized:
    State:                           Country:
    Delaware                         United States

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK RESOURCES IV-A GP, LLC |

    (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

    No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):
    ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

    No Information Filed

                                                                                         Yes No
6.  (a) Is this a "master fund" in a master-feeder arrangement?                            ○  ◉

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

    No Information Filed

                                                                                         Yes No
    (c) Is this a "feeder fund" in a master-feeder arrangement?                            ○  ◉

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
    Name of *private fund*:

    *Private fund* identification number:
    (include the "805-" prefix also)

    NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

    No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | | Yes | No |
|---|---|---|---|
| 8. | (a) Is this *private fund* a "fund of funds"? | ○ | ● |
| | NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies. | | |
| | (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

    ● hedge fund  ○ liquidity fund  ○ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

    NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

    $ 452,920,693

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

    $ 5,000,000

    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

    21

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

    2%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

    3%

|  | | Yes | No |
|---|---|---|---|
| | (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

    0%

**Your Advisory Services**

|  | | Yes | No |
|---|---|---|---|
| 17. | (a) Are you a subadviser to this *private fund*? | ○ | ● |

    (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | | Yes | No |
|---|---|---|---|
| 18. | (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

    (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

    *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

    0%

**Private Offering**

Yes No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ⦿ ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-256545 |

B. SERVICE PROVIDERS

**Auditors**

Yes No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ⦿ ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ⦿ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
>     PRICEWATERHOUSE COOPERS
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | HOUSTON | Texas | United States |
>
> Yes No
>
> (d) Is the auditing firm an *independent public accountant*?   ⦿ ○
>
> (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ⦿ ○
>
> If yes, Public Company Accounting Oversight Board-Assigned Number:
> 238
>
> (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ⦿ ○

Yes No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ⦿ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

Yes No

24. (a) Does the *private fund* use one or more prime brokers?   ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

**Custodian**

Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)   Legal name of custodian:
      AMEGY BANK, N.A.

(c)   Primary business name of custodian:
      AMEGY BANK, N.A.

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

|  | Yes | No |
|---|---|---|
| (e)   Is the custodian a *related person* of your firm? | ○ | ⊙ |

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):
      -

      CRD Number (if any):

(g)   If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

|  | Yes | No |
|---|---|---|
| 26.   (a)   Does the *private fund* use an administrator other than your firm? | ○ | ⊙ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27.   During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28.   (a)   Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ⊙ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.   (a)   Name of the *private fund*:

LIME ROCK RESOURCES IV-C, L.P.

    (b) *Private fund* identification number:
    (include the "805-" prefix also)
    805-2286364695

2.   Under the laws of what state or country is the *private fund* organized:

    State:                  Country:
    Delaware         United States

3.   (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| LIME ROCK RESOURCES IV-C GP, LLC |

    (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.   The *private fund* (check all that apply; you must check at least one):
    ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.   List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                             **Yes No**

6.   (a) Is this a "master fund" in a master-feeder arrangement?      ○ ●

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                             **Yes No**

    (c) Is this a "feeder fund" in a master-feeder arrangement?      ○ ●

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
        Name of *private fund*:

        *Private fund* identification number:
        (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.   If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                             **Yes No**

8.   (a) Is this *private fund* a "fund of funds"?      ○ ●

    NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

    (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?      ○ ○

                                           **Yes No**

9.   During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?      ○ ●

10. What type of fund is the *private fund*?

⊙ hedge fund ○ liquidity fund ○ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 330,409,357

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:
$ 5,000,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
30

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
2%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
5%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ⊙ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

## Your Advisory Services

| | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ⊙ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ⊙ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ⊙ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

## Private Offering

| | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ⊙ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-256547 |

B. SERVICE PROVIDERS

## Auditors

Yes  No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?     ⊙ ○

    (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?     ⊙ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
PRICEWATERHOUSE COOPERS

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

                                                     **Yes No**

(d) Is the auditing firm an *independent public accountant*?     ⊙ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?     ⊙ ○

    If yes, Public Company Accounting Oversight Board-Assigned Number:
238

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?     ⊙ ○

                                                     **Yes No**

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?     ⊙ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

    ⊙ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

                                                     **Yes No**

24. (a) Does the *private fund* use one or more prime brokers?     ○ ⊙

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

                                                     **Yes No**

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?     ⊙ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
AMEGY BANK, N.A.

(c) Primary business name of custodian:
AMEGY BANK, N.A.

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| HOUSTON | Texas | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⦿ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

‑

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

## Administrator

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ⦿ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

| | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ⦿ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

## Information About the *Private Fund*

1. (a) Name of the *private fund*:

   LR-CROWNROCK MINERALS 2018 COINVESTMENT, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-6477768273

2. Under the laws of what state or country is the *private fund* organized:

   | State: | Country: |
   |---|---|
   | | Cayman Islands |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director |
   |---|
   | LIME ROCK PARTNERS GP VIII, L.P. |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4. The *private fund* (check all that apply; you must check at least one):
   - ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                                                                    **Yes  No**

6. (a) Is this a "master fund" in a master-feeder arrangement?                                                          ○    ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                                                                    **Yes  No**

   (c) Is this a "feeder fund" in a master-feeder arrangement?                                                          ○    ◉

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
       Name of *private fund*:

       *Private fund* identification number:
       (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                                                                                    **Yes  No**

8. (a) Is this *private fund* a "fund of funds"?                                                                        ○    ◉

   NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

   (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?                         ○    ○

                                                                                                                    **Yes  No**

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?                                   ○    ◉

10. What type of fund is the *private fund*?

    ○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

    NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
    $ 22,546,823

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
    $ 5,000,000
    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

18

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

58%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

0%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-323486 |

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| Additional Auditor Information : 1 Record(s) Filed. |
|---|
| If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm. |

(b) Name of the auditing firm:

ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

City:                               State:                          Country:

NEW YORK                    New York                 United States

|  |  | Yes | No |
|---|---|---|---|
| (d) | Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) | Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

|  |  | Yes | No |
|---|---|---|---|
| (f) | If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

|  |  | Yes | No |
|---|---|---|---|
| (g) | Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

|  |  | Yes | No |
|---|---|---|---|
| 24. (a) | Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

## Custodian

|  |  | Yes | No |
|---|---|---|---|
| 25. (a) | Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

|  |  | Yes | No |
|---|---|---|---|
| (e) | Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

|  | Yes | No |
|---|---|---|

26. (a) Does the *private fund* use an administrator other than your firm?    ○ ◉

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | Yes | No |
|---|---|---|

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    ○ ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

    LR-CROWNROCK MINERALS COINVESTMENT II, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)
   805-6612783934

2. Under the laws of what state or country is the *private fund* organized:

    State:                    Country:
                              Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

    | Name of General Partner, Manager, Trustee, or Director |
    |---|
    | LIME ROCK PARTNERS GP VII, L.P. |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   > No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
   - ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   > No Information Filed

| | Yes | No |
|---|---|---|

6. (a) Is this a "master fund" in a master-feeder arrangement?    ○ ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   > No Information Filed

Yes No

(c)  Is this a "feeder fund" in a master-feeder arrangement?          ○ ◉

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

Yes No

8.  (a)  Is this *private fund* a "fund of funds"?          ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?          ○ ○

Yes No

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?          ○ ◉

10.  What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:
$ 245,876,989

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:
$ 1,000,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:
7

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
0%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
6%

Yes No

(b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?          ○ ○

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

**Your Advisory Services**

| | Yes | No |
|---|---|---|

17. (a) Are you a subadviser to this *private fund*?  ○  ◉

 (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?  ○  ◉

 (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|

19. Are your *clients* solicited to invest in the *private fund*?  ○  ◉

 *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
 0%

**Private Offering**

| | Yes | No |
|---|---|---|

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?  ◉  ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-276271 |

**B. SERVICE PROVIDERS**

**Auditors**

| | Yes | No |
|---|---|---|

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?  ◉  ○

 (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?  ◉  ○

 If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

 (b) Name of the auditing firm:
 ERNST & YOUNG

 (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

| | Yes | No |
|---|---|---|

 (d) Is the auditing firm an *independent public accountant*?  ◉  ○

 (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?  ◉  ○

 If yes, Public Company Accounting Oversight Board-Assigned Number:
 42

 (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  ◉  ○

---

| | Yes | No |
|---|---|---|

 (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's*  ◉  ○

investors?

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

Yes No

24. (a) Does the *private fund* use one or more prime brokers?  ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
| --- |

## Custodian

Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?  ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
| --- | --- | --- |
| BOSTON | Massachusetts | United States |

Yes No

(e) Is the custodian a *related person* of your firm?  ○ ⦿

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity Identifier* (if any)

## Administrator

Yes No

26. (a) Does the *private fund* use an administrator other than your firm?  ○ ⦿

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

| No Information Filed |
| --- |

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any

relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?  ○ Yes  ⊙ No

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
   .LR-CROWNROCK MINERALS COINVESTMENT,.L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)
   805-5775846640

2. Under the laws of what state or country is the *private fund* organized:
   State:                     Country:
                              Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director | | | |
   |---|---|---|---|
   | LIME ROCK PARTNERS GP VII, L.P. | | | |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   | No Information Filed |
   |---|

4. The *private fund* (check all that apply; you must check at least one):
   ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   ☒ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   | No Information Filed |
   |---|

|  | Yes | No |
|---|---|---|

6. (a) Is this a "master fund" in a master-feeder arrangement?   ○ Yes  ⊙ No

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   | No Information Filed |
   |---|

|  | Yes | No |
|---|---|---|

   (c) Is this a "feeder fund" in a master-feeder arrangement?   ○ Yes  ⊙ No

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|

8. (a) Is this *private fund* a "fund of funds"?     ○ ●

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?     ○ ○

|  | Yes | No |
|---|---|---|

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?     ○ ●

10. What type of fund is the *private fund*?

    ○ hedge fund   ○ liquidity fund   ● private equity fund   ○ real estate fund   ○ securitized asset fund   ○ venture capital fund   ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 247,571,867

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

$ 1,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

11

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

4%

|  | Yes | No |
|---|---|---|

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?     ○ ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

0%

## Your Advisory Services

|  | Yes | No |
|---|---|---|

17. (a) Are you a subadviser to this *private fund*?     ○ ●

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

|  | Yes | No |
|---|---|---|

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?     ○ ●

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

|  | Yes | No |
|---|---|---|

19. Are your *clients* solicited to invest in the *private fund*?     ○ ●

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?   ⦿ ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-261774 |

B. SERVICE PROVIDERS

**Auditors**

Yes  No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ⦿ ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ⦿ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
> ERNST & YOUNG
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | NEW YORK | New York | United States |
>
> Yes  No
>
> (d) Is the auditing firm an *independent public accountant*?   ⦿ ○
>
> (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ⦿ ○
>
> If yes, Public Company Accounting Oversight Board-Assigned Number:
> 42
>
> (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ⦿ ○

Yes  No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ⦿ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

Yes  No

24. (a) Does the *private fund* use one or more prime brokers?   ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

**Custodian**

Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ◉ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

Yes No

(e) Is the custodian a *related person* of your firm?   ○ ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

Yes No

26. (a) Does the *private fund* use an administrator other than your firm?   ○ ◉

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

---

No Information Filed

---

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

Yes No

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?   ○ ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

---

No Information Filed

---

A. PRIVATE FUND

**Information About the _Private Fund_**

1.  (a) Name of the _private fund_:

    LR-IMAGINEA COINVESTMENT, L.P.

    (b) _Private fund_ identification number:
    (include the "805-" prefix also)

    805-7855488589

2.  Under the laws of what state or country is the _private fund_ organized:

    State:                           Country:
                                     Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or _persons_ serving in a similar capacity):

    | Name of General Partner, Manager, Trustee, or Director |
    | --- |
    | LIME ROCK PARTNERS GP VI, L.P. |

    (b) If filing an _umbrella registration_, identify the _filing adviser_ and/or _relying adviser(s)_ that sponsor(s) or manage(s) this _private fund_.

    | No Information Filed |
    | --- |

4.  The _private fund_ (check all that apply; you must check at least one):

    ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each _foreign financial regulatory authority_ with which the _private fund_ is registered.

    | No Information Filed |
    | --- |

                                                                                                    Yes  No
6.  (a) Is this a "master fund" in a master-feeder arrangement?                                       ○   ◉

    (b) If yes, what is the name and _private fund_ identification number (if any) of the feeder funds investing in this _private fund_?

    | No Information Filed |
    | --- |

                                                                                                    Yes  No
    (c) Is this a "feeder fund" in a master-feeder arrangement?                                       ○   ◉

    (d) If yes, what is the name and _private fund_ identification number (if any) of the master fund in which this _private fund_ invests?
        Name of _private fund_:

        _Private fund_ identification number:
        (include the "805-" prefix also)

    NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

    | No Information Filed |
    | --- |

    NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                                                                    Yes  No
8.  (a) Is this _private fund_ a "fund of funds"?                                                     ○   ◉

    NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also _private funds_ or registered investment companies.

    (b) If yes, does the _private fund_ invest in funds managed by you or by a _related person_?                    ○   ○

                                                                                                    Yes  No

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?                    ○  ●

10. What type of fund is the *private fund*?

    ○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

    NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

    $ 16,442,403

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

    $ 1,000,000

    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

    17

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

    0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

    12%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

    34%

## Your Advisory Services

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ● |

    (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed In Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

    (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

    NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

    0%

## Private Offering

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ● | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-217437 |

B. SERVICE PROVIDERS

**Auditors**

|  |  | Yes | No |
|---|---|---|---|

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?    ⊙ ○

    (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?    ⊙ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

                                                                                   Yes No

(d) Is the auditing firm an *independent public accountant*?    ⊙ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?    ⊙ ○

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ⊙ ○

---

                                                                               Yes No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?    ⊙ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⊙ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

                                                                               Yes No

24. (a) Does the *private fund* use one or more prime brokers?    ○ ⊙

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

---

No Information Filed

---

**Custodian**

                                                                               Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?    ⊙ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 2 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
SOCIETE GENERALE BANK & TRUST

(c) Primary business name of custodian:
SOCIETE GENERALE BANK & TRUST

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| LUXEMBOURG |  | Luxembourg |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

|  | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ◉ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
0%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
|---|

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a) Name of the *private fund*:

     LR-SAN JACINTO MINERALS II COINVESTMENT, LP

     (b) *Private fund* identification number:
     (include the "805-" prefix also) .
     805-6937734494

2.  Under the laws of what state or country is the *private fund* organized:

     State:               Country:
                            Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| LIME ROCK PARTNERS GP VII, L.P. |

     (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
|---|

4.  The *private fund* (check all that apply; you must check at least one):

     ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
     ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
|---|

                                                               **Yes No**

6.  (a) Is this a "master fund" in a master-feeder arrangement?           ○ ◉

     (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

                                                               **Yes No**

     (c) Is this a "feeder fund" in a master-feeder arrangement?           ○ ◉

     (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
     Name of *private fund*:

     *Private fund* identification number:
     (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  |  | Yes | No |
|---|---|---|---|
| 8. | (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

| | (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  |  | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

   ○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

   NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

   $ 28,063,735

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

   $ 10,000,000

   NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

   6

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

   1%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

   0%

|  |  | Yes | No |
|---|---|---|---|
| | (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

   0%

## Your Advisory Services

|  |  | Yes | No |
|---|---|---|---|
| 17. | (a) Are you a subadviser to this *private fund*? | ○ | ● |

   (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

   | No Information Filed |
   |---|

|  |  | Yes | No |
|---|---|---|---|
| 18. | (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

   (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

   | No Information Filed |
   |---|

|  |  | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

   *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

   0%

                                                                     **Yes  No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?  ⦿  ○

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-286513 |

B. SERVICE PROVIDERS

**Auditors**

                                                                     **Yes  No**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?  ⦿  ○

       (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?  ⦿  ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
>
>     ERNST & YOUNG
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | NEW YORK | New York | United States |
>
>                                                                     **Yes  No**
>
> (d) Is the auditing firm an *independent public accountant*?  ⦿  ○
>
> (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?  ⦿  ○
>
>     If yes, Public Company Accounting Oversight Board-Assigned Number:
>
>     42
>
> (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  ⦿  ○

                                                                        **Yes  No**

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  ⦿  ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

    ⦿ Yes  ○ No  ○ Report Not Yet Received

    *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

                                                                       **Yes  No**

24. (a) Does the *private fund* use one or more prime brokers?  ○  ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

**Custodian**

                                                                       **Yes  No**

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?  ⦿  ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund*

uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ● |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

|  | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ● |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ● |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

## A. PRIVATE FUND

## Information About the *Private Fund*

1. (a) Name of the *private fund*:
LR-SHELF COINVESTMENT, L.P.

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-7915862590

2. Under the laws of what state or country is the *private fund* organized:

State:                           Country:
                                 Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| LIME ROCK PARTNERS GP VI, L.P. |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4. The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

|  | Yes | No |
| --- | --- | --- |
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ● |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

|  | Yes | No |
| --- | --- | --- |
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ● |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
| --- | --- | --- |
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
| --- | --- | --- |
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
| --- | --- | --- |
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 23,037,306

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 10,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

4

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

50%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

0%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-187757 |

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
ERNST & YOUNG

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| NEW YORK | New York | United States |

|  | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
42

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ◉ ○

---

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

---

No Information Filed

---

**Custodian**

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
COMERICA BANK

(c) Primary business name of custodian:
COMERICA BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:      State:      Country:
BOSTON      Massachusetts      United States

|  | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ● |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

|  | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ○ | ● |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ● |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

---

## SECTION 7.B.(2) *Private Fund* Reporting

> No Information Filed

---

## Item 8 Participation or Interest in *Client* Transactions

In this Item, we request information about your participation and interest in your *clients'* transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

### Proprietary Interest in *Client* Transactions

|  | Yes | No |
|---|---|---|
| A. Do you or any *related person*: | | |
|    (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ● |
|    (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ○ | ● |
|    (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ○ | ● |

### Sales Interest in *Client* Transactions

|  |  |  | Yes | No |
|---|---|---|---|---|
| B. | Do you or any *related person*: | | | |
| | (1) | as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| | (2) | recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ○ | ◉ |
| | (3) | recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

|  |  |  | Yes | No |
|---|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | | |
| | (1) | securities to be bought or sold for a *client's* account? | ◉ | ○ |
| | (2) | amount of securities to be bought or sold for a *client's* account? | ◉ | ○ |
| | (3) | broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ◉ | ○ |
| | (4) | commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ◉ | ○ |
| D. | If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? | | ○ | ◉ |
| E. | Do you or any *related person* recommend brokers or dealers to *clients*? | | ○ | ◉ |
| F. | If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? | | ○ | ○ |
| G. | (1) | Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? | ○ | ◉ |
| | (2) | If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? | ○ | ○ |
| H. | (1) | Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? | ○ | ◉ |
| | (2) | Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? | ○ | ◉ |
| I. | Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? | | ○ | ◉ |

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

|  |  |  | Yes | No |
|---|---|---|---|---|
| A. | (1) | Do you have *custody* of any advisory *clients'*: | | |
| | | (a) cash or bank accounts? | ○ | ◉ |
| | | (b) securities? | ○ | ◉ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

U.S. Dollar Amount

(a) $

Total Number of *Clients*

(b)

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

|  |  |  | Yes | No |
|---|---|---|---|---|
| B. | (1) | In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: | | |
| | | (a) cash or bank accounts? | ◉ | ○ |
| | | (b) securities? | ◉ | ○ |

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

U.S. Dollar Amount

(a) $ 6,077,865,947

Total Number of *Clients*

(b) 19

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools. ☑

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

|  |  | Yes | No |
|---|---|---|---|
| D. | Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*? | | |
| | (1) you act as a qualified custodian | ○ | ◉ |
| | (2) your *related person(s)* act as qualified custodian(s) | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

12

---

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

|  |  | Yes | No |
|---|---|---|---|
| A. | Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A. *Control Persons***

No Information Filed

---

**SECTION 10.B. *Control Person* Public Reporting Companies**

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ⦿ | ○ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

|  | Yes | No |
|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ⦿ |
| (2) been *charged* with any *felony*? | ○ | ⦿ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

|  | Yes | No |
|---|---|---|
| B. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ⦿ |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ⦿ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

|  | Yes | No |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ⦿ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ⦿ | ○ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⦿ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ⦿ | ○ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ⦿ | ○ |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ⦿ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ⦿ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⦿ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ⦿ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate*'s registration or license, or otherwise prevented you or any *advisory affiliate*, by order, from associating with an *investment-related* business or restricted your or any *advisory affiliate*'s activity? | ○ | ⦿ |
| E. Has any *self-regulatory organization* or commodities exchange ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ⦿ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ⦿ |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⦿ |

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?   ○ ⦿

F.   Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?   ○ ⦿

G.   Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?   ○ ⦿

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

|  |  |  | Yes | No |
|---|---|---|---|---|
| H. | (1) | Has any domestic or foreign court: |  |  |
|  |  | (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ⦿ |
|  |  | (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ⦿ |
|  |  | (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ⦿ |
|  | (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ⦿ |

---

## Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the *profits*, of another *person* is presumed to *control* the other *person*.

|  |  |  | Yes | No |
|---|---|---|---|---|
| A. | Did you have total assets of $5 million or more on the last day of your most recent fiscal year? |  | ○ | ○ |
|  | *If "yes," you do not need to answer Items 12.B. and 12.C.* |  |  |  |
| B. | Do you: |  |  |  |
|  | (1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? |  | ○ | ○ |
|  | (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? |  | ○ | ○ |
| C. | Are you: |  |  |  |
|  | (1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? |  | ○ | ○ |
|  | (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? |  | ○ | ○ |

---

## Schedule A

### Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, *all* general partners and those limited and special partners that have the right to receive upon dissolution, or

have contributed 5% or more of your capital;

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?   ⊙ Yes   ○ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:    NA - less than 5%         B - 10% but less than 25%    D - 50% but less than 75%
                                        A - 5% but less than 10%   C - 25% but less than 50%   E - 75% or more

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| FARBER, JONATHAN, CLARK | I | CO-FOUNDER/MANAGING DIRECTOR | 06/1998 | NA | Y | N | 2130092 |
| JCF INVESTMENTS, LLC | DE | LIMITED PARTNER | 09/2006 | C | Y | N | 20-5608959 |
| REYNOLDS, JOHN, THOMAS | I | CO-FOUNDER/MANAGING DIRECTOR, LIMITED PARTNER | 06/1998 | B | Y | N | 2285502 |
| THE JOHN REYNOLDS 2006 CONTINUATION TRUST | DE | LIMITED PARTNER | 04/2008 | A | N | N | TRUST |
| THE JOHN REYNOLDS 2010 DESCENDANTS' TRUST | DE | LIMITED PARTNER | 12/2010 | A | N | N | 45-6564084 |
| MULLINS, ERIC, DWAYNE | I | LIMITED PARTNER, MANAGING DIRECTOR | 07/2005 | B | Y | N | 2088585 |
| ADCOCK, CHARLES, WILLIS | I | LIMITED PARTNER, MANAGING DIRECTOR | 07/2005 | NA | Y | N | 6029200 |
| LIME ROCK MANAGEMENT GP LLC | DE | GENERAL PARTNER | 06/1998 | NA | Y | N | 13-4011234 |
| BELLANTONI, SUSAN, MARIE | I | CHIEF FINANCIAL OFFICER | 05/2015 | NA | Y | N | 6623606 |
| STEIN, DAVID, ANDREW | I | TRUSTEE - THE JOHN REYNOLDS 2006 CONTINUATION TRUST | 06/2015 | A | Y | N | 6623610 |
| STEIN, DAVID, ANDREW | I | TRUSTEE - THE JOHN REYNOLDS 2010 DESCENDANTS' TRUST | 06/2015 | A | Y | N | 6623610 |
| MEHTA, ANURAGH, RAJ | I | CHIEF COMPLIANCE OFFICER/ GENERAL COUNSEL | 01/2017 | NA | Y | N | 6748776 |
| MCLANE, JASON | I | LIMITED PARTNER | 07/2016 | A | N | N | 6749358 |
| MCCALL, MARK, ADRIAN | I | MANAGING DIRECTOR | 03/2017 | NA | Y | N | 2657219 |
| Miller, Clarence, Tim | I | PRESIDENT AND CHIEF OPERATING OFFICER OF LIME ROCK RESOURCES | 01/2018 | A | Y | N | 6932298 |
| SCOFIELD, JEFFREY, BENNETT | I | LIMITED PARTNER | 03/2019 | A | N | N | 4319556 |

## Schedule B

### Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:   C - 25% but less than 50%   E - 75% or more

   D - 50% but less than 75%   F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| FARBER, JONATHAN, CLARK | I | JCF INVESTMENTS, LLC | MANAGING MEMBER | 09/2006 | E | Y | N | 2130092 |
| FARBER, JONATHAN, CLARK | I | LIME ROCK MANAGEMENT GP LLC | ELECTED MANAGER | 06/1998 | F | Y | N | 2130092 |
| REYNOLDS, JOHN, THOMAS | I | LIME ROCK MANAGEMENT GP LLC | ELECTED MANAGER | 06/1998 | F | Y | N | 2285502 |
| JCF INVESTMENTS, LLC | DE | LIME ROCK MANAGEMENT GP LLC | MEMBER | 09/2006 | C | Y | N | 20-5608959 |

---

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

Lime Rock Management LP has entered into a strategic relationship with Sears Point Capital Management, LP and Sears Point Capital, LLC, whereby the Lime Rock Management LP or its affiliates became a minority owner of Sears Point Capital Management, LP and Sears Point Capital, LLC. Lime Rock Management LP and the Sears Point entities will operate independently, and the strategic relationship will not impact or influence the advisory services provided by Lime Rock Management LP.

---

**Schedule R**

No Information Filed

---

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ○ INITIAL *OR* ◉ AMENDED response used to report details for affirmative responses to Items 11.C., 11.D., 11.E., 11.F. or 11.G. of Form ADV.

Regulatory Action

Check item(s) being responded to:

| | | | | |
|---|---|---|---|---|
| ☐ 11.C(1) | ☑ 11.C(2) | ☐ 11.C(3) | ☑ 11.C(4) | ☑ 11.C(5) |
| ☐ 11.D(1) | ☐ 11.D(2) | ☐ 11.D(3) | ☐ 11.D(4) | ☐ 11.D(5) |
| ☐ 11.E(1) | ☐ 11.E(2) | ☐ 11.E(3) | ☐ 11.E(4) | |
| ☐ 11.F. | ☐ 11.G. | | | |

Use a separate DRP for each event or *proceeding* . The same event or *proceeding* may be reported for more than one *person* or entity using one DRP. File with a completed Execution Page.

One event may result in more than one affirmative answer to Items 11.C., 11.D., 11.E., 11.F. or 11.G. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details for each action on a separate DRP.

PART I

A.  The *person(s)* or entity(ies) for whom this DRP is being filed is (are):

- ⦿ You (the advisory firm)
- ○ You and one or more of your *advisory affiliates*
- ○ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name). If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

ADV DRP - *ADVISORY AFFILIATE*

No Information Filed

☐ This DRP should be removed from the ADV record because the *advisory affiliate(s)* is no longer associated with the adviser.
☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC or reporting as an *exempt reporting adviser* with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority* , you may remove a DRP for an event you reported only in response to Item 11.D(4), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

☐ This DRP should be removed from the ADV record because it was filed in error, such as due to a clerical or data-entry mistake. Explain the circumstances:

B.  If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.

- ○ Yes   ○ No

NOTE: The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

PART II

1.  Regulatory Action initiated by:
    ⦿ SEC   ○ Other Federal   ○ State   ○ SRO   ○ Foreign
    (Full name of regulator, *foreign financial regulatory authority*, federal, state, or *SRO*)
    SECURITIES AND EXCHANGE COMMISSION

2.  Principal Sanction:
    Civil and Administrative Penalt(ies) /Fine(s)
    Other Sanctions:
    CENSURE; CEASE AND DESIST

3.  Date Initiated (MM/DD/YYYY):
    01/17/2017  ⦿ Exact   ○ Explanation
    If not exact, provide explanation:
    THE ORDER AND SETTLEMENT WAS ENTERED INTO ON JANUARY 17, 2017.

4.  Docket/Case Number:
    3-17782

5.  *Advisory Affiliate* Employing Firm when activity occurred which led to the regulatory action (if applicable):

6.  Principal Product Type:
    Other
    Other Product Types:
    EQUITY IN PRIVATE COMPANIES.

7.  Describe the allegations related to this regulatory action (your response must fit within the space provided):
    ON JANUARY 17, 2017, THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") INSTITUTED ADMINISTRATIVE PROCEEDINGS AGAINST THE REGISTRANT, PURSUANT TO SECTIONS 203(E) AND 203(K) OF THE ADVISERS ACT OF 1940, AS AMENDED (THE "ADVISERS ACT"), FINDING THAT THE REGISTRANT HAD VIOLATED ADVISERS ACT RULE 206(4)-5 WHEN AN EMPLOYEE MADE A $1,000 PERSONAL CONTRIBUTION TO THE CAMPAIGN OF A CANDIDATE FOR PRESIDENT OF THE UNITED STATES, AND THEN GOVERNOR OF OHIO, WHILE THE REGISTRANT ADVISED A POOLED INVESTMENT VEHICLE WHERE AN OHIO PUBLIC ENTITY WAS AN INVESTOR. THE SEC FOUND THAT AFTER THE CONTRIBUTION WAS MADE, ITS RETURN WAS SOUGHT AND RECEIVED, AND NOTED THAT ADVISERS ACT RULE 206(4)-5 DOES NOT REQUIRE A SHOWING OF QUID PRO QUO OR ACTUAL INTENT TO INFLUENCE AN ELECTED OFFICIAL OR CANDIDATE.

8.  Current Status?  ○ Pending   ○ On Appeal   ● Final

9.  If on appeal, regulatory action appealed to (SEC, *SRO,* Federal or State Court) and Date Appeal Filed:

If Final or On Appeal, complete all items below. For Pending Actions, complete Item 13 only.

10. How was matter resolved:
    Order

11. Resolution Date (MM/DD/YYYY):
    01/17/2017 ● Exact   ○ Explanation
    If not exact, provide explanation:
    THE ORDER AND SETTLEMENT WAS ENTERED INTO ON JANUARY 17, 2017.

12. Resolution Detail:
    A.  Were any of the following Sanctions *Ordered* (check all appropriate items)?
        ☑ Monetary/Fine Amount: $ 75,000.00
        ☐ Revocation/Expulsion/Denial            ☐ Disgorgement/Restitution
        ☑ Censure                                ☑ Cease and Desist/Injunction
        ☐ Bar                                    ☐ Suspension
    B.  Other Sanctions *Ordered:*
        WITHOUT ADMITTING TO ANY ALLEGATIONS, THE REGISTRANT CONSENTED TO THE ISSUANCE OF AN ORDER ON JANUARY 17, 2017 AND PAID A
        CIVIL MONETARY PENALTY OF $75,000.
        Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal,
        Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to
        requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution,
        disgorgement or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate,* date paid and if any portion of
        penalty was waived:
        CIVIL MONETARY PENALTY OF $75,000.

13. Provide a brief summary of details related to the action status and (or) disposition and include relevant terms, conditions and dates (your response
    must fit within the space provided).
    ON JANUARY 17, 2017, THE SEC INSTITUTED ADMINISTRATIVE PROCEEDINGS AGAINST THE REGISTRANT REGARDING A CAMPAIGN CONTRIBUTION BY AN
    EMPLOYEE OF THE REGISTRANT MADE IN VIOLATION OF THE SEC'S RULES GOVERNING POLITICAL CONTRIBUTIONS BY INVESTMENT ADVISER
    EMPLOYEES AND THE REGISTRANT'S OWN COMPLIANCE POLICIES. WITHOUT ADMITTING OR DENYING LIABILITY, THE REGISTRANT AGREED TO PAY
    $75,000 TO RESOLVE THE MATTER. UPON BECOMING AWARE OF THE $1,000 CONTRIBUTION, THE RESPONDENT CAUSED THE EMPLOYEE TO OBTAIN ITS
    RETURN AND VOLUNTARILY REPORTED THE MATTER TO THE SEC. THE ORDER SETTLING THIS MATTER FINDS THAT ADVISERS ACT RULE 206(4)-5 DOES
    NOT REQUIRE A SHOWING OF QUID PRO QUO OR ACTUAL INTENT TO INFLUENCE AN ELECTED OFFICIAL OR CANDIDATE FOR PUBLIC OFFICE, AND THAT
    THE SEC WAS NOT REQUIRED TO SHOW THAT THE REGISTRANT WAS AWARE OF THE ACTIONS RESULTING IN THE VIOLATION OF THE RULE. THE
    REGISTRANT FOLLOWS RIGOROUS COMPLIANCE PROCEDURES, TAKES REASONABLE STEPS TO ENFORCE ITS POLICIES, AND TRAINS AND PERIODICALLY
    REEDUCATES ITS EMPLOYEES OF THOSE POLICIES.

---

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a
brochure to *all* of your advisory clients, you do not have to prepare a brochure.

                                                                                              **Yes  No**
Are you exempt from delivering a brochure to all of your clients under these rules?             ○    ●

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 292814 | LIME ROCK FORM ADV PART 2A - MARCH 2019 | Private funds or pools |

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>/S/ ANU MEHTA | Date: MM/DD/YYYY<br>03/29/2019 |
| Printed Name:<br>/S/ ANU MEHTA | Title:<br>GENERAL COUNSEL AND CHIEF COMPLIANCE OFFICER |
| Adviser *CRD* Number:<br>157127 | |

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits

and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                      Date: MM/DD/YYYY

Printed Name:                Title:

Adviser *CRD* Number:
157127

# EXHIBIT 17

Form ADV Part 2A Brochure I Lime Rock                    March 2019



**LIME ROCK**

# Form ADV Part 2A:  Firm Brochure

# Lime Rock Management LP
### (March 30, 2019)

## <u>Principal Office</u>

**Lime Rock Management LP**
274 Riverside Avenue, 3rd Floor
Westport, CT 06880
Phone: 203.293.2750; Fax: 203.293.2760
www.lrpartners.com
www.limerockresources.com

This brochure provides information about the qualifications and business practices of Lime Rock Management LP and its affiliates (collectively, "Lime Rock" or the "Adviser"). If you have any questions about the contents of this Brochure, please contact our Chief Compliance Officer, Anu Mehta, at 713-345-2105 or email amehta@lrpartners.com.

Additional information about Lime Rock is also available on the SEC's website at: www.adviserinfo.sec.gov.

Lime Rock is registered as an investment adviser with the United States Securities and Exchange Commission (the "SEC") under the Investment Advisers Act of 1940, as amended (the "Advisers Act"). Registration as an investment adviser with the SEC does not imply a certain level of skill or training. In addition, the information in this Brochure has not been approved or verified by the SEC or by any state securities authority.

# Item 2:  Material Changes

Lime Rock filed its most recent annual amendment to Form ADV Part 2A on March 30, 2018. This section is designed to make clients and investors aware of certain information that has changed since the most recent version of the Brochure and that may be important to them.

On January 18, 2019, Lime Rock amended this Form ADV Part 2A to remove the disclosure in Item 10 relating to Lime Rock's relying adviser, Lime Rock Management LLP.  Lime Rock Management LLP voluntarily deregistered from the Financial Conduct Authority on December 21, 2018 as its activities no longer required registration thereunder, and was removed from Lime Rock's Form ADV in connection with the wind-down of Lime Rock Management LLP's advisory business.

This annual amendment updates the description of the business practices of Lime Rock and its affiliates, including with respect to regulatory assets under management, certain risks, conflicts of interest, client referrals and other compensation.  We encourage all recipients of this Brochure to read it carefully in its entirety.

Form ADV Part 2A Brochure | Lime Rock                          March 2019

## Item 3:  Table of Contents

Item 2:  Material Changes ..................................................................................................2

Item 3:  Table of Contents ................................................................................................3

Item 4:  Advisory Business................................................................................................4

Item 5:  Fees and Compensation .......................................................................................5

Item 6:  Performance Based Fees and Side-by-Side Management......................................8

Item 7:  Types of Clients ...................................................................................................9

Item 8:  Methods of Analysis, Investment Strategies and Risk of Loss............................9

Item 9:  Disciplinary Information ....................................................................................17

Item 10:  Other Financial Industry Activities and Affiliations.........................................17

Item 11:  Code of Ethics, Participation or Interest in Client Transactions and Personal Trading...18

Item 12:  Brokerage Practices..........................................................................................18

Item 13:  Review of Accounts ..........................................................................................19

Item 14:  Client Referrals and Other Compensation ........................................................20

Item 15:  Custody ............................................................................................................20

Item 16:  Investment Discretion ......................................................................................20

Item 17:  Voting Client Securities ...................................................................................21

Item 18:  Financial Information........................................................................................21

## Item 4:  Advisory Business

Lime Rock Management LP ("Lime Rock") was founded in 1998, and as of December 31, 2018 manages approximately $7.1 billion in client assets on a discretionary basis for investments in the energy industry through two types of private investment funds, Lime Rock Partners and Lime Rock Resources.

Lime Rock Partners was formed to generate long-term capital appreciation through investments of private growth capital in energy companies in three principal sectors: (i) exploration and production; (ii) energy service; and (iii) oil service technology.   Lime Rock Partners consists of seven private investment funds (the "Partners Funds") and six co-investment funds (the "Co-investment Funds"). Lime Rock Partners does not invest directly in oil and natural gas properties, but its exploration and production portfolio companies do invest in those types of assets.

Two of the Partners Funds, Lime Rock Partners III, L.P. ("Fund III") and Lime Rock Partners IV, L.P. ("Fund IV") do not have active investments.  Fund III is in the process of disposing its final passive assets prior to commencing dissolution.

Lime Rock created Lime Rock Partners IV AF, L.P. ("Fund IV AF") in 2018 to hold certain assets of Fund IV.  Fund IV transferred its remaining investments to Fund IV AF in 2018, and has no remaining assets except a potential escrow payment.  Fund IV is expected to commence dissolution in the summer of 2019.  Since Fund IV AF was created to hold specific investments and not to invest in new opportunities, many of its commercial terms vary from the other Partners Funds as explained in further detail below.

Lime Rock Resources was formed by Lime Rock for the purpose of acquiring mature, lower-risk producing oil and natural gas properties with long-lived production profiles, and currently consists of three private investment funds (collectively, the "Resources Funds").

Lime Rock is principally owned by Jonathan Farber, John Reynolds and their estate planning vehicles.

Lime Rock serves as an investment manager and provides discretionary advisory services to the Partners Funds, the Resources Funds and the Co-investment Funds (collectively, the "Funds"). Investors in the Funds include large institutional investors such as endowments, foundations and pension funds as well as fund of funds, family trusts and high net worth individuals.

The Funds include private investment partnerships and foreign investment companies, together with any respective parallel funds, special purpose and/or subsidiary investment vehicles. Typically, within each Fund structure is a designated general partner (the "General Partner"), and the Co-investment Funds share the general partner of one of the Funds that they are co-invested with. Unless, and only to the extent that the context otherwise requires, references to Lime Rock include the General Partners.

In providing services to the Funds, Lime Rock provides portfolio management and administrative services, including investigating, analyzing, structuring, and negotiating potential investments, monitoring the performance of portfolio companies, and advising the Funds as to disposition

opportunities.  Investment advice is provided directly to the Funds and not tailored individually to the limited partners or shareholders of the Funds (the "Investors" or "Limited Partners").  Lime Rock manages the assets of the Funds in accordance with the terms of each Fund's individual limited partnership agreement, offering memorandum and other governing documents applicable to each Fund (the "Governing Fund Documents").  All terms are generally established at the time of the formation of a Fund, and are only terminable once the applicable Fund is dissolved, wound up, and terminated.  The Investors generally may not restrict investments by the Funds in any capacity beyond the Governing Fund Documents, and except in limited circumstances, Limited Partners are not permitted to withdraw from a Fund prior to the Fund's dissolution.

Equity interests in the Funds are not registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and the Funds are not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").  Accordingly, equity interests in the Funds are offered and sold exclusively to investors satisfying the applicable eligibility and suitability requirements, either in private transactions within the United States or in offshore transactions.

## Item 5:  Fees and Compensation

General

Lime Rock provides investment advisory services to each of the Funds pursuant to separate management agreements (the "Agreements").  The Agreements for each Fund, along with the applicable Governing Fund Documents, set forth in detail the fee structure relevant to each such Fund, and they may vary by Fund.  The terms of the Agreements are generally established at the time of the formation of the applicable Fund.

Although it varies by Fund, Lime Rock typically receives compensation from fees based on a percentage of assets under management, carried interest allocations and certain other fees or expenses related to transactions (see below).  Investors should review all fees charged by Lime Rock and others to fully understand the total amount of fees to be paid by a Fund and, indirectly, by its Limited Partners.

Management Fee

The Partners Funds and Resources Funds, other than Fund III, Fund IV and Fund IV AF, pay Lime Rock an annual management fee (the "Management Fee") that generally ranges between 1.5% to 2.0% (per annum) of committed capital during the investment period, subject to a downward adjustment in instances including, without limitation, Lime Rock raising a successor fund, the investment period expiring, or in the case of the Partners Funds, the aggregate remaining capital commitments of the limited partners being reduced below 10% of the aggregate commitments of all the partners. These fees are negotiable.  The Co-investment Funds do not pay an annual management fee, except certain investors in the Co-investment Funds that are not also investors in the Partners Funds or the Resources Funds, pay an annual management fee of 0.5% (per annum) of committed capital during the investment period of the applicable Co-investment Funds.  The Management Fee is payable quarterly in advance and is typically based upon committed capital during the investment period and on remaining invested contributions thereafter, in each case in accordance with the terms of the applicable Governing Fund Documents.  As described more fully below, the Management Fee is subject to reduction due to other types of collected fees; and Lime

Rock or the General Partner each reserves the right to waive or reduce management fees in its sole discretion.

Lime Rock has waived its right to collect management fees from Fund III. Additionally, Fund IV has no investments and does not currently charge a management fee.

Fund IV AF charges an annual management fee 0.75% (per annum) of contributed capital to certain (but not all) Limited Partners in that fund that is subject to downward adjustment in later years of the fund.

Carried Interest Allocations
A portion of each Fund's (other than the Co-investment Funds) net investment profit may be allocated to the capital account of its General Partner as "carried interest." The manner of calculation of such carried interest is disclosed in the Governing Fund Documents, and may vary by Fund. Generally, however 20% of the investment profits of the Funds (with the exception of Fund IV AF) are allocated as carried interest to such Fund's General Partner after payment of a preferred return of 8% per annum to its Investors. Carried interest is subject to a clawback obligation and an escrow in certain Funds. The Co-investment Funds do not allocate carried interest to such Co-investment Funds' General Partner. Fund IV AF only charges carried interest to certain of its Limited Partners, which carried interest varies depending on performance of the fund and ranges from 0% to 25%. Please refer to Item 6 for further details regarding such performance-based compensation.

Transaction, Break-Up and Other Fees And Other Fees Earned by Lime Rock
While Lime Rock does not typically charge transaction or monitoring fees, in certain circumstances it may receive portfolio company directors' fees, transaction fees, monitoring fees, break-up fees, and other similar advisory fees ("Fee Income"). An amount ranging from 80% to 100% of all Fee Income paid by portfolio companies that are received by Lime Rock, a General Partner or any of their respective affiliates, net of any related expenses, will be applied to reduce future Management Fees otherwise payable. All such fees will be allocated between the applicable Fund and any related co-investing entities on the basis of capital committed by each to the relevant investment. As a result, a Fund will, in most cases, benefit only with respect to its allocable portion of any such Fee Income and not the portion of any Fee Income that relates to any other person or entity participating in the relevant transaction. Management Fee reductions will be carried forward if necessary. Investors who pay no management fees with respect to the Co-investment Funds are allocated their pro rata share of any monitoring fee payable to the Co-investment Funds as fee income, although in the case of one of the Co-investment Funds, Lime Rock is entitled to collect any directors' fees paid to its employees in connection with serving on the board of the portfolio company (this portfolio company did not pay directors' fees until 2018). Additionally, Fee Income received by Lime Rock in respect of Funds for which it has *waived* the right to collect Management Fees will be retained by Lime Rock up to the amount of total Management Fees payable. At this time, only Fund III falls into this category.

Organizational Expenses
Each Fund bears all legal and other expenses incurred in the formation of such Fund and the offering of the interests, up to an amount not to exceed $1 million except for Fund IV AF, which has a

maximum threshold for such expenses of $300,000.  Organizational expenses in excess of this amount will be paid by the Fund, but borne by Lime Rock through a 100% offset against the Management Fee.

<u>Other Expenses</u>
With respect to Funds other than the Resources Funds, Lime Rock will pay all normal operating expenses incidental to the provision of the day-to-day administrative services of the Funds, including its own overhead and costs related to compliance with applicable laws and regulations. To the extent possible, third-party costs will be charged to portfolio companies.  The Funds will pay all costs, expenses, and liabilities in connection with their operations, including, without limitation: fees, costs, and expenses (including travel expenses) related to the investigations, pursuits, acquisitions, holding, and disposition of portfolio investments (each, to the extent not reimbursed by a portfolio company); software costs; D&O insurance costs (including with respect to the coverage of Lime Rock); taxes; fees and expenses of consultants and operating partners for advising on a portfolio company matter that a portfolio company was not charged; legal, custodial and accounting expenses, including costs of reporting to the limited partners, expenses associated with the preparation of financial statements, tax returns and Schedule K-1s and the representation of the Funds or the partners by the tax matters representative; auditing, accounting, and banking expenses; costs and expenses of the investor advisory committee and the annual meeting; litigation expenses; indemnification of covered employees, officers and managers of the Funds and their affiliates, and other extraordinary expenses. The Funds will also bear third-party expenses incurred in connection with transactions not consummated.

For the Resources Funds, Lime Rock will pay all compensation and employee benefit expenses allocable to the top five executives of the Resources Funds (the "Executive Team"), travel costs, rent and other occupancy costs allocable to the Executive Team, and certain other overhead and administrative expenses. The Resources Funds will pay all costs, expenses (including travel expenses) and liabilities in connection with its operations and the operation and development of investments, including, without limitation, the fees and expenses relating to consummated portfolio investments, proposed but unconsummated investments, and temporary investments, including the identification, evaluation, arrangement, negotiation, structuring, acquisition, holding and disposition thereof, including, without limitation, any reasonable travel, legal, tax and accounting expenses in connection therewith, to the extent that any such fees and expenses are not otherwise reimbursed by any third person; costs, fees and expenses of monitoring, holding, hedging, valuing or selling portfolio investments, including record-keeping expenses; premiums for insurance protecting the investments as well as D&O insurance (including with respect to the coverage of Lime Rock), the Resource Funds and any covered persons from liabilities to third persons in connection with Resource Fund affairs; legal, custodial and accounting expenses, including costs of reporting to the limited partners, expenses associated with the preparation of financial statements, tax returns and Schedule K-1s and the representation of the Resource Funds or the partners by the tax matters representative; auditing, accounting, banking, engineering, and consulting expenses; appraisal expenses; expenses related to organizing persons through or in which portfolio investments may be made; expenses of the advisory committees of the Resources Funds; costs and expenses that are classified as extraordinary expenses under generally accepted accounting principles; taxes and other governmental charges, fees and duties levied against the Resources Funds or on its income or assets or in connection with its business or operations; damages; costs of

reporting to the partners and of the annual meeting; costs of any audit, investigation, proceedings, litigation and threatened litigation; costs and expenses of computer software specific to the affairs of a fund; capital payments, interest and other expenses in respect of indebtedness for borrowed money; costs of winding up and liquidating; costs and expenses related to compliance with applicable laws and regulations; and the pro rata portion of the expenses of Lime Rock personnel (other than the Executive Team) and Lime Rock Resources Operating Company, Inc. personnel with respect to the operation and development of a fund's properties and review of potential investments and compliance with the policies of the organization.

The Partners Funds and the Resources Funds will pay all costs, expenses and liabilities in connection with dead deal costs, including dead deal costs relating to transactions that have been offered to co-investors. In the event that a transaction in which a co-investment was planned, including a transaction for which a co-investment was believed necessary in order to consummate such transaction or would otherwise be beneficial, in the judgement of the applicable General Partner, ultimately is not consummated, all dead deal costs relating to such proposed transaction will be borne by the Funds, and not by any potential co-investors, that were to have participated in such transaction.

## Item 6: Performance Based Fees and Side-by-Side Management

As described above, the General Partner (other than the General Partner of the Co-investment Funds as it relates to contributed capital of the co-investors to the portfolio companies) is allocated carried interest, which amount is based on the profits generated on the sale or disposition of Fund assets. The fact that a significant portion of the Adviser's compensation (and its affiliates' and investment professionals' compensation) is directly computed on the basis of profits generated by the sale or disposition of Fund assets may create an incentive for Lime Rock to make investments on behalf of the Funds that are riskier or more speculative than would be the case in the absence of such compensation. However, this incentive may be mitigated by the fact that losses will reduce a Fund's performance and thus Lime Rock's compensation.

<u>Allocation of Investment Opportunities</u>
Lime Rock and its affiliates are required to act in a manner that is considered fair, reasonable and equitable in allocating investment opportunities to the Funds. In allocating investment opportunities amongst the Funds, Lime Rock will act in good faith and will consider factors reasonably appropriate for such determinations, including, but not limited to, investment strategies, risk tolerances, the nature of the investment, investment time frames and other similar factors. Lime Rock and its affiliates are generally not required to accord exclusivity or priority to the Funds in the event of limited investment opportunities.

To the extent that the available amount of an investment opportunity exceeds the amount that would be appropriate for the applicable Fund, any such excess may be offered to one or more potential co-investors, including third parties, as determined by Lime Rock in accordance with the relevant Governing Fund Documents, side letters and Lime Rock's procedures regarding allocation. Lime Rock's procedures permit it to take into consideration a variety of factors in making such determinations.

Lime Rock's allocation of investment opportunities among the persons (including the Funds) and in the manner discussed herein may not, and often will not, result in proportional allocations among such persons, and such allocations may be more or less advantageous to some persons relative to others. While Lime Rock will allocate investment opportunities in a manner that it believes in good faith is fair and equitable to its clients under the circumstances over time and considering relevant factors, there can be no assurance that a Fund's actual allocation of an investment opportunity, if any, or the terms on which that allocation is made, will be as favorable as they would have been if the conflicts of interest to which Lime Rock and its affiliates may be subject, did not exist.

## Item 7:  Types of Clients

Lime Rock provides discretionary management and advisory services directly to the Funds, which are pooled investment vehicles exempt from registration under the Investment Company Act, subject to the direction and control of the General Partner of each Fund, and not individually to the Limited Partners.  Investors in the Funds may include, but are not limited to, pension plans, endowments, foundations, pooled investment vehicles (e.g., funds-of-funds), trusts, estates or charitable organizations, high net worth individuals, and corporate or business entities.

The minimum commitment for a Limited Partner is outlined in the Governing Fund Documents; however, Lime Rock maintains discretion to accept less than the minimum investment threshold. In addition, the Funds may enter into separate agreements, commonly referred to as "side letters" with certain Investors.  Side letters waive certain terms or allow such Investors to invest on different terms including idiosyncratic and non-economic issues.  Pursuant to the terms of the Governing Fund Documents, all side letter provisions are shared with all other Investors in the relevant Fund and each Investor is allowed to select any such provision from which it may benefit (to the extent relevant to such Investor).

Investors will be required to meet certain suitability qualifications, such as being an "accredited investor" within the meaning set forth in Rule 501(a) of Regulation D under the Securities Act. Also, each Investor will be required to make certain representations when investing in a Fund, including, but not limited to that (i) it is acquiring an interest for its own account, (ii) it received or had access to all information it deemed relevant to evaluate the merits and risks of the prospective investment and (iii) it has the ability to bear the economic risk of an investment in the Fund.  Details concerning applicable Investor suitability criteria are set forth in the respective Governing Fund Documents and subscription materials, which are furnished to each Investor.

## Item 8:  Methods of Analysis, Investment Strategies and Risk of Loss

The Partners Funds (with the exception of Fund IV AF) are long-term investors of growth capital in energy companies worldwide targeting investments ranging in size from $25 million to $150 million.  The Partners Funds' objectives (with the exception of Fund IV AF) are to generate long-term capital appreciation through investments of private growth capital in energy companies in three principal sectors: (i) exploration and production; (ii) energy service; and (iii) oil service technology. The Partners Funds do not invest directly in oil and natural gas properties, but their exploration and production portfolio companies do invest in those types of assets.

The Co-investment Funds were formed to enable investors to invest additional funds alongside Lime Rock Partners Funds in certain portfolio companies.

The Resources Funds were formed by Lime Rock for the purpose of acquiring mature, low-risk producing oil and natural gas properties with long-lived production profiles.

Fund IV AF was formed by Lime Rock as a continuation fund to allow the existing limited partners of Fund IV to, at their option, either liquidate their investment or continue to hold their interest in a specific oil and gas portfolio company held by Fund IV as well as allow new limited partners to have exposure to this portfolio company.

The Lime Rock investment team is led by senior investment professionals with prior experience from leading organizations in finance, private equity, and energy.

The Partners Funds' strategy is to differentiate itself by being a creative, value-adding, and long-term investor, which seeks to enable these Funds to benefit from capital appreciation in investments in existing portfolio companies and to provide Lime Rock a competitive advantage in sourcing attractive new investment opportunities. Lime Rock's strategy to be a different kind of investment partner consists of five elements: taking a creative and flexible approach; being a true investment partner; bringing to investments its strong track record of value creation; pursuing a global, cross sector strategy; and investing for the long-term. The Partners Funds seek to pursue this strategy through a four-part investment process: identify high quality opportunities within a variety of growth strategies; structure investments creatively and flexibly; seek to create value through active partnering; and exit investments at the right time and in the right way.

The Resources Funds target a minimum gross IRR along with three other objectives (relative to the Partners Funds): a lower-risk investment; long-term capital gains and cash distributions; and a more direct exposure to oil and natural gas prices. The Resources Funds have developed a differentiated strategy emphasizing flexibility, creativity, patience, and discipline. There are six key parts to this strategy: pursue proprietary opportunities whenever possible; target niche acquisitions with differentiated competitive dynamics; seek opportunities in disrupted or difficult marketed asset processes; patiently wait for quality acquisitions at the right price; capture opportunities made available by the Resources Funds' capital structure; and balance building core operating areas with entering new ones.

Associated Risks

All investing involves a risk of loss and the investment strategy offered by Lime Rock and the Funds could lose money over short or even long periods.  An investment in the Funds may be deemed a speculative investment and is not intended as a complete investment program.  It is designed for sophisticated investors who fully understand and are capable of bearing the risk of an investment in the Funds. No guarantee or representation is made that a Fund will achieve its investment objective or that Limited Partners will receive a return of their capital.

Identifying and participating in portfolio company investments and assisting in building successful enterprises is challenging.  Many investment decisions made by Lime Rock will be dependent upon the ability of its investment professionals to obtain relevant information predominantly from non-public sources, and reliance upon information provided by third parties that is impossible to verify.

The marketability and value of each investment will depend upon many factors beyond the control of Lime Rock.

Key risk areas inherent to investing in portfolio companies include operational, investment and market risks. Lime Rock seeks to mitigate these risks through a variety of mechanisms, including operational due diligence, risk modeling, physical and financial hedging where possible and appropriate investment structuring.

The descriptions contained below provide a brief overview of certain material market risks related to Lime Rock's investment strategy; however, it is not intended to serve as an exhaustive list or a comprehensive description of all risks that may arise in connection with the management and operations of the Funds.  Investors should review the risks detailed in the relevant Fund's Governing Documents for more information.

Lime Rock faces both general industry risks and company-specific risks. The general industry risks arise from volatility in energy commodity prices.  Because of shifting commodity prices, short-term financial performance of energy companies is often more volatile than in other industries. Lime Rock attempts to mitigate commodity price risk in several ways:

- Invest in well-managed companies in attractive business niches that will grow in a neutral commodity price environment;
- During periods of high commodity prices, remain disciplined in the investment process in terms of valuation and investment terms;
- Maintain prudent capital structures in portfolio companies;
- When appropriate, encourage portfolio companies in the E&P sector to hedge oil and gas production to protect cash flows necessary for development; and
- Invest in companies in the oil service technology sector whose performance is less correlated to oil and gas prices.

While any sustained commodity price decline would impact business conditions at Partners Funds' portfolio companies and the Resources Funds, likely severely, those companies and future portfolio companies may also find opportunities, Lime Rock believes, to acquire assets and operations currently managed by under-experienced management teams or leveraged with imprudent capital structures.

Company-specific risks include geographic risk, exploration risk, development stage risk, management execution risk and financial risk.  Lime Rock believes that investments with a slightly increased geographic, exploration, or development stage risk are appropriate at this time; and that the rewards available have increased to compensate for the higher risk. Furthermore, Lime Rock has put processes in place to mitigate increased risks.

When investing in new areas, the Partners Funds seek to invest with management teams with extensive experience in those areas or alongside local co-investors. Lime Rock will be particularly cautious about investing in certain markets given the political sensitivity of foreign resource ownership in many countries. Lime Rock also believes that it can manage exploration risk in certain investments by using the latest technology to lower exploration risk, backing experienced

management teams with expertise in a particular field, hedging a portion of its commodity exposure, and by seeking control of significant capital expenditures on exploration-oriented projects on either a board or investment committee level.

General Business and Management Risk

Investments in portfolio companies subject the Funds to the general risks associated with the underlying businesses, including market conditions, changes in regulatory requirements, reliance on management at the company level, interest rate and currency fluctuations, general economic downturns, domestic and foreign political situations and other factors. With respect to management at the portfolio company level, many portfolio companies rely on the services of a limited number of key individuals, the loss of any one of whom could significantly adversely affect the portfolio company's performance. While in all cases the Adviser will monitor portfolio company management, management of each portfolio company will have day-to-day responsibility regarding the operation of such portfolio company.

Liquidity Issues

The Funds generally invest in instruments where there is likely to be no actively traded market. Moreover, many of the Fund's investments may be held by relatively few other investors. Under adverse market or economic conditions or in the event of adverse changes in the financial condition of the issuer or of the asset, a Fund may find it more difficult to sell such instruments when the Adviser believes it advisable to do so or may be forced to sell them at prices lower than if the instruments were widely held. It is uncertain as to when profits, if any, will be realized. Losses on unsuccessful investments may be realized before gains on successful investments are realized. The return of capital and the realization of gains, if any, generally will occur only upon the partial or complete disposition of an investment. Thus, the range of disposal strategies available to the Funds may be further limited. Finally, dispositions of investments may be subject to contractual and other limitations on transfer, or other restrictions that would interfere with subsequent sales of such investments or adversely affect the terms obtainable upon a disposition. Before such time, there may be no current return on investment and expenses of operating a Fund may exceed its income.

Highly Competitive Market for Investment Opportunities

The activity of identifying, completing and realizing attractive investments is highly competitive and involves a high degree of uncertainty. The Funds face competition from numerous competitors in all fields of activity. The Funds will be competing for investments with a variety of other investment vehicles, as well as with individuals, financial institutions and other institutional investors. Additional private investment funds with similar investment objectives may be formed in the future by other unrelated parties. There can be no assurance that a Fund will be able to locate and complete investments which satisfy its investment objectives or that it will be able to invest fully its available capital. The Funds' Limited Partners will be required to bear Management Fees through such Funds during the commitment period based on the entire amount of the Limited Partners commitment to such Funds and other expenses pursuant to the Governing Fund Documents.

Valuation of Assets

Most of the securities owned by the Funds are not publicly traded and are required to be fair valued by the Adviser. When estimating fair value, the Adviser will apply a methodology based on its best

judgment that is appropriate in light of the nature, facts and circumstances of the investments. Valuations are subject to multiple levels of review for approval and ensuring that portfolio investments are fairly valued is an important focus of the Adviser. There can be no assurance that the Adviser will have all the information necessary to make valuation decisions in respect of these investments, or that any information provided by third parties on which such decisions are based will be correct. There can be no assurance that the valuation decision of the Adviser with respect to an investment will represent the value realized by the relevant Fund on the eventual disposition of such investment or that would, in fact, be realized upon an immediate disposition of such investment on the date of its valuation. Accordingly, the valuation decisions made by the Adviser may cause it to ineffectively manage the relevant Fund's investment portfolios and risks, and may also affect the diversification and management of such Fund's portfolio of investments.

No Assurance of Returns
There is no assurance that the Funds will be able to generate returns for its Investors or that the returns will be commensurate with the risks of investing in the types of companies and transactions described herein. There can be no assurance that the Funds' investment objectives will be achieved or that there will be any return of capital. Therefore, an investor should only invest in a Fund if the investor can withstand a total loss of its investment. The past investment performance of the entities with which officers and employees of the Adviser have been associated cannot be taken to guarantee future results of any investment in the Funds.

Industry Concentration and Diversification
Since the Funds' investments are concentrated within a particular industry or related group of industries (the energy sector), an investment in a Fund may be subject to greater market fluctuations than an investment in a portfolio of securities representing a broader range of industries. As a consequence, the aggregate return on a Limited Partner's investment in the Funds may be substantially adversely affected by the unfavorable performance of even a single portfolio investment.

Leverage
Certain of the Funds may make equity investments in companies whose capital structures may include leverage in significant amounts. While the use of leverage may increase the potential returns on equity, leverage also increases the risk of loss since borrowings represent a prior claim on assets and require fixed payments regardless of the profitability of particular investments encumbered by such borrowings. In the case of default under any borrowing, some or all of the assets of the borrower could be taken by the lenders in payment of their claims. Moreover, the leveraged capital structures of portfolio companies will increase the exposure of a Fund's investments to any deterioration in a company's condition or industry, competitive pressures, an adverse economic environment or rising interest rates (which have been at or near historic lows) and could accelerate and magnify declines in the value of such Fund's investments in the leveraged portfolio companies in a down market.

Derivatives
The Funds do not intend to trade in derivatives for speculative purposes but may use such transactions at the portfolio company level (or in the case of the Resources Funds, at the fund level) to reduce commodity price risk associated with their investments. The prices of commodities and

related derivative instruments may be subject to periods of extreme volatility. Price movements in commodities and derivatives are influenced by many factors, including, without limitation, supply and demand relationships, fiscal, monetary, and trade policies, and political events. As a result, a portfolio company's (or a Resource Fund's) use of derivative transactions may be affected by such volatility as well as by any market disruption and unanticipated changes in interest rates, securities prices, or currency exchange rates, all of which may expose the portfolio company (or Resource Fund) to the risk of material financial loss or may reduce a Fund's ability to hedge commodity prices. In addition, the portfolio company (or Resource Fund) will be at risk for the performance of the counterparty on the derivative transaction. In the event that the counterparty defaults, the cost of replacing the transaction or the counterparty could be significant.

<u>Nature of Investments in the Energy Sector</u>
Investments in the energy sector may be subject to a variety of risks, not all of which can be foreseen or quantified.  Such risks may include but are not limited to: *(i)* the risk that the technology employed in an energy project will not be effective or efficient; *(ii)* uncertainty about the availability or efficacy of energy sales agreements or fuel supply agreements that may be entered into in connection with a project; *(iii)* risks that regulations affecting the energy industry will change in a manner detrimental to the industry; *(iv)* environmental liability risks related to energy properties and projects; *(v)* risks of equipment failures, fuel interruptions, loss of sale, and supply contracts or fuel contracts, decreases or escalations in power contract or fuel contract prices, bankruptcy of key customers or suppliers, tort liability in excess of insurance coverage, inability to obtain desirable amounts of insurance at economic rates, acts of God and other catastrophes; *(vi)* uncertainty about the extent, quality, and availability of oil and gas reserves; *(vii)* the risk that interest rates may increase, making it difficult or impossible to obtain project financing, or impairing the cash flow of leveraged projects; and *(viii)* the risk of changes in values of companies in the energy sector whose operations are affected by changes in prices and supplies of energy fuels (prices and supplies of energy fuels can fluctuate significantly over a short period of time due to changes in international politics, energy conservation, the success of exploration projects, the tax and other regulatory policies of various governments, and the economic growth of countries that are large consumers of energy, as well as other factors).  The occurrence of events related to the foregoing may have a material adverse effect on the Funds and their investments.  Because of the Fund's sector focus, investment-related decisions and determinations, such as portfolio construction and diversification, may generally differ as compared to a more broadly-focused private equity fund.  When making such decisions and determinations, the Adviser may emphasize factors in a different manner and consider different factors, in each case, as compared to such decisions and determinations relating to a more broadly-focused private equity fund.

In addition to the foregoing, certain of the companies in which the Funds invest may be subject to the risks inherent in acquiring or developing recoverable oil and natural gas reserves, including capital expenditures for the identification and acquisitions of projects, the drilling and completing of wells, and the conduct of development and production operations.  The presence of unanticipated pressures or irregularities in formations, miscalculations, or accidents may cause such activity to be unsuccessful, which may result in losses.  Furthermore, successful investment in oil and natural gas properties and other related facilities and properties requires an assessment of *(i)* recoverable reserves, *(ii)* future oil and natural gas prices, *(iii)* operating and capital costs, *(iv)* potential environmental and other liabilities, and *(v)* other factors; such assessments are necessarily inexact

and their accuracy inherently uncertain.  Also, the revenues generated by certain of the companies in which the Funds invest may be dependent on the future prices of and the demand for oil and natural gas.  Oil and gas investments may have significant shortfalls in projected cash flow if oil and gas prices decline from levels projected at the time the investment is made.  Various factors beyond the control of the Funds will affect prices of oil, natural gas, and natural gas liquids, including the worldwide supply of oil and natural gas, political instability or armed conflict in oil and natural gas producing regions, the price of foreign imports, the level of consumer demand, the price and availability of alternative fuels, the availability of pipeline capacity, and changes in existing government regulation, taxation, and price control.  Prices for oil and natural gas have fluctuated greatly during the past, and markets for oil, natural gas, and natural gas liquids continue to be volatile.

Investments in the energy sector may entail risks associated with more mature businesses and heavily regulated industries. The energy and natural resources industries are subject to comprehensive U.S. federal, state and local laws and regulations as well as non-U.S. laws and regulations. Further, environmental laws, rules, regulations and regulatory initiatives play a significant role in the energy and natural resources industries and can have a substantial impact on investments in these industries. Failure to comply with any such requirements could have a material adverse effect on a portfolio company, and there can be no assurance that portfolio companies will at all times comply with all applicable environmental laws, rules, regulations and permit requirements.

<u>Material Non-Public Information; Other Regulatory Restrictions</u>
As a result of the operations of the Adviser and its affiliates, the Adviser frequently comes into possession of confidential or material non-public information.  Therefore, the Adviser and its affiliates may have access to material, non-public information that may be relevant to an investment decision to be made by a Fund.  Consequently, a Fund may be restricted from initiating a transaction or selling an investment which, if such information had not been known to it, may have been undertaken on account of applicable securities laws or the Adviser's internal policies. Due to these restrictions, a Fund may not be able to make an investment that it otherwise might have made or sell an investment that it otherwise might have sold. Similarly, anti-money laundering, anti-boycott and economic and trade sanction laws and regulations in the United States and other jurisdictions may prevent Lime Rock or the Funds from entering into transactions with certain individuals or jurisdictions. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") and other governmental bodies administer and enforce laws, regulations and other pronouncements that establish economic and trade sanctions on behalf of the United States.  Among other things, these sanctions may prohibit transactions with or the provision of services to, certain individuals or portfolio companies owned or operated by such persons, or located in jurisdictions identified from time to time by OFAC. Additionally, antitrust laws in the United States and other jurisdictions give broad discretion to the U.S. Federal Trade Commission, the United States Department of Justice and other U.S. and non-U.S. regulators and governmental bodies to challenge, impose conditions on, or reject certain transactions. In certain circumstances, antitrust remedies relating to one Fund's acquisition of a portfolio company may require one or more other Funds to sell all or a portion of certain portfolio companies owned by them.

<u>Cybersecurity Risk</u>

With the increased use of technologies such as the Internet to conduct business, the Adviser and the Funds are susceptible to operational, information security and related risks. In general, cyber incidents can result from deliberate attacks or unintentional events. Cyber attacks include, but are not limited to, gaining unauthorized access to digital systems (e.g., through "hacking" or malicious software coding) for purposes of misappropriating assets or sensitive information, corrupting data, or causing operational disruption. Cyber attacks may also be carried out in a manner that does not require gaining unauthorized access, such as causing denial-of-service attacks on websites (*i.e.*, efforts to make network services unavailable to intended users). Cyber incidents affecting the Adviser's and other service providers (including, but not limited to, accountants, prime brokers and financial intermediaries) have the ability to cause disruptions and impact business operations, potentially resulting in financial losses, interference with the Funds' ability to value its securities or other investments, impediments to trading, the inability of investors to transact business, violations of applicable privacy and other laws, regulatory fines, penalties, reputational damage, reimbursement or other compensation costs, or additional compliance costs. Similar adverse consequences could result from cyber incidents affecting issuers of securities in which the Funds invest, counterparties with which the Funds engage in transactions, governmental and other regulatory authorities, exchange and other financial market operators, banks, brokers, dealers, insurance companies and other financial institutions (including financial intermediaries and service providers for investors) and other parties. To the extent that a portfolio company is subject to cyber-attack or other unauthorized access is gained to a portfolio company's systems, such portfolio company may be subject to substantial losses in the form of stolen, lost or corrupted (i) customer data or payment information; (ii) customer or portfolio company financial information; (iii) portfolio company software, contact lists or other databases; (iv) portfolio company proprietary information or trade secrets; or (v) other items. In certain events, a portfolio company's failure or deemed failure to address and mitigate cybersecurity risks may be the subject of civil litigation or regulatory or other action.

In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future. While the Funds' significant service providers have established business continuity plans in the event of, and risk management systems to prevent, such cyber incidents, there are inherent limitations in such plans and systems including the possibility that certain risks have not been identified. Furthermore, the Funds cannot control the cyber security plans and systems put in place by its service providers or any other third parties whose operations may affect the Funds or their investors. The Funds and their investors could be negatively impacted as a result.

<u>Conflicts of Interest</u>
Investors should be aware that there may be occasions where Lime Rock and its affiliates encounter potential conflicts of interest in connection with the Funds' activities. Lime Rock and its affiliates may engage in activities involving the energy industry including financial advisory activities and investment activities that are independent from, and may from time to time conflict with, that of the Funds. In certain circumstances, the interests of Lime Rock and its affiliates conflict with the interest of the Funds and their Investors. Also, as a result of existing investments and activities, the Lime Rock investment team and their affiliates may from time to time acquire confidential information that they will not be able to use for the benefit of the Funds. Any of these situations subjects Lime Rock and/or its affiliates to potential conflicts of interest.

Lime Rock attempts to resolve such conflicts of interest in light of its obligations to investors in its Funds and the obligations owed by Lime Rock's advisory affiliates to investors in investment vehicles managed by them, and attempts to allocate investment opportunities among a Fund, other Funds and such investment vehicles in a fair and equitable manner. To the extent that an investment or relationship raises particular conflicts of interest, Lime Rock will review the circumstances of such investment or relationship with a view to addressing and reducing the potential for conflict. Where necessary, Lime Rock consults and receives consent to conflicts from an advisory committee consisting of Limited Partners of the relevant Fund(s) and such other investment vehicles.

## Item 9:  Disciplinary Information

On January 17, 2017, the SEC instituted administrative proceedings against Lime Rock, pursuant to Sections 203(e) and 203(k) of the Advisers Act, finding that Lime Rock had violated Advisers Act Rule 206(4)-5 when an employee made a $1,000 personal contribution to the campaign of a candidate for President of the United States, and then governor of Ohio, while Lime Rock advised a pooled investment vehicle where an Ohio public entity was an investor. The SEC found that after the contribution was made, its return was sought and received, and noted that Advisers Act Rule 206(4)-5 does not require a showing of quid pro quo or actual intent to influence an elected official or candidate.  Without admitting or denying liability, Lime Rock agreed to pay $75,000 to resolve the matter.

## Item 10:  Other Financial Industry Activities and Affiliations

Lime Rock organizes and sponsors the Funds, which are private investment companies.  These pooled investment vehicles managed by Lime Rock are controlled by affiliated General Partner entities ("GP Entities"). Lime Rock or the GP Entities will be responsible for all decisions regarding portfolio transactions of the Funds and have full discretion over the management of the Funds' investment activities.  While the GP Entities are not separately registered as investment advisers with the SEC, all of their investment advisory activities are subject to the Advisers Act and the rules thereunder.  In addition, employees and persons acting on behalf of the GP Entities are subject to the supervision and control of Lime Rock.  Thus, the GP Entities and employees acting on behalf of the GP Entities would be "persons associated with" the registered investment adviser so that the SEC could enforce the requirements of the Advisers Act on the GP Entities.

Certain GP Entities will have an investment in a Fund or Funds.  Therefore, Lime Rock may be considered to participate indirectly in transactions effected for those clients. The foregoing relationships, fees, and any other actual or potential conflicts of interest arising therefrom are disclosed in the respective Governing Fund Documents.

Employees of the Adviser may serve as directors and officers of certain portfolio companies and, in that capacity, will be required to make decisions that consider the best interests of such portfolio companies and their respective shareholders.  In certain circumstances, for example in situations involving bankruptcy or near-insolvency of a portfolio company, actions that may be in the best interests of the portfolio company may not be in the best interests of the Fund, and vice versa. Accordingly, in these situations, there will be conflicts of interest between such individual's duties as an employee of the Adviser and such individual's duties as a director or officer of such portfolio company.

Furthermore, decisions regarding whether and to whom to offer co-investment opportunities may be made by Lime Rock or its related persons in consultation with other participants in the relevant transactions, such as a co-sponsor. Co-investment opportunities may, and typically will, be offered to some and not to other Lime Rock clients. When and to the extent that employees and related persons of Lime Rock and its affiliates make capital investments in or alongside certain Funds, Lime Rock and its affiliates are subject to conflicting interests in connection with these investments. There can be no assurance that any Fund's return from a transaction would be equal to and not less than another Fund or person participating in the same transaction or that it will be as favorable as it would have been had such conflict not existed.

## Item 11:  Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

Pursuant to Rule 204A-1 of the Advisers Act, Lime Rock has adopted a written Code of Ethics (the "Code") predicated on the principle that the Adviser owes a fiduciary duty to the Funds. The Code is designed to address and avoid potential conflicts of interest and is applicable to all officers, directors, members, partners or employees of Lime Rock (the "Employees"). The Adviser requires its Employees to act in the Funds' best interests, abide by all applicable regulations and avoid any action that is, or could even appear to be, legally or ethically improper.

Lime Rock generally prohibits employees from purchasing or selling securities that are held by the Funds. Additionally, Lime Rock requires pre-clearance before purchasing an IPO or limited offering (i.e., private placement); requires periodic reporting of access persons' personal securities transactions and holdings; and requires prompt internal reporting of Code violations. Lime Rock endeavors to maintain current and accurate records of all personal securities accounts of its access persons in an effort to monitor all such activity. A copy of the Code is available to investors upon request.

Certain transactions in which Lime Rock engages may require, for either business or legal reasons that no Employees trade in the subject securities for specified time periods. Such securities will appear on a list (the "Restricted List") that will be circulated to all Employees. Employees are not permitted to trade on securities on the Restricted List.

Principals and employees of Lime Rock and its affiliates may directly or indirectly own an interest in one or more Funds.

## Item 12:  Brokerage Practices

The Adviser focuses on making investments in private securities, and does not ordinarily deal with any financial intermediary such as a broker-dealer; therefore commissions are not ordinarily payable in connection with such investments. To the limited extent Lime Rock transacts in public securities, or other non-private equity investments (e.g., currency hedging), Lime Rock will, consistent with its fiduciary obligations, seek to obtain best execution. Lime Rock intends to select brokers based upon the broker's ability to provide best execution for the Funds. Lime Rock and/or the General Partner are generally authorized to make the following determinations, subject to each Fund's

investment objectives and restrictions, without obtaining prior consent from the relevant Fund or any of its Investors: (1) which securities or other instruments to buy or sell; (2) the total amount of securities or other instruments to buy or sell; (3) the executing broker or dealer for any transaction; and (4) the commission rates or commission equivalents charged for transactions.

The Adviser does not participate in any soft dollar arrangements outside of receiving research generally available to other institutional investors.  Research services received from brokers and dealers are supplemental to Lime Rock's own research effort.  To the best of Lime Rock's knowledge, these services are generally made available to all institutional investors doing business with such broker-dealers.  The Adviser does not separately compensate such broker-dealers for the research and does not believe that it "pays-up" for such broker-dealers' services due to the difficulty associated with the broker-dealers not breaking out the costs for such services.

<u>Trade Allocation</u>
The Adviser is required to act in a manner that is considered fair, reasonable, and equitable in allocating investment opportunities to the Funds and any other Lime Rock investment vehicles. In allocating investment opportunities among the Funds and any other Lime Rock investment vehicles, the Adviser will act in good faith and will consider factors reasonably appropriate for such determinations, including, but not limited to, investment strategies, risk tolerances, the nature of the investment, investment time frames, and other similar factors.

## Item 13:  Review of Accounts

All investments are reviewed and approved by the relevant Fund's Investment Committee. The Partners Funds' portfolio companies and the Resources Funds' oil and gas properties are reviewed on a continuous basis and the investment personnel meet regularly to discuss investment ideas, economic developments, industry outlook and other issues related to current holdings and potential investment opportunities.  Some of the processes and procedures utilized by Lime Rock to monitor and review portfolio companies and oil and gas properties and to mitigate risk include the following:

- Regular weekly communications and formal updates on Lime Rock portfolio companies and weekly communications on the Resources Funds' performance;
- Active hedging program for Resources Funds, to limit the funds' commodity price risk, with regular meetings of the investment team to monitor hedges;
- Quarterly valuation exercises and annual audit/third-party reserve report to analyze, monitor, and judge individual portfolio company performance and reserve base; and
- Firm-wide discussions in person twice per year to review and highlight important events or risks.

Lime Rock provides each Limited Partner of the Partners Funds, the Resources Funds and the Co-investment Funds with the following reports in accordance with the terms of the applicable Governing Fund Documents: (i) audited annual financial statements; (ii) unaudited quarterly financial statements for the first three quarters of a year; (iii) individual capital account statements on a quarterly basis; and (iv) annual tax information necessary to complete any applicable tax returns. Lime Rock also holds annual meetings with the Limited Partners of the Partners Funds and Resources Funds.

# Item 14:  Client Referrals and Other Compensation

From time to time, Lime Rock may enter into solicitation arrangements pursuant to which it compensates third parties for referrals that result in a potential investor becoming a limited partner in a Fund. Any fees payable to any such placement agents will be borne by Lime Rock indirectly through an offset against the Management Fee.  Related expenses incurred pursuant to the relevant placement agent or similar agreement, including but not limited to placement agent travel, meal and entertainment expenses, typically are borne by the relevant Funds as part of their syndication costs.

As described in Section 5 above, Lime Rock does not typically charge transaction or monitoring fees, but in certain circumstances it may receive Fee Income.  An amount ranging from 80% to 100% of all Fee Income paid by portfolio companies that are received by Lime Rock, the General Partner or any of its affiliates, net of any related expenses, will be applied to reduce future Management Fees otherwise payable.  All such fees will be allocated between the applicable Fund and any related co-investing entities on the basis of capital committed by each to the relevant investment.  Management Fee reductions will be carried forward if necessary.  Investors who pay no management fees with respect to the Co-investment Funds are allocated their pro rata share of any monitoring fee payable to the Co-investment Funds as fee income, although in the case of one of the Co-investment Funds, Lime Rock is entitled to collect any directors' fees (but not monitoring fees) paid to its employees for serving on the board of the portfolio company (this company did not pay directors' fees until 2018).  Additionally, Fee Income received by Lime Rock in respect of funds for which it has *waived* the right to collect Management Fees will be retained by Lime Rock up to the amount of total Management Fees payable.  At this time, only Fund III falls into this category.

# Item 15:  Custody

All assets of the Funds (other than privately offered securities) are held in custody by unaffiliated qualified custodians (i.e., broker-dealers or banks).  Lime Rock has access to client accounts since it or an affiliate serves as the investment manager or general partner of each Fund. Investors will not receive statements from the custodian.  Instead, the Funds, pursuant to Advisers Act Rule 206(4)-2, are subject to an independent annual audit by an independent public accountant that is registered with, and subject to regular inspection by, the Public Company Accounting Oversight Board.  Each such Fund's audited financial statements is prepared in accordance with generally accepted accounting principles and are generally distributed within 90 days of the applicable Fund's fiscal year end, pursuant to the Governing Fund Documents.  Limited Partners should carefully review these statements, and should compare these statements to any account information provided by the Adviser.

# Item 16:  Investment Discretion

In accordance with the terms and conditions of the Governing Fund Documents, and subject to the direction and control of the General Partner of each Fund, the Adviser generally has discretionary authority to determine, without obtaining specific consent from the Funds or its Limited Partners, the securities and the amounts to be bought or sold on behalf of the Funds, and to perform the day-to-day investment operations of the Funds.

## Item 17:  Voting Client Securities

In accordance with its fiduciary duty to clients and Rule 206(4)-6 of the Advisers Act, Lime Rock has adopted and implemented written policies and procedures governing the voting of client securities.

Lime Rock shall vote client proxies in the best interests of its clients.  Lime Rock's investment professionals are generally responsible for making voting decisions with respect to proxies received.

In exercising its voting discretion, Lime Rock and its employees will seek to avoid any direct or indirect conflict of interest raised by such voting decision. All conflicts of interest will be resolved in the interests of Lime Rock's clients.  In situations where Lime Rock perceives a material conflict of interest, Lime Rock may defer to the voting recommendation of an independent third party provider of proxy services, or take such other action in good faith which would protect the interests of Lime Rock's clients.

Certain investment professionals of Lime Rock may serve as board members for the Funds' portfolio companies.  In situations where Lime Rock votes the proxy for a company in which an employee of Lime Rock serves on the board of directors, Lime Rock has determined that this does not inherently present a conflict of interest as the purpose for serving on the board is to maximize the return on the Funds' investment and to ensure that the Funds' best interests are protected.

All proxies that Lime Rock receives will be treated in accordance with these policies and procedures.  A copy of Lime Rock's written proxy voting policies and procedures, as well as a record of how Lime Rock has voted in the past, will be maintained and available for review upon written request.

## Item 18:  Financial Information

A balance sheet is not required to be provided as Lime Rock (i) does not solicit fees more than six months in advance, (ii) does not have a financial condition that is likely to impair its ability to meet contractual commitments to clients or (iii) has not been subject to any bankruptcy proceeding during the past 10 years.

# EXHIBIT 18

About Us    Our Approach    Team    Portfolio    Ne    Lime Rock Resources.

 **LIME ROCK PARTNERS**    Who We Are



John Reynolds
Co-Founder and Managing Director

John Reynolds is co-founder and a Managing Director of Lime Rock. He joined Goldman Sachs in 1992 and spent six years in the Investment Research Department where he had senior analyst responsibility for global oil service sector research and was one of the top-rated analysts in the sector. He co-founded Lime Rock in 1998. John is a graduate of Bucknell University (B.A.), where he now serves on the Board of Trustees.

Based in Westport, Connecticut, John leads the Lime Rock Partners team's efforts in the global oilfield service sector. He currently serves on the board of directors of Blackjewel and Shelf Drilling. He previously served on the board of directors of Archer, Eastern Drilling, EnerMech, Hercules Offshore, IPEC, Noble Rochford Drilling, Patriot Drilling, Roxar, Sensa, Tercel Oilfield Products, Tesco, Torch Offshore, and VEDCO Holdings.

1/14/2020

Lime Rock Partners | Team | John Reynolds

Back to Team

## PORTFOLIO HIGHLIGHTS







Disclosure

© 2020 LIME ROCK PARTNERS. ALL RIGHTS RESERVED.

# EXHIBIT 19

About Us      Our Approach      Team      Portfolio      Ne      Lime Rock Resources

 # Who We Are



# Mark McCall

**Managing Director**

Mark McCall is a Managing Director of the Lime Rock New Energy team with responsibility for deal sourcing, execution, and overall fund management. Mark was appointed by President Obama to serve as the Executive Director of the Loan Programs Office at the U.S. Department of Energy from 2015 to 2017. In that capacity, he reported directly to the Secretary of Energy and was responsible for a $30 billion portfolio of existing clean energy technology investments, as well as originating new loans from four loan programs designed to support the commercialization of innovative technologies spanning the automotive, nuclear, hydrocarbons, and renewables industries. Mark joined Lime Rock Partners at its inception in 1998 and served as the firm's first Chief Financial Officer (17 years) and General Counsel (12 years). He also served as a member of the Lime Rock Partners Investment Committee for 13 years. Excluding his time of service in the Department of Energy, he had oversight responsibility for the operational functions of both Lime Rock Partners and Lime Rock Resources, including accounting, tax, legal, compliance, human resources, and information technology.

Prior to joining Lime Rock, Mark worked at Delus Corporation, Lehman Brothers, and E–II Holdings in positions in finance and international business. Based in Westport, Connecticut, Mark previously served on the board of directors of Deer Creek Energy, Nexcom Telecommunications, Noble Rochford Drilling, and SmartSynch, Inc. He is a graduate of Georgetown University (B.A.) and Yale Law School (J.D.). (See www.lrnewenergy.com).

Back to Team

Disclosure

© 2020 LIME ROCK PARTNERS. ALL RIGHTS RESERVED.