1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
2

3       _____
                                       )
4       IN RE: KIDD                    )
                                       ) No. 3:20-MC-00016-TOF
5                                      )
                                       ) May 1, 2020
6                                      )
                                       ) 2:05 p.m.
7                                      )
                                       ) 450 Main Street
8                                      ) Hartford, Connecticut
        _____)
9

10

11

                        MOTION HEARING (VIA ZOOM)
12

13

14
        B E F O R E:
15
               THE HONORABLE THOMAS O. FARRISH, U.S.M.J.
16

17

18

19

20

21
                        Official Court Reporter:
22                      Melissa J. Cianciullo, RMR, CRR, CRC
                        (203) 606-1794
23

24

25

```
 1   A P P E A R A N C E S:

 2   For the Respondents John Thomas Reynolds and Mark
     McCall:
 3
           Toby S. Soli, Esq.
 4         Greenberg Traurig
           200 Park Avenue
 5         New York, NY 10166
           (212) 801-3196
 6         Email: Solit@gtlaw.com

 7
     For the Movant Robert Gordon Kidd:
 8
           Adam Lavine, Esq.
 9         Kobre & Kim LLP
           800 Third Avenue
10         6th Floor
           New York, NY 10022
11         (212) 488-1200
           Email: Adam.lavine@kobrekim.com
12
           Bryan L. LeClerc, Esq.
13         Berchem Moses P.C.
           75 Broad Street
14         Milford, CT 06460
           (203) 783-1200
15         Email: Bleclerc@berchemmoses.com

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to Order, 2:05 p.m.)

 2         THE COURT:  Thank you, Mr. Wood.

 3         And good afternoon, everyone.  And good

 4    evening to those who are calling in from Europe.

 5         We're here in the matter of In re: Kidd.

 6    It's on the docket as Number 3:20-MC-16.  My name is

 7    Judge Farrish.

 8         We're here for a hearing on the motion to

 9    quash of the respondents John Thomas Reynolds and

10    Mark McCall.  It's docketed at, I think, ECF Number

11    8, is it, or 9, docketed at ECF Number 9.

12         Okay.  May I have the appearances of counsel,

13    please, beginning with the petitioner.

14         MR. LeCLERC:  For the petitioner Mr. Kidd,

15    Mr. Brian LeClerc, Berchem Moses.

16         MR. LAVINE:  Good afternoon, Your Honor.

17    Adam Lavine of Kobre & Kim on behalf of Mr. Kidd.

18         Also on the line is David Kerr who is a

19    declarant in this matter at the moment as well as,

20    among others, lead counsel for Mr. Kidd in Scotland

21    Andrew Smith QC.

22         THE COURT:  Okay.  Very well.  Thank you.

23    And for the respondent, please.

24         MS. SOLI:  Yes.  Good afternoon, Your Honor.

25    Toby Soli with Greenberg Traurig for respondents
```

```
 1    Mr. Reynolds and Mr. McCall.

 2            THE COURT:   Okay.   Good afternoon, Ms. Soli.

 3            So let me begin by saying that I've read

 4    every document that the parties have filed.   Given

 5    their volume, I hope you'll forgive me, I don't have

 6    fingertip demand of every word in them.   But the

 7    quality of the papers was at a very high level on

 8    both sides, and I thank you for that.   And it leaves

 9    me with only a few questions.

10            So what I propose to do, rather than do a

11    traditional oral argument, is just start with, to

12    respond, I'll tell you that one question that's still

13    weighing on me as I read the papers, and it concerns

14    the apex discovery principle.

15            So, if I could, let me just give you my

16    understanding of that principle by using some

17    examples.   So let's imagine that somebody slips and

18    falls on a wet floor at the McDonald's restaurant

19    right over here on Washington Street in Hartford,

20    Connecticut, and then they seek to depose the CEO of

21    McDonald's out in the corporate office in Chicago.

22    In that case I completely understand why the

23    plaintiff would need to make some showing of personal

24    knowledge on the part of the CEO before he should be

25    given the keys to depose him.
```

1          But now instead let's imagine a 10- or a

2    20-person financial firm down in Greenwich, it does

3    eight or ten big deals a year and the guy who's the

4    CEO is involved in every aspect of the organization

5    and then it gets sued over one of them.  In that case

6    I don't understand the CEO to be able to avoid a

7    deposition just by saying, well, I'm a CEO and you've

8    got to start with everybody below me and work your

9    way up and depose me and -- me only if you find out

10   that there's some fact you can't from -- get from

11   somebody else.

12          So all of that is a very long wind up to

13   asking you, Ms. Soli, don't I need to know something

14   more about what kind of companies the Lime Rock

15   Partners are than what's been placed in the record

16   before me?  And don't I need to know something more

17   about the improbability of the respondents knowing

18   anything about this transaction before I can invoke

19   the apex discovery principle?

20          MS. SOLI:  Yes, Your Honor, I would agree

21   that you probably need additional information.  But I

22   would state that it's the petitioner's obligation to

23   set forth some basis as to why he believes that

24   Mr. McCall or Mr. Reynolds might actually have

25   relevant information as participants.

1          And I think in your hypothetical, for

2     example, you had eight to ten people at a Greenwich

3     firm and where the CEO was involved in the

4     transaction, this is a situation actually with --

5     we're talking about Lime Rock Management, a

6     particular management company, having offices both in

7     Westchester and in Texas.  There's approximately

8     30-plus individuals at both locations, so a total of

9     60 individuals.  And those individuals that the

10    petitioner has been able to determine from the

11    extensive discovery and litigation that has been

12    going on for years, long before I got involved in

13    this case, petitioner has identified the individuals

14    for Lime Rock Management that were involved in the

15    transaction some ten, twelve years ago, and that is

16    Mr. Lawrence Ross and Mr. Jason Smith, both of who

17    are defenders, i.e., defendants, in the Scottish

18    litigation.

19          So we would submit that the petitioner has

20    the obligation to show that Mr. McCall or

21    Mr. Reynolds have some relevant information before

22    they just start off with them being the high-level

23    executives that they are at a firm that does have

24    multiple employees and do not just ten or twelve

25    transactions a year but many more transactions across

1  -- internationally and that this particular

2  transaction was over ten, twelve years ago that it

3  started.

4      So there's been no showing by the petitioner

5  that either of the respondents have any

6  individualized knowledge about the particular

7  transactions.

8      We believe, in contrast, that they were

9  picked specifically for burdensome and harassment

10 ideas, not because they believe that they have

11 anything involved with or particular knowledge with

12 respect to the transaction.

13     THE COURT:  Okay.  So I do understand the

14 respondents to say that it is the petitioner's burden

15 to show that these guys know something, in other

16 words, that we're kind of in a McDonald's situation

17 here although not that extreme, perhaps.  And, you

18 know, as I decide this, I'll go back to chambers and

19 I'll consider who bears what burden.

20     But let's just imagine for a second that

21 we're not in McDonald's land and they don't bear that

22 burden.  You know, in that case, I think to avoid

23 discovery, it would be the respondent's obligation to

24 affirmatively raise their hand and say I don't know

25 anything, I wasn't involved in the transaction.  And

1  is that the case here?  Did these two respondents --

2  were they not involved in the transaction?

3          MS. SOLI:  In terms of your -- that's my

4  understanding, Your Honor.  They were not involved in

5  the transaction in terms of regular e-mails,

6  negotiating the deal, et cetera.

7          I think the -- the only hesitation that I

8  make is that there are multiple entities and multiple

9  roles that these individuals play at various levels

10  of the Lime Rock entities.  And do they have a

11  position in an entity that may have had a role in the

12  transaction?  Potentially.

13          But if you're asking me practically

14  speaking -- you know, and I've spoken to them and my

15  firm has spoken to them extensively.  They said,

16  look, you know, it's a total waste of time.  I'm not

17  going to know anything.  So they were not involved

18  in --

19          THE COURT:  Well, the declarations didn't

20  quite say that though.  The declarations didn't say,

21  I don't know anything.  They say, I don't know

22  anything that anybody else wouldn't know, right?

23          MS. SOLI:  Well, I think --

24          MR. LAVINE:  Your Honor, if you would allow

25  me --

             THE COURT:  I'll get to you, Mr. Mr. Lavine.

1

2    Let me hear Ms. Soli's response to that.

3            MS. SOLI:  Yeah.  I think the difficulty in

4    -- with their affidavit, Your Honor, and addressing

5    it is they were subpoenaed individually, not in their

6    various capacities for various entities.  And so I

7    think it's difficult for them to say are they a

8    potentially managing director or a general partner of

9    an entity that ultimately had to approve the

10   transaction down the road in order for it to be

11   engaged in?  Potentially.  That's -- you know, we

12   haven't gone through all of that discovery and gone

13   through that process because those particular

14   entities that were involved are defenders in the

15   Scottish proceeding.

16           So we really felt like we were in a catch-22,

17   Your Honor, where the burden is on them to set forth

18   this information and show where they need this

19   information, yet we are in a position where it would

20   take us pulling out all of that discovery, going

21   through all of those documents in order to answer

22   them for the entities.

23           And we really believe strongly that 1782

24   should not be used in this manner because they -- of

25   the rule -- the first discretionary element that you

can consider, Your Honor, is whether they are
participants in the foreign proceeding.  And I think
this is really where the petitioner is trying to,
forgive the euphemism, have their cake and eat it
too.  They want to say that they're not participants
in the foreign proceeding because of their
individual -- because individually, they are not
named defendants, yet the documents they are seeking
are all of the documents from the actual defenders in
the proceeding.

So if the entity Lime Rock Management -- you
know, there's document requests and then there's
deposition requests.  If we're talking about, you
know, documents that the two individual respondents
would have that are not Lime Rock Management
documents, they do not have any such documents.

THE COURT:  Okay.  Well, we may get to that.
And I'll get to Mr. Mr. Lavine in a moment.  But --
and I understand your arguments about where the
burdens lie and so forth.  And as I say, I'll go back
to chambers and I'll consider that, where the burdens
lie.

But I'm -- let me just ask again, if I decide
that the burden is not on them to show, you know,
using our analogy, that the CEO of McDonald's knows

```
1    something about this fall down, but if instead the
2    burden is on you to show that you don't, that these
3    two respondents don't know anything, and that the
4    discovery is unduly burdensome in a Rule 26 sense as
5    a result, then a straight-up factual question will
6    become relevant to you.  And the straight-up factual
7    question is this:  Did this transaction cross these
8    two gentlemen's desks?
9            MS. SOLI:  Your Honor, with that, the answer
10   is no.  I have not reviewed thousands of e-mails,
11   I've not gone back to.  I cannot represent to the
12   Court that there might not -- they are copied on a
13   particular e-mail.
14           But the answer is no, they were not involved
15   and did not participate in the negotiations of this
16   transaction.
17           THE COURT:  Okay.
18           MS. SOLI:  And, Your Honor, I might just also
19   add that in terms of the burden -- and I recognize
20   and appreciate your statement that you will consider
21   that at a further point.
22           I would like to point out that the petitioner
23   in this case has -- and particularly the Kobre Kim
24   firm has been involved in this litigation for years,
25   including the preceding litigation against the law
```

 1  firm that allegedly was in breach of its fiduciary

 2  duties and had a conflict of interest.  They received

 3  and have in their possession hundreds of pages of

 4  documents.  I have an index that I could read to the

 5  Court of all of the documents that they've received

 6  and they used to prepare this petition that -- to

 7  show Your Honor in their application what the

 8  corporate structure was, what the e-mails were, et

 9  cetera.

10        And so they are -- I would submit, Your

11  Honor, that the reason that they didn't set forth

12  what the involvement of the two respondents,

13  Mr. McCall and Mr. Reynolds, were is because there

14  are no such documents.  They already have them and

15  they already know that.

16        And I would also add that this is part of the

17  reason, frankly, that this entire proceeding and

18  process has -- appears very burdensome and harassing

19  to the respondents in that this litigation has been

20  ongoing for some time, and Mr. Reynolds himself

21  received a threatening letter and a demand over a

22  year and a half ago that he might be personally sued.

23  And he responded to that letter and explained his

24  involvement, and they did not sue him and name him as

25  a defender.

1        So for them to come to the Court now seeking

2   his deposition, seeking for him to be obligated to go

3   and produce all of the underlying documents of the

4   Lime Rock entities and putting the burden on him to

5   show that he wasn't involved, they find the entire

6   subpoena was burdensome and apex discovery,

7   specifically because they went after these two

8   individuals individually, and they did not subpoena

9   any other of these Lime Rock entities, whether

10  they're defenders or not defenders.  They subpoenaed

11  the two individuals and served them at their homes in

12  Westport and Wilton never having asked them whether

13  they would provide this information or explain

14  anything, and also submitted it to Your Honor ex

15  parte without calling and without any communications

16  to counsel who they knew were represented and a part

17  of this case.

18        So we believe that all of that, you know,

19  Your Honor, goes to the overall element that they --

20  that this is a really burdensome, harassing and meant

21  to go after apex high-level executives in discovery

22  for that purpose.

23        THE COURT:  Okay.  So I do want to ask you

24  some questions about that but with apologies for

25  seeming like a dog who just saw a squirrel.  I do

1    want to ask you something that -- you used the word

2    "service" and it just triggered a question that I was

3    going to ask you at the very beginning and I forgot.

4         So there is some stuff in your papers about

5    alleged defects in the service and, you know, the

6    location of the depositions if they were to happen

7    and whatnot.  It sounds like all of that has been

8    resolved, right?  So we're really just here talking

9    about the four discretionary Intel factors; is that

10   right?

11        MS. SOLI:  I think in some aspects, Your

12   Honor.  In terms of the location, I'm still not clear

13   whether they've agreed that we could do the

14   depositions, if they become necessary, in Westport.

15        But, yes, in terms of the service, they

16   did -- and in terms of delivering a check, they did

17   provide those afterward, yes.

18        THE COURT:  Okay.  So I don't need to decide

19   the technical service of the subpoena grounds.  Okay.

20   Very well.

21        So returning to the substance of what you

22   were saying there, so if it's true that every

23   document that Messrs. Reynolds and McCall control

24   have been produced to the Kobre Kim firm in the

25   context of other proceedings, that would have been a

1    simple matter of put in an affidavit, right?  And

2    what do I make of the fact that I don't have that?

3    How does that filter into the fourth Intel factor in

4    the Rule 26 analysis.

5         MS. SOLI:  Right.  Let me just clarify, and I

6    apologize if I misspoke.  I'm not indicating that all

7    of the Lime Rock entities have already produced all

8    of the documents in the Scottish proceeding that is

9    currently pending.  That proceeding is at its infancy

10   stages.

11        What I was suggesting is given the prior

12   litigation and the prior communications with the law

13   firm, when they sued P&W, the law firm, and the

14   lawyer who had alleged by been in the conflict, the

15   e-mails that were going back and forth from Lime Rock

16   to that law firm, I understand, have already been

17   produced and were part of the letters when they sent

18   the demand letter draft complaint to Mr. Reynolds.

19        THE COURT:  Okay.  Was third-party discovery

20   served on the Lime Rock entities during the

21   proceeding against the P&W firm or -- and would they,

22   for example, have e-mails that were just internal

23   within Lime Rock?  Or did they -- was instead

24   discovery only served on P&W and, therefore, all they

25   would have from those proceedings are things that

1   made their way to P&W?

2        MS. SOLI:  Your Honor, I don't know the

3   answer to that question because I wasn't involved in

4   that litigation, nor was I involved -- or involved in

5   the Scottish proceedings as well.

6        But I do want to point out, just on the

7   Scottish proceedings that have just started and the

8   procedures involved there, my understanding and as

9   set forth in the affidavits is there is an argument

10  set on -- well, there's two arguments, one coming up

11  that would be relevant to Your Honor which is

12  essentially the -- what we're calling the motion for

13  protective order.  It has a fancy name, but it's the

14  equivalent motion for a protective order.  That

15  hearing, I understand, is going to be held in

16  Scotland on May 5th, next Wednesday, number one.

17       Number two, my understanding of the Scottish

18  proceeding is there is essentially what is the

19  equivalent of a motion to dismiss proceeding taking

20  place and that that is set for June and that the

21  scope of discovery leading up to and prior to that

22  determination has already -- has been set.  And the

23  only discovery that the Scottish Court ordered was

24  for Mr. Kidd to produce the settlement agreement to

25  determine whether that action can in fact proceed.

1          But I do want to go back to just for a

2     second, because you're raising an issue about whether

3     there was third-party discovery on the Lime Rock

4     entities or now what would be party discovery on the

5     Lime Rock entities that would give you the internal

6     communications.  And I would submit, Your Honor, I'm

7     sure that there are between the funds and the

8     management company.  Both of those entities are in

9     fact defenders in the Scottish proceeding in which

10    case they are participants in the Scottish proceeding

11    and that for -- that in this case they isn't subpoena

12    Lime Rock Management.  They didn't subpoena Lime Rock

13    Fund V.  Those entities may have internal

14    communications related to the transactions, but they

15    are participants in the Scottish proceeding.  And

16    under the criteria set forth in that first factor, if

17    they are participants, then this discovery should not

18    go forward in the United States because they're

19    participating in the Scottish proceeding as

20    defenders.

21          THE COURT:  Okay.  So, Ms. Soli, I'm going to

22    let you say anything you want in support of your

23    motion.  So I don't mean to cut you off.

24          But if you may, while we've got the logical

25    thread, let me switch to Mr. Lavine here and just ask

1    him about that and what we make of the kind of

2    complex web here of what proof comes from what

3    particular Lime Rock entity.

4            So, Mr. Lavine, I think Attorney Soli has

5    just invited us to think about that in the context of

6    the first Intel factor, and I certainly will.  But I

7    also think about it in the context of the fourth

8    Intel factor.  It seems like both parties agree that

9    that factor is judged by Rule 26.  And under the

10   edition of Rule 26 that we've had since the last rule

11   change, we're supposed to kind of weigh the burden of

12   the discovery against the degree of relevance that

13   the information has and its importance to the

14   proceedings and so forth.  I'm going to state this

15   perhaps a little bit provocatively, but I want you to

16   tell me what's wrong with it.

17           So it seems to me like the marginal benefit

18   you get from Section 1782 discovery in the United

19   States over the discovery that's available to you in

20   Scotland is not so much about the claims that you

21   have pled in Scotland but about claims that you have

22   not pled against nondefenders.  Having stated it,

23   perhaps provocatively, I'd like you to react to that.

24           MR. LAVINE:  Sure.

25           THE COURT:  And tell me in particular what

1    relevance you claim to observe in, you know, that

2    additional quantum of discovery that you can obtain

3    through this proceeding, I want you to tell me how

4    it's relevant to what you pled in Scotland.

5          MR. LAVINE:  Sure.  And I actually think this

6    point goes to a number of different items that we've

7    been discussing today.  It goes to factor one and

8    whether they are participants.  It goes to burden, as

9    you suggest, on Rule 26, and it also goes directly to

10   the apex discovery doctrine.

11         And I think the best way to tackle your

12   question is to take a step back for a moment and talk

13   about what precisely the claims are in Scotland and

14   what precisely is the discovery we are seeking.

15         And so I think, Your Honor, if you've read

16   the papers, then you well know that the Scottish

17   proceeding is really claims for fraud and civil

18   conspiracy where the allegations are that certain --

19   the defenders in the current Scottish proceeding

20   played a role in, knew about and intentionally

21   facilitated the undisclosed conflict of interest of

22   Mr. Kidd's attorneys Paull & Williamsons, and they

23   did so, we allege, because it would ultimately result

24   in a better deal for Lime Rock V.

25         So these are the critical facts that we're

```
 1   trying to prove, essentially, that the defendants in
 2   Scotland knew of the conflict and they facilitated
 3   it.
 4          Now, Reynolds and McCall are or were
 5   officers, directors, control persons of three of the
 6   Scottish defenders and, therefore, their knowledge of
 7   the conflict is essential because if they had
 8   knowledge of the conflict, then such knowledge can be
 9   potentially imputed to the Scottish defendants.  And
10   so our discovery is primarily aimed at assessing
11   Reynolds' and McCall's knowledge and also relevant --
12          THE COURT:  And accordingly, you can get that
13   discovery in the Scottish proceeding, right?
14          MR. LAVINE:  Well, that is the issue, right,
15   because we can't.  We can't depose Reynolds and
16   McCall about their knowledge in the Scottish
17   proceeding.  And there's no dispute about that
18   because in the motion to quash, the procedure that is
19   suggested by Reynolds and McCall for obtaining
20   discovery or deposition testimony from Reynolds and
21   McCall is that the Scottish Court issue a letter of
22   request to Your Honor or another district court.  And
23   if that were to happen, that necessarily implies that
24   it's the U.S. courts that must exercise jurisdiction
25   over Reynolds and McCall.  So --
```

1          THE COURT:  And I'm sorry to interject, but

2     let me just make sure that I understand you.

3          So you're saying that the -- Reynolds and

4     McCall cannot be deposed under the aegis of the

5     Scottish proceeding without the help of a United

6     States court, or they can't be deposed in the

7     Scottish proceeding at all?

8          MR. LAVINE:  Without the -- the -- the way

9     it's currently pled as by respondents, who have not

10    consented to the Scottish court's jurisdiction,

11    without their consenting to such jurisdiction, there

12    would be no way, as I understand it, for a Scottish

13    Court to take discovery or to exercise any

14    jurisdiction over someone who is located in

15    Connecticut.

16         THE COURT:  Okay.  All right.  Do you mind if

17    I grab the mike back and turn to Ms. Soli and just

18    ask her to react to that.

19         So, Ms. Soli, you know, I'll give some

20    thought to what I think about deposing Mr. Reynolds

21    and Mr. McCall about the imputed knowledge of Lime

22    Rock entities that are not defenders in Scotland.

23    But I think what I hear Mr. Lavine saying is that he

24    wants to depose them about their knowledge about Lime

25    Rock entities that are defenders in Scotland but that

```
 1   for whatever reason, he's not able to do that in
 2   Scotland.
 3         And if I may, let me riff off what I think I
 4   heard him say, not because of any Scottish proof
 5   limitation but rather because the Lime Rock entities
 6   haven't consented to the jurisdiction of the Scottish
 7   court.  Is he right about all of that?
 8         MS. SOLI:  Your Honor, I -- no, he's not.
 9   And it's that last statement that you just made which
10   is because all the Lime Rock entities have not
11   consented to the Scottish jurisdiction, he's mixing
12   the individuals versus the Lime Rock entities.
13         The Lime Rock entities are defenders, and I
14   don't -- I don't know of anything in Scotland or
15   their procedures that would prevent them from asking
16   the Lime Rock entities to provide -- whether it be
17   Mr. McCall and Mr. Reynolds or other individuals who
18   could testify about the knowledge or capacity of
19   those Lime Rock entities.
20         And the problem here is that the subpoena
21   didn't go to the Lime Rock entities.  It went to
22   Mr. McCall and Mr. Reynolds individually.  And, yes,
23   they have not consented to -- because they have not
24   been -- they were not defenders, so technically
25   speaking, yes, they are not defenders and have
```

1    consented to that.  But their capacity is as

2    employees of people who are defenders.  And those

3    defenders have in fact consented to the jurisdiction

4    of Scotland and are proceeding there.

5         And, Your Honor, this is precisely why I was

6    saying they didn't ask the Scottish Court for that

7    deposition of either Mr. McCall or Mr. Reynolds or of

8    any Lime Rock individuals, where my understanding of

9    the Scottish proceeding is that there was no

10   discovery requested at this initial proceeding stage

11   and that the only discovery that was requested and

12   therefore ordered was for Mr. Kidd to produce the

13   settlement agreement.

14        So I think it -- for the respondent to say

15   that they cannot get the information about

16   Mr. Reynolds and Mr. McCall is false for two reasons:

17   Number one, they haven't asked.  And, number two, the

18   information that they are seeking is the corporate

19   information of the defenders, and I don't know of

20   anything in Scotland that would prevent that, from

21   getting that information from the defenders that are

22   participating in the litigation.

23        THE COURT:  Okay.  So when the time comes in

24   Scotland, if Mr. Lavine's Scottish correspondent were

25   to say to your Scottish correspondent, I would like

1    to depose Messrs. Reynolds and McCall in their

2    capacity as directors, or whatever their title is of

3    the Lime Rock entities that are defenders in the

4    Scottish proceeding, Lime Rock would say absolutely,

5    have at it?

6           MS. SOLI:  Well, I'm not a Scottish lawyer so

7    I don't know if those are the proper procedures.

8    But, yes, Your Honor, I don't have any reason to

9    believe that they would prohibit or not participate.

10   And, in fact, that's one of -- that invoked my

11   client's, kind of, response to this petition and all

12   these proceedings in the U.S.  Why didn't they just

13   ask in Scotland?  Just ask.

14          THE COURT:  Well, I'll turn my mind to what

15   we make of that, and we've actually probably gotten a

16   little bit far afield of where we started on this

17   inquiry.

18          So, Mr. Lavine, I'll let you respond.  But

19   let me also just ask, if we could kind of refocus

20   where this inquiry began.  So I'm trying to do is

21   kind of a traditional Rule 26 analysis that goes to

22   the fourth Intel factor, and under Rule 26, we're

23   told that we're supposed to weigh the burdensomeness

24   of the discovery against, among other things, the

25   importance of what we expect it to reveal to the

1    proceedings.

2         And I take from your papers that we hope that

3    will tell us something about Lime Rock entities that

4    are not defenders in Scotland.  But what I'm trying

5    to figure out is what it will tell us about the Lime

6    Rock entities who are defenders in Scotland.

7         So with that, I'll throw the mike back to

8    you.

9         MR. LAVINE:  Sure.  So, first off, we're not

10   just seeking the corporate information of defenders

11   in these proceedings.  We are seeking testimony from

12   Reynolds and McCall as well as documents that they

13   control, including at many nondefenders.  And so if

14   we stick to the depositions for a moment.

15        THE COURT:  Okay.

16        MR. LAVINE:  Reynolds and McCall and only

17   Reynolds and McCall can speak to the dates on which

18   they became aware of the Paull & Williamsons conflict

19   of interest.  Those were Mr. Kidd's attorneys.

20   Reynolds and McCall and only Reynolds and McCall can

21   speak to the actions that they took or failed to take

22   once they became aware of that conflict and the

23   reasonings why they took those actions or didn't take

24   those actions.

25   in other words, this is not the typically apex

discovery case where the party seeking discovery is
trying to obtain from senior-level executives
information about some transaction or event that was
largely handled by, you know, more junior folks.  The
information we're seeking is very limited, and it's
about their specific knowledge and their specific
role in this conflict of interest, because that
information goes directly to the pertinent issues in
the case, and that's imputation of knowledge to the
defendants as well as the overall corporate structure
of the Lime Rock entities.

And on the corporate structure, what I think
Ms. Soli is -- has kind of not mentioned in her
presentation or, frankly, in the papers is that when
it comes to the corporate structure here of the
defenders themselves, a critical point is that Lime
Rock V, which is a defender, is a Cayman investment
fund.  And the respondents do not deny that, like
most or all private equity investment funds, the fund
itself has no employees, right?  It holds investments
and it has limited partnership investors.

Now, as a Cayman investment fund, it's
controlled by additional layers of Cayman special
purpose entities which are the general partners.  And
as we set forth in the declaration of Rebecca Hume

1   which was included in our initial moving papers on

2   that location, the key defender in Scotland, Lime

3   Rock V, cannot act unless it is directed to do so, or

4   it cannot act but for through these Cayman entities.

5   And who are these Cayman entities controlled by?

6   They're controlled by Reynolds and McCall.

7          And so earlier there was a suggestion that

8   Reynolds and McCall were not involved in the

9   transaction.  That's just, frankly, an impossibility

10  and we think, frankly, close to misleading of the

11  Court.  Because they were certainly involved in the

12  transaction in their capacities as directors and

13  officers of the entities that actually had to make

14  the decision to invest.  That's what the corporate

15  documents of Lime Rock V, the fund, say.  They say

16  that investment decisions like the purchase of the

17  ITS shares are made by the general partners.  And,

18  again, the directors and officers of the general

19  partners are Reynolds and McCall.

20         And so when we're seeking discovery from

21  Reynolds and McCall, both deposition testimony and

22  documents, these are also deposition testimony and

23  documents related to this, these Cayman general

24  partners.  Those are not available in Scotland.  As I

25  said before, Reynolds and McCall have not submitted

1    to the jurisdiction of the Court.

2          And I think you actually have in front of you

3    declarations from two separate Scottish counsel, both

4    counsel representing Mr. Kidd and counsel

5    representing respondents, and those declarations say

6    that the way to get deposition or other testimony

7    from abroad, like Reynolds and McCall are in the

8    U.S., is through a letter of request process.  Again,

9    that process invokes your jurisdiction as a U.S.

10   court.

11         And separately, when it comes to these Cayman

12   general partners, and I can point to specific

13   document requests because I think it's helpful, but I

14   think it's document request 1C which asks for

15   communications by or other -- well, let me just pull

16   it up, if you will bear with me.

17              THE COURT:  Sure.

18              MR. LAVINE:  This is ECF 11-1.

19              THE COURT:  I've got it.

20              MR. LAVINE:  All documents executed by or on

21   behalf of you, LRP GP V Inc., LRP GP V LP or LRM GP

22   LLC in connection with the transaction.

23         These are all Cayman entities.  And

24   separately, in Questions Number 5 and 6, those

25   requests, those document requests are all about the

1   internal affairs of nondefenders, including corporate

2   organizational documents, bylaws, et cetera.  And

3   when it comes to these kinds of documents, despite

4   the kind of lawyer argument that we've received from

5   Ms. Soli and the generalized statements that she had

6   discussions with her clients about this, frankly,

7   there is no way that the corporate organizational

8   documents of Cayman SPVs somehow belong to investment

9   management companies in Delaware.  That's just

10  corporate -- kind of corporate affairs 101.

11          And so this notion that every document or

12  every piece of paper that we're seeking is available

13  through the Scottish court through defenders in that

14  case is just false.  It's true of the documents, and

15  as I explained, it's true of deposition testimony

16  which must take place in the United States.

17          THE COURT:  Okay.

18          MR. LAVINE:  And then -- sorry.  But I think

19  your -- your real question, in coming back to it, was

20  on the Rule 26 analysis.

21          THE COURT:  Right.

22          MR. LAVINE:  And so I kind of walked you

23  through why I think this information is critically

24  important, because Reynolds and McCall, their

25  knowledge is critical and the dates on which they

```
 1    learned of such conflict of interest is critical.
 2           But let's also consider this, and this goes
 3    to burden and proportionality.  Reynolds and McCall
 4    do not deny that they had knowledge of the conflict
 5    of interest prior to the closing of the transaction.
 6    They do not deny that they had a role in the subject
 7    transaction, at least in some capacity.  And I
 8    explained how clearly it's in capacity as the
 9    ultimate decision-maker at the general partner level.
10    And they do not deny having readily access to the
11    information that's available here.
12           Instead they just contend that discovery
13    ought to be denied outright.  They're not suggesting
14    that it be limited to certain documents.  They're not
15    suggesting that it be limited to alternative
16    witnesses that they propose.  They're suggesting that
17    discovery be denied outright, again, for burden.  But
18    this is entirely inconsistent with the Rule 26
19    analysis of proportionality, I mean, particularly
20    when you consider that the claims here are asserted
21    in the amount of $210 million, when you consider the
22    fact that each of respondents here is represented by
23    sophisticated counsel and have the means to fight and
24    are fighting very aggressively here and elsewhere.
25           And so to simply deny discovery outright, we
```

1    think, would be inconsistent with Rule 26 and

2    inconsistent with decisions of the Second Circuit

3    which, of course, prefer, both in civil litigation

4    and in the 1782 context, that, you know, narrowly

5    tailored discovery orders or conferences amongst

6    counsel to narrow issues is the preferred course

7    rather than denying discovery outright.

8            THE COURT:  Well, and let me take that up.

9    So -- yeah.  So I have read the Second Circuit and

10   other cases under 1782 about narrowly tailoring

11   discovery to avoid burden and so forth.  And it leads

12   me to one of the questions I wanted to ask you,

13   which is why can't we do this under a 30(b)(6) in

14   which case, you know, Lime Rock would put up a

15   corporate designee witness.  It would certainly be

16   that person's obligation to go speak to Mr. Reynolds

17   and Mr. McCall and acquire their knowledge on the

18   requested topics, but that's something that the

19   30(b)(6) witness could do without disrupting the two

20   managing directors' schedules, and in theory you

21   could obtain the same information through less

22   intrusive means.  What would you say in response to

23   that?

24           MR. LAVINE:  Yeah.  I think there are a

25   couple of issues.

1        First, it would -- my question back would be

2    a 30(b)(6) deposition of which entity?  Because here

3    we have and we allege that there are at least eight

4    entities, Lime Rock entities, with the role in the

5    transaction.  Some of them are foreign entities.  So

6    whether a 30(b)(6) deposition would even be in the

7    cards is a matter of dispute.

8        And so what we have proposed is frankly what

9    we believe to be the most efficient course which is

10   we know the two individuals who have a role at each

11   and every one of these entities.  Rather than eight

12   30(b)(6) depositions, let's do two depositions of the

13   individuals with the most knowledge, individuals,

14   again, whose own knowledge is relevant or a critical

15   factor in the Scottish proceeding.

16            THE COURT:  Okay.

17            MR. LAVINE:  And I would --

18            THE COURT:  Go ahead.

19            MR. LAVINE:  To add one more point, we have

20   also offered to delay the deposition.  Of course,

21   that -- of course that's for reasons related to

22   COVID-19.  But in the interim, if documents are

23   produced which surely show that, one, there's an

24   alternative witness who would be better or, two, that

25   these folks truly had no involvement, this is

1    certainly something that in good faith we could

2    discuss with Ms. Soli about whether there might be an

3    alternative for depositions.  But in the meantime,

4    given the pace at which the Scottish case is

5    proceeding, we don't think there's any need to delay

6    production of documents.

7           THE COURT:  Okay.  Very well.  Thank you,

8    Mr. Lavine.  You have answered all the questions that

9    I had prepared for you.

10          So this being Ms. Soli's motion, she's going

11   to get the last word.  Before I throw the mike back

12   to her, is there anything else that you would like to

13   say in opposition of the motion?

14          MR. LAVINE:  I would.  If you'd just give me

15   a moment to collect my thoughts and see what points I

16   may have missed.

17          THE COURT:  Certainly.

18          MR. LAVINE:  Yeah.  I -- so when I'm

19   reading -- and I'm reading responses from members of

20   the team as well who are handing me virtual notes, if

21   you will.

22          And what is to say is that -- and we will

23   represent that Mr. Reynolds was part of the deal team

24   involved in the transaction.  And to correct a

25   statement, Kobre & Kim was not involved in the

 1   initial lawsuit in Scotland against Paull &

 2   Williamsons.  We were involved after the fact in

 3   connection with this second lawsuit, and it's also my

 4   understanding that internal Lime Rock documents were

 5   not in fact produced.  And so that continues to be a

 6   black box to us, both the Lime Rock defenders as well

 7   as the Lime Rock entities across the globe.

 8          Another point I just want to discuss, and it

 9   came up early in the case -- in the argument today is

10   about burden for the apex discovery rule.  You know,

11   they have -- respondents have suggested that we bear

12   the burden, and they cite to a Second Circuit case.

13   That case involved a deposition of -- or a proposed

14   deposition of the mayor of New York City, this is

15   Mayor Bloomberg.  And that case dealt exclusively

16   with depositions of high-ranking government

17   officials.

18          And so there's no similar decision of the

19   Second Circuit of which we are aware that squarely

20   addresses the burden of non-governmental witnesses.

21          And we disagree wholeheartedly that the

22   burden rests with us, particularly where, as here,

23   this motion to quash is seeking to prohibit all

24   discovery in the U.S. completely.  And certainly to

25   the extent the burden is on us, we have met that

1   burden.  We've gone to great lengths to meet that

2   burden.  If you -- simply if you look closely at the

3   papers, we have established that there is unique

4   knowledge on the part of Reynolds and McCall

5   regarding the corporate structure, regarding entities

6   involved in this transaction, and, most importantly,

7   their knowledge of their own involvement.  That is

8   not something that we may receive from any other

9   witness.

10          And so instead of that Second Circuit case

11  which deals exclusively with depositions of

12  government witnesses, we think here that, just like

13  in any other motion to quash setting, that the burden

14  should be on the movants to establish compelling

15  circumstances for avoiding depositions entirely.  And

16  we cite to cases in our papers that stand for that

17  proposition.

18          THE COURT:  Okay.  Thank you.

19          Ms. Soli, you get the last word.

20          MS. SOLI:  Thank you, Your Honor.

21          I don't want to take up too much more of your

22  time because we've obviously covered lots of these

23  sections.

24          I do just want to address the statement from

25  opposing counsel insinuating that I might have been

1    intentionally misleading the Court, and I think that

2    that's --

3            THE COURT:  We know no one would do that.

4            MS. SOLI:  Thank you, Your Honor.

5            I think that it does raise the point though,

6    when you're talking about the burden and the various

7    eight entities, and he said we just tried to do it as

8    expeditiously as possible and get one person who

9    could cover all eight entities, that's precisely the

10   problem, Your Honor.  They're looking to avoid the

11   corporate structure that has been created.  And I

12   think looking at the document requests themselves,

13   which was suggested, I think helps show that.  When

14   you look at the scope of the document request,

15   they're not just looking for information from the

16   Cayman islands general partners, the two entities

17   Lime Rock Partners GP V LP and Lime Rock Partners GP

18   V Inc.  If that was all that they were looking for

19   was information from nondefenders, they would have

20   tried some other process.

21           Instead what they did -- these requests cover

22   information and communications about all of the Lime

23   Rock entities, and most importantly Lime Rock

24   Management and Lime Rock fund which they are seeking

25   that are in fact defenders in the Scottish

```
 1    litigation, and they're seeking to get all of that
 2    information here, Your Honor.  And I would say that
 3    that violates both the first and the fourth criteria
 4    that you're supposed to consider.  One, because are
 5    participants -- all of the defenders are
 6    participants, and that information should be -- they
 7    should be required to go and get that from Scotland.
 8         Number two, with respect to harassing and
 9    burdensome, they brought it against these two
10    executives for that very reason and went straight to
11    the top apex.
12         In terms of a 30(b)(6) that Your Honor
13    suggested, what if we just get a 30(b)(6) to Lime
14    Rock Management, the reason they didn't do that, Your
15    Honor, is because Lime Rock Management is a defender
16    and a participant.  And so one of the elements there
17    would have shown that you in your discretion could
18    have said, no, they're participants in Scotland, you
19    should get them in Scotland and follow the procedures
20    in Scotland.  That's why they didn't do it that way.
21    And they sought to come this way and subpoena two
22    individuals in their individual capacities and make
23    them go out and get all of the other documents.
24    If -- and I might just say again, I -- it does look
25    like we're headed in a direction where there might be
```

1   some information that Your Honor orders that we

2   produce or some additional information that we need

3   to set forth with respect to the role or involvement

4   of Reynolds and McCall.  And I would be happy to do

5   that.

6        And I would also be happy to work with

7   opposing counsel here to show why it is that they're

8   wasting their time by taking a deposition against

9   these two individuals, and it really is a burdensome

10   and harassment process.  They're not looking to get

11   the underlying information.  And I think that if what

12   they're looking for is limited to the scope of McCall

13   and Reynolds' personal knowledge, when did they first

14   find out or personal e-mails that they received, not

15   that the entity received from others that could be

16   imputed from the entity but from them personally,

17   there might be some areas that we could work through

18   and solve that for them.

19        But I would submit, Your Honor, that that's

20   not what these subpoenas were for and that's not what

21   this process was for and we sought to quash them

22   because they violated the Intel factors.

23        And, Your Honor, we respectfully request that

24   in your discretion, you quash the subpoenas or, at a

25   minimum, greatly reduce the scope and process of

producing them because they are overburdensome and
request documents from multiple entities that are
participants and defenders in the Scottish proceeding
which has its own process going on right now.

THE COURT:  Okay.  Well, on that last point,
I'm not sure that I really have enough in the papers
to craft a good, you know, middle ground order
between you guys.  So let me just say that I -- you
made a comment that, you know, Your Honor, you seem
leaning towards X or Y.  I actually haven't decided
this yet.  I'm going to return to my chambers.  My
law clerk and I are going to talk about it next week,
and we will get it decided.

But it does strike me that you guys have kind
of left me with an all-or-nothing proposition.
Nobody has really kind of sketched out to me a good
middle ground by which we might follow those Second
Circuit 1782 cases that talk about cabining discovery
to control the burden.

So all of that is a long way of getting
around to closing this hearing by saying that, you
know, you guys might consider continuing to talk in
the days between now and when I issue my decision.
Because I haven't decided how I'm going to go on it
yet, but I think it's likely to be an all-or-nothing

1    one way or the other, only because I don't have a

2    clear picture of a middle ground view.

3         In that regard, I should also mention, this

4    hearing that's happening in Scotland on May 5th, I

5    don't understand myself to have the authority to stay

6    consideration of the petitioner's pursuit of this

7    discovery in the U.S. while we wait to see whether

8    the Scottish Court quashes it.

9         But with that said, if we have not ruled by

10   Wednesday and somebody in Scotland does direct

11   Mr. Kidd not to pursue this discovery in the United

12   States, I trust that somebody from Mr. Lavine's side

13   will inform our chambers of that.

14        MR. LAVINE:  Your Honor, we certainly will.

15        And just, I think, for your own benefit and

16   to ensure that you know, any work that you put in

17   between now and next week or whenever you might issue

18   an opinion will not be in vain.  You know, our -- my

19   understanding, at least, of Scottish law is, one, the

20   decision on Wednesday is more akin not to a motion

21   for protective order but more like a temporary

22   injunction, and so that there will be, perhaps many

23   months in the future, kind of a hearing potentially

24   on a final injunction on that matter.

25        And further, even if -- and we think our

```
 1    clients have -- Mr. Kidd has the stronger of the
 2    arguments in Scotland on the preliminary injunction.
 3    But even in the event that that were granted, there
 4    are abilities to have the Scottish Court reconsider
 5    that decision and the granting of the preliminary
 6    injunction including, for example, if Your Honor were
 7    to determine that, well, under U.S. standards, there
 8    is -- you will grant discovery because, among other
 9    things, discovery is proportional and not overly
10    burdensome.  That kind of decision is something that
11    we think the Scottish Court, even after it's issued
12    its preliminary injunction or denied a preliminary
13    injunction, would -- might want to know about.
14         THE COURT:  All right.  Well, very well.
15    Okay.  I suppose we should give Ms. Soli an
16    opportunity, if there's anything in there that she
17    wanted to respond to before we recess.
18         MS. SOLI:  No, Your Honor.  I -- that's my
19    understanding as well of the Scottish proceeding.
20         THE COURT:  Okay.  Well, just to put a capper
21    on it, my law clerk and I will take this under
22    consideration and start working on this -- well, we
23    have been working on it.  But we will take everything
24    that's been said today into consideration beginning
25    Monday morning, and we will issue a decision when we
```

1    are ready to issue a decision.  If events in Scotland

2    overtake that while we're working, I trust that

3    somebody will let us know about it subject to all the

4    caveats that Mr. Lavine has expressed here about how

5    permanent that might be.  But in any event, you will

6    hear from us.

7            All right.  Very well.  If that's it, I will

8    ask the clerk to recess court.

9            MR. LAVINE:  Thank you, Your Honor.

10           MS. SOLI:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           (Proceedings adjourned, 3:01 p.m.)

13

14                  C E R T I F I C A T E

15                  IN RE: KIDD
                 No. 3:20-MC-00016-TOF

16

17           I hereby certify that the within and

18   foregoing is a true and accurate transcript taken in

19   the aforementioned matter to the best of my skill and

20   ability.

21

22           /s/ Melissa J. Cianciullo_____

23       MELISSA J. CIANCIULLO, RMR, CRR, CRC
                Official Court Reporter
24          United States District Court
            141 Church Street, Room 147
25          New Haven, Connecticut  06510
                  (203) 606-1794